EEOC FORM 131 (5/01)

# U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| | **Eddie Haynes** |

MONTGOMERY FIRE DEPT.
D.S. Yelder, District III Chief
P. O. Box 1111
Montgomery, AL 36101

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**130-2005-04376**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act     [X] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act     [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **13-JUN-05** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **27-MAY-05** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033**
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Booker T. Lewis,
Enforcement Supervisor

*EEOC Representative*

Telephone: **(205) 212-2115**

Enclosure(s): [X] Copy of Charge

**Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205**

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [X] DISABILITY  [ ] RETALIATION  [ ] OTHER

**See enclosed copy of charge of discrimination.**

DEFENDANT'S
EXHIBIT

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 12, 2005 | Bernice Williams-Kimbrough, District Director | |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 130-2005-04376 |

_____ and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| **Mr. Eddie Haynes** | **(334) 272-0317** | **08-17-1970** |

| Street Address | City, State and ZIP Code |
|---|---|
| **4501 Middle Fork  Road Montgomery, AL 36106** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **MONTGOMERY FIRE DEPT** | **201 - 500** | **(334) 241-2400** |

| Street Address | City, State and ZIP Code |
|---|---|
| **Post Office Box 1111, Montgomery, AL 36101** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON  (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **01-29-2003** | **03-15-2005** |

☐ CONTINUING ACTION

THE PARTICULARS ARE  (If additional paper is needed, attach extra sheet(s)):

I was hired by the above-named employer on April 4, 1990, as a fire fighter.  Since January 29, 2003, and continuing I have been subjected to harassment and intimidation due to my being disabled.  My employer has made an issue over the medication that I am required to take.  I have further been subjected to adverse conditions of employment because I complained about the unfair treatment of Black employees.  On March 15, 2005, I was forced to take leave while an investigation is being conducted into my medication.

I believe that I am being discriminated against because of my race, Black, my disability and in retaliation for having opposed practices made unlawful under Title VII of the Civil Rights Act of 1964, as amended and the American with Disabilities Act of 1990.  White employees on medication are treated more favorably.

RECEIVED
EEOC

MAY - 9 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **May 09, 2005**<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | |
|---|---|
| Human Resource Director<br>MONTGOMERY FIRE DEPT.<br>P. O. Box 1111<br>Montgomery, AL 36101 | PERSON FILING CHARGE<br><br>**Eddie  Haynes** |
| | THIS PERSON *(check one or both)*<br>☐ Claims To Be Aggrieved<br>☐ Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**420-2006-04376** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

☐ Title VII of the Civil Rights Act          ☒ The Americans with Disabilities Act

☐ The Age Discrimination in Employment Act          ☐ The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. ☐ No action is required by you at this time.

2. ☐ Please call the EEOC Representative listed below concerning the further handling of this charge.

3. ☒ Please provide by  **11-SEP-06**  a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. ☐ Please respond fully by                    to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. ☐ EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Ollie M. Croom,
Investigator

*EEOC Representative*

Telephone:  **(205) 212-2140**

**Birmingham District Office - 420**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

Enclosure(s): ☒ Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN   ☐ AGE   ☒ DISABILITY   ☐ RETALIATION   ☐ OTHER

**See enclosed copy of charge of discrimination.**

RECEIVED AUG 1 4 2006

DEFENDANT'S
EXHIBIT
2
tabbies'

| Date<br>**August   11,<br>2006** | Name / Title of Authorized Official<br>**Bernice  Williams-Kimbrough,<br>District Director** | Signature |

| I. AMENDED CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; See Privacy Act Statement before Completing this form. | III. AGENCY<br>☐ FEPA<br>☒ EEOC | IV. CHARGE NUMBER<br>420-2006-04376 |
|---|---|---|

| II. | | State or Local Agency, if any | and EEOC |
|---|---|---|---|

| NAME *(Indicate Mr., Ms., Mrs.,)*<br>Mr. Eddie Haynes | HOME TELEPHONE *(Include Area Code)*<br>(334)272-0317 |
|---|---|

| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>4501 Middle Fork Road, Montgomery, Alabama  36106 | DATE OF BIRTH<br>8-17-1970 |
|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (if more than one list below.)

| NAME<br>Montgomery Fire Department | NUMBER OF EMPLOYEES, MEMBERS<br>201-500 | TELEPHONE *(Indicate Area Code)*<br>(334)241-2400 |
|---|---|---|

| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>Post Office Box 1111, Montgomery, Alabama 36101 | COUNTY |
|---|---|

| NAME | TELEPHONE NUMBER *(Indicate Area Code)* |
|---|---|

| STREET ADDRESS        CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*<br>☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ OTHER *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST January 29, 2003    LATEST  June 14, 2006<br><br>☒ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

### Amended Charge

1.    On May 9, 2005 I filed a Charge of Discrimination, Charge number 130-2005-04376, against the above employer.  This Charge is an amendment to, and supplements, that Charge.  I expressly reallege all allegations made in my previous charge dated May 9, 2005.

2.    Since the filing of my original Charge on May 9, 2005 I continued to be on involuntary leave from my employment until June 14, 2006, when the employer terminated my employment.

3.    I believe that I was subjected to discrimination, harassment, adverse conditions of employment, involuntary leave and termination in violation of the Americans with Disabilities Act of 1990 because the employer perceived or regarded me as being disabled.

| I want this charge filed with both the EEOC and the State or Local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT     RECEIVED<br>EEOC |
| x 8-3-06     x *(signature)*<br>Date        Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>AUG 0 8 2006 |

EEOC FORM 5 (REV. 3/01)

RECEIVED AUG 1 4 2006                    BIRMINGHAM DISTRICT OFFICE



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5056 4872

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

November 8, 2006

Mr. Eddie Haynes
c/o Gerald L. Miller, Esquire
Law Offices of Redden, Mills, & Clark
940 Financial Center
505 Twentieth St. North
Birmingham, AL  35203-2605

Re:  EEOC Charge Against Montgomery Fire Dept.
     No. 130200504376

Dear Mr. Haynes:

Because you filed the above charge with the Equal Employment
Opportunity Commission, and more than 180 days have elapsed since
the date the Commission assumed jurisdiction over the charge, and no
suit based thereon has been filed by this Department, and because
you through your attorney have specifically requested this Notice,
you are hereby notified that you have the right to institute a civil
action against the above-named respondent under:

    Title I of the Americans with Disabilities Act of 1990,
    42 U.S.C. 12111, et seq., and,
    Title V, Section 503 of the Act, 42 U.S.C. 12203.

If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice.

This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

                    Sincerely,

                    Wan J. Kim
              Assistant Attorney General
                Civil Rights Division

        by   *Karen J. Ferguson*

                 Karen L. Ferguson
             Supervisory Civil Rights Analyst
             Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Montgomery Fire Dept.

DEFENDANT'S
EXHIBIT
3
tabbies



U.S. Department of Justice

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5056 4872

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

November 8, 2006

Mr. Eddie Haynes
c/o Gerald L. Miller, Esquire
Law Offices of Redden, Mills, & Clark
940 Financial Center
505 Twentieth St. North
Birmingham, AL  35203-2605

Re:  EEOC Charge Against Montgomery Fire Dept.
     No. 130200504376

Dear Mr. Haynes:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Wan J. Kim
Assistant Attorney General
Civil Rights Division

by *Karen J. Ferguson*

Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Montgomery Fire Dept.



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5056 4872

Mr. Eddie Haynes
c/o Gerald L. Miller, Esquire
Law Offices of Redden, Mills & Clark
940 Financial Center
505 Twentieth St. North
Birmingham, AL  35203-2605

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

November 8, 2006

Re:  EEOC Charge Against Montgomery Fire Dept.
     No. 420200604376

Dear Mr. Haynes:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action against the above-named respondent under:
        Title I of the Americans with Disabilities Act of 1990,
        42 U.S.C. 12111, et seq., and,
        Title V, Section 503 of the Act, 42 U.S.C. 12203.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                         Sincerely,

                         Wan J. Kim
                  Assistant Attorney General
                     Civil Rights Division

        by  *Karen L. Ferguson*

                   Karen L. Ferguson
              Supervisory Civil Rights Analyst
               Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Montgomery Fire Dept.



DEFENDANT'S
EXHIBIT
4



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5056 4872

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

November 8, 2006

Mr. Eddie Haynes
c/o Gerald L. Miller, Esquire
Law Offices of Redden, Mills & Clark
940 Financial Center
505 Twentieth St. North
Birmingham, AL  35203-2605

Re:  EEOC Charge Against Montgomery Fire Dept.
     No. 420200604376

Dear Mr. Haynes:

Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                          Sincerely,

                          Wan J. Kim
                  Assistant Attorney General
                     Civil Rights Division

          by  *Karen J. Ferguson*

                     Karen L. Ferguson
                Supervisory Civil Rights Analyst
                Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Montgomery Fire Dept.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDDIE J. HAYNES,    )
         )
  Plaintiff,    )
         )
v.        ) CASE NO.  2:06cv1093-WKW
         )
         )
CITY OF MONTGOMERY,  )
ALABAMA     )
         )
  Defendant.   )

### AFFIDAVIT OF M. JORDAN

STATE OF ALABAMA    )

COUNTY OF MONTGOMERY  )

Before me, the undersigned authority, personally appeared M. Jordan, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is M. Jordan. I am over nineteen years of age. I am currently employed as Chief of the City of Montgomery Fire Department. Prior to becoming Chief, I was employed for over nine years as the Deputy Chief, during which time I was responsible for handling Fire Department personnel issues. It is in my capacity as former Deputy Chief that I make this statement.

In March 2005, I received copies of two memos dated February 24, 2005 and March 4, 2005. The first was from Firefighter Eddie Haynes' supervisor, Captain Hackett, to District Chief Stoudenmier. The second was from Haynes to District Chief M. F. Smith. Both memos are attached hereto as *Exhibits A and B*, respectively.

The memo from Captain Hackett to District Chief Stoudenmier requested that Firefighter Eddie Haynes be moved from being the only driver for "C" Shift to being an assistant driver for "A" Shift. Captain Hackett made this shift change request because Haynes was extremely paranoid about wrecking the fire truck. Hackett knew that Haynes had previously advised his supervisor that he was on medication that might affect his ability to drive, but in my review of Haynes' file, I was unable to locate any request from Haynes asking to be relieved from his driving duties.

1


DEFENDANT'S EXHIBIT
5
tabbies

In the Haynes' file there was, however, a memo from District Chief Yelder in January 2003 regarding a discussion between Lieutenant R. Johnson and Firefighter Haynes in which Haynes stated he was taking medications that may affect his ability to drive the truck. Upon receiving this information, District Chief Yelder ordered that Haynes be removed from the truck and sent home until his doctor verified Haynes' medications and their side effects. Lieutenant Johnson's memo indicates that Haynes was sent home at 0900 and returned to work at 1700 the same day, once the requested information was received. A copy of this memo is attached hereto as *Exhibit C*.

In his March 4, 2005 memo to District Chief Smith, Haynes asked to be relieved as driver of Engine 14, saying he felt he must inform District Chief Smith of all the prescription medications he was taking. The Montgomery Fire Department treats very seriously any request from a firefighter to be relieved of duty, because it shows the firefighter himself is less than confident in his own ability to perform his job.

In his memo, Haynes identified nine medications in all. Haynes also provided a letter from his psychiatrist, Dr. Clemmie Palmer. Dr. Palmer's letter said that Haynes could continue to perform his duties without restrictions while on Lexapro, Valium and Gabitril. A copy of Dr. Palmer's letter is attached hereto as *Exhibit D*.

All firefighters, including Haynes, are assigned to the Fire Suppression Division. In March 2005, Assistant Chief C. E. Walker was in charge of the Fire Suppression Division and, as Deputy Chief, I was responsible for handling all personnel matters, so Assistant Chief Walker and I reviewed Haynes' request to be relieved from his driving duties along with the letter from Dr. Palmer, in order to come to a decision together about how to handle the request.

Assistant Chief Walker and I met with Haynes to discuss his medications, his request to be relieved from driving the truck, and Dr. Palmer's opinion that Haynes could continue performing his current job duties without restrictions. After our meeting with Haynes, I spoke with Risk Management and referred Firefighter Haynes to Dr. Michael Turner, the City physician, for a "Fit for Duty" examination to determine how the nine medications Haynes listed in his March 4, 2005, memo might affect his ability to perform his job responsibilities as a firefighter on the fire line and truck driver.

The Montgomery Fire Department routinely utilizes "Fit for Duty" examinations in compliance with National Fire Protection Association ("NFPA") Rules and Regulations on medical evaluations and fitness for duty standards. The Department has not formally adopted the NFPA Rules and Regulations in their entirety.

The Montgomery Fire Department follows Chapter 10, NFPA 1500 *Standard on Fire Department Occupational Safety and Health Program*, which governs medical and physical requirements. NFPA 1500 §10.1.1 and §10.1.2 require that firefighters be medically evaluated and certified by the fire department physician, and that such medical evaluations must take into account the risks and functions associated with the individual's duties and responsibilities. In this case, Firefighter Haynes told us he had doubts about his own ability to drive a fire truck, so we had to require an evaluation by Dr. Turner to determine Haynes' fitness not only to drive a fire

truck, but also to work on the fireline itself. Working the fire line is as dangerous and fast paced as getting to the fire, if not more so, and any concerns about reflex times or readiness would apply to both tasks equally.

The Montgomery Fire Department has also follows NFPA 1582 *Standard on Comprehensive Occupational Medical Program for Fire Departments*, which also governs medical and physical requirements. NFPA 1582 governs our "Fit for Duty" assessments, setting forth the responsibilities of the Department, the City physician and the firefighters. A copy of NFPA 1582 is attached hereto as *Exhibit E.*

NFPA 1582 also contains detailed standards and criteria for the City physician to follow in performing fitness assessments. Dr. Turner provides fitness for duty assessments when requested on current employees and on every newly hired firefighter. Dr. Turner is aware of these standards and criteria and uses them in his "Fit for Duty" assessments. These standards are very important in protecting the firefighters themselves, as well as the public at large, from situations where a firefighter's medical condition could affect his ability to safely respond to emergency operations. In the line of duty, firefighters are subjected to very high physiological, psychological and environmental demands, and the Department has an obligation to ensure that each firefighter is fully capable of withstanding those pressures unique to emergency response and firefighting.

In his fit for duty assessment, Haynes told to Dr. Turner that he did not take some of his medications when he was on duty. Dr. Turner indicated that he could not understand the logic as to why Haynes would not take medicine for stress when he was bound to be in stressful situations. Dr. Turner also stated that he had safety concerns with Haynes performing his job duties, on the fire line and driving the truck, while under the influence of the various prescriptions Haynes was taking. More specifically, Dr. Turner stated in his evaluation dated March 31, 2005, "...these medication effects could carry over to his on duty time. Any drug screen performed would most likely be positive even when on duty. There are safety issues for him driving a truck and working on the fire line while under the influence of these medications though he claims he does not take while on duty." Dr. Turner advised that an administrative decision was needed as to whether to allow Haynes to return to the fire line and to driving.

We made repeated requests to Firefighter Haynes to have his personal physician contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking, versus the three Dr. Palmer mentioned in his letters. Although Dr. Palmer provided a letter to the Department stating that Haynes had no work restrictions or side effects on the three medications, we had to rely on Dr. Turner's assessment because he was aware of more medications that Haynes was taking and knew what medications are permitted under NFPA standards. Dr. Turner advised the Department that Haynes was physically fit for duty, but that the combined effect of the medications he reported taking required an administrative decision on his fit for duty status.

Firefighter Haynes went on paid leave the third week of March 2005 and unpaid leave in May 2005. Haynes was always advised that he could return to work once he was certified fit for duty by Dr. Turner. We wanted Haynes to be able to return to work as a firefighter. Haynes had been with the Department for fifteen years. The objective in asking him to resolve the

medications issue was not to fire Haynes. The objective was to get Haynes certified fit for duty and back to work. Despite the fact that Haynes refused to complete FMLA paperwork, the Fire Department kept Haynes' position open for until June 2006, approximately 15 months.

A year after Haynes went on unpaid leave, in May 2006, Chief J. W. McKee sent Haynes a letter giving him until May 22, 2006, to resolve the issue of his prescription medications with Dr. Palmer and Dr. Turner in order to be released as fit for duty. Haynes was also told that failure to return to work by May 22, 2006, pursuant to Montgomery City-County Rules and Regulations, Rule IX, Section I, would be considered a resignation from his job as a firefighter. A copy of that letter is attached hereto as *Exhibit F*.

Firefighter Haynes returned to Dr. Turner on May 25, 2006 for another "Fit for Duty" examination. Dr. Turner determined that Haynes was still physically fit for duty, but that nothing had changed with regard to medications in the year since Haynes' last exam, other than a change in the muscle relaxant Haynes had been prescribed. Haynes never returned to work and his resignation became effective on June 14, 2006.

The Montgomery Fire Department has never maintained medical files on its employees. I was not aware of the medications Haynes was taking until he listed them in the memo to his District Chief asking to be relieved from his driving duties. We have no way of knowing what prescriptions our employees might be taking unless they tell us voluntarily. Therefore, I have no way of knowing if any white employees taking comparable prescription medications have been treated differently or more favorably than Firefighter Haynes.

Finally, in my capacity as Deputy Chief, I would have been advised by the supervisors below me, namely District Chiefs or Assistant Chiefs, of complaints of racial discrimination made by any Montgomery Fire Department employee. I am not aware of any complaint of racial discrimination made by Firefighter Haynes in the last nine years.

I have read the above and foregoing affidavit consisting of four (4) pages and state that it is true and correct to my present knowledge and information.

**Further the affiant saith not.**

_M. Jordan_
Chief M. Jordan
Montgomery Fire Department

SWORN TO AND SUBSCRIBED before me this 3rd day of December, 2007.

_Lorene Briley_
Notary Public
My commission expires 8-29-09

(SEAL)

4

MHS

To:      M.H. Stoudenmier, District Chief

From:    B.S. Hackett, Captain

Date:    February 24, 2005

Re:      Transfer

Sir,

I would like to transfer E.J. Haynes to "A" shift and G.M. Sides to "C" shift. This transfer will allow F/F Sides to be the assistant driver on "C" shift. F/F Haynes would be behind R.E. Simmons, the assistant driver on "A" shift. There is no other driver available on "C" shift. F/F J.L. Williams is on active military duty and the only other person is Recruit Thomas, who has not attended recruit school yet. Sgt. M.A. Williams is scheduled for a vacation during the OCS class. This vacation was scheduled before the OCS date was announced. There will be a 2 week period that only the assistant driver and Recruit Thomas will be present. F/F Haynes is extremely paranoid of wrecking the apparatus. I was told that he wrote a letter years ago that stated he was on medicine and did not need to drive the truck. This letter is not present in his file. F/F Haynes is alert and does all that he is asked to do around the station but I do not feel confident in his mental status while driving Engine 14. He will drive when asked but is overly cautious while he is driving. I understand that caution while driving is important but being worried about other things while driving could cause a possible problem in the future. In the past this problem has not come up because F/F Payton was the assistant driver. F/F Payton was transferred to Engine 9 several months ago. I would appreciate if this letter would remain confidential since there is some mention of F/F Haynes medical history.

Respectfully,

B.S. Hackett

B.S. Hackett, Captain
Station 14, District III

EXHIBIT

A

TO:    M.F. Smith, District Chief

From:  E.J. Haynes, Firefighter

Date:  March 4, 2005

RE:    Engine 14 Driver

Dear Sir,

It is a pleasure as well as an honor to be chosen Driver of Engine 14.
I am more than willing if the City of Montgomery needs me to do so.
However, if there is someone else is more willing or highly qualified to drive
Engine 14, I will assist them as needed to be ready to take any assignment.  I have
been driving the Fire Truck off and on for the last fourteen years and I am
currently the driver.

Being a Driver for Engine 14 I know I must inform you of my medications. The
medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4
mg. PRN(two – three times a week).
Medications that I take on my off days and on a as needed basis are Hydrocodone
5/500, Diazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50.,
and over the counter Benadryl for my sinus problem.

Again, thank you for your consideration for me being Engine 14 Driver.  It is an
honor to be a Montgomery Firefighter and take on the duties of a dedicated
Fireman.

Respectfully,

E. J. Haynes, F/F Station 14

EXHIBIT
B

TO:     C.E. Walker, Assistant Chief

From:   D. S. Yelder, District Chief

Date:   January 29, 2003

RE:     E. J. Haynes, F/F

Sir;

On the above date at approximately 0815 hrs. Lt. R.L. Johnson notified me that F/F E. J. Haynes did not feel comfortable about driving the apparatus. He stated that F/F Haynes has been taking medication that may have an effect on his ability to operate the vehicle. I inquired as to what kind of medication was he taking and what doctor had prescribed it to F/F Haynes. I requested that Lt. R.L. Johnson remove F/F Haynes from riding the apparatus until F/F. Haynes doctor noted verification of medication and its side effect. F/F Haynes was sent home at 0900 hrs. Pending his doctor verification, the verification was confirmed by his doctor and F/F Haynes was able to return to duty at 1700 hrs the same date.

See attached memo noted by Lt. R.L. Johnson.

Respectfully,

D.S. Yelder, District Chief
Station 12, District III


EXHIBIT
C

**Palmer Psychiatric Services, PC**
Clemmie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:    (334) 280-3230
Fax:        (334) 280-3272
Email:  CPalm94@aol.com

March 4, 2005

RE: Eddie Haynes
DOB 08/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work on the current medications Lexapro, Valium, and Gabitril. He has not had any side effects on his current medications. Mr. Haynes is to take his medication as prescribed. He was instructed to take Valium on an as needed basis. Mr. Haynes has no work restrictions and should continue to perform his duties at his current capacity. He has been stable on his current medication and working full time without difficulty. If you have concerns do not hesitate to call or write.

Cordially,

CP/nb

EXHIBIT

tabbies

Copyright © 2003, National Fire Protection Association, All Rights Reserved

# NFPA 1582

## Standard on

# Comprehensive Occupational Medical Program for Fire Departments

## 2003 Edition

This edition of NFPA 1582, *Standard on Comprehensive Occupational Medical Program for Fire Departments*, was prepared by the Technical Committee on Fire Service Occupational Safety and Health and acted on by NFPA at its May Association Technical Meeting held May 18–21, 2003, in Dallas, TX. It was issued by the Standards Council on July 18, 2003, with an effective date of August 7, 2003, and supersedes all previous editions.

This edition of NFPA 1582 was approved as an American National Standard on July 18, 2003.

### Origin and Development of NFPA 1582

The issues of medical care and evaluation of both candidates and incumbents within a fire department have been discussed in numerous NFPA standards. The initial discussion and mandatory medical requirements were contained in NFPA 1001. In the late 1980s, respective members of the 1001 and 1500 technical committees formed a working subcommittee to develop a new standard, NFPA 1582.

The first edition of NFPA 1582 was issued in 1992, and subsequent editions were issued in 1997 and 2000.

The initial development of this edition was begun by members of the Technical Committee on Fire Service Occupational Medical and Health, including Kimberly S. Bevins, Paul "Shon" Blake, Anthony L. Clark, John F. Folan, Richard D. Gerkin, Jr., Juan Gonzalez, W. Larry Kenney, Sandra Kirkwood, Deborah L. Pritchett, Gordon M. Sachs, James Sewell, Robert M. Stratman, Kathy Tinios, and Decker Williams. This technical committee later was combined with the current Technical Committee on Fire Service Occupational Safety and Health. This committee completed the work on this edition of the standard.

Members of both committees have broken significant ground in providing a standard that the user — the fire department physician — can understand. The physicians on the committee have developed physician guidance text that provides a link between the essential job tasks of a fire fighter doing manual fire suppression and the medical requirements in the standard. This will assist the user in determining, based on medical evaluations, if someone can do the essential job tasks.

In addition, the standard has delineated the document to address those medical issues of a candidate seeking to become a fire fighter, and those incumbents currently performing the tasks of firefighting. This standard does not differentiate between volunteer, paid-on-call, part-time, or career fire fighters — the tasks are the same.

Since the committee has changed the title of the standard to reflect a comprehensive occupational medical program, it has included references to the IAFC-IAFF *Joint Wellness Initiative*, and to NFPA 1583. These two documents outline a health-related fitness program that is medically validated against this edition of NFPA 1582.

While some may say that the cost of medical exams is too high, one must measure that against long-term job related illnesses, injuries, and fatality costs. Fire departments spend a lot of money on preventive apparatus and equipment maintenance; however, that is an inefficient use of resources if they do not have medically qualified personnel to operate them and to respond to emergency incidents.

Work on this edition of the standard was done by a dedicated group of committee members who have the best interests of the fire service and its members in their deliberations. Without their knowledge, hard work, and due diligence to the occupation of firefighting, the completion of this edition could not have been accomplished. Many thanks to them, and especially to the physicians who gave their expertise and time to make this standard one that their profession can use.

EXHIBIT

tabbies®

E

## Technical Committee on Fire Service Occupational Safety and Health

Glenn P. Benarick, *Chair*
Fairfax County Fire & Rescue Department, VA [U]
Rep. NFPA Fire Service Section

Murrey E. Loflin, *Secretary*
Virginia Beach Fire Department, VA [U]
Rep. NFPA Fire Service Section
(Alt. to G. Benarick)

Donald Aldridge,  Lion Apparel, Inc., OH [M]

David J. Barillo,  Medical University of South Carolina, SC [SE]

Paul "Shon" Blake,  City of Baytown Fire & Rescue Services, TX [E]
Rep. Industrial Emergency Response Working Group

Mary S. Bogucki,  Yale University, CT [SE]

Randy F. Caratachea,  U.S. Air Force, VA [U]

Dennis R. Childress,  Orange County Fire Authority, CA [U]
Rep. California State Firefighters Association

Dominic J. Colletti,  Hale Products, Inc., PA [M]
Rep. Fire Apparatus Manufacturers Association

Thomas J. Cuff, Jr.,  Firemens Association of the State of New York, NY [U]

Scott L. Davidson,  Volunteer Firemen's Insurance Services, Inc. (VFIS), PA [I]

Phil Eckhardt,  Mine Safety Appliances Company, PA [M]
Rep. International Safety Equipment Association

Tom Hillenbrand,  Underwriters Laboratories, IL [RT]

Jonathan D. Kipp,  Primex3, NH [I]

Richard A. Knopf,  City of Lancaster, TX [E]

Steve L. Kreis,  City of Phoenix Fire Department, AZ [E]

Tamara DiAnda Lopes,  Reno Fire Department, NV [U]

George L. Maier, III,  New York City Fire Department, NY [U]

Roger A. McGary,  Montgomery County, MD [U]
Rep. International Society of Fire Service Instructors

Robert D. Neamy,  Los Angeles City Fire Department, CA [U]

Stephen E. Norris,  United Firefighters of Los Angeles City, CA [L]

Richard S. Pike,  Wantagh Fire District, NY [U]
Rep. Association of Fire Districts/State of New York

David J. Prezant,  New York City Fire Department, NY [E]

Timothy D. Riley,  City of Newport Beach Fire Department, CA [E]
Rep. International Association of Fire Chiefs

Neil Rossman,  Rossman, Rossman & Eschelbacher, MA [SE]

Daniel G. Samo,  ENH-OMEGA, IL [SE]

Charles C. Soros,  Fire Department Safety Officers Association, WA [E]

Donald F. Stewart,  Hunter Medical/Fairfax County Fire & Rescue, VA [E]

Philip C. Stittleburg,  LaFarge Fire Department, WI [U]
Rep. National Volunteer Fire Council

Andrew C. Teeter,  Tulsa Fire Department, OK [U]
Rep. International Fire Service Training Association

Clifford H. Turen,  University of Maryland Orthopaedics, MD [SE]

Teresa Wann,  Santa Ana College, CA [SE]

Don N. Whittaker,  Bechtel, Babcock, & Wilcox Idaho, LLC, ID [E]

### Alternates

Janice C. Bradley,  International Safety Equipment Association, VA [M]
(Alt. to P. Eckhardt)

Angelo M. Catalano,  New York State Association of Fire Districts, NY [U]
(Alt. to R. S. Pike)

Craig A. Fry,  Los Angeles City Fire Department, CA [U]
(Alt. to R. D. Neamy)

James Johannessen,  Underwriters Laboratories, PA [RT]
(Alt. to T. Hillenbrand)

David A. Love, Jr.,  Volunteer Firemen's Insurance Services, Inc., PA [I]
(Alt. to S. L. Davidson)

Richard A. Marinucci,  Farmington Hills Fire Department, MI [E]
(Alt. to T. D. Riley)

Brian V. Moore,  Phoenix Fire Department, AZ [E]
(Alt. to S. L. Kreis)

Gary L. Neilson,  Reno Fire Department, NV [U]
(Alt. to T. D. Lopes)

Andrew E. Pompe,  Lion Apparel, Inc., PA [M]
(Alt. to D. Aldridge)

Joseph W. Rivera,  U.S. Air Force, VA [U]
(Alt. to R. F. Caratachea)

David Ross,  Toronto Fire Services, Canada [E]
(Alt. to C. C. Soros)

Michael W. Smith,  Nevada Division of Forestry, NV [U]
(Alt. to P. C. Stittleburg)

### Nonvoting

Thomas R. Hales,  National Institute for Occupational Safety & Health, OH [RT]

Stephen N. Foley, NFPA Staff Liaison

*This list represents the membership at the time the Committee was balloted on the final text of this edition. Since that time, changes in the membership may have occurred. A key to classifications is found at the back of the document.*

NOTE: Membership on a committee shall not in and of itself constitute an endorsement of the Association or any document developed by the committee on which the member serves.

**Committee Scope:** This Committee shall have primary responsibility for documents on occupational safety in the working environment of the fire service; and safety in the proper use of fire department vehicles, tools, equipment, protective clothing, and protective breathing apparatus.

# Contents

Chapter 1   Administration ............................. 1582– 4
  1.1   Scope ............................................. 1582– 4
  1.2   Purpose ......................................... 1582– 4
  1.3   Implementation .............................. 1582– 4

Chapter 2   Referenced Publications ............... 1582– 4
  2.1   General ......................................... 1582– 4
  2.2   NFPA Publications ........................... 1582– 4
  2.3   Other Publications .......................... 1582– 5

Chapter 3   Definitions ................................. 1582– 5
  3.1   General ......................................... 1582– 5
  3.2   NFPA Official Definitions ................... 1582– 5
  3.3   General Definitions ......................... 1582– 5

Chapter 4   Roles and Responsibilities ............. 1582– 6
  4.1   Fire Department Responsibilities .......... 1582– 6
  4.2   Fire Department Physician
        Responsibilities .............................. 1582– 6
  4.3   Candidate and Member Responsibilities ... 1582– 7

Chapter 5   Essential Job Tasks ..................... 1582– 7
  5.1   Essential Job Tasks and Descriptions ...... 1582– 7

Chapter 6   Medical Evaluations of Candidates .... 1582– 8
  6.1   Medical Evaluation .......................... 1582– 8
  6.2   Medical Conditions Affecting Ability to
        Safely Perform Essential Job Tasks ........ 1582– 8
  6.3   Head and Neck ............................... 1582– 8
  6.4   Eyes and Vision .............................. 1582– 8
  6.5   Ears and Hearing ............................ 1582– 8
  6.6   Dental ......................................... 1582– 9
  6.7   Nose, Oropharynx, Trachea,
        Esophagus, and Larynx ..................... 1582– 9
  6.8   Lungs and Chest Wall ....................... 1582– 9
  6.9   Heart and Vascular System ................. 1582– 9
  6.10  Abdominal Organs and Gastrointestinal
        System ......................................... 1582–10
  6.11  Reproductive System ........................ 1582–10
  6.12  Urinary System .............................. 1582–10
  6.13  Spine and Axial Skeleton ................... 1582–10
  6.14  Extremities ................................... 1582–11
  6.15  Neurological Disorders ...................... 1582–11
  6.16  Skin ........................................... 1582–11
  6.17  Blood and Blood-Forming Organs ........ 1582–12
  6.18  Endocrine and Metabolic Disorders ...... 1582–12
  6.19  Systemic Diseases and Miscellaneous
        Conditions .................................... 1582–12
  6.20  Tumors and Malignant Diseases .......... 1582–12
  6.21  Psychiatric Conditions ...................... 1582–12
  6.22  Chemicals, Drugs, and Medications ....... 1582–12

Chapter 7   Occupational Medical Evaluation of
            Members ..................................... 1582–13
  7.1   General ......................................... 1582–13
  7.2   Member Education Regarding Medical
        Evaluation Program ......................... 1582–13

  7.3   Timing of the Annual Occupational
        Medical Evaluation of Members .......... 1582–13
  7.4   Components of the Annual
        Occupational Medical Evaluation of
        Members ..................................... 1582–13
  7.5   Medical History .............................. 1582–13
  7.6   Physical Examination ........................ 1582–13
  7.7   Spirometry .................................... 1582–14
  7.8   Chest Radiographs ........................... 1582–14
  7.9   Electrocardiograms (EKG) ................. 1582–14
  7.10  Mammography ................................ 1582–14
  7.11  Immunizations and Infectious Disease
        Screening ..................................... 1582–14
  7.12  Heavy Metal Evaluation .................... 1582–14
  7.13  Screening Colonoscopy Services .......... 1582–14

Chapter 8   Annual Occupational Fitness
            Evaluation of Members ................. 1582–15
  8.1   Weight and Body Composition ............ 1582–15
  8.2   Annual Fitness Evaluation .................. 1582–15

Chapter 9   Essential Job Tasks — Specific
            Evaluation of Medical Conditions
            in Members ................................. 1582–15
  9.1   Essential Job Tasks .......................... 1582–15
  9.2   Medical Conditions .......................... 1582–15
  9.3   Fire Department Physician Roles .......... 1582–15
  9.4   Cardiovascular Disorders ................... 1582–16
  9.5   Vascular Disorders ........................... 1582–17
  9.6   Endocrine and Metabolic Disorders ...... 1582–17
  9.7   Lung, Chest Wall, and Respiratory
        Disorders ..................................... 1582–17
  9.8   Infectious Diseases .......................... 1582–19
  9.9   Spine Disorders .............................. 1582–19
  9.10  Orthopedic Disorders ....................... 1582–20
  9.11  Disorders Involving Gastrointestinal
        Tract and Abdominal Viscera ............. 1582–21
  9.12  Medical Conditions Involving Head,
        Eyes, Ears, Nose, Neck, or Throat ........ 1582–21
  9.13  Neurologic Disorders ....................... 1582–21
  9.14  Psychiatric and Psychologic Disorders ... 1582–22
  9.15  Substance Abuse ............................. 1582–22
  9.16  Medications .................................. 1582–22
  9.17  Tumors — Malignant or Benign .......... 1582–22

Annex A   Explanatory Material .................... 1582–23

Annex B   Guide for Fire Department
          Administrators ............................. 1582–39

Annex C   Protocols for Evaluation of Fitness of
          Members ..................................... 1582–41

Annex D   Informational References ............... 1582–46

Index ................................................... 1582–49

NFPA 1582

Standard on

# Comprehensive Occupational Medical Program for Fire Departments

2003 Edition

*IMPORTANT NOTE: This NFPA document is made available for use subject to important notices and legal disclaimers. These notices and disclaimers appear in all publications containing this document and may be found under the heading "Important Notices and Disclaimers Concerning NFPA Documents." They can also be obtained on request from NFPA or viewed at www.nfpa.org/disclaimers.*

NOTICE: An asterisk (*) following the number or letter designating a paragraph indicates that explanatory material on the paragraph can be found in Annex A.

A reference in brackets [ ] following a section or paragraph indicates material that has been extracted from another NFPA document. As an aid to the user, Annex D lists the complete title and edition of the source documents for both mandatory and nonmandatory extracts. Editorial changes to extracted material consist of revising references to an appropriate division in this document or the inclusion of the document number with the division number when the reference is to the original document. Requests for interpretations or revisions of extracted text shall be sent to the technical committee responsible for the source document.

Information on referenced publications can be found in Chapter 2 and Annex D.

## Chapter 1   Administration

**1.1 Scope.** This standard contains descriptive requirements for a comprehensive occupational medical program for fire departments.

**1.1.1\*** The medical requirements in this standard are applicable to candidates and members whose essential job tasks, as defined by the authority having jurisdiction (AHJ), are described in NFPA 1001, NFPA 1002, NFPA 1003, NFPA 1006, NFPA 1021, and NFPA 1051.

**1.1.2** This standard provides information for physicians and other health care providers responsible for fire department occupational medical programs.

**1.1.3** These requirements are applicable to public, governmental, military, private, and industrial fire department organizations providing rescue, fire suppression, emergency medical services, hazardous materials mitigation, special operations, and other emergency services.

**1.1.4** This standard shall not apply to industrial fire brigades that also can be known as emergency brigades, emergency response teams, fire teams, plant emergency organizations, or mine emergency response teams.

**1.2 Purpose.** The purpose of this standard is to reduce the risk and burden of fire service occupational morbidity and mortality while improving the safety and effectiveness of fire fighters operating to protect civilian life and property.

**1.2.1** Accordingly, the standard specifies the following information:

(1) Minimal medical requirements for candidates as delineated in Chapter 6
(2) Occupational medical and fitness evaluations for members as delineated in Chapter 7 and Chapter 8
(3) Information regarding fire department activities and essential job tasks that assist the department physician in providing proper medical support for members
(4) Methods and types of data that must be collected to sustain comprehensive occupational medical programs for fire departments

**1.2.2\*** The implementation of the medical requirements outlined in this standard ensures that candidates and current members are medically capable of performing their required duties and will reduce the risk of occupational injuries and illnesses.

**1.2.3** Nothing herein is intended to restrict any jurisdiction from exceeding these minimum requirements.

**1.3 Implementation.**

**1.3.1** For candidates, the medical requirements of this standard shall be implemented when this standard is adopted by an AHJ, on an effective date specified by the AHJ.

**1.3.2\*** When this standard is adopted by a jurisdiction, date(s) shall be set for members to achieve compliance by establishing a phase-in schedule for compliance with specific requirements, if needed.

**1.3.3\*** The fire department shall incorporate the comprehensive occupational medical program's risk management plan as required by NFPA 1500. The risk management plan shall include a written plan for compliance with this standard.

## Chapter 2   Referenced Publications

**2.1 General.** The documents or portions thereof listed in this chapter are referenced within this standard and shall be considered part of the requirements of this document.

**2.2 NFPA Publications.** National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

NFPA 1001, *Standard for Fire Fighter Professional Qualifications,* 2002 edition.
NFPA 1002, *Standard for Fire Apparatus Driver/Operator Professional Qualifications,* 2003 edition.
NFPA 1003, *Standard for Airport Fire Fighter Professional Qualifications,* 2000 edition.
NFPA 1006, *Standard for Rescue Technician Professional Qualifications,* 2003 edition.
NFPA 1021, *Standard for Fire Officer Professional Qualifications,* 2003 edition.
NFPA 1051, *Standard for Wildland Fire Fighter Professional Qualifications,* 2002 edition.
NFPA 1500, *Standard on Fire Department Occupational Safety and Health Program,* 2002 edition.
NFPA 1561, *Standard on Emergency Services Incident Management System,* 2002 edition.
NFPA 1581, *Standard on Fire Department Infection Control Program,* 2000 edition.
NFPA 1583, *Standard on Health-Related Fitness Programs for Fire Fighters,* 2000 edition.

2.3 Other Publications.

2.3.1 ANSI Publication. American National Standards Institute, Inc., 1819 L St. NW, 6th floor, Washington, DC 20036.

ANSI Z24.5, *Audiometric Device Testing*, 1951.

2.3.2 Spirometry Publications.

American College of Occupational and Environmental Medicine Position Statement on Occupational Spirometry in the Occupational Setting. Townsend MC and the Occupational and Environmental Lung Disorder Committee. *J Occup Envir Med* 2000; 42:228–245.

American Thoracic Society. Standardization of spirometry. *Am J Respir Crit Care Med* 1994; 152:1107–36.

Knudson R. J., Lebowitz M.D., Holberg, C. J., Burrows B. Changes in the normal maximal expiratory flow-volume curve with growth and aging. *Am Rev Respir Dis* 1983; 127:725–734.

2.3.3 U.S. Government Publications. U.S. Government Printing Office, Washington, DC 20401.

Title 29, *Code of Federal Regulations*, Part 1910.95, "Occupational Noise Exposure," 1980.

Title 29, *Code of Federal Regulations*, Part 1910.120, "Access to Employee Exposure and Medical Records." 1980.

Title 29, *Code of Federal Regulations*, Part 1910.120, "Hazardous Waste Operations and Emergency Response," 1986.

Title 29, *Code of Federal Regulations*, Part 1910.134, "Respiratory Protection," 1998.

Title 29, *Code of Federal Regulations*, Part 1910.1030, "Bloodborne Pathogens," 1995.

## Chapter 3   Definitions

3.1 General. The definitions contained in this chapter shall apply to the terms used in this standard. Where terms are not included, common usage of the terms shall apply.

3.2 NFPA Official Definitions.

3.2.1* Approved. Acceptable to the authority having jurisdiction.

3.2.2* Authority Having Jurisdiction (AHJ). An organization, office, or individual responsible for enforcing the requirements of a code or standard, or for approving equipment, materials, an installation, or a procedure.

3.2.3 Shall. Indicates a mandatory requirement.

3.2.4 Should. Indicates a recommendation or that which is advised but not required.

3.3 General Definitions.

3.3.1* Candidate. A person who has made application to commence performance as a member of the fire department.

3.3.2 Category A Medical Condition. See 3.3.15, Medical Condition Classifications.

3.3.3 Category B Medical Condition. See 3.3.15, Medical Condition Classifications.

3.3.4 Emergency Medical Services. The provision of treatment, such as first aid, cardiopulmonary resuscitation, basic life support, advanced life support, and other pre-hospital procedures including ambulance transportation, to patients.

3.3.5 Essential Job Task. Task or assigned duty that is critical to successful performance of the job. (*See Chapter 5 and Section 9.1.*)

3.3.6 Evaluation. See 3.3.16, Medical Evaluation.

3.3.7 Exposure Incident. A specific eye, mouth, or other mucous membrane, nonintact skin, or parenteral contact with blood, body fluids, or other potentially infectious materials, or inhalation of airborne pathogens or ingestion of foodborne pathogens or toxins.

3.3.8 Fire Department Physician. A licensed doctor of medicine or osteopathy who has been designated by the fire department to provide professional expertise in the areas of occupational safety and health as they relate to emergency services.

3.3.9 Functional Capacity Evaluation. An assessment of the correlation between that individual's capabilities and the essential job tasks.

3.3.10 Health and Fitness Coordinator. A person who, under the supervision of the fire department physician, has been designated by the department to coordinate and be responsible for the health and fitness programs of the department.

3.3.11 Health and Safety Committee. A representative group of individuals who serve along with the fire department physician and health and fitness coordinator, and is chaired by the fire department health and safety officer who oversee the implementation of the fire department occupational safety and health program.

3.3.12 Health and Safety Officer. The member of the fire department assigned and authorized by the fire chief as the manager of the safety and health program and who performs the duties and responsibilities specified in this standard.

3.3.13 Health-Related Fitness Programs (HRFP). A comprehensive program designed to promote the member's ability to perform occupational activities with vigor and to assist the member in the attainment and maintenance of the premature development of injury, morbidity, and mortality.

3.3.14 Infection Control Program. This program includes, but is not limited to, implementation of written policies and standard operating procedures regarding exposure follow-up measures, immunizations, members' health screening programs, and educational programs.

3.3.15 Medical Condition Classifications.

3.3.15.1 *Category A Medical Condition*. A medical condition that would preclude a person from performing as a member in a training or emergency operational environment by presenting a significant risk to the safety and health of the person or others.

3.3.15.2 *Category B Medical Condition*. A medical condition that, based on its severity or degree, could preclude a person from performing as a member in a training or emergency operational environment by presenting a significant risk to the safety and health of the person or others.

3.3.16 Medical Evaluation. The analysis of information for the purpose of making a determination of medical certification. Medical evaluation includes a medical examination.

3.3.17 Medical Examination. An examination performed or directed by the fire department physician.

**3.3.18 Medically Certified.** A determination by the fire department physician that the candidate or current member meets the medical requirements of this standard.

**3.3.19 Member.** A person involved in performing the duties and responsibilities of a fire department under the auspices of the organization. A fire department member can be a full-time or part-time employee or a paid or unpaid volunteer, can occupy any position or rank within the fire department, and can engage in emergency operations.

**3.3.20 Occupational Safety and Health Program.** An occupation specific program, implemented to reduce the risks associated with the occupation, that outlines the components of a program and the roles and responsibilities of the fire department and its members.

**3.3.21 Performance.** Those criteria that are required by members to safely and efficiently do the required essential job tasks.

## Chapter 4 Roles and Responsibilities

### 4.1 Fire Department Responsibilities.

**4.1.1\*** The fire department shall establish a medical program that includes medical evaluations for candidates and members.

**4.1.2** The medical evaluations and any additional medical tests ordered by the fire department physician shall be provided at no cost to the members.

**4.1.2.1\*** This obligation shall not extend to medical tests beyond the basic medical evaluation for candidates.

**4.1.3** The fire department shall have an officially designated physician who shall be responsible for guiding, directing, and advising the members with regard to their health, fitness, and suitability for duty as required by NFPA 1500.

**4.1.4\*** The fire department shall ensure that the fire department physician is a licensed doctor of medicine or osteopathy who has completed residency training in an accredited medical training program and/or is American Boards of Medical Specialties (ABMS) or American Osteopathic Association (AOA) board certified or international equivalent.

**4.1.5** The fire department shall provide the fire department physician with a fire service overview, current job descriptions, and the essential job tasks required for all fire department positions and ranks.

**4.1.6** The fire department shall provide the fire department physician with the department's organizational statement that outlines types and levels of services provided by the department, in accordance with NFPA 1500.

**4.1.7\*** The types and levels of services provided by the fire department shall dictate for candidates and members the essential job tasks that pertain to its members and shall therefore be correlated to the medical requirements outlined in this standard.

**4.1.8** For the purpose of conducting medical evaluations, the fire department shall assist the fire department physician to understand the physiological and psychological demands placed on members as well as the environmental conditions under which they must perform and the personal protective

ensembles they must wear during various types of emergency operations.

**4.1.9** The fire department shall ensure member access to evaluation by medical specialists, medical and/or surgical treatment, rehabilitation, and any other intervention prescribed by a medical provider, in consultation with the fire department physician, following an injury or illness resulting from a member's participation in fire department functions.

**4.1.10** The fire department shall require that the fire department health and safety officer and the health and fitness coordinator maintain a liaison relationship with the fire department physician to ensure that all aspects of the comprehensive occupational medical program are actively engaged.

**4.1.11** The fire department shall ensure employee privacy and confidentiality regarding medical conditions identified during the medical evaluation except as required by law.

**4.1.12** Where possible, the fire department shall provide alternate duty position for members with temporary work restrictions as recommended by the fire department physician.

**4.1.13\*** The fire department comprehensive occupational medical program shall include collection and maintenance of a confidential medical and health information system for members. All medical record keeping shall comply with the requirements of 29 CFR 1910.120, "Access to Employee Exposure and Medical Records," and other applicable regulations and laws.

**4.1.14** The provisions of 4.1.13 shall apply to all health and medical records regarding individual members and to all methods of communicating or transferring the information contained in these records, including written, oral, electronic and any other means of communication.

### 4.2 Fire Department Physician Responsibilities.

**4.2.1** The fire department physician shall fulfill the following responsibilities:

(1) Understand the physiological, psychological, and environmental demands placed on fire fighters.

(2) Evaluate fire department candidates and members to identify medical conditions that could affect their ability to safely respond to emergency operations.

(3) Utilize the essential job task descriptions, supplied by the fire department, to determine a candidate's or a member's medical certification.

(4) Identify and report the presence of Category A or disqualifying Category B medical conditions if present in candidates.

(5) Inform the fire department chief or designee whether or not the candidate or current member is medically certified to safely perform the essential job tasks. Specific information concerning medical diagnosis shall be released only with written permission from the candidate or member. **Physician Guidance (Confidentiality):** Confidentiality of all medical data is critical to the success of the program. Members need to feel assured that the information provided to the physician will not be inappropriately shared. No fire department supervisor or manager shall have access to medical records without the express written consent of the member. There are occasions, however, when specific medical information is needed to make a decision about placement, return to work, and so forth, and a fire depart-

ment manager shall have more medical information for decision making. In that situation, written medical consent shall be obtained from the member to release the specific information necessary for that decision.

(6) Report the results of the medical evaluation to the candidate or current member, including any medical condition(s) identified during the medical evaluation, and the recommendation as to whether the candidate or current member is medically certified to safely perform the essential job tasks.

(7) Forward copies of any abnormal results along with patient instructions regarding primary care follow-up to candidates or current members who were instructed to seek (as appropriate) medical follow-up to address any medical conditions, or lab abnormalities, identified during the medical evaluation.

(8) Review results of the annual fitness evaluation as described in Chapter 8.

(9) Provide or arrange for a prescriptive rehabilitation and/or fitness program when indicated to aid a member's recovery from illness or injury and enhance his/her ability to safely perform essential job tasks.

**4.2.2** When medical evaluations are conducted by a physician or medical provider other than the fire department physician, the evaluation shall be reviewed and approved by the fire department physician.

**4.2.3** The fire department physician shall review individual medical evaluations and aggregate data from member evaluations in order to detect evidence of occupational exposure(s) or clusters of occupational disease.

**4.2.4** The fire department physician shall be a member of the Fire Department Occupational Safety and Health Committee chaired by the health and safety officer as required by NFPA 1500.

**4.2.5** The fire department physician shall provide medical supervision for the fire department fitness, return-to-duty rehabilitation, and physical conditioning programs as required by NFPA 1583.

**4.2.6\*** The fire department physician shall ensure adequate on-scene medical support at incident scene rehabilitation sector for members during emergency operations as required by NFPA 1500 and NFPA 1561.

**4.2.7** The fire department physician shall provide supervision for the fire department infection control program as required by NFPA 1581.

**4.3  Candidate and Member Responsibilities.** Each candidate or member shall adhere to the following requirements:

(1) Cooperate, participate, and comply with the medical evaluation process

(2) Provide complete and accurate information to the fire department physician and other authorized medical care provider(s)

(3) Report any occupational exposure such as exposures to hazardous materials or toxic substances and exposure to infectious or contagious diseases

(4) Report to the fire department physician any medical condition that could interfere with the ability of the individual to safely perform essential job tasks, such as illness or injury, use of prescription or nonprescription drugs, and pregnancy

## Chapter 5    Essential Job Tasks

**5.1  Essential Job Tasks and Descriptions.**

**5.1.1** The types and levels of emergency services provided to the local community by the fire department, together with a consideration of the structures and occupancies comprising the community, and the configuration of the fire department shall dictate the essential job tasks of fire department members.

**5.1.2** Medical requirements for candidates and members shall be correlated with their essential job tasks as determined by the fire department and AHJ.

**5.1.3** The essential job tasks shall reflect the physical, physiological, intellectual, and psychological demands of the occupation.

**5.1.3.1  Physician Guidance:** Before this list is used in any jurisdiction, the fire department shall provide the fire department physician with the essential job tasks, listed below, which are applicable:

(1) Performing fire-fighting tasks (e.g., hoseline operations, extensive crawling, lifting and carrying heavy objects, ventilating roofs or walls using power or hand tools, forcible entry), rescue operations, and other emergency response actions under stressful conditions while wearing personal protective ensembles (PPE) and self-contained breathing apparatus (SCBA), including working in extremely hot or cold environments for prolonged time periods.

(2) Wearing an SCBA, which includes a demand valve-type positive pressure facepiece or HEPA filter masks, which requires the ability to tolerate increased respiratory workloads.

(3) Exposure to toxic fumes, irritants, particulates, biological (infectious) and nonbiological hazards, and/or heated gases, despite the use of PPE including SCBA.

(4) Depending on the local jurisdiction, climbing 6 or more flights of stairs while wearing fire protective ensemble weighing at least 50 lb or more and carrying equipment/tools weighing an additional 20 to 40 lb.

(5) Wearing fire protective ensemble that is encapsulating and insulated. Wearing this clothing will result in significant fluid loss that frequently progresses to clinical dehydration and can elevate core temperature to levels exceeding 102.2°F (39°C).

(6) Searching, finding, and rescue-dragging or carrying victims ranging from newborns up to adults weighing over 200 lb to safety despite hazardous conditions and low visibility.

(7) Advancing water-filled hoselines up to 2.5 in. in diameter from fire apparatus to occupancy (approximately 150 ft); can involve negotiating multiple flights of stairs, ladders, and other obstacles.

(8) Climbing ladders, operating from heights, walking or crawling in the dark along narrow and uneven surfaces, and operating in proximity to electrical power lines and/or other hazards.

(9) Unpredictable emergency requirements for prolonged periods of extreme physical exertion without benefit of warm-up, scheduled rest periods, meals, access to medication(s), or hydration.

(10) Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens.

(11) Critical, time-sensitive, complex problem solving during physical exertion in stressful, hazardous environments (including hot, dark, tightly enclosed spaces), further aggravated by fatigue, flashing lights, sirens, and other distractions.

(12) Ability to communicate (give and comprehend verbal orders) while wearing PPE and SCBA under conditions of high background noise, poor visibility, and drenching from hoselines and/or fixed protection systems (sprinklers).

(13) Functioning as an integral component of a team, where sudden incapacitation of a member can result in mission failure or in risk of injury or death to civilians or other team members (e.g., two in, two out as described in NFPA 1500).

**5.1.4**  In addition to general fire-fighting duties, members of specialized teams such as hazardous materials units, self-contained underwater breathing apparatus (SCUBA) teams, Technical Rescue Teams, EMS teams, or units supporting tactical law enforcement operations shall be required to perform additional tasks not specified in 5.1.3.1(1) through 5.1.3.1(13). These tasks shall require members to wear or utilize specialized PPE that can increase weight, environmental isolation, sensory deprivation, and/or dehydration potential above levels experienced with standard fire suppression PPE. They also can include additional medical and/or physical requirements that shall not all be enumerated in this standard.

## Chapter 6    Medical Evaluations of Candidates

**6.1\* Medical Evaluation.**  Medical evaluations of candidates shall be conducted prior to training programs or participation in departmental emergency response activities.

**6.1.1\***  Medical evaluation of candidates including history, examination, and laboratory tests as indicated shall be performed on each candidate in order to detect any physical or medical condition(s) that could adversely affect the candidate's ability to safely perform all essential job tasks under emergency conditions.

**6.1.2**  If a candidate presents with a condition that temporarily interferes with his/her ability to safely perform essential job tasks, the pre-placement medical evaluation shall be postponed until the candidate has recovered from that condition.

**6.2 Medical Conditions Affecting Ability to Safely Perform Essential Job Tasks.**

**6.2.1**  Medical conditions that can affect a candidate's ability to safely perform essential job tasks shall be designated either Category A or Category B.

**6.2.2**  Candidates with Category A medical conditions shall not be certified as meeting the medical requirements of this standard.

**6.2.3**  Candidates with Category B medical conditions shall be certified as meeting the medical requirements of this standard only if they can perform the essential job tasks without posing a significant safety and health risk to themselves, members, or civilians.

**6.3 Head and Neck.**

**6.3.1 Head.**

**6.3.1.1**  Category A medical conditions shall include the following:

(1) Defect of skull preventing helmet use or leaving underlying brain unprotected from trauma

(2) Any skull or facial deformity that would not allow for a successful respiratory facepiece fit test

(3) Any head condition that results in a person not being able to safely perform essential job tasks

**6.3.1.2**  Category B medical conditions shall include the following:

(1)\*Deformities of the skull such as depressions or exostoses

(2)\*Deformities of the skull associated with evidence of disease of the brain, spinal cord, or peripheral nerves

(3)\*Loss or congenital absence of the bony substance of the skull

**6.3.2 Neck.**

**6.3.2.1**  Category A medical conditions shall include the following:

(1) Any neck condition that results in a person not being able to safely perform essential job tasks

(2) Reserved

**6.3.2.2**  Category B medical conditions shall include the following:

(1)\*Thoracic outlet syndrome

(2)\*Congenital cysts, chronic draining fistulas, or similar lesions

(3)\*Contraction of neck muscles

**6.4 Eyes and Vision.**

**6.4.1**  Category A medical conditions shall include the following:

(1)\*Far visual acuity. Far visual acuity less than 20/40 binocular, corrected with contact lenses or spectacles. Far visual acuity less than 20/100 binocular for wearers of hard contacts or spectacles, uncorrected.

(2)\*Color perception. Monochromatic vision resulting in inability to use imaging devices.

(3)\*Monocular vision.

(4) Any eye condition that results in a person not being able to safely perform essential job tasks.

**6.4.2**  Category B medical conditions shall include the following:

(1)\*Diseases of the eye such as retinal detachment, progressive retinopathy, or optic neuritis

(2)\*Ophthalmological procedures such as radial keratotomy, Lasik procedure, or repair of retinal detachment

(3) Peripheral vision in the horizontal meridian of less than 110 degrees in the better eye or any condition that significantly affects peripheral vision in *both* eyes

**6.5\* Ears and Hearing.**

**6.5.1**  Category A medical conditions shall include the following:

(1) Chronic vertigo or impaired balance as demonstrated by the inability to tandem gait walk.

(2) On audiometric testing, average hearing loss in the unaided better ear greater than 40 decibels (dB) at 500 Hz, 1000 Hz, and 2000 Hz when the audiometric device is calibrated to ANSI Z24.5.

(3) Any ear condition (or hearing impairment) that results in a person not being able to safely perform essential job tasks.

6.5.2  Category B medical conditions shall include the following:

(1)*Unequal hearing loss
(2) Average uncorrected hearing deficit at the test frequencies 500 Hz, 1000 Hz, 2000 Hz, and 3000 Hz greater than 40 dB in *either* ear
(3) Atresia, stenosis, or tumor of the auditory canal
(4)*External otitis
(5)*Agenesis or traumatic deformity of the auricle
(6)*Mastoiditis or surgical deformity of the mastoid
(7)*Ménière's syndrome, labyrinthitis, or tinnitus
(8)*Otitis media

### 6.6  Dental.

6.6.1  Category A medical conditions shall include the following:

(1) Any dental condition that results in a person not being able to safely perform essential job tasks
(2) Reserved

6.6.2  Category B medical conditions shall include the following:

(1)*Diseases of the jaws or associated tissues
(2)*Orthodontic appliances
(3)*Oral tissues, extensive loss
(4)*Relationship between the mandible and maxilla that interferes with satisfactory postorthodontic replacement or ability to use protective equipment

### 6.7  Nose, Oropharynx, Trachea, Esophagus, and Larynx.

6.7.1  Category A medical conditions shall include the following:

(1)*Tracheostomy
(2)*Aphonia
(3) Any nasal, oropharyngeal, tracheal, esophageal, or laryngeal condition that results in not being able to safely perform essential job tasks

6.7.2  Category B medical conditions shall include the following:

(1)*Congenital or acquired deformity
(2)*Allergic rhinitis
(3) Epistaxis, recurrent
(4)*Sinusitis, recurrent
(5)*Dysphonia
(6) Anosmia
(7) Tracheal stenosis
(8) Naso-pharyngeal polyposis

### 6.8  Lungs and Chest Wall.

6.8.1  Category A medical conditions shall include the following:

(1) Active hemoptysis.
(2) Empyema.
(3) Pulmonary hypertension.
(4) Active tuberculosis.
(5)*Obstructive lung diseases (e.g., emphysema, chronic bronchitis, asthma, etc.) with an $FEV_1/FVC < 0.75$, with both $FEV_1$ and FVC below normal ($< 0.80\%$) as defined by the American Thoracic Society *(see references in Annex D)*.
(6)*Hypoxemia — Oxygen saturation <90% at rest or exercise desaturation to <90% (exercise testing indicated when resting oxygen is <94% but >90%). Evaluate $V_{O_{2max}}$ as described by American College of Sports Medicine (ACSM).
(7)*Asthma — Reactive airways disease requiring bronchodilator or corticosteroid therapy in the previous 2 years. A candidate who has required these medications but who does not believe he/she has asthma shall demonstrate a normal response to cold air or methacholine (PC20 greater

than 16 mg/ml). To be safely administered, this test shall be performed by a qualified specialist and to be valid the candidate shall be off all anti-inflammatory medications for at least 4 weeks and off bronchodilators the day of testing. A negative challenge test [as described by American Thoracic Society (ATS)], along with no recent episode of bronchospasm off medication shall be considered evidence that the candidate does not have clinically significant airways hyperactivity or asthma.
(8) Any pulmonary condition that results in a person not being able to safely perform essential job tasks.

6.8.2  Category B medical conditions shall include the following:

(1)*Pulmonary resectional surgery, chest wall surgery, and pneumothorax
(2) Pleural effusion
(3)*Fibrothorax, chest wall deformity, and diaphragm abnormalities
(4)*Interstitial lung diseases
(5)*Pulmonary vascular diseases or history of pulmonary embolism
(6)*Bronchiectasis
(7) Infectious diseases of the lung or pleural space
(8) Cystic fibrosis
(9) Central or obstructive apnea
(10) Any other pulmonary condition that results in a person not being able to safely perform as a member

### 6.9  Heart and Vascular System.

### 6.9.1  Heart.

6.9.1.1  Category A medical conditions shall include the following:

(1)*Coronary artery disease, including history of myocardial infarction, angina pectoris, coronary artery bypass surgery, coronary angioplasty, and similar procedures
(2)*Cardiomyopathy or congestive heart failure, including signs or symptoms of compromised left or right ventricular function, including dyspnea, S3 gallop, peripheral edema, enlarged ventricle, abnormal ejection fraction, and/or inability to increase cardiac output with exercise
(3)*Acute pericarditis, endocarditis, or myocarditis
(4)*Syncope, recurrent
(5)*A medical condition requiring an automatic implantable cardiac defibrillator or history of ventricular tachycardia or ventricular fibrillation due to ischemic or valvular heart disease, or cardiomyopathy
(6) Third-degree atrioventricular block
(7)*Cardiac pacemaker
(8) Idiopathic hypertrophic subaortic stenosis
(9) Any cardiac condition that results in a person not being able to safely perform essential job tasks

6.9.1.2  Category B medical conditions shall include the following:

(1)*Valvular lesions of the heart, including prosthetic valves
(2)*Recurrent supraventricular or atrial tachycardia, flutter, or fibrillation
(3)*Left bundle branch block
(4) Second-degree atrioventricular block in the absence of structural heart disease
(5) Sinus pause >3 seconds

(6)*Ventricular arrhythmia (history or presence of multi-focal PVCs or nonsustained ventricular tachycardia on resting EKG with or without symptoms; history or presence of sustained ventricular tachycardia with or without symptoms)

(7)*Cardiac hypertrophy or hypertrophic cardiomyopathy

(8)*History of a congenital abnormality

(9)*Chronic pericarditis, endocarditis, or myocarditis

### 6.9.2 Vascular System.

6.9.2.1  Category A medical conditions shall include the following:

(1)*Hypertension with evidence of end organ damage or not controlled by approved medications

(2)*Thoracic or abdominal aortic aneurysm

(3)  Carotid artery stenosis or obstruction resulting in ≥50 percent reduction in blood flow

(4)*Peripheral vascular disease resulting in symptomatic claudication

(5)  Any other vascular condition that results in a person not being able to safely perform essential job tasks

6.9.2.2  Category B medical conditions shall include the following:

(1)  Vasospastic phenomena such as Raynaud's phenomenon

(2)*Thrombophlebitis and varicosities

(3)*Chronic lymphedema due to lymphadenopathy or venous valvular incompetency

(4)*Congenital or acquired lesions of the aorta or major vessels

(5)*Circulatory instability as indicated by orthostatic hypotension, persistent tachycardia, and peripheral vasomotor disturbances

(6)  History of surgical repair of aneurysm of the heart or major vessel

### 6.10 Abdominal Organs and Gastrointestinal System.

6.10.1  Category A medical conditions shall include the following:

(1)  Presence of uncorrected inguinal/femoral hernia regardless of symptoms

(2)  Any gastrointestinal condition that results in a person not being able to safely perform essential job tasks

6.10.2  Category B medical conditions shall include the following:

(1)*Cholecystitis

(2)*Gastritis

(3)*GI bleeding

(4)*Acute hepatitis

(5)  Hernia including the following:

    (a)  Uncorrected umbilical, ventral, or incisional hernia if significant risk exists for infection or strangulation

    (b)  Significant symptomatic hiatal hernia if associated with asthma, recurrent pneumonia, chronic pain, or chronic ulcers

    (c)*Surgically corrected hernia >3 months after surgical correction

(6)*Inflammatory bowel disease or irritable bowel syndrome

(7)*Intestinal obstruction

(8)*Pancreatitis

(9)  Diverticulitis

(10)*History of gastrointestinal surgery

(11)*Peptic or duodenal ulcer or Zollinger-Ellison syndrome

(12)*Asplenia

(13)*Cirrhosis, hepatic or biliary

(14)*Chronic active hepatitis

### 6.11* Reproductive System.

6.11.1  Category A medical conditions shall include the following:

(1)  Any genital condition that results in a person not being able to safely perform essential job tasks

(2)  Reserved

6.11.2  Category B medical conditions shall include the following:

(1)  Pregnancy, for its duration

(2)  Dysmenorrhea

(3)  Endometriosis, ovarian cysts, or other gynecologic conditions

(4)  Testicular or epididymal mass

### 6.12 Urinary System.

6.12.1  Category A medical conditions shall include the following:

(1)  Renal failure or insufficiency requiring continuous ambulatory peritoneal dialysis (CAPD) or hemodialysis

(2)  Any urinary condition that results in a person not being able to safely perform essential job tasks

6.12.2  Category B medical conditions shall include the following:

(1)  Diseases of the kidney

(2)  Diseases of the ureter, bladder, or prostate

### 6.13 Spine and Axial Skeleton.

6.13.1  Category A medical conditions shall include the following:

(1)  Scoliosis of thoracic or lumbar spine with angle ≥40 degrees

(2)  History of multiple spinal surgeries or spinal surgery involving fusion of more than 2 vertebrae, diskectomy or laminectomy, or rods that are still in place

(3)  Any spinal or skeletal condition producing sensory or motor deficit(s) or pain due to radiculopathy or nerve root compression

(4)  Any spinal or skeletal condition causing pain that frequently or recurrently requires narcotic analgesic medication

(5)  Cervical vertebral fractures with multiple vertebral body compression greater than 25 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), abnormal exam, ligament instability, symptomatic, and/or less than 6 months post injury or 1 year since surgery

(6)  Thoracic vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (severe — with or without surgery), abnormal exam, ligament instability, symptomatic, and/or less than 6 months post injury or 1 year since surgery

(7)  Lumbosacral vertebral fractures with vertebral body compression greater than 50 percent; evidence of posterior element involvement, nerve root damage, disc involvement, dislocation (partial, moderate, severe), fragmentation abnormal exam, ligament instability, symptomatic, and/or less than 6 months post injury or 1 year since surgery

(8)  Any spinal or skeletal condition that results in a person not being able to safely perform essential job tasks

6.13.2 Category B medical conditions shall include the following:

(1) Congenital or developmental malformations of the back, particularly those that can cause instability, neurological deficits, pain, or limit flexibility
(2) Scoliosis with angle <40 degrees
(3) Arthritis of the cervical, thoracic, or lumbosacral spine
(4) Facet atrophism, high lumbosacral angle, hyperlordosis, Schmorl's nodes, Scheuermann's disease, spina bifida occulta, spondylolisthesis, spondylolysis, or transitional vertebrae
(5) History of infections or infarcts in the spinal cord, epidural space, vertebrae, or axial skeletal joints

## 6.14 Extremities.

6.14.1 Category A medical conditions shall include the following:

(1) Bone hardware such as metal plates or rods supporting bone during healing
(2) History of total joint replacement
(3) Amputation or congenital absence of upper extremity limb (hand or higher)
(4) Amputation of either thumb proximal to the mid-proximal phalanx
(5) Amputation or congenital absence of lower extremity limb (foot or above)
(6) Chronic nonhealing or recent bone grafts
(7) History of more than one dislocation of shoulder without surgical repair or with history of recurrent shoulder disorders within the last 5 years with pain or loss of motion, and with or without radiographic deviations from normal
(8) Any extremity condition that results in a person not being able to safely perform essential job tasks

6.14.2 Category B medical conditions shall include the following:

(1)*History of shoulder dislocation with surgical repair
(2) Significant limitation of function of shoulder, elbow, wrist, hand, or finger, due to weakness, reduced range of motion, atrophy, unequal length, absence, or partial amputation
(3) Significant lack of full function of hip, knee, ankle, foot, or toes due to weakness, reduced range of motion, atrophy, unequal length, absence, or partial amputation
(4)*History of meniscectomy or ligamentous repair of knee
(5)*History of intra-articular, malunited, or nonunion of upper or lower extremity fracture
(6)*History of osteomyelitis, septic, or rheumatoid arthritis

## 6.15 Neurological Disorders.

6.15.1 Category A medical conditions shall include the following:

(1) Ataxias of heredo-degenerative type.
(2) Cerebral arteriosclerosis as evidenced by a history of transient ischemic attack, reversible ischemic neurological deficit, or ischemic stroke.
(3) Hemiparalysis or paralysis of a limb.
(4)*Multiple sclerosis with activity or evidence of progression within previous 3 years.
(5)*Myasthenia gravis with activity or evidence of progression within previous 3 years.
(6) Progressive muscular dystrophy or atrophy.
(7) Uncorrected cerebral aneurysm.

(8) All epileptic conditions to include simple partial, complex partial, generalized, and psychomotor seizure disorders other than those with complete control during previous 5 years. A candidate shall also have normal neurological examination without structural abnormality on brain imaging, normal awake and asleep EEG with photic stimulation and hyperventilation, as well as a definitive statement from qualified neurological specialist. A candidate with epilepsy shall not be cleared for fire-fighting duty until he or she has completed 5 years without a seizure on a stable medical regimen or 1 year without a seizure after discontinuing all anti-epileptic drugs.
(9) Dementia (Alzheimer's and other neuro-degenerative diseases) with symptomatic loss of function or cognitive impairment (e.g., ≤28 on Mini-Mental Status Exam).
(10) Parkinson's disease and other movement disorders resulting in uncontrolled movements, bradykinesia, or cognitive impairment (e.g., ≤28 on Mini-Mental Status Exam).
(11) Any neurological condition that results in a person not being able to safely perform essential job tasks.

6.15.2 Category B medical conditions shall include the following:

(1) Congenital malformations
(2)*Migraine
(3) Clinical disorders with paresis, dyscoordination, deformity, abnormal motor activity, abnormality of sensation, or complaint of pain
(4) History of subarachnoid or intraparenchymal hemorrhage
(5) Abnormalities from recent head injury such as severe cerebral contusion or concussion

## 6.16 Skin.

6.16.1 Category A medical conditions shall include the following:

(1) Metastatic or locally extensive basal or squamous cell carcinoma or melanoma
(2) Any dermatologic condition that would not allow for a successful respiratory facepiece fit test
(3) Any dermatologic condition that results in the person not being able to safely perform essential job tasks

6.16.2 Category B medical conditions shall include the following:

(1)*Skin conditions of a chronic or recurrent nature (eczema, cystic acne, psoriasis) that cause skin openings or inflammation or irritation of the skin surface
(2)*Surgery or skin grafting
(3)*Mycosis fungoides
(4)*Cutaneous lupus erythematosus
(5)*Raynaud's phenomenon
(6)*Scleroderma (skin)
(7)*Vasculitic skin lesions
(8)*Atopic dermatitis/eczema
(9)*Contact or seborrheic dermatitis
(10)*Stasis dermatitis
(11)*Albinism Dariers Disease, Ichthyosis Marfan's Syndrome, Neurofibromatosis, and other genetic conditions
(12)*Folliculitis, Pseudo-folliculitis, Miliaria, Keloid folliculitis
(13)*Hidradenitis suppurativa, Furuncles, Carbuncles, or Grade IV acne (cystic)
(14)*Mechano-Bullous Disorders (Epidermolysis Bullosa, Hailey Pemphigus, Porphyria, Pemphigoid)
(15)*Urticaria or Angioedema

1582–12    COMPREHENSIVE OCCUPATIONAL MEDICAL PROGRAM FOR FIRE DEPARTMENTS

## 6.17 Blood and Blood-Forming Organs.

6.17.1  Category A medical conditions shall include the following:

(1) Hemorrhagic states requiring replacement therapy
(2) Sickle cell disease (homozygous)
(3) Clotting disorders
(4) Any hematological condition that results in a person not being able to safely perform essential job tasks

6.17.2  Category B medical conditions shall include the following:

(1) Anemia
(2) Leukopenia
(3) Polycythemia vera
(4) Splenomegaly
(5) History of thromboembolic disease
(6) Any other hematological condition that results in a person not being able to safely perform essential job tasks

## 6.18 Endocrine and Metabolic Disorders.

6.18.1  Category A medical conditions shall include the following:

(1) Diabetes mellitus, which is treated with insulin
(2) *Diabetes not treated by insulin, which is not controlled as evidenced by Hemoglobin A1C (Hb A1C) measurement
(3) Any endocrine or metabolic condition that results in a person not being able to safely perform essential job tasks

6.18.2  Category B medical conditions shall include the following:

(1) *Diseases of the adrenal gland, pituitary gland, parathyroid gland, or thyroid gland of clinical significance
(2) Nutritional deficiency diseases or other metabolic disorder
(3) Diabetes mellitus that is well controlled on diet, exercise, and/or oral hypoglycemic agents

## 6.19 Systemic Diseases and Miscellaneous Conditions.

6.19.1  Category A medical conditions shall include the following:

(1) Any systemic condition that results in a person not being able to safely perform essential job tasks
(2) Reserved

6.19.2  Category B medical conditions shall include the following:

(1) Connective tissue disease, such as dermatomyositis, systemic lupus erythematosus, scleroderma, and rheumatoid arthritis
(2) *History of thermal, chemical, or electrical burn injury with residual functional deficit
(3) Documented evidence of a predisposition to heat stress with recurrent episodes or resulting residual injury

## 6.20 Tumors and Malignant Diseases.

6.20.1  Category A medical conditions shall include the following:

(1) Malignant disease that is newly diagnosed, untreated, or currently being treated
(2) Any tumor or similar condition that results in a person not being able to safely perform essential job tasks

6.20.2  Category B medical conditions shall be evaluated on the basis of an individual's current physical condition and on the staging and prognosis of the malignancy (i.e., likelihood that the disease will recur or progress), and include the following:

(1) *Benign tumors
(2) *History of CNS tumor or malignancy
(3) *History of head and neck malignancy
(4) *History of lung cancer
(5) *History of GI or GU malignancy
(6) *History of bone or soft tissue tumors or malignancies
(7) *History of hematological malignancy

## 6.21 Psychiatric Conditions.

6.21.1  Category A medical conditions shall include the following:

(1) Any psychiatric condition that results in a person not being able to safely perform essential job tasks
(2) Reserved

6.21.2  Category B medical conditions shall include the following:

(1) A history of psychiatric condition or substance abuse problem
(2) Requirement for medications that increase an individual's risk of heat stress, or other interference with the ability to safely perform essential job tasks

## 6.22 Chemicals, Drugs, and Medications.

6.22.1  Category A medical conditions shall include those that require chronic or frequent treatment with any of the following medications or classes of medications:

(1) Narcotics, including methadone
(2) Sedative-hypnotics
(3) Drugs that prolong Prothrombin Time, Partial Thromboplastin Time, or INR
(4) Beta-adrenergic blocking agents
(5) Respiratory medications: Inhaled bronchodilators, inhaled corticosteroids, systemic corticosteroids, theophylline, and leukotriene receptor blockers/antagonists
(6) Any chemical, drug, or medication that results in a person not being able to safely perform essential job tasks

6.22.1.1  Tobacco use shall be a Category A medical condition.

6.22.1.2  Evidence of illegal drug use detected through testing, conducted in accordance with Substance Abuse and Mental Health Service Administration (SAMHSA), shall be a Category A medical condition.

6.22.1.3  Evidence of clinical intoxication or a measured blood alcohol level that exceeds the legal definition of intoxication according to the AHJ at the time of medical evaluation shall be a Category A medical condition.

6.22.2*  Category B medical conditions shall include the use of the following:

(1) Cardiovascular agents
(2) Stimulants
(3) Psychoactive agents
(4) Corticosteroids
(5) Antihistamines
(6) Muscle relaxants

## Chapter 7    Occupational Medical Evaluation of Members

### 7.1 General.

7.1.1  The fire department shall establish and maintain a confidential medical evaluation program for members.

7.1.2  Medical evaluations shall be conducted as a baseline for surveillance and annually thereafter.

7.1.3*  Medical evaluations shall be performed following occupational exposure, illness, injury, or protracted absence from the job. The scope of that evaluation shall be determined by the fire department physician reviewing the type and severity of the condition.

7.1.4  The components of the medical evaluations shall conform to all applicable OSHA standards, including 29 CFR 1910.120, "Hazardous Waste Operations and Emergency Response," 29 CFR 1910.134, "Respiratory Protection," 29 CFR 1910.95, "Occupational Noise Exposure," and 29 CFR 1910.1030, "Bloodborne Pathogens."

### 7.2 Member Education Regarding Medical Evaluation Program.

7.2.1  The fire department, the fire department physician, and member organizations where they exist shall be responsible to convey the purposes and importance of the annual occupational medical evaluation to members and to the AHJ.

7.2.2  The purpose of the annual occupational medical evaluation of members shall include but cannot be limited to the following:

(1) Identifying conditions that interfere with a member's physical or mental ability to safely perform essential job tasks without undue risk of harm to self or others
(2) Monitoring the effects of exposure to specific biological, physical, or chemical agents on individual members
(3) Detecting changes in a member's health that can be related to harmful working conditions
(4) Detecting patterns of disease or injury occurrence in the workforce that could indicate underlying work-related problems
(5)* Providing members with information about their current health, promoting wellness, and referring them for appropriate further evaluation and treatment
(6) Providing members with information and education about occupational hazards
(7) Providing a cost-effective investment in work-related disease prevention, early detection, and health promotion for members
(8) Complying with federal, state, provincial, local, and/or other jurisdictional requirements

### 7.3 Timing of the Annual Occupational Medical Evaluation of Members.

7.3.1  All members shall receive a baseline medical evaluation after hiring and prior to performing fire fighter emergency functions and at least annually thereafter.

7.3.2  The baseline medical evaluation shall include the components of the annual occupational medical evaluation not performed as part of the candidate medical evaluation, provided the candidate medical evaluation was performed within the past 12 months.

7.3.3  The annual evaluation shall be completed every 12 months (±3 months).

7.3.4  Annual medical evaluations shall be compared to baseline and subsequent evaluations to identify clinically relevant changes.

7.3.5  The interval requirements for performance of the annual occupational medical evaluation (as listed in Section 7.4) shall not preclude more frequent medical evaluations of members for new or recurring conditions when requested by the member, fire department physician, or AHJ.

### 7.4 Components of the Annual Occupational Medical Evaluation of Members.

7.4.1  All components listed in Section 7.4 shall be included in the baseline and annual occupational medical evaluations of members.

7.4.2  It shall be acceptable for certain components of the annual occupational medical evaluation to be performed by a member's private physician provided full results are forwarded in the required time frame to the fire department physician.

7.4.3  Each medical evaluation shall include a medical history (including exposure history), physical examination, blood tests, urinalysis, vision tests, audiograms, spirometry, chest X-ray (as indicated), electrocardiogram, cancer screening (as indicated), and immunizations and infectious disease screening (as indicated).

7.4.4  Tests for illegal drugs shall not be performed as part of the annual medical evaluation.

### 7.5 Medical History.

7.5.1  A medical history questionnaire shall be completed by each member to provide baseline information with which to compare future medical concerns.

7.5.2  An annual medical history questionnaire shall be completed to provide follow-up information, which includes changes in health status and known occupational exposures since the previous annual evaluation.

7.5.3  Information on the questionnaire and interval concerns shall be reviewed with each member by the fire department physician or designated medical evaluator.

### 7.6 Physical Examination.

7.6.1  The annual physical examination shall include each of the following components:

(1) Vital signs
(2) Head, eyes, ears, nose, and throat (HEENT)
(3) Neck
(4) Cardiovascular
(5) Pulmonary
(6) Breast
(7) Gastrointestinal (includes rectal exam for mass, occult blood)
(8) Genitourinary (includes pap smear, testicular exam, rectal exam for prostate mass)
(9) Hernia
(10) Lymph nodes
(11) Neurological
(12) Musculoskeletal
(13) Skin (includes screening for cancers)
(14) Vision

**7.6.2\*** The laboratory tests in 7.6.3 through Section 7.13 shall be performed annually for each member.

**7.6.3 Blood Tests.** The blood tests required shall include the following:

(1) CBC with differential, RBC indices and morphology, and platelet count
(2) Electrolytes (Na, K, Cl, $HCO_3$, or $CO_2$)
(3) Renal function (BUN, creatinine)
(4) Glucose
(5) Liver function tests (ALT, AST, direct and indirect bilirubin, alkaline phosphatase)
(6) Total cholesterol, HDL, LDL, clinically useful lipid ratios (e.g., percent LDL), and triglycerides
(7) Prostate Specific Antigen (PSA) after age 40 for positive family history, African American, or if otherwise clinically indicated; after age 50 for all other male members

**7.6.4 Urine Laboratory Tests.** The urine laboratory tests required shall include the following:

(1) Dipstick analysis for glucose, ketones, leukocyte esterase, protein, blood, and bilirubin
(2) Microscopic analysis for RBC, WBC, casts, and crystals if indicated by results of dipstick analysis
(3) Analysis for occupational chemical exposure if indicated

**7.6.5 Audiology.** Hearing thresholds shall be assessed in each ear at each of the following frequencies:

(1) 500 Hz
(2) 1000 Hz
(3) 2000 Hz
(4) 3000 Hz
(5) 4000 Hz
(6) 6000 Hz
(7) 8000 Hz

**7.6.5.1** The fire department physician or other qualified medical evaluator shall compare audiogram results obtained during yearly evaluations with baseline and subsequent test results.

**7.6.5.2** Standard threshold shifts shall be corrected for age as permitted by OSHA.

**7.7 Spirometry.**

**7.7.1\*** Pulmonary function testing (spirometry) shall be conducted to measure the member's forced vital capacity (FVC), forced expiratory volume in 1 second ($FEV_1$), and the $FEV_1/FVC$ ratio.

**7.7.2** The fire department physician or other qualified medical evaluator shall compare spirometry results obtained during yearly evaluations with baseline and subsequent test results.

**7.7.3\*** Results shall be corrected according to American Thoracic Society (ATS) guidelines and normative equations found in Knudson et al. (1983) and the American College of Occupational and Environmental Medicine (2000).

**7.8 Chest Radiographs.**

**7.8.1** Chest X-rays shall include an initial baseline and shall be repeated every 5 years or as medically indicated.

**7.8.2** The fire department physician or other qualified medical evaluator shall compare any chest radiographs with baseline and subsequent radiographs.

**7.9 Electrocardiograms (EKG).**

**7.9.1\*** A resting EKG shall be performed as part of the baseline medical evaluation and shall be obtained annually thereafter.

**7.9.2** The fire department physician or other qualified medical evaluator shall compare EKGs obtained during yearly evaluations with baseline and subsequent EKGs.

**7.9.3\*** Stress EKG with or without echocardiography or radionuclide scanning shall be performed as clinically indicated by history or symptoms.

**7.10 Mammography.**

**7.10.1** Mammography shall be performed annually on each female member over the age of 40.

**7.10.2** A qualified radiologist shall compare mammograms to prior mammograms. The fire department physician shall compare mammography reports to prior reports.

**7.11 Immunizations and Infectious Disease Screening.** The following infectious disease immunizations or infectious disease screening shall be provided, as indicated:

(1)\*Tuberculosis screen (PPD) (annually or more frequently according to CDC guidelines) unless member has a history of positive PPD. If positive by history, CDC guidelines for management and subsequent chest radiographic surveillance shall be followed.
(2) Hepatitis C virus screen (baseline and following occupational exposure).
(3) Hepatitis B virus vaccinations and titers (as specified in CDC guidelines).
(4) Tetanus/diphtheria vaccine (booster every 10 years).
(5) Measles, mumps, rubella vaccine (MMR).
(6) Polio vaccine.
(7) Hepatitis A vaccine. Vaccine shall be offered to high risk (HazMat, USAR, and SCUBA) and other personnel with frequent or expected exposures to contaminated water.
(8) Varicella vaccine. Vaccine shall be offered to all nonimmune personnel.
(9) Influenza vaccine. Vaccine shall be offered to all personnel annually.
(10) HIV screening. Screening shall be available to all personnel.
(11)\*HIV testing shall be offered on a confidential basis as part of post-exposure protocols and as requested by the physician or member. All results from HIV tests are provided directly to the member and will be maintained by the physician as confidential documents, and shall not be forwarded to any local, state, provincial, national, or international database unless mandated by public health statute.
(12)\*All members shall be immunized against infectious diseases as required by the authority having jurisdiction and by 29 CFR 1910.1030, "Bloodborne Pathogens." The fire department physician shall ensure that all members are offered currently recommended immunizations.

**7.12 Heavy Metal Evaluation.**

**7.12.1** Baseline testing for heavy metals shall be required when indicated.

**7.12.2** Evaluations shall be performed following known exposures, for recurrent exposures, or where required under federal, state, or provincial regulations.

**7.13 Screening Colonoscopy Services.** Screening colonoscopy services shall be provided to all members above the age of 50 or earlier if clinically indicated.

## Chapter 8   Annual Occupational Fitness Evaluation of Members

### 8.1  Weight and Body Composition.

8.1.1* Body weight shall be measured and recorded annually.

8.1.2  A body composition evaluation including the following shall be conducted on personnel solely for the purpose of departmental health surveillance:

(1)*Circumferential measurements
(2) Hydrostatic weighing or Bod-Pod
(3)*Skinfold measurements
(4) Bio impedance analysis

### 8.2  Annual Fitness Evaluation.

8.2.1* The fitness evaluation shall be conducted on an annual basis. It shall include a mandatory pre-evaluation procedure and the components in 8.2.1.1 through 8.2.1.4. *(For additional information, see Annex C.)*

8.2.1.1* An evaluation of aerobic capacity shall be conducted using either a stairmill or a treadmill protocol.

8.2.1.2  An evaluation of muscular strength shall be conducted using each of the following protocols:

(1)*Grip strength evaluation
(2)*Leg strength evaluation
(3)*Arm strength evaluation

8.2.1.3  An evaluation of muscular endurance shall be conducted using each of the following protocols:

(1)*Push-up evaluation
(2)*Curl-up evaluation

8.2.1.4* An evaluation of flexibility shall be conducted using the sit-and-reach protocol.

## Chapter 9   Essential Job Tasks — Specific Evaluation of Medical Conditions in Members

### 9.1  Essential Job Tasks.

A representative list of essential job tasks was enumerated in Chapter 5 and shall be reproduced here for ease of use. Throughout this chapter, each task (1 through 13) shall be referred to by number only.

(1)*Performing fire-fighting tasks (e.g., hoseline operations, extensive crawling, lifting and carrying heavy objects, ventilating roofs or walls using power or hand tools, forcible entry, etc.), rescue operations, and other emergency response actions under stressful conditions while wearing PPE and SCBA, including working in extremely hot or cold environments for prolonged time periods.

(2) Wearing an SCBA, which includes a demand valve-type positive pressure facepiece or HEPA filter masks, which requires the ability to tolerate increased respiratory workloads.

(3) Exposure to toxic fumes, irritants, particulates, biological (infectious) and nonbiological hazards, and/or heated gases, despite the use of PPE including SCBA.

(4) Depending on the local jurisdiction, climbing 6 or more flights of stairs while wearing fire protective ensemble weighing at least 50 lb or more and carrying equipment/tools weighing an additional 20 to 40 lb.

(5) Wearing fire protective ensemble that is encapsulating and insulated. Wearing this clothing will result in significant fluid loss that frequently progresses to clinical dehydration and can elevate core temperature to levels exceeding 102.2°F (39°C).

(6) Searching, finding, and rescue-dragging or carrying victims ranging from newborns up to adults weighing over 200 lb to safety despite hazardous conditions and low visibility.

(7) Advancing water-filled hoselines up to 2.5 in. in diameter from fire apparatus to occupancy (approximately 150 ft); can involve negotiating multiple flights of stairs, ladders, and other obstacles.

(8) Climbing ladders, operating from heights, walking or crawling in the dark along narrow and uneven surfaces, and operating in proximity to electrical power lines and/or other hazards.

(9) Unpredictable emergency requirements for prolonged periods of extreme physical exertion without benefit of warm-up, scheduled rest periods, meals, access to medication(s), or hydration.

(10) Operating fire apparatus or other vehicles in an emergency mode with emergency lights and sirens.

(11) Critical, time-sensitive, complex problem solving during physical exertion in stressful, hazardous environments (including hot, dark, tightly enclosed spaces), further aggravated by fatigue, flashing lights, sirens, and other distractions.

(12) Ability to communicate (give and comprehend verbal orders) while wearing PPE and SCBA under conditions of high background noise, poor visibility, and drenching from hoselines and/or fixed protection systems (sprinklers).

(13) Functioning as an integral component of a team, where sudden incapacitation of a member can result in mission failure or in risk of injury or death to civilians or other team members (e.g., two in, two out as described in NFPA 1500).

9.1.1  In addition to general fire-fighting duties, members of specialized teams such as hazardous materials units, SCUBA teams, Technical Rescue Teams, EMS teams, or units supporting tactical law enforcement operations shall be required to perform additional tasks not specified in 9.1(1) through 9.1(13). These tasks shall require members to wear or utilize specialized PPE that can increase weight, environmental isolation, sensory deprivation, and/or dehydration potential above levels experienced with standard fire suppression PPE. They also can include additional medical and/or physical requirements that shall not all be enumerated in this standard.

### 9.2  Medical Conditions.

9.2.1  Medical conditions that potentially interfere with a member's ability to safely perform essential job tasks shall be listed by organ system.

9.2.2  The relevant task(s) shall be identified by number.

### 9.3  Fire Department Physician Roles.

The fire department physician shall recommend restricting members from performing only those specific essential job tasks that cannot be safely performed by the member given his/her medical condition.

9.3.1  If an illness, injury, or other debilitating condition has altered a member's ability to safely perform an essential job task, the fire department physician shall notify the fire department that the member is restricted from performing that task while on duty.

**9.3.2\*** The fire department shall determine possible accommodations for members restricted from certain job tasks.

**9.4\* Cardiovascular Disorders.**

**9.4.1** Cardiovascular disorders shall include any disorder of the cardiovascular system including but not limited to supraventricular or ventricular arrhythmias (abnormal heart beats), coronary artery disease, and cardiac muscle disease or valve disease.

**9.4.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Coronary artery disease including history of myocardial infarction, coronary artery bypass surgery, coronary angioplasty with stent placement, or similar procedures. **Physician Guidance:** Evaluation of coronary artery disease requires a coronary angiogram and some assessment of left ventricular function. Following a myocardial infarction or a coronary revascularization procedure, a radionuclide stress test must be performed to evaluate exercise tolerance and the presence of exercise-induced myocardial ischemia or ventricular arrhythmias. The following clinical conditions referable to coronary artery disease compromise a member's ability to safely perform essential job tasks 1, 2, 4, 5, 6, 7, 9, and 13:

(a) Current angina pectoris even if relieved by medication.

(b) Persistent significant stenosis in any coronary artery (>70 percent lumen diameter narrowing) following treatment.

(c) Lower than normal left ventricular ejection fraction as measured by radionuclide scan, contrast ventriculography, or echocardiography. **Physician Guidance:** Reports of left ventricular ejection fraction should include "normal" values for the lab performing the test and formal interpretation by a cardiologist.

(d) Maximal exercise tolerance of <42 ml $O_2$/min/kg or <12 metabolic equivalents (METS). **Physician Guidance:** Workload demands of fire fighting have been shown to exceed these levels.

(e) Exercise-induced ischemia or ventricular arrhythmias at ≤12-METS workload by radionuclide stress test.

(f) History of myocardial infarction (MI), angina, or coronary artery disease with persistence of modifiable risk factor(s) for acute coronary plaque rupture (e.g., tobacco use, hypertension despite treatment or hypercholesterolemia with cholesterol ≥180 or low density lipoproteins ≥100 despite treatment, or glycosylated hemoglobin >6.5 despite exercise and/or weight reduction).

(2) Congestive heart failure due to any etiology. Any disease leading to a lower than normal left or right ventricular ejection fraction, even if corrected by medication, compromises a member's ability to safely perform essential job tasks 1, 2, 4, 7, 9, and 13. **Physician Guidance:** If the heart failure is due to a reversible process that ultimately results in no abnormality in cardiac performance off all cardiac medications (e.g., hyperthyroidism, anemia), then a history of congestive heart failure does not permanently prevent a member from safely performing the essential job tasks.

(3) Restrictive cardiomyopathy and constrictive pericarditis. When these conditions result in heart failure, they compromise a member's ability to safely perform essential job tasks 1, 2, 4, 7, and 9.

(4) Acute pericarditis, acute endocarditis, and acute myocarditis. These conditions compromise a member's ability to safely perform essential job tasks 1, 4, 5, 6, 7, 9, and 13.

(5) Chronic pericarditis, endocarditis, or myocarditis can result in the inability to safely perform essential job tasks 1, 4, 5, 6, 7, and 13 due to limitations of endurance. **Physician Guidance:** In such members, cardiac function, rhythm, and valvular competence needs to be carefully and regularly assessed at least annually by cardiac echo or other noninvasive or invasive monitoring in consultation with a cardiologist.

(6) Hypertrophic obstructive cardiomyopathy (idiopathic hypertrophic subaortic stenosis). This condition is associated with sudden cardiac death without previous symptoms of heart failure. This condition compromises a member's ability to safely perform essential job task 13.

(7)\*Recurrent syncope. This condition compromises a member's ability to safely perform essential job task 13.

(8)\*Medical condition requiring a pacemaker or automatic implantable defibrillator. This condition compromises a member's ability to safely perform essential job task 13.

(9) Moderate to severe mitral valve stenosis defined as valve area ≤1.5 cm$^2$ or pulmonary artery systolic pressure >35 mm Hg. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 5, 7, and 9.

(10) Moderate to severe mitral valve insufficiency defined as the presence of left ventricular dysfunction. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 5, 7, and 9. **Physician Guidance:** Mitral valve prolapse only interferes with safe performance of critical job tasks if associated with arrhythmias or if moderate to severe mitral regurgitation is present.

(11) Moderate to severe aortic valve stenosis defined as mean aortic valvular gradient ≥20 mm Hg and/or valve area ≤1.0 cm$^2$. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 5, 6, 7, 9, and 13.

(12) Moderate to severe aortic valve insufficiency if the cause of left ventricular dysfunction. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 7, and 9.

(13) Prosthetic cardiac valves if full dose anticoagulation is required or if left ventricular dysfunction is present. This condition compromises a member's ability to safely perform essential job task 8 if full dose anticoagulation is required and essential job tasks 1, 4, 6, 7, and 9 if left ventricular dysfunction is present.

(14)\*Wolff-Parkinson-White (WPW) syndrome with a history of supraventricular tachycardia (SVT). This condition compromises a member's ability to safely perform essential job task 13.

(15)\*Other supraventricular arrhythmias, atrial fibrillation, or atrial flutter that is persistent or if full dose anticoagulation is required. This condition compromises a member's ability to safely perform essential job task 13 and essential job task 8 if full-dose anticoagulation is required. **Physician Guidance:** If the atrial fibrillation is recurrent but self-limited off cardiac medications, there is no evidence of ischemia, and the echocardiogram reveals both a normal mitral valve and a normal sized left atrium, then the member can continue to safely perform full duties. Paroxysmal atrial tachycardia can sometimes be resolved with modification of diet or treatment of other underlying noncardiac conditions.

(16) History of ventricular ectopy (e.g., ventricular tachycardia, ventricular fibrillation, and premature ventricular contractions). This condition compromises a member's ability to safely perform essential job task 13. **Physician Guidance:** History of ventricular ectopy or ventricular arrhythmias other than ventricular tachycardia or ventricular fibrillation poses significant risk for life-threatening sudden incapacitation in the presence of either structural abnormalities, functional abnormalities, or ectopy that occurs during exercise. Echocardiograph must show no evidence of structural abnormalities. Stress testing off cardiac medications must show no evidence for ischemia, ventricular tachycardia, ventricular fibrillation, and premature ventricular contractions (PVCs) should resolve with increasing levels of exercise up to 12 METS.

(17) Third-degree or complete atrioventricular block or any type of atrioventricular block with sinus pause >3 seconds, left bundle branch block, right bundle branch block, and second degree Type I atrioventricular block. These blocks interfere with safe performance of essential job task 13 if cardiac structural (i.e., coronary arteries, valves, myocardium) abnormalities are present, if left ventricular function is abnormal, or if heart rate does not increase with exercise in the absence of a mechanical pacemaker.

(18)*Severe uncontrolled hypertension [defined as systolic pressure >180 mm Hg, diastolic pressure >100 mm Hg, or mean systolic blood pressure (⅓ systolic + ⅔ diastolic) >110 mm Hg] or malignant hypertension (defined as hypertension with the presence of target organ damage). These conditions compromise a member's ability to safely perform essential job tasks 1, 5, 7, 9, and 13.

(19) History of a congenital abnormality that has been treated by surgery but with residual complications or that has not been treated by surgery, leaving residuals or complications. Evaluate for ability to safely perform essential job tasks 1, 4, 5, 6, 7, 9, and 13.

(20) Cardiac hypertrophy. Nonphysiological hypertrophy when not in normal response to exercise of the heart can result in the potential for sudden incapacitation and the inability to safely perform essential job task 13 and other job functions due to limitations of endurance.

## 9.5 Vascular Disorders.

**9.5.1** Vascular disorders shall refer to any disorder of the vascular (arterial or venous) system including but not limited to aneurysm, peripheral vascular insufficiency, and thromboembolic disease. **Physician Guidance:** Heart rate, blood pressure, and shear forces on vessel walls are increased when performing many of the essential job tasks, increasing the risk of acute dissection, rupture, and/or embolic phenomena that even in a normal environment can result in life-threatening sudden incapacitation.

**9.5.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Aortic aneurysm (thoracic aortic aneurysm of any size or abdominal aortic aneurysm ≥4 cm) compromises a member's ability to safely perform essential job tasks 1, 4, 6, 7, and 13. **Physician Guidance:** Abdominal aortic aneurysm <4 cm requires careful control of blood pressure. A minimum of 6 months post-surgical repair of any aortic aneurysm is required before the member can be evaluated for return-to-duty status.

(2) Carotid artery disease. If symptomatic and reduction in blood flow of greater than 70 percent on the clinically relevant side. This condition compromises a member's ability to safely perform essential job task 13.

(3) Thoracic outlet syndrome (symptomatic). This condition compromises a member's ability to safely perform essential job tasks 1 and 13.

(4) Peripheral vascular disease (arterial or venous) if symptomatic (claudication) or severe peripheral edema. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 5, 7, and 9.

(5) Thrombophlebitis and/or deep venous thrombosis if recurrent, persistent, or requires full dose anticoagulation. This condition compromises a member's ability to safely perform essential job tasks 1, 4, 5, 7, and 9. Full-dose anticoagulation compromises a member's ability to safely perform essential job task 8.

(6) Circulatory instability as indicated by orthostatic hypotension or persistent tachycardia. This condition compromises a member's ability to safely perform essential job tasks 1, 5, 9, and 13.

(7) Peripheral vascular disease, such as severe Raynaud's phenomenon, interferes with a member's ability to safely perform essential job tasks (e.g., under certain conditions, including cold weather).

(8) Chronic, severe lymphedema or massive edema of any type due to lymphadenopathy, severe venous valvular incompetency, endocrine abnormalities, or low flow states can result in the inability to safely perform essential job tasks 1, 4, 5, and 8.

(9) Congenital or acquired lesions of aorta or major vessels can interfere with circulation and prevent the safe performance of essential job tasks 1, 4, and 7 due to limitations of endurance and the potential for life-threatening sudden incapacitation (essential job task 13).

## 9.6* Endocrine and Metabolic Disorders.

**9.6.1** Endocrine and metabolic disorders shall include disorders of the hypothalamic-pituitary-thyroid-adrenal axis.

**9.6.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1)*Diabetes mellitus that is poorly controlled or requires insulin therapy compromises a member's ability to safely perform essential job tasks 5, 9, and 13.

(2) Nutritional deficiencies, including those caused by congenital or acquired disorders of metabolism, potentially interfere with a member's ability to safely perform essential job tasks 1, 5, and 9.

(3) Diseases of the adrenal gland, pituitary gland, parathyroid gland, or thyroid gland of clinical significance. If untreated or inadequately controlled, compromise a member's ability to safely perform essential job tasks 1, 5, and 9.

## 9.7* Lung, Chest Wall, and Respiratory Disorders.

**9.7.1** Lung, chest wall, and respiratory disorders shall include disorders of breathing and the exchange of respiratory gases (oxygen and carbon dioxide), central neurologic control of respiratory drive, nose, sinuses, throat, pharynx, larynx, trachea, airways, lungs, pleura, and chest wall. **Physician Guidance:** Efficient breathing and respiratory gas exchange is required for essential job tasks 1, 2, 4, 5, 7, 9, and 13. Wearing protective clothing increases the oxygen consumption required to safely perform these tasks and, therefore, increases the respiratory workload. SCBA is a positive pressure demand valve respirator that provides

1582-18    COMPREHENSIVE OCCUPATIONAL MEDICAL PROGRAM FOR FIRE DEPARTMENTS

a barrier against the inhalation of noxious/toxic gases and particulate matter but at increased metabolic cost due to its weight and increased respiratory workload (resistance and dead space). If respiratory function or gas exchange is already compromised (increased work of breathing from structural or functional abnormalities, hypoxia, and/or hypercapnia) prior to the performance of essential job tasks, then the increased oxygen demand of strenuous physical exertion, while wearing PPE and/or SCBA, leads to early onset of fatigue or respiratory insufficiency.

**9.7.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Tracheostomy compromises the ability to safely wear SCBA (essential job task 2), communicate effectively due to oropharyngeal dysfunction (essential job task 12), and effectively clear secretions or inhaled particulate matter (essential job task 3). **Physician Guidance:** History of tracheostomy now sealed and without persistent respiratory disease or dysfunction does not prevent safe performance of essential job tasks.

(2) Chronic cough with or without hemoptysis compromises the ability to safely wear SCBA (essential job task 2). **Physician Guidance:** Need to evaluate the cause of chronic cough and/or hemoptysis, as the underlying conditions can also produce increased work of breathing, gas exchange abnormalities, or airway hyperreactivity.

(3)*Asthma compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, 7, 9, and 13. **Physician Guidance:** Exposures to exertion, temperature extremes, combustion by-products, irritants, and particulate matter are all potent provokers of asthma attacks. Bronchodilator or anti-inflammatory medications are not adequate maintenance therapy to control symptoms in the irritant environment of the fire ground or hazardous materials incident scene. Acute hyperreactivity in this environment can induce immediate or progressive clinical asthma (bronchospasm and wheeze) that can lead to sudden incapacitation from status asthmaticus and/or cardiac ischemia.

(4)*Allergic lower respiratory disorders compromise a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, 7, 9, and 13. **Physician Guidance:** Allergic respiratory disorder is a term used to define asthma (clinical reversible bronchospasm) triggered by a known allergic insult. Once triggered, these patients have demonstrable airway hyperreactivity for weeks to months and can be recurrent and/or permanent.

(5)*Chronic obstructive airways disease (chronic bronchitis, emphysema), if moderate to severe ($FEV_1/FVC$ ratio ≤0.59), compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, 7, 9, and 13.

(6) Hypoxemic disorders when moderate to severe (oxygen saturation ≤90 percent or a $P_{O_2}$ ≤65 mm Hg, corrected to sea level) or the presence of significant exercise desaturation compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 7, and 13. **Physician Guidance:** A resting oxygen saturation of 91 to 93 percent corrected to sea level requires measurement at exercise to determine if desaturation occurs (decrease in oxygen saturation by ≥4 percent from baseline). Hypoxia can be the result of central regulatory disturbances, obstructive sleep apnea, asthma, chronic obstructive airways diseases, interstitial lung disease, pulmonary hypertension, chronic pulmonary embolism, etc. In this environment, gas exchange abnormalities and respiratory insufficiency no matter the cause has the potential for life-threatening sudden incapacitation from cardiopulmonary insufficiency.

(7) Hypercapnic disorders (elevated carbon dioxide with serum $P_{CO_2}$ ≥45 mm Hg) can be found during evaluation of respiratory complaints or disease. If present, hypercapnia compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, 7, and 13. **Physician Guidance:** Hypercapnia can be the result of central regulatory disturbance, medications, obstructive sleep apnea, severe asthma, end-stage chronic obstructive airways diseases, or end-stage interstitial lung disease. In this environment, gas exchange abnormalities and respiratory insufficiency no matter the cause has the potential for life-threatening sudden incapacitation from cardiopulmonary insufficiency.

(8) Pulmonary hypertension compromises a member's ability to safely perform essential job tasks 1, 3, 4, 7, and 13. For further details see sections on hypoxia and cardiac valve dysfunction.

(9) Tracheal stenosis can prevent the successful and safe performance of essential job tasks 1, 2, 3, 4, 5, 7, and 12 if pulmonary dysfunction is reduced below certifiable limits or if the underlying cause of the stenosis prevents the successful and safe performance of the essential job tasks.

(10) Pulmonary resection surgery, chest wall surgery, and/or traumatic pneumothorax. Evaluate for full recovery from surgery with pulmonary function testing (PFT). Abnormal PFTs or decreased oxygenation compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 7, and 13. **Physician Guidance:** Pulmonary function tests should be performed after adequate healing and pain resolution. Generally, this is 4 weeks after thoracoscopic surgery and 6 to 8 weeks after open chest surgery. Pulmonary function tests should be either normal or show only a minimal restrictive disorder without evidence for interstitial disease or gas exchange abnormalities. If moderate to severe restriction is present (FVC <60% of predicted with an $FEV_1/FVC$ ratio ≥0.80) then the member may not be able to safely perform essential job tasks unless a more complete evaluation of gas exchange and exercise capacity shows the ability to exercise at a 12-METS workload without evidence of exercise desaturation.

(11)*Spontaneous pneumothorax, when present, compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 7, and 13 due to pain and dyspnea. **Physician Guidance:** Members with a history of spontaneous pneumothorax whose essential job tasks include SCUBA diving cannot safely perform this task since pressure changes can induce recurrence.

(12) Fibrothorax, chest wall deformity, and/or diaphragm abnormalities can compromise a member's ability to safely perform essential job tasks 2, 4, and 7. **Physician Guidance:** If moderate to severe restriction is present (FVC <60% of predicted with an $FEV_1/FVC$ ratio greater than 0.80%) then the member may not be able to safely perform essential job tasks unless more complete evaluation of gas exchange and exercise capacity shows ability to exercise at a 12-METS level without exercise desaturation.

(13)*Pleural effusions can compromise the ability to safely perform essential job tasks 2, 4, and 7.

(14) Bronchiectasis and/or bronchiolitis obliterans with frequent productive cough, wheeze, or dyspnea, or if pulmonary function tests show moderate to severe dysfunction, compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, and 7.

(15) Interstitial lung diseases include pneumoconiosis (coal, silicosis, asbestosis), hypersensitivity pneumonitis, eosinophilic pneumonitis, infections, and inhalation pneumonitis. If moderate or severe pulmonary dysfunction exists, as shown by pulmonary function or gas exchange tests (hypoxia at rest or exercise), member cannot safely perform essential job tasks 1, 2, 3, 4, and 7.

(16) Sarcoidosis. Moderate or severe pulmonary dysfunction, significant visual impairment, cardiac dysfunction at rest or exercise, or the need for current treatment with systemic corticosteroids compromises a member's ability to safely perform essential job tasks 1, 2, 3, 4, 7, 8, and 13.

(17) Acute, recent, or chronic pulmonary embolism. Requiring anticoagulation interferes with a member's ability to safely perform essential job tasks 2 and 8.

(18) Disorders of respiratory regulation can result in gas exchange abnormalities that prevent the safe performance of essential job tasks 1, 2, 4, 7, and 9. Physician Guidance: Conditions including but not limited to obstructive sleep apnea, central apnea, and disordered central breathing regulation require evaluation of medical history, physical exam, pulmonary function tests, exercise tests, sleep tests, and other tests as deemed necessary.

(19) Cystic lung diseases (e.g., congenital bullous disease, pneumatocele, or blebs) with abnormalities on chest film or moderate to severe pulmonary dysfunction compromise a member's ability to safely perform essential job tasks 1, 2, and 4. Members shall be restricted from SCUBA diving even if pulmonary function tests are normal.

(20) Tuberculosis, see Section 9.8.

(21) Lung cancer, see Section 9.17.

## 9.8 Infectious Diseases.

9.8.1 Infectious diseases shall include systemic, local, acute, and chronic infections as well as post-infectious processes. Physician Guidance: Many infections interfere with control of body temperature, hydration, and nutritional status. Many also produce severe pain, compromise mobility, and/or ability to safely perform heavy physical exertion. Members must be able to safely interact with other fire fighters and civilians without posing a significant public health risk. Acute and/or self-limited infectious processes can require temporary work restriction. Examples include influenza or upper respiratory tract infection, which can interfere with safe performance of essential job tasks 2 and 3, or acute dermatitis, which would interfere with safe performance of essential job task 3. Following resolution of these acute processes, members can return to full duty.

9.8.2 For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Skin infections and draining ulcers or cysts that prevent wearing personal protective clothing (essential job tasks 2 and 5) or because of their extent and severity present too high a risk for exposure to biologic or non-biologic toxins (essential job task 3).

(2) Upper or lower respiratory infections that compromise a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, and 7.

(3) Ear infections that interfere with balance and/or hearing that compromise a member's ability to safely perform essential job tasks 8 and 12.

(4) Gastrointestinal infections including parasites that result in dehydration or frequent use of toilet facilities at least temporarily compromise a member's ability to safely perform essential job tasks 1, 5, 8, and 9.

(5) Kidney or urinary infections that result in dehydration or the frequent use of toilet facilities compromise a member's ability to safely perform essential job tasks 1, 5, and 9.

(6)*Any infection that results in dizziness, weakness, significant weight loss, or pain compromises a member's ability to safely perform essential job tasks 1, 5, 8, and 9.

(7)*Active pulmonary tuberculosis poses a public health risk to the community and other members. It also compromises a member's ability to safely perform essential job tasks 2, 4, 5, and 12.

(8)*Hepatitis, specifically infectious diseases of the liver caused by viruses including but not limited to A, B, C, D, and E. Physician Guidance: Medical management of members following occupational exposure or development of any viral hepatitis shall conform to the current CDC guidelines. This includes recommendations for restriction from various types of duty. [See Section 7.11(2)].

(9)*Human immunodeficiency virus (HIV) infection. Members with AIDS and significant organ damage or dysfunction resulting from HIV infection can be unable to safely perform essential job tasks 1, 2, 4, 5, 7, 8, and 9 due to debilitation. Anemia, cardiopulmonary dysfunction, or neurologic dysfunction compromises a member's ability to safely perform essential job task 1, 2, 3, 4, 5, 7, 9, and 13. Peripheral neuropathy compromises a member's ability to safely perform essential job tasks 1, 3, and 5. Dementia compromises a member's ability to safely perform essential job tasks 1, 11, and 12.

## 9.9* Spine Disorders.

9.9.1 Spine disorders shall include conditions of the cervical, thoracic, and lumbosacral spine such as strains, fractures, and discogenic disease as well as cord, cauda equina, and paraspinous syndromes. Physician Guidance: Fire fighters with active, ongoing, or recurrent spinal disorders can have difficulty due to reduced motor strength, sensation, and flexibility as well as problems with fatigue, coordination, gait, and equilibrium. The PPE and SCBA can place the fire fighter's spine at a biomechanical disadvantage due to added weight and altered center of gravity.

9.9.2 For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Spine fusion at two or more levels places the spine at risk for future degenerative changes. Degenerative changes can prevent the member from safely performing essential job tasks 1, 2, 4, 5, 6, 7, 8, and 13.

(2) Ankylosing spondylitis. Prevents members from safely performing essential job tasks 1, 2, 4, 5, 6, 7, and 8.

(3) Any spinal condition with significant radiculopathy resulting in peripheral motor weakness, loss of strength, loss of sensation, and loss of reflexes. Due to limitations of endurance, strength, flexibility, pain, and gait disturbances, these conditions prevent the member from safely performing essential job tasks 1, 2, 4, 5, 6, 7, 8, and 13.

(4) The use of narcotics or muscle relaxants to treat any spinal condition compromises a member's ability to safely perform essential job tasks 1, 2, 4, 5, 6, 7, 8, and 13. Physician Guidance: Medication-induced somnolence, discoordination, and/or disequilibrium reduces a member's ability to operate in hazardous environments.

(5) Spine structural abnormality, fracture, or dislocation that causes progressive or recurrent impairment. These illnesses can prevent the member from safely performing essential

job tasks 1, 2, 4, 5, 6, 7, 8, and 13 due to limitations of endurance, strength, flexibility, or pain. These conditions can also result in ligament instability increasing the risk for future dislocation and neurologic compromise.

(6) Herniation of nucleus pulposus or history of laminectomy, discectomy, or single level fusion. These illnesses can prevent the member from safely performing essential job tasks 1, 2, 4, 5, 6, 7, 8, and 13 due to pain or limitations of endurance, strength, or flexibility.

## 9.10* Orthopedic Disorders.

**9.10.1** Orthopedic disorders shall include injuries and illnesses involving upper extremities, pelvis, and lower extremities including nerves, muscles, tendons, joints, and bones. **Physician Guidance:** Fire fighters with active, ongoing, or recurrent orthopedic disorders can have difficulty due to reduced motor strength, sensation, and flexibility as well as problems with fatigue, coordination, gait, and equilibrium. The PPE and SCBA can place the fire fighter's involved extremity (upper or lower) at a biomechanical disadvantage due to added weight and altered center of gravity. Certain medications (narcotics and muscle relaxants) used to treat orthopedic conditions can produce or worsen somnolence, discoordination, and disequilibrium.

**9.10.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Amputation of arm, hand, or thumb prevents the safe performance of essential job tasks 1, 2, 6, 7, and 8. The amputation of these limbs or joints interferes with grip and other physical abilities required to safely perform essential job tasks. Prosthetic limbs do not provide adequate function to safely perform these essential job tasks rapidly in a life-threatening, unforgiving environment.

(2) Amputation of leg (above or below knee) or entire foot prevents the safe performance of essential job tasks 1, 4, 6, 7, and 8. The amputation of these limbs or joints prevents ambulation and other physical abilities required to safely perform essential job tasks. Prosthetic limbs do not provide adequate function to safely perform these essential job tasks rapidly in a life-threatening, unforgiving environment.

(3) Amputation of finger(s), other than thumb, needs evaluation to determine if the member can safely perform essential job tasks 1, 2, 6, 7, and 8. The amputation of these limbs or joints can interfere with grip and other physical abilities required to safely perform essential job tasks.

(4) Amputation of partial foot or toe(s) needs evaluation to determine if the member can safely perform essential job tasks 1, 4, 6, 7, and 8. The amputation of these limbs or joints can prevent ambulation and other physical abilities required to safely perform essential job tasks.

(5) Recurrent joint dislocation of a major joint (e.g., shoulder). Unrepaired repeat joint dislocations indicate an unstable shoulder, which can easily dislocate, thereby preventing the safe performance of essential job tasks 1, 2, 4, 6, 7, and 8. This can lead to sudden incapacitation, placing the member or the person depending on the member at life-threatening risk. Post-surgical repair, the member can safely perform essential job tasks if joint exam shows full functional motion, strength, and stability.

(6) Ligament and/or meniscus knee disease. A history of locking, buckling, or giving-way prevents the safe performance of essential job tasks 1, 4, 6, 7, and 8. This can lead

to sudden incapacitation, placing the member or the person depending on the member at life-threatening risk. Post-surgical repair, the member can safely perform essential job tasks if joint exam shows full functional motion, strength, and stability.

(7) Joint replacements or any artificial joints can prevent the safe performance of essential job tasks 1, 4, 6, 7, and 8. **Physician Guidance:** Competitive athletes with artificial hip joints are not cleared for contact sports where explosive effort, high impact, and blunt trauma are frequent. Fire fighting presents similar limitations and stress, especially as their consequence can place the member or others at risk for life-threatening injuries.

(8) Limitation of joint motion to a degree that prevents the safe performance of essential job tasks 1, 2, 4, 6, 7, and 8 due to reduced flexibility.

(9) Dislocation of a joint. Single episode of joint dislocation or dislocation with residual limitation of motion of a degree to interfere with safe performance of essential job tasks 1, 2, 4, 6, 7, and 8. Successful surgery for shoulder dislocation, if range of motion and strength were intact, would not interfere with the safe performance of essential job tasks.

(10) Joint reconstruction. In cases where residual limitation of motion or strength can interfere with safe performance of essential job tasks 1, 4, 6, 7, and 8. For example, surgery for a torn anterior cruciate ligament or meniscus can interfere with safe performance of essential job tasks 1, 4, 6, 7, and 8 if quadriceps strength is reduced or if the knee is unstable or develops pain or swelling when stressed.

(11) Fractures. When healed and asymptomatic, evaluation should focus on ability to safely perform essential job tasks 1, 4, 6, 7, and 8. Fractures, including hip fractures requiring internal fixation, should not interfere with safe performance of essential job tasks as long as the radiograph demonstrates healing and exam is normal. Non-union fractures are not healed, and members cannot safely perform essential job tasks 1, 4, 6, 7, and 8 until union is achieved.

(12) Appliances (screws, pins, and/or metal plates) should not interfere with safe performance of essential job tasks 1, 4, 6, 7, and 8. If they are superficial and they lead to perforation of the skin under the normal abrasive conditions of fire fighting, surgical consultation is advised to determine the risk benefit analysis for removing the appliance. After removing the appliance, radiographic evidence of bone healing (approximately 6 months) should be obtained before the member is allowed to safely perform the essential job tasks.

(13) Bone grafts if well healed do not interfere with the safe performance of essential job tasks 1, 4, 6, 7, and 8 as long as the radiograph demonstrates healing and the exam is normal.

(14) Chronic osteoarthritis or traumatic arthritis can result in frequent episodes of pain and reduced range of motion. Evaluate for ability to safely perform essential job tasks 1, 4, 6, 7, and 8.

(15) Inflammatory arthritis (in cases where it is severe, recurrent, or a progressive illness or associated with deformity or limitation of range of motion) can result in frequent episodes of pain, reduced strength, and reduced flexibility. Evaluate for the ability to safely perform essential job tasks 1, 4, 6, 7, and 8.

(16) Reflex sympathetic dystrophy can interfere with the safe performance of essential job tasks 1, 4, 6, 7, and 8 if pain is severe, medications are required, or strength/flexibility is limited.

(17) Osteomyelitis or septic arthritis if active can cause pain, local drainage, systemic infection, and/or increased risk for pathologic or traumatic fractures. Evaluate for the ability to safely perform essential tasks 1, 4, 6, 7, and 8.

## 9.11 Disorders Involving Gastrointestinal Tract and Abdominal Viscera.

9.11.1 Disorders involving gastrointestinal tract and abdominal viscera shall include conditions of the abdominal wall and peritoneum, as well as esophagus, stomach, small bowel, colon, mesenteric structures, and intra-abdominal organs.

9.11.2 Potential for interference with essential job tasks — evaluate members for the likelihood of inadequate nutrition, a propensity for symptomatic dehydration, anemia, or incapacitating pain syndromes. The following GI disorders resulting in the above complications compromise a member's ability to safely perform essential job tasks 1, 4, 6, 7, 9, and 13:

(1) Cholecystitis
(2) Gastritis
(3) GI bleeding
(4) Inflammatory bowel disease or irritable bowel syndrome
(5) Intestinal obstruction
(6) Pancreatitis
(7) Diverticulitis
(8) History of gastrointestinal surgery
(9) Gastric or other GI ulcers, including Zollinger-Ellison syndrome
(10) Cirrhosis
(11) Hernias, such as the following:
   (a) Hernias of the abdominal wall, especially inguinal and femoral hernias, potentially interfere with a member's ability to safely perform essential job tasks 1, 4, 6, 7, and 13 due to the risk of incarceration and bowel strangulation during heavy exertion and lifting.
   (b) Large ventral hernias have a low risk of incarceration but can weaken the abdominal wall musculature and interfere with a member's ability to safely perform essential job tasks 1, 4, 6, and 7.
   (c) Umbilical hernias that are small and asymptomatic will not generally interfere with fire-fighting duties.
   (d) Abdominal wall hernias at any site that have been surgically corrected do not prevent otherwise qualified members from safely performing essential fire-fighting tasks, provided the incision site is well healed and the surgeon has cleared the member for full lifting.

## 9.12 Medical Conditions Involving Head, Eyes, Ears, Nose, Neck, or Throat.

9.12.1* For potential interference with essential job tasks, the member shall be evaluated for conditions that interfere with a member's ability to comfortably wear and be protected by the fire fighter's protective ensemble. Such conditions compromise a member's ability to safely perform essential job tasks 2, 4, 5, and 13.

(1) Deformities of the skull associated with evidence of disease of the brain, spinal cord, or peripheral nerves can result in the potential for sudden incapacitation and the inability to properly wear protective equipment.

(2) Contraction of head and neck muscles can interfere with wearing of protective equipment, impair speech, or otherwise compromise a member's ability to safely perform essential job tasks.

(3)* Disorders of the eyes or vision can interfere with a member's ability to safely perform essential job tasks 6, 8, 10, and 11.
   (a)* Far visual acuity worse than 20/40 binocular corrected with contact lens or spectacles, and far visual acuity uncorrected worse than 20/100 binocular for wearers of hard contacts or spectacles, compromises a member's ability to safely perform essential job tasks 6, 8, 10, and 11. Successful soft contact lens wearers are not subject to the uncorrected standard.
   (b)* Monocular vision, stereopsis without fusional capacity, inadequate depth perception, or loss of peripheral vision (>110 degrees on confrontation) interferes with safe performance of essential job task 10.
   (c) Peripheral vision in the horizontal meridian of less than 110 degrees in the better eye or any condition that significantly affects peripheral vision in both eyes. **Physician Guidance:** New monocular vision requires a minimum of 6 months for depth perception accommodation in order to safely perform other essential job tasks.

(4)* Abnormal hearing requiring a hearing aid or impairing a member's ability to hear and understand the spoken voice under conditions of high background noise, or hear, recognize, and directionally locate cries or audible alarms, interferes with safe performance of essential job tasks 2, 6, 8, 10, 12, and 13.

(5)* Any condition causing chronic or recurring vertigo, ataxia, or other disturbance of gait and balance compromises a member's ability to safely perform essential job tasks 1, 8, 10, and 13.

(6)* Any deformity or disease of the nose, naso- or oropharynx, or dental structures, including anosmia and sinusitis, can interfere with a member's ability to safely perform essential job tasks 2, 3, 5, 8, 12, and 13.

## 9.13* Neurologic Disorders.

9.13.1 Neurologic disorders shall refer to ongoing, chronic, or recurrent disorders that impair an individual's neurological functions, including central regulation, cognitive abilities, strength, perception, reflexes, coordination, gait, and equilibrium.

9.13.2 For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Ataxias of the hereditary or degenerative type compromise a member's ability to safely perform essential job tasks 1, 4, 6, 7, and 8.

(2)* Cerebral arteriosclerosis as evidenced by documented episodes of focal, reversible, or irreversible neurological impairment interferes with a member's ability to safely perform essential job tasks 1 through 13.

(3)* Neuromuscular, demyelinating, and other progressive neurologic diseases interfere with a member's ability to safely perform essential job tasks 1, 4, 6, 7, 8, 12, and 13. **Physician Guidance:** This category refers to, but is not limited to, multiple sclerosis, myasthenia gravis, muscular dystrophies, Huntington's chorea, amyotrophic lateral sclerosis, and bulbar palsy.

(4)*Epileptic conditions including simple, partial complex, generalized, and psycho-motor seizure disorders interfere with a member's ability to safely perform essential job tasks 8, 9, 10, 11, and 13. **Physician Guidance:** A member diagnosed with epilepsy shall not be cleared for structural fire-fighting duty until he or she has completed 5 years without a seizure on a stable medical regimen or 1 year without a seizure after discontinuing all anti-epileptic drugs. In addition the member must have a normal neurological examination, no structural abnormality on brain imaging, normal EEG including provocative testing, normal awake and asleep EEG with photic stimulation and hyperventilation, as well as a definitive statement by a qualified neurologist.

(5)*Cerebral vascular bleeding prevents safe performance of essential job tasks 1, 4, 6, 7, 8, 9, 10, 11, 12, and 13.

(6)*Head trauma including concussion, brain contusion, subarachnoid hemorrhage, subdural, and/or epidural hematoma interferes with a member's ability to safely perform essential job tasks 1 through 13. **Physician Guidance:** Following significant head trauma a member should be evaluated and cleared to return to duty by a qualified neurosurgeon or neurologist.

(7) CNS tumors can interfere with the safe performance of essential job tasks 1 through 13 depending on location and size of the mass. **Physician Guidance:** After successful resection of a CNS tumor a member can safely return to duty with a neurosurgeon's certification that exam and imaging studies are normal (except for surgical site) and EEG shows no epileptic activity off all anti-convulsant medications. Where applicable, meta-static workup must be negative.

(8) Parkinson's and other diseases with tremor interfere with a member's ability to safely perform essential job tasks 1, 2, 4, 5, 6, 7, 8, and 9. **Physician Guidance:** Evaluate gait, balance, movement, and medications required to maintain function. The impact of the operational environment including heat, hazards, stress, and exertion must be considered and specifically addressed.

(9) Progressive dementia (e.g., Alzheimer's) compromises a member's ability to safely perform essential job tasks 1 through 13.

### 9.14* Psychiatric and Psychologic Disorders.

**9.14.1** Psychiatric and psychologic disorders shall include acute, ongoing, chronic, or recurrent disorders that impair psychological or emotional function.

**9.14.2** For potential interference with essential job tasks, the member shall be evaluated for ability to safely perform essential job tasks 1, 3, 4, 5, 7, 8, 11, 12, and 13.

### 9.15* Substance Abuse.

**9.15.1** Substance abuse shall refer to the frequent and/or persistent use of alcohol or other substances causing the following:

(1) Failure to fulfill major obligations either at work or at home
(2) Verifiable physical or emotional harm to the member
(3) Recurrent legal problems
(4) Exacerbation of social and/or other interpersonal problems

**9.15.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) DSM IV criteria for substance abuse of alcohol and controlled substances prevents the safe performance of essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13.

**Physician Guidance:** Use of medical evaluations, supervisory evaluations, and/or performance evaluations coupled with urine screen and blood toxicology form a basis for determining and documenting substance abuse. There is a high recidivism rate with treatment but members must be offered treatment as in most cases this is a medical illness.

(2) Methadone maintenance interferes with cognitive functions, energy, coordination, and equilibrium and therefore prevents safe performance of essential job tasks 1, 4, 5, 7, 8, 10, and 11.

### 9.16 Medications. Physician Guidance: The medications in this section are listed because of noteworthy side effects that may interfere with essential job tasks.

**9.16.1** Medications shall include prescribed and over-the-counter medications.

**9.16.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Full dose anticoagulation due to the risk of internal bleeding from trauma with potential for significant internal bleeding while performing essential job task 8. If significant internal bleeding occurs it can result in life-threatening sudden incapacitation.

(2) Narcotics. Members cannot safely perform essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 due to alteration in mental status and other neurologic functions. Muscle relaxants can interfere with a member's ability to safely perform essential job tasks 8, 10, and 11.

(3) Sedatives and hypnotics prevent the safe performance of essential job tasks 8, 10, and 11.

(4) Psychoactive agents can interfere with a member's ability to safely perform essential job tasks 5, 8, 11, and 13 due to increased risk of heat stress, movement disorders, and somnolence.

(5) Anti-hypertensive agents (e.g., beta-blockers and high-dose diuretics). Some agents prevent the safe performance of essential job tasks 5 and 8 due to risk for dehydration, electrolyte disorders, lethargy, and disequilibrium. Evaluate for ability to safely perform essential job tasks 5 and 8.

(6) Other medications that can prevent the safe performance of essential job tasks 5, 8, 11, and 13 under certain conditions and require careful evaluation with specialized annual followup (e.g., MAOIs, phenothiazines, anti-cholinergics, tricyclic antidepressants). Evaluate for ability to safely perform essential job tasks 5, 8, 11, and 13.

### 9.17 Tumors — Malignant or Benign.

**9.17.1** Malignant conditions of any organ system can produce specific organ dysfunction or generalized debilitation. **Physician Guidance:** Malignancy or its treatment can result in anemia, malnutrition, pain, and generalized weakness temporarily or permanently disabling a member.

**9.17.2** For potential interference with essential job tasks, the member shall be evaluated for the following:

(1) Benign tumors can prevent the safe performance of essential job tasks 1 through 13 only if the space-occupying lesion and/or its treatment affects energy levels or the involved organ system's function.

(2) Acute illness related to malignancy or its treatment can prevent the safe performance of essential job tasks 1, 2, 3, 4, 5, 6, 7, 8, 9, and 13 due to lower energy levels, anemia, weight loss, or specific aspects of that organ's dysfunction, all of which lead to an acute debilitated state.

(3) Central nervous system tumors can prevent the ability to safely perform essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 due to lower energy levels, anemia, undernutrition, weight loss, and specific organ dysfunction (seizures, loss of balance, inability to communicate, inability to process complicated commands in an emergency situation, weakness), all of which lead to a debilitated state affecting anaerobic and aerobic job tasks and the ability to wear personal protective clothing and SCBA. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam is normal, imaging studies are normal (except for surgical site), and epilepsy is not present off medications (1 year later), and there is no further evidence of malignancy.

(4) Head and neck malignancies can prevent the safe performance of essential job tasks 1 through 13 due to lower energy levels, anemia, undernutrition, weight loss, inability to clear oral secretions, or other specific organ dysfunction that interferes with respiration, communication, hydration, and/or eating. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam allows for normal function, imaging studies show no tumor, and overall medical evaluation reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

(5) Lung cancer can prevent safe performance due to lower energy levels, anemia, undernutrition, weight loss, or specific organ dysfunction (abnormal secretions, dyspnea, or pulmonary dysfunction interfering with or prohibiting use of SCBA or strenuous physical activities, paraneoplastic syndromes, weakness) that if present, interferes with essential job tasks 1, 2, 3, 4, 5, 7, 8, 9, and 13, and a specialist concludes that a member has normal function, imaging studies show no tumor, and overall medical evaluation reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

(6) Gastrointestinal malignancies can prevent safe performance due to lower energy levels, anemia, undernutrition, weight loss, or specific organ dysfunction (abnormal secretions or bowel function interfering with or prohibiting prolonged use of personal protective clothing, or strenuous physical activities, paraneoplastic syndromes, weakness, etc). This debilitated state may affect a member's ability to safely perform essential job tasks 1, 3, 4, 5, 7, 8, and 9. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam allows for normal function (including nutrition intake and excretion), imaging reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

(7) Genitourinary malignancies can prevent the safe performance of essential job tasks 1, 3, 4, 5, 7, 8, and 9 if altered urinary function prevents prolonged activity without use of toilet facilities or if underlying tumor has produced lower energy levels, anemia, undernutrition, weight loss, or specific organ dysfunction. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam allows for normal function (including nutrition intake and excretion), imaging studies show no tumor, and overall medical evaluation reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

(8) Hematologic or lymphatic malignancies (leukemia, lymphoma, etc.) can prevent safe performance if anemia, lymphopenia, or thrombocytopenia is present, or if adverse effects of treatment are present (i.e., neurologic or cardiac dysfunction after chemotherapy). This debilitated state can affect a member's ability to safely perform essential job tasks 1, 2, 3, 4, 5, 7, 8, and 9. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam allows for normal function, imaging studies show no tumor, and overall medical evaluation reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

(9) Skin cancer that requires significant resection or loss of skin integrity can prevent the safe performance of essential job tasks 1, 3, and 9 because of increased risk of burns, infection, dehydration, and heat rash while fire fighting and wearing PPE. If treated successfully, essential job tasks can be performed safely if, after evaluation by a specialist, it is concluded that exam allows for normal function, imaging studies show no tumor, and overall medical evaluation reveals no reason that the safe performance of essential job tasks would be impaired or that performance of such tasks would place member at undue risk.

## Annex A    Explanatory Material

*Annex A is not a part of the requirements of this NFPA document but is included for informational purposes only. This annex contains explanatory material, numbered to correspond with the applicable text paragraphs.*

**A.1.1.1** Some of the medical requirements in this standard are not applicable to candidates and members whose essential job tasks within the fire department are not described in NFPA 1001, NFPA 1002, NFPA 1003, NFPA 1006, NFPA 1021, and NFPA 1051. However, particular attention must be paid to the essential job tasks of individual candidates or members when applying this standard (for example, administrative staff personnel, some EMS personnel, fire/police, and others who do not have responsibility for structural fire fighting and are not required to wear PPE and use SCBA). Medical requirements should reflect essential job tasks and all may not be specifically addressed in this standard. *(See also Chapter 5 and Chapter 9.)*

**A.1.2.2** A direct relationship exists between the medical requirements and the job description of members. The job description should include all essential job functions of members, both emergency and nonemergency. Members perform a variety of emergency operations including fire fighting, emergency medical care, hazardous materials mitigation, driving/operating fire apparatus, and special operations. Nonemergency duties can include, but are not limited to, training, station and vehicle maintenance, and physical fitness. Each fire department needs to identify and develop a written job description for members.

**A.1.3.2** The specific determination of the authority having jurisdiction depends on the mechanism under which this standard is adopted and enforced. Where this standard is adopted voluntarily by a particular fire department for its own use, the authority having jurisdiction should be the fire chief or the political entity that is responsible for the operation of the fire

1582–24   COMPREHENSIVE OCCUPATIONAL MEDICAL PROGRAM FOR FIRE DEPARTMENTS

department. Where this standard is legally adopted and enforced by a body having regulatory authority over a fire department, such as federal, state, or local government or political subdivision, this body is responsible for making those determinations as the authority having jurisdiction. The compliance program should take into account the services the fire department is required to provide, the financial resources available to the fire department, the availability of personnel, the availability of trainers, and such other factors as will affect the fire department's ability to achieve compliance.

A.1.3.3 The most vital resource of any fire department is its members. This standard is to be implemented in a process aimed at improving member health and wellness. Due to the hazardous nature of the occupation, methods to reduce the risk of occupational injury, illness, and exposures to communicable diseases are warranted. Annual reports repeatedly indicate over 100 line-of-duty deaths and 100,000 occupational injuries and illnesses among career and volunteer fire fighters. Another concern is the fire fighters who experience disabling injuries or develop occupational diseases and conditions, which often have debilitating or fatal results, forcing them to leave their fire service activities. There is an increased risk of respiratory and heart disease in fire fighters and strong evidence of a link to some cancers and other conditions related to occupational exposures to carcinogens, toxic products of combustion, and hazardous materials.

Safety and health are two of the many components of the risk management process. The intent of this standard is to reduce the risk and burden of fire service occupational morbidity and mortality while improving the welfare of fire fighters. By implementing the medical requirements of this standard, a fire department commits to a process that evaluates and enhances the health and fitness for duty of members.

A.3.2.1 Approved. The National Fire Protection Association does not approve, inspect, or certify any installations, procedures, equipment, or materials; nor does it approve or evaluate testing laboratories. In determining the acceptability of installations, procedures, equipment, or materials, the authority having jurisdiction may base acceptance on compliance with NFPA or other appropriate standards. In the absence of such standards, said authority may require evidence of proper installation, procedure, or use. The authority having jurisdiction may also refer to the listings or labeling practices of an organization that is concerned with product evaluations and is thus in a position to determine compliance with appropriate standards for the current production of listed items.

A.3.2.2 Authority Having Jurisdiction (AHJ). The phrase "authority having jurisdiction," or its acronym AHJ, is used in NFPA documents in a broad manner, since jurisdictions and approval agencies vary, as do their responsibilities. Where public safety is primary, the authority having jurisdiction may be a federal, state, local, or other regional department or individual such as a fire chief; fire marshal; chief of a fire prevention bureau, labor department, or health department; building official; electrical inspector; or others having statutory authority. For insurance purposes, an insurance inspection department, rating bureau, or other insurance company representative may be the authority having jurisdiction. In many circumstances, the property owner or his or her designated agent assumes the role of the authority having jurisdiction; at government installations, the commanding officer or departmental official may be the authority having jurisdiction.

A.3.3.1 Candidate. Volunteer members are considered employees in some states or jurisdictions. Volunteer fire departments should seek legal counsel as to their legal responsibilities in these matters.

A.4.1.1 See Annex B.

A.4.1.2.1 Fire departments can require candidates to provide some form of medical clearance for candidate participation in pre-employment physical strength and agility tests. When there is such a requirement, the medical clearance forms should enumerate the tasks that the candidate will be asked to safely perform during the test.

A.4.1.4 This physician should also have experience with running an occupational medicine program for public safety workers, preferably fire fighters.

A.4.1.7 The fire department should provide the fire department physician with a representative list of essential job tasks for members of fire departments who wear PPE and SCBA to conduct interior structural fire-fighting operations. The tasks on this list should be verified by the fire department to be essential to the job under consideration for each individual candidate or member. A sample list based on NFPA 1001, NFPA 1002, NFPA 1003, NFPA 1006, NFPA 1021, and NFPA 1051 is provided in 5.1.3.1 and Section 9.1. An effective way to transmit this information to the physician is to use the list with checkboxes in front of each essential job task. This list is taken by a candidate or member to the medical provider at the time of medical evaluation. A check in the box indicates that there is no medical reason why an individual cannot safely perform that particular essential job task.

A.4.1.13 Suggested fields (data points) include but are not necessarily limited to the following:

(1) Medical history including the following:
   (a) Date of exam
   (b) Medical history
   (c) Smoking history
   (d) Tobacco (smokeless) use
   (e) Smoking in the past year
   (f) Tobacco cessation program participation
   (g) Alcohol use
   (h) Family history of heart disease or cancer
   (i) Personal history of past disease, disorders, or cancer
   (j) Exercise history
(2) Current medical and fitness results including the following:
   (a) Blood pressure and heart rate
   (b) ICD9 codes for physician assessment
   (c) Height and weight
   (d) Body composition (local recording only)
   (e) Blood analysis results
   (f) Urinalysis results
   (g) Vision
   (h) Hearing
   (i) Spirometry
   (j) Chest X-ray
   (k) Resting electrocardiogram
   (l) Cancer screening results
   (m) Immunizations
   (n) Aerobic capacity results
   (o) Muscle strength results
   (p) Muscle endurance results
   (q) Flexibility results

**A.4.2.6** Incident scene rehabilitation is an important component of incident scene management that protects the health and safety of fire department members. NFPA 1500 and NFPA 1561 require the establishment of "REHAB" during incident scene operations. A significant component of member rehabilitation is ongoing medical evaluation. The standard does not require the fire department physician to be at every incident but does require that the physician coordinate with the EMS medical director to provide protocols for medical evaluation and management of members in emergency incident rehab. This medical planning process ensures optimal medical support for members at the scene and should include criteria for transportation to a medical facility for additional evaluation and treatment. Fire departments can develop specific standard operating procedures establishing conditions under which fire department physician(s) are dispatched to emergency incidents. (See NFPA 1584.)

**A.6.1** The Americans with Disabilities Act requires that any medical examination must take place after an offer of employment is made and prior to the commencement of duties.

**A.6.1.1** The medical history should include the candidate's known health problems, such as major illnesses, surgeries, medication use, and allergies. Symptom review is also important for detecting early signs of illness. A medical history should also include a personal health history, a family health history, a health habit history, an immunization history, and a reproductive history. An occupational history should also be obtained to collect information about the person's past occupational and environmental exposures.

Physical examination should include the following:

(1) Vital signs
(2) Head, eyes, ears, nose, and throat (HEENT)
(3) Neck
(4) Cardiovascular
(5) Pulmonary
(6) Breast
(7) Gastrointestinal (includes rectal exam for mass, occult blood)
(8) Genitourinary (includes pap smear, testicular exam, rectal exam for prostate mass)
(9) Hernia
(10) Lymph nodes
(11) Neurological
(12) Musculoskeletal
(13) Skin (includes screening for cancers)
(14) Vision testing

Laboratory tests on candidates should include the following:

(1) Blood tests including the following:
(a) CBC with differential, RBC indices and morphology, and platelet count
(b) Electrolytes (Na, K, Cl, $HCO_3$, or $CO_2$)
(c) Renal function (BUN, creatinine)
(d) Glucose
(e) Liver function tests (ALT, AST, direct and indirect bilirubin, alkaline phosphatase)
(f) Total cholesterol, HDL, LDL, clinically useful lipid ratios (e.g., percent LDL), and triglycerides
(2) Urinalysis. Dipstick test for glucose, ketones, leukocyte esterase, protein, blood, and bilirubin.
(3) Audiology. Hearing assessed in each ear at each of the following frequencies: 500 Hz, 1000 Hz, 2000 Hz, 3000 Hz, 4000 Hz, 6000 Hz, and 8000 Hz. Results should be corrected for age as permitted by OSHA. Baseline audiometry is performed in accordance with 29 CFR 1910.95, "Occupational Noise Exposure." The basics of this standard include the following:
(a) The first audiogram done (for members this will probably be done during their pre-placement exam) becomes the baseline audiogram.
(b) If subsequent audiograms are better than the baseline, then the best one becomes the baseline. All audiograms should be done with no exposure to industrial noise for 14 hours.
(4) Spirometry. Pulmonary function testing (spirometry) is conducted to measure the member's forced vital capacity (FVC), forced expiratory volume in 1 second ($FEV_1$), and the $FEV_1$/FVC ratio. Data is corrected within American Thoracic Society Guidelines and normative equations. (Knudson et al., 1983 and ACOEM 2000)
(5) Chest radiography. Chest X-ray posterior-anterior and lateral views.
(6) Electrocardiograms (EKG). A resting 12-lead EKG.
(7) Immunizations and infectious disease screening. The following infectious disease immunizations or infectious disease screening are to be provided, as indicated:
(a) Tuberculosis screen (PPD).
(b) Hepatitis C virus screen (baseline).
(c) Hepatitis B virus vaccinations.
(d) Tetanus/diphtheria vaccine (booster every 10 years).
(e) Measles, mumps, rubella vaccine (MMR).
(f) Polio vaccine given to uniformed personnel if vaccination or disease is not documented.
(g) Hepatitis A vaccine. Vaccine offered to high risk (HazMat, USAR, and SCUBA) and other personnel with frequent or expected frequent contaminated water exposures.
(h) Varicella vaccine. Vaccine offered to all non-immune personnel.
(i) Influenza vaccine. Vaccine offered to all personnel.
(j) HIV screening. Screening available to all personnel.
(k) HIV testing offered on a confidential basis as part of post-exposure protocols and as requested by the physician or patient.
(l) All results from HIV tests are provided directly to the patient and will be maintained by the physician as a highly confidential document, and will not be forwarded to any local, state, provincial, national, or international database unless mandated by public health statute.

**A.6.3.1.2(1)** Deformities of the skull can result in the member's inability to properly wear protective equipment.

**A.6.3.1.2(2)** These deformities can result in the potential for sudden incapacitation, the inability to properly wear protective equipment, and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.3.1.2(3)** Loss of or congenital absence of the bony substance of the skull can result in the inability to properly wear protective equipment and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.3.2.2(1)** Thoracic outlet syndrome can result in frequent episodes of pain or inability to safely perform work.

**A.6.3.2.2(2)** Congenital cysts, chronic draining fistulas, or similar lesions can result in the inability to properly wear protective equipment and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.3.2.2(3)** The contraction of neck muscles can result in the inability to properly wear protective equipment and the inability to safely perform functions as a member due to limitation of flexibility.

**A.6.4.1(1)** Far visual acuity is at least 20/30 binocular, corrected with contact lens or spectacles. Far visual acuity uncorrected is at least 20/40 binocular for wearers of hard contacts or spectacles. Successful long-term soft contact lens wearers (that is, 6 months without a problem) are not subject to the uncorrected standard. Inadequate far visual acuity can result in the failure to be able to read placards and street signs or to see and respond to imminently hazardous situations.

**A.6.4.1(2)** Persons with severe color vision loss will likely fail the acuity requirement. Formerly, color vision deficiency was listed as a Category B medical condition. However, it is felt that within most cases this condition will not affect the ability of a member to safely perform the essential functions of his or her job. The fire service physician should consider the color vision deficiency of the individual and consider the color vision requirements of the member's job and reach an individual determination.

**A.6.4.1(3)** Candidates with monocular vision are not allowed to drive per DOT/CDL regulations.

**A.6.4.2(1)** These diseases of the eye can result in the failure to read placards and street signs or to see and respond to imminently hazardous situations.

**A.6.4.2(2)** With retinal detachment, sufficient time (1 to 2 weeks for radial keratotomy and Lasik-type surgeries, and 3 months for retinal detachment) must have passed to allow stabilization of visual acuity and to ensure that there are no post-surgical complications. These ophthalmological procedures can result in the failure to be able to read placards and street signs or to see and respond to imminently hazardous situations.

**A.6.5** Currently, no hearing tests will allow the fire department physician to accurately predict whether the fire fighter will adequately be able to safely perform essential job duties. Job-specific hearing tests should be individualized for each department and its specific job functions. The following list of hearing-specific tasks can assist to direct development of hearing protocols:

(1) Understanding spoken commands, both over the radio and while wearing SCBA
(2) Hearing alarm signals, including building evacuation, low air alarm on the SCBA, and PASS alarms
(3) Hearing and locating the source of calls for assistance from victims or other fire fighters

All of these tasks will need to be performed with reasonably simulated incident scene background noise and SCBA noise. The inability to hear sounds of low intensity or to distinguish voice from background noise can lead to failure to respond to imminently hazardous situations. *(See 5.1.3.1.)*

**A.6.5.2(1)** Unequal hearing can result in the inability to localize sounds, leading to failure in the ability to safely perform search and rescue and other localization tasks.

**A.6.5.2(4)** Severe external otitis, that is, recurrent loss of hearing can result in the inability to hear sounds of low intensity or to distinguish voice from background noise, leading to failure to respond to imminently hazardous situations.

**A.6.5.2(5)** Severe agenesis or traumatic deformity of the auricle can result in the inability to properly wear protective equipment and the inability to hear sounds of low intensity or to distinguish voice from background noise, leading to failure to respond to imminently hazardous situations.

**A.6.5.2(6)** Severe mastoiditis or surgical deformity of the mastoid can result in the inability to properly wear protective equipment and the inability to hear sounds of low intensity or to distinguish voice from background noise, leading to failure to respond to imminently hazardous situations.

**A.6.5.2(7)** Ménière's syndrome or severe labyrinthitis can result in the potential for sudden incapacitation and the inability to safely perform job functions due to limitations of balance.

**A.6.5.2(8)** Otitis media (chronic) can result in frequent episodes of pain or the inability to safely perform work and the inability to hear sounds of low intensity or to distinguish voice from background noise, leading to failure to respond to imminently hazardous situations.

**A.6.6.2(1)** Diseases of the jaws or associated tissues can result in the inability to properly wear protective equipment.

**A.6.6.2(2)** The wearing of orthodontic appliances can result in the inability to properly wear protective equipment.

**A.6.6.2(3)** Extensive loss of oral tissues can result in the inability to properly wear protective equipment and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.6.2(4)** This condition can result in the inability to properly wear protective equipment and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.7.1(1)** A tracheostomy can result in the inability to properly wear protective equipment, the inability to safely perform job functions due to limitations of endurance, and the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.7.1(2)** Aphonia can result in the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.7.2(1)** A congenital or acquired deformity can result in the inability to properly wear protective equipment.

**A.6.7.2(2)** Allergic rhinitis can result in frequent episodes of pain, the inability to safely perform work, and the inability to safely perform functions as a member due to limitations of endurance.

**A.6.7.2(4)** Recurrent sinusitis can result in frequent episodes of pain and the inability to safely perform work.

**A.6.7.2(5)** Severe dysphonia can result in the inability to communicate effectively due to oropharyngeal dysfunction.

**A.6.8.1(5)** Chronic obstructive airways disease can result in the inability to safely perform functions as a member due to limitations of endurance.

**A.6.8.1(6)** Hypoxemic disorders can result in the inability to safely perform functions as a member due to limitations of endurance.

A.6.8.1(7)  Bronchial asthma or reactive airways disease can result in frequent episodes of pain or the inability to safely perform work, the potential for sudden incapacitation, and the inability to safely perform functions as a member due to limitations of endurance.

A.6.8.2(1)  These conditions can result in the inability to safely perform functions as a member due to limitations of strength or endurance and can result in the potential for sudden incapacitation.

A.6.8.2(3)  Fibrothorax, chest wall deformity, and diaphragm abnormalities can result in the inability to safely perform functions as a member due to limitations of endurance.

A.6.8.2(4)  Interstitial lung diseases can result in the inability to safely perform functions as a member due to limitations of endurance.

A.6.8.2(5)  Pulmonary vascular diseases and pulmonary embolism can result in frequent episodes of pain and the inability to safely perform functions as a member due to limitations of endurance.

A.6.8.2(6)  Bronchiectasis can result in the inability to safely perform functions as a member due to limitations of endurance.

A.6.9.1.1(1)  Angina pectoris can result in frequent episodes of pain or inability to safely perform work, progressive illness leading to functional impairment, and the potential for sudden incapacitation.

A.6.9.1.1(2)  Heart failure can result in frequent episodes of pain or inability to safely perform work, progressive illness leading to functional impairment, and the potential for sudden incapacitation.

A.6.9.1.1(3)  These conditions can result in frequent episodes of pain or the inability to safely perform work.

A.6.9.1.1(4)  Recurrent syncope can result in the potential for sudden incapacitation.

A.6.9.1.1(5)  A medical condition requiring an automatic implantable cardiac defibrillator can result in the potential for sudden incapacitation.

A.6.9.1.1(7)  If the person is pacemaker-dependent, then the risk for sudden failure due to trauma is not acceptable. Those with cardiac pacemakers can have the potential for sudden incapacitation.

A.6.9.1.2(1)  Specific recommendations include the following:

(1) *Mitral stenosis.* Mitral stenosis is acceptable if in sinus rhythm and stenosis is mild, that is, valve area is >1.5 cm$^2$ or pulmonary artery systolic pressure is <35 mm Hg.
(2) *Mitral insufficiency.* Mitral insufficiency is acceptable if in sinus rhythm with normal left ventricular size and function.
(3) *Aortic stenosis.* Aortic stenosis is acceptable if stenosis is mild, that is, mean aortic valvular pressure gradient is <20 mm Hg.
(4) *Aortic regurgitation.* Aortic regurgitation is acceptable if left ventricular size is normal or slightly increased and systolic function is normal.
(5) *Prosthetic valves.* Prosthetic valves are acceptable unless full anticoagulation is in effect.

A.6.9.1.2(2)  Recurrent paroxysmal tachycardia can result in the potential for sudden incapacitation and the inability to safely perform job functions due to limitations of strength or endurance.

A.6.9.1.2(3)  These blocks will result in disqualification unless exercise can be performed with an adequate heart rate response. They can result in frequent episodes of pain, the inability to safely perform work, and have the potential for sudden incapacitation.

A.6.9.1.2(6)  Ventricular tachycardia can result in the potential for sudden incapacitation and the inability to safely perform job functions due to limitations of strength or endurance.

A.6.9.1.2(7)  Hypertrophy of the heart can result in the potential for sudden incapacitation and the inability to safely perform job functions due to limitations of endurance.

A.6.9.1.2(8)  A history of a congenital abnormality that has been treated by surgery but with residual complications or that has not been treated by surgery, leaving residuals or complications can result in frequent episodes of pain or inability to safely perform work and the potential for sudden incapacitation.

A.6.9.1.2(9)  These conditions can result in the inability to safely perform job functions due to limitations of endurance.

A.6.9.2.1(1)  Hypertension that is uncontrolled, poorly controlled, or requires medication likely to interfere with the performance of duties. Hypertension is an illness that can lead to functional impairment and potential for sudden incapacitation.

A.6.9.2.1(2)  An aneurysm of the heart or major vessel, congenital or acquired, can result in inability to safely perform essential job tasks and the potential for sudden incapacitation.

A.6.9.2.1(4)  Peripheral vascular disease can impair sensation, can increase the likelihood of injury, and can result in frequent episodes of pain or the inability to safely perform essential job tasks due to limitations of endurance.

A.6.9.2.2(2)  Recurrent thrombophlebitis can result in frequent episodes of pain or the inability to safely perform work and the inability to safely perform functions as a member due to limitations of endurance.

A.6.9.2.2(3)  Chronic lymphedema can result in the inability to safely perform functions as a member due to limitations of endurance.

A.6.9.2.2(4)  Congenital or acquired lesions of the aorta or major vessels, for example, syphilitic aortitis, demonstrable atherosclerosis that interferes with circulation, and congenital acquired dilatation of the aorta, can result in the potential for sudden incapacitation and the inability to safely perform job functions due to limitations of endurance.

A.6.9.2.2(5)  Marked circulatory instability can result in the inability to safely perform job functions due to limitations of endurance and the inability to safely perform job functions due to limitations of balance.

A.6.10.2(1)  Cholecystitis (that which causes frequent pain due to stones or infection) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(2)  Gastritis (that which causes recurrent pain and impairment) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(3)  GI bleeding can cause fatigue and/or hemodynamic instability resulting in inability to safely perform work.

A.6.10.2(4)  Acute hepatitis (until resolution of acute hepatitis as determined by clinical examination and appropriate laboratory testing) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(5)(c)  The member should be evaluated for persistent abnormality causing increased risk of infection and/or strangulation.

A.6.10.2(6)  Inflammatory bowel disease (that which causes disabling pain or diarrhea) can result in frequent episodes of pain or the inability to safely perform work. It is a progressive illness leading to functional impairment.

A.6.10.2(7)  Intestinal obstruction (that is, recent obstruction with impairment) can result in frequent episodes of pain, the inability to safely perform work, and the potential for sudden incapacitation.

A.6.10.2(8)  Pancreatitis (chronic or recurrent) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(10)  A bowel resection (if frequent diarrhea precludes performance of duty) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(11)  A gastrointestinal ulcer (where symptoms are uncontrolled by drugs or surgery) can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(12)  The member should be evaluated for underlying disease, history of trauma, or associated infections.

A.6.10.2(13)  Cirrhosis, hepatic or biliary (that which is symptomatic or in danger of bleeding), can result in frequent episodes of pain or the inability to safely perform work.

A.6.10.2(14)  Chronic active hepatitis can result in weakness, general malaise, or the inability to safely perform work.

A.6.11  See B.1.2.1.

A.6.14.2(1)  The member should be evaluated for residual instability (subluxation) or significant limitation of motion.

A.6.14.2(4)  The member should be evaluated for residual instability or laxity of ligament or intra-articular arthritis, which could cause instability in limb, inadequate range of motion, or increased pain, or use would limit crawling, kneeling, jumping, safe ladder use, or safe stretcher carrying.

A.6.14.2(5)  The member should be evaluated for residual signs or symptoms (e.g., pain, swelling, atrophy, range of motion, gait).

A.6.14.2(6)  The member should be evaluated for resulting functional impairment, disease activity, and chronicity.

A.6.15.1(4)  Candidate must be free of clinical disease for 3 years, neurologic exam must be normal, and candidate must not require drugs that can impair ability to safely perform essential job tasks. In considering performance of essential job tasks, the impact of the operational environment (e.g., heat, stress, activity, variable night shifts) on exacerbations must be considered and specifically addressed by the neurological specialist and the medical officer.

A.6.15.1(5)  The candidate must be free of clinical disease for 3 years and off all drug and other treatment. Cognitive function, neurologic exam, and respiratory status must all be normal and the candidate must be free of disease exacerbations for 3 years and off all drug treatment.

A.6.15.2(2)  Exam and imaging studies must be normal and medications needed to control chronic pain will not affect neurologic or cardiac function (energy, cognitive ability, equilibrium, etc.). Examples include the following:

(1)  Neuropathy (cranial, peripheral, plexus, etc.). Motor and sensory neurological exams and diagnostic/imaging studies (as needed) must be normal and medications needed to control pain will not affect nervous system function (energy, cognitive ability, equilibrium, etc.).
(2)  Myopathy and/or myositis. Motor strength is normal, pain is controlled without narcotics, renal function is normal, and neither heart nor diaphragm is involved.
(3)  History of infectious myo-neuropathies (e.g., Guillain-Barre, post-botulism, post-polio syndrome). Cognitive function, neurologic exam, and diagnostic imaging studies (as needed) must be normal.

A.6.16.2(1)  The member should be evaluated for severity, chronicity, pain, likelihood of serious occupational infectious exposure, requirement for continuous medication, and impairment of ability to safely perform essential job tasks.

A.6.16.2(2)  The member should be evaluated for thinned, stretched skin that is at risk for easy breakdown, burn damage, abnormal sensations, or infection.

A.6.16.2(3)  The member should be evaluated for systemic involvement, skin involvement that interferes with function, or if localized complications such as fissures, weeping, or ulcerations are present due to risk of burn injury and/or infection.

A.6.16.2(4)  The member should be evaluated for associated systemic lupus, skin integrity, and Raynaud's phenomenon.

A.6.16.2(5)  The member should be evaluated for functional limitation of hand and/or foot when exposed to cold or systemic involvement of skin, muscles, heart, lungs, or joints.

A.6.16.2(6)  The member should be evaluated for sclerodactyly with significant loss of function or systemic involvement.

A.6.16.2(7)  The member should be evaluated for associated leg swelling, loss of function, or systemic involvement.

A.6.16.2(8)  The member should be evaluated for percent body involvement with redness and scaling, requirement for regular application of lubrication/medication, and/or potential effect on performance of essential job tasks.

A.6.16.2(9)  The member should be evaluated for extent, severity, chronicity, and known precipitants with attention to potential risk of serious, occupational infectious exposures or other interference with safe performance of essential job tasks.

A.6.16.2(10)  The member should be evaluated for swelling, redness, scaling, itching, weeping, and/or cracking, pain, loss of function (e.g., cannot stand for long periods of time), or ulceration.

A.6.16.2(11)  The member should be evaluated for functional limitations, ability to wear helmet, SCBA facepiece and protective clothing, and requirements for continuous treatment.

A.6.16.2(12)  The member should be evaluated for extent, chronicity, and interference with essential job task performance.

A.6.16.2(13)  The member should be evaluated for extent, chronicity, pain, ability to wear protective ensemble, and risk of occupational infectious exposure.

A.6.16.2(14)  The member should be evaluated for extent and acuity of blistering, loss of function, aggravating agent(s) if known, ability to wear protective ensemble, ability to tolerate moderate, incidental, job-related trauma to skin, risk of occupational infectious exposure, or inability to safely perform essential job tasks.

A.6.16.2(15)  The member should be evaluated for severity, chronicity, association with underlying medical condition, and requirement for medications (antihistamines) that interfere with ability to safely perform essential job tasks.

A.6.18.1(2)  A Hemoglobin A1C <6.5 is a reasonable serum blood test of diabetes control according to the American Diabetes Association.

A.6.18.2(1)  The member should be evaluated for absence of orthostatic hypotension, electrolyte disorders, ability to maintain hydration during exercise under extreme environmental conditions, and for normal thyroxine levels with supplementation.

A.6.19.2(2)  Previous burn injury per se does not interfere with the essential job tasks of fire fighting. Extensive burn injury with or without the need for skin grafting can result in skin surfaces that are easily damaged, sensitive to chemical or solvent exposure, or lacking in sweat or sebaceous glands. The member should be evaluated for heat or cold intolerance, range of motion and motor strength, and ability to wear personal protective clothing and equipment.

A.6.20.2(1)  The member should be evaluated for space-occupying lesion, treatment, or sequelae affecting ability to perform essential job tasks.

A.6.20.2(2)  The member should be evaluated for history or risk of seizure, residual effects on balance, coordination, strength, speech, judgment, and medication requirements.

A.6.20.2(3)  The member should be evaluated for ability to wear SCBA and maintain nutrition and oral hydration.

A.6.20.2(4)  The member should be evaluated for residual pulmonary function and medication requirements.

A.6.20.2(5)  The member should be evaluated for abnormal bowel or urinary function that would interfere with emergency operations where toilet facilities are unavailable, ability to maintain nutrition and hydration, and medication requirements.

A.6.20.2(6)  The member should be evaluated for muscle strength, deformity interfering with function, or ability to wear protective ensemble.

A.6.20.2(7)  The member should be evaluated for anemia, leukopenia, or thrombocytopenia, residual cardiac, pulmonary, GI, dermatological or neurological effects of surgery, radiation, or chemotherapy.

A.6.22.2  The member should be evaluated for underlying condition requiring the medication and effects of medication that could affect ability to safely perform essential job tasks.

A.7.1.3  A department should set protocols regarding length of time absent from duty and/or medical conditions that require the department physician to evaluate a member. Physical therapy, strength training, work hardening, functional capacity evaluations, and alternate duty are all activities that can be helpful.

A.7.2.2(5)  Universal agreement exists that wellness, fitness, and risk reduction for cardiovascular disease, pulmonary disease, and cancer can be reduced by tobacco abstinence, regular exercise, and control of weight, hypertension, cholesterol, and blood sugar. The annual medical evaluation should serve as one of many opportunities in the fire department to modify these risk factors. Clearly, risk reduction is easier if there is early intervention and if the department promotes wellness and fitness. Tobacco cessation programs should be available to the member, and all fire department facilities should be tobacco-free zones. Control of weight, hypertension, cholesterol, and blood sugar are all improved with dietary education and regular exercise.

A.7.6.2  If performing these tests as part of an automated panel that includes additional tests is more cost effective, it is acceptable to do so.

A.7.7.1  Pulmonary spirometry is an essential part of the annual medical evaluation of fire fighters while wearing personal protective clothing and SCBA. Spirometric measures include the forced vital capacity (FVC), the forced expiratory volume at 1 second ($FEV_1$), and the calculated $FEV_1/FVC$ ratio. Other spirometric measures of small airway flow limitations (e.g., FEF 25% to 75%) should not be used for screening evaluations. For spirometric measurements to be properly interpreted, they need to be performed according to American Thoracic Society recommendations. Modern spirometry allows for this through the use of computer-assisted quality control of both calibration and testing procedures. Based on American Thoracic Society criteria, a normal FVC or $FEV_1$ is within the range of 80 to 120 percent of predicted and minimal reductions are between 60 and 79 percent of predicted. Thus, when the FVC or $FEV_1$ is reduced below 60 percent of predicted, substantial dysfunction is present. For this reason, the American Thoracic Society considers moderate chronic obstructive pulmonary disease to be present when the $FEV_1/FVC$ ratio is 0.45 to 0.59 (absolute ratio rather than percent of predicted) and severe chronic obstructive pulmonary disease to be present when the $FEV_1/FVC$ ratio is <0.45 (absolute ratio rather than percent of predicted). Moderate to severe restriction is defined by an FVC <0.60 percent of predicted with an $FEV_1/FVC$ ratio >0.80. In certain cases, additional pulmonary function testing can be required such as pre- and post-spirometry, lung volumes, diffusing capacity, exercise testing, and/or challenge testing but these tests are not screening tests and should be performed in a laboratory setting by an experienced specialist.

A.7.7.3  See D.2.4.

A.7.9.1  Baseline resting electrocardiography should be conducted. (Periodic resting electrocardiograms have not been shown to be useful but can be reasonable as a member's age increases.)

A.7.9.3  No firm guidelines for stress electrocardiography in asymptomatic individuals have been developed. False-positive results from this testing have been a problem, especially in younger age groups and in women. In those with two or more risk factors for coronary artery disease [hypercholesterolemia (total cholesterol greater than 240 mg/dl), hypertension (systolic blood pressure greater than 90 mmHg), smoking, diabetes mellitus, or family history of premature coronary artery disease (heart attack or sudden cardiac death in a first degree relative less than 60 years old)], there is probable justification for performing the testing. As well, stress tests are more important in those whose work deals with public safety.

Stress tests can be performed using a treadmill, bicycle, or stair climber as long as the protocol being used gradually increases in workload metabolic equivalent of resting energy expenditure (METS). A submaximal test, with the endpoint being the attainment of 85 percent of predicted maximal heart rate (PMHR), can be performed. Additional information gained by performing a maximal symptom-limited test might not be worth the additional time, effort, cost, and risk.

A.7.11(1)  An annual TB program should include the following:

(1) Documentation of a two-step purified protein derivative (PPD) prior to this PPD or a 0-mm PPD within the past year.
(2) Placement of PPD and reading by a trained, designated reader within 48 hours to 72 hours of placement. Members with a history of positive PPD should fill out a questionnaire.
(3) PPD results should be documented in millimeters (mm). A test with no skin reaction should be recorded as 0 mm.
(4) A PPD skin test will be considered positive if the following conditions are present:
    (a) Greater than 5 mm in someone who is immunosuppressed
    (b) Greater than 10 mm in someone with a normal immune system who is at risk for conversion due to an exposure
    (c) Greater than 10-mm increase from previous reading
(5) If PPD is positive (conversion), the following steps should be taken:
    (a) Fill out questionnaire
    (b) Obtain chest X-ray
    (c) Evaluate for active disease
    (d) Evaluate for preventative therapy
(6) If active disease is diagnosed, the member has to be removed from any duty until he/she has been determined to be noninfectious. This will occur when adequate therapy has been instituted, the cough has resolved, and 3 consecutive sputum smears for acid-fast bacillus (AFB) on different days are negative.

In the event of an exposure to TB, the following steps should be taken:

(1) Member should receive a PPD within 14 days of exposure. Members with a history of positive PPD should fill out a TB questionnaire.
(2) Repeat PPD or questionnaire should be done 6 weeks to 12 weeks after the first.
(3) If PPD is positive (conversion) or questionnaire is positive, proceed as per (5) and (6).

A.7.11(11)  Physicians who care for members need to be familiar and up-to-date with the most current recommendations for post-exposure prophylaxis (PEP) for bloodborne pathogen (BBP) exposures. Also, there should be a written protocol for dealing with members who present with BBP exposures. The protocol should be based on the following elements:

(1) Fact sheet that explains in lay language the risks of infection, the various prophylactic and therapeutic options, the testing and follow-up that will be needed, and recommendations for personal behavior (i.e., safe sex, blood donation, and so forth) following an exposure.

(2) Classification table to determine the exposure type and recommendation for prophylaxis.
(3) Current recommendations of U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, and Public Health Services.
(4) Listing of testing to be done on exposed member, including the following:
    (a) HIV
    (b) Hepatitis B surface Antibody (HBsAb), if not previously known to be positive
    (c) Hepatitis B surface Antigen (HBsAg), if not previously known to be positive HBsAb
    (d) Hepatitis C Antibody (HCAb)
    (e) If HIV prophylaxis is to be given, the following tests should be done:
        i. CBC
        ii. Glucose, renal, and hepatic chemical function
        iii. Pregnancy test for females
(5) Listing of testing to be done on source patient, including the following:
    (a) HIV
    (b) HBsAg
    (c) HCAb
(6) If source is available, interview for HIV, HepB, and HepC risk/status.
(7) Determination of risk and need for PEP.
(8) Member counseling regarding PEP medication(s) and side effects of treatment. A printed fact sheet should be available for the member to review.
(9) If PEP prophylaxis is to be given, it should be done as soon as possible after the incident, preferably within 2 hours.
(10) Members on prophylaxis need to be followed for the duration of their treatment.
(11) Assessment of tetanus status and administration of dT booster, if appropriate.
(12) Assess HepB status as follows:
    (a) If previously immunized with a positive post-immunization titer, no further treatment is needed.
    (b) If previously immunized, titer was negative, and source is HBsAg positive or high risk, give Hepatitis B Immune Globulin (HBIG) as soon as possible, preferably within 24 hours, and a dose of Hepatitis B vaccine.
    (c) If previously immunized and titer is unknown, draw titer.
        i. If titer is positive, no further treatment is needed.
        ii. If titer is negative and source is HBsAg positive or high risk, then give HBIG as soon as possible, preferably within 24 hours, and a dose of Hepatitis B vaccine.
        iii. If previously immunized with negative titer and revaccinated with a negative titer, give HBIG immediately and a second dose 1 month later.
        iv. If never immunized, give HBIG and begin Hepatitis B vaccine series.
(13) Follow-up instructions should include the following:
    (a) Adverse events and side effects of PEP
    (b) Signs and symptoms of retroviral illness (fever, adenopathy, rash)

(c) Appointments for follow-up blood work, including the following:

   i. HIV at 6 weeks, 3 months, 6 months, and 9 months

   ii. HBsAb and/or HCAb at 6 weeks, 3 months, and 6 months, if source is HepB and/or HepC positive

   iii. Every other week CBC, renal and liver function, if receiving PEP

**A.7.11(12)** For further guidelines and requirements also refer to local and state Department of Health and the Centers for Disease Control (CDC).

**A.8.1.1** Besides the methods of determination of body fat mentioned in 8.1.2, other cruder methods have been used. Insurance companies have used height–weight tables to estimate risk of mortality. These tables of "ideal" weight for a given height simply reflect the norm for the U.S. population without consideration of relationship of the norm to health or fitness. Another means of determining obesity that has more scientific basis is the measurement of body mass index (BMI) or the Quetelet index. This is defined as body weight in kilograms divided by height in meters squared. Studies have shown that the Quetelet index correlates rather well ($r = 0.70$) with actual measurement of body fat from hydrostatic weighing — better than do height–weight tables. BMI also correlates with risks associated with obesity. Some experts feel that the major limitation of the body mass index is that it is difficult to interpret to patients and to use in counseling about weight loss. It does have the advantage of being more precise than weight tables and of permitting comparison of populations. However, skinfold measurements correlate more highly with data from hydrostatic weighing, measuring percent body fat, and are thus more accurate for fat-related classification than the Quetelet index. Researchers from The Panel on Energy, Obesity, and Body Weight Standards have recommended that Table A.8.1.1 be used when using the Quetelet index for obesity classification.

Table A.8.1.1 Quetelet Index for Obesity

| BMI (kg/m²) | Classifications |
|---|---|
| 20–25 | Desirable range for men and women |
| 25–29.9 | Grade 1 Obesity |
| 30–40 | Grade 2 Obesity |
| >40 | Grade 3 Obesity (morbid obesity) |

The health risks associated with obesity begin in the range of 25 to 30 kg/m². For example, someone with a large fat-free mass (e.g., a bodybuilder) would be classified by the Quetelet index as obese, though not to the same extent as he/she would with relative weight or the height–weight tables. Another example of exception to this standard would be members of the Phoenix Fire Department, whose average BMI is 28. This would place the members in the mildly obese range, yet on their fitness evaluations they score in the excellent range.

**A.8.1.2(1)** A number of researchers have found that the ratio of waist-to-hip circumference (WHR) and the following circumference measurements are an accurate and convenient method of determining the type of obesity present:

(1) Abdomen I (males) over the umbilicus

(2) Abdomen II (females) just below the umbilicus, at the narrowest portion of the waistline below the ribs and above hips with the abdomen relaxed

The guide for measurement is as follows:

(1) Hips at the widest part below the waist; landmark is the greater trochanter, feet should be together.

(2) Neck just below the larynx perpendicular to the long axis of the neck.

Equations for body fat prediction from circumferences and height measured in inches are as follows:

Males (N = 592; R = 90; S.E. meas = 3.52% fat) % fat = + [85.20969 × log (abdomen I circumference − neck circumference)] − [69.73016 × log (height)] + 37.26673

Females = + [161.27327 × log (abdomen II circumference + hip − neck circumference)] − [100.81032 × log (height)] − 69.55016

**A.8.1.2(3)** The most widely used method for determining obesity is based on the thickness of skinfolds. The measures, when performed correctly, have a high correlation ($r = 0.80+$) with body density from underwater weighing.

Many researchers in the United States (including those performing the large national surveys of the U.S. population that form the basis for normative data worldwide) take skinfold measurements on the right side of the body. UK and European investigators, on the other hand, tend to take measurements on the left side of the body. Most research, however, reveals that it matters little on which side measurements are taken.

A suggested way to conduct measurements is as follows:

(1) As a general rule, those with little experience in skinfold measurement should mark the site to be measured with a black felt pen. A flexible steel tape can be used with sites when it is necessary to locate a bodily midpoint. With experience, however, the sites can be located without marking.

(2) The measurer should feel the site prior to measurement, to familiarize himself and the person being measured with the area where the skinfold will be taken.

(3) The skinfold should be firmly grasped by the thumb and index finger of the left hand and pulled away from the body. While this is usually easy with thin people, it is much harder with the obese, and can be somewhat uncomfortable for the person being tested. The amount of tissue pinched up must be enough to form a fold with approximately parallel sides. The thicker the fat layer under the skin, the wider the necessary fold (and the more separation needed between thumb and index finger).

(4) The caliper is held in the right hand, perpendicular to the skinfold and with the skinfold dial facing up and easily readable. The caliper heads should be placed ¼ in. to ½ in. away from the fingers holding the skinfold, so that the pressure of the caliper will not be affected.

(5) The skinfold caliper should not be placed too deep into the skinfold or too far away on the tip of the skinfold. Try to visualize where a true double fold of skin thickness is and place the caliper heads there. It is good practice to position the caliper arms one at a time, first the fixed arm on one side and then the lever arm on the other.

(6) The dial is read approximately 4 seconds after the pressure from your hand has been released on the lever arm of the caliper jaw.

(7) A minimum of two measurements should be taken at each site. Measurements should be at least 15 seconds apart to allow the skinfold site to return to normal. If consecutive measurements vary by more than 1 mm, more should be taken until there is consistency.

(8) Maintain the pressure with the thumb and forefinger throughout each measurement.

(9) When measuring the obese, it can be impossible to elevate a skinfold with parallel sides, particularly over the abdomen. In this situation, try using both hands to pull the skinfold away while a partner attempts to measure the width. If the skinfold is too wide for the calipers, underwater weighing or another technique will have to be used.

(10) Measurements should not be taken when the skin is moist because there is a tendency to grasp extra skin, obtaining inaccurately large values. Also measurements should not be taken immediately after exercise or when the person being measured is overheated, because the shift of body fluid to the skin will inflate normal skinfold size.

(11) It takes practice to be able to grasp the same amount of skinfold consistently at the same location every time. Accuracy can be tested by having several technicians take the same measurements and comparing results. It can take up to 20 to 50 practice sessions to become proficient. Calipers should be accurately calibrated and have constant pressure of 10 g/mm$^2$ throughout the full measurement range. The accuracy of skinfold measurements can be reduced by many factors, including measurement at the wrong sites, inconsistencies among different calipers and testers, and the use of inconsistent equations. However, when testers practice together and take care to standardize their testing procedures, inconsistencies among testers can usually be held under 1 percent.

**A.8.2.1 Fitness Evaluation for Members.** Fitness evaluations shall be mandatory for all members, shall be part of a comprehensive fitness and wellness program as required by NFPA 1583, and shall be conducted under the auspices of the fire department physician. The actual evaluations may be performed by the fire department's fitness personnel. All data collected by the evaluator(s) are considered clinical in nature and are to be maintained in the member's confidential medical file. Protocols for assessment of fitness levels of members are outlined in Annex C.

**A.8.2.1.1** See C.2.1.1.1 for the protocol.

**A.8.2.1.2(1)** See C.2.1.1.1.3 for the protocol.

**A.8.2.1.2(2)** See C.2.1.1.1.4 for the protocol.

**A.8.2.1.2(3)** See C.2.1.1.1.5 for the protocol.

**A.8.2.1.3(1)** See C.2.1.1.1.6 for the protocol.

**A.8.2.1.3(2)** See C.2.1.1.1.7 for the protocol.

**A.8.2.1.4** See C.2.1.1.1.8 for the protocol.

**A.9.1(1)** A member, while wearing full protective clothing (turnout coat and pants, helmet, boots, and gloves) and SCBA, is required to safely perform a variety of fire-fighting tasks that require upper body strength and aerobic capacity. For those not familiar with fire suppression, the following specific details inherent to the activities in essential job task 1 are offered:

(1) Lifting and carrying tools and equipment (e.g., axe, halligan tool, pike pole, chain saw, circular saw, rabbet tool, high-rise pack and hose) that weigh between 7 and 20 lb and are used in a chopping motion over the head, extended in front of the body, or in a push/pull motion.

(2) Advancing a 1¾ in. or a 2½ in. diameter hose line, which requires lifting, carrying, and pulling the hose at grade, below or above grade, or up ladders. In addition to the weight of the hose itself, a 50 ft section of charged 1¾ in. hose contains approximately 90 lb of water, and a 50-ft section of 2½ in. hose holds approximately 130 lb of water.

(3) Performing forcible entry while utilizing tools and equipment (e.g., axe, halligan tool, chain saw, circular saw, or rabbet tool) that requires chopping, pulling, or operating these items to open doors, windows, or other barriers to gain access to victims, possible victims, or to initiate fire-fighting operations.

(4) Performing ventilation (horizontal or vertical) utilizing tools and equipment (e.g., axe, circular saw, chain saw, pike pole) while operating on a flat or pitched roof or operating off a ground or aerial ladder. This task requires the fire fighter to chop or push tools through roofs, walls, or windows.

Other tasks that could be performed can include search and rescue operations and other emergency response actions under stressful conditions, including working in extremely hot and cold environments for prolonged time periods.

**A.9.3.2** Possible accommodations include but are not limited to changes in assignment, provision of devices, revision of SOPs, and/or schedules.

**A.9.4** The medical conditions relating to the cardiovascular system have been reviewed since the previous edition (2000) of this document. The task forces at the Bethesda Conference published recommendations for athletes competing with cardiovascular disease in the *Journal of the American College of Cardiology*, in October 1994. The analysis used by the task force has relevance to the evaluation of members with cardiovascular disease. Fire-fighting activities have a high static component (i.e., inducing predominantly an increase in blood pressure) and a moderate to high dynamic component (i.e., inducing predominantly an increase in heart rate). Sports with a similar set of demands include wrestling, body building, and boxing. Recommendations made by the task force with respect to athletic activities that have these physical demands (high static, moderate dynamic) have been followed in this document.

Performance of the aerobic and anaerobic critical job tasks in a stressful, noxious fire or rescue environment with low oxygen, high carbon monoxide, and numerous toxic gases has significant risk for acutely aggravating pre-existing arrhythmias and cardiac ischemia (oxygen delivery), and decreasing cardiac valve or muscle function (oxygen supply). To protect from this environment requires that the fire fighter wear personal protective equipment (PPE) and SCBA. The PPE provides a thermal barrier at the cost of added weight, encapsulation, dehydration, and increased metabolic cost for a given workload. The SCBA is a positive pressure demand valve respirator that provides a barrier against the inhalation of noxious/toxic gases and particulate matter but at increased metabolic cost due to its weight and increased respiratory workload. Fire-fighting activities have a high static component (i.e., inducing predominantly an increase in blood pressure) and a moderate

to high dynamic component (i.e., inducing predominantly an increase in heart rate). These factors increase physiologic stress and cardiac demand and can precipitate acute cardiac collapse, heart attack, syncope (black-out), or sudden death. In the absence of sudden death, the fact that the fire fighter was operating in an isolated, dangerous environment when a cardiac event occurred would make the subsequent risk for such an event leading to death unacceptably high for that fire fighter, for the civilian who depends upon that fire fighter, or for other fire fighters who not only depend upon that fire fighter but can also be called upon to rescue that fire fighter.

**A.9.4.2(7)** Syncope first episode must be fully evaluated to determine that the underlying cause does not compromise a member's ability to safely perform essential job tasks. Underlying neurologic, cardiovascular, circulatory, and/or endocrine disturbance must be ruled out. If after evaluation there is no evidence for underlying disease, exam is normal, and there has been no reoccurrence, then the member need not be restricted from performing essential job tasks. If underlying disease is present and not reversible, then the member may not safely perform essential job tasks 1, 4, 5, 7, 8, 9, and 13 due to risk for life-threatening sudden incapacitation *(for additional recommendations, see section relevant to the underlying disease)*. If recurrent and no underlying disease, then the member may not safely perform essential job tasks 1, 4, 5, 7, 8, 9, and 13.

**A.9.4.2(8)** This technology has not been FDA approved for operating effectively under conditions commonly found on the fire ground (electromagnetic interference). In addition, the requirement for pacemaker or implantable defibrillator defines the underlying cardiac condition as life threatening. Many pacemakers do not have the ability to automatically increase heart rate upon demand during the critical job tasks performed on the fire ground.

**A.9.4.2(14)** Evaluation with EKG, holter monitor, and/or stress test should be further supplemented with electrophysiologic study (EPS). If rapid supraventricular tachycardia is inducible and surgical ablation is successful, there is no medical reason to restrict the member from performing essential job task 13.

**A.9.4.2(15)** Even if rate controlled (with or without medication), the added catecholamine stress and dehydration produced when performing critical job tasks on the fire ground makes the potential for life-threatening sudden incapacitation associated with this rhythm disturbance too great a risk. If persistent or recurrent, these arrhythmias, even if rate controlled, can result in embolic events, which prevent the successful and safe performance of critical job tasks on the fire ground or during emergency responses.

**A.9.4.2(18)** Severe uncontrolled hypertension is a significant risk factor for the development of coronary artery disease, congestive heart failure, and stroke. Blood pressure increases as a normal response to exercise. This response is further exaggerated by the emotional and physical stress of performing these critical tasks while operating in personal protective clothing at extremes of temperature. This normal elevation of blood pressure under these response conditions can lead to life-threatening hypertensive emergencies if a member's daily blood pressure is already elevated to high levels. In addition, hypertension is a progressive illness that, when uncontrolled, ultimately and inevitably leads to target organ damage. Target organs that are sensitive to the effects of elevated blood pres-

sure are the central nervous system, vision, heart, major blood vessels, and kidneys.

**A.9.6** All disorders of the hypothalamic-pituitary-adrenal axis can potentially affect fire fighters because these hormonal systems play an essential role in maintaining homeostasis when exposed to physiologic and emotional stress while performing critical tasks on the fire ground or during emergency operations. Homeostatic regulation is further impaired under conditions of extreme temperature and dehydration, both of which are common when performing the critical tasks of fire fighting while wearing personal protective clothing on the fire ground.

Without treatment, the risk of life-threatening dehydration, extreme alterations in body temperature, electrolyte disturbances, and muscle weakness while operating at a fire scene is unacceptably high. Mineralocorticoid deficiency also increases the risk of life-threatening hypotension and/or arrhythmias associated with exertion and dehydration. For this reason, untreated or uncorrected hypothalamic, hypopituitarism, hypothyroidism, hyperthyroidism, thyroid storm, hypoadrenalism, hyperadrenalism, parathyroidism, and other disorders of thyroid and adrenal function threaten a member's ability to safely perform essential job tasks.

**A.9.6.2(1)** Insulin-requiring diabetics, regardless of usual glycemic control on medication(s), are not able to safely perform certain essential job tasks on the fire ground during prolonged incidents due to the precipitous nature of the progression from early hypoglycemic symptoms to complete incapacitation. There is generally no safe access to food while wearing respiratory protection in a hazardous environment, and it is not always possible to exit a hazard zone rapidly enough to treat hypoglycemic symptoms before complete incapacitation occurs. Unpredictable meal schedules, periods of physical exertion, adrenergic stimulation, and sleep deprivation all compound the likelihood of incapacitating hypoglycemia on the fire ground. Members engaged in fire suppression are at greater risk than those engaged in other emergency activities (EMS, law enforcement) for this reason.

A major concern for diabetic fire fighters is the risk of becoming hypoglycemic during fire ground operations or other emergency responses. Both exogenous insulin and oral hypoglycemic agents can be associated with episodes of hypoglycemia that can progress from impaired judgment to unconsciousness. In one study of insulin-dependent adolescents conducted at the Joslin Clinic, all 196 patients experienced hypoglycemia at least once during the 2-year observation period. Of these, 15 percent were classified as severe, based on loss of consciousness, seizure, or the clinical need for therapeutic glucagon or intravenous glucose. It was of particular concern that 24 percent of hypoglycemic episodes detected by blood glucose monitoring were not apparent to the patients. The probable causes of hypoglycemia were identified in 71 percent of cases, and the most common were strenuous exercise and skipped meals or snacks. Both of these precipitants are likely to occur in emergency responders, especially fire service personnel. In addition to accelerating glucose utilization, strenuous exercise increases insulin sensitivity.

Physicians strongly encourage tighter glucose control to decrease and delay onset of diabetic complications. However, with more aggressive treatment, there is concomitantly increased likelihood of exercise-induced hypoglycemia. In sharp contrast to the general population or even competitive athletes with diabetes requiring medication, fire fighters are

not capable of maintaining scheduled food intake during emergency operations, and their physical exertion (time of onset, duration, or extent) is not predictable. Furthermore and again in contrast to the general population or competitive athletes, the warning signs of hypoglycemia (diaphoresis, weakness, fatigue, dizziness, tachycardia, and thirst) are experienced by most fire fighters operating on the fire ground, and can therefore be ignored, possibly progressing to life-threatening incapacitation.

Type II diabetics controlled with diet and/or exercise or by oral hypoglycemics are at far less risk for life-threatening hypoglycemia and sudden incapacitation than either Type I or Type II diabetics requiring insulin therapy. Very large studies place the risk of symptomatic hypoglycemia among patients on oral agents alone at less than 2 percent annually. Incapacitating hypoglycemia is quite rare in this group and occurs almost exclusively in patients over the age of 65, those with significant renal impairment, and those on medications that potentiate the effects or interfere with the metabolism of the sulfonylureas. Additionally, the counter-regulatory hormonal responses in non-insulin dependent diabetics are not altered following episodes of hypoglycemia as they are with insulin use. This population therefore tends to remain more sensitive to early clinical signs of hypoglycemia. Recent studies have also documented that diabetics using oral agents, even very long acting forms such as glipizide, are able to safely perform moderate exercise while fasting without chemical or symptomatic hypoglycemia. There are no studies that approximate the exercise intensity of fire fighting, but exercise durations have exceeded 90 minutes in some experiments.

Non-insulin dependent diabetic members should be carefully monitored for control of blood sugar because lack of glycemic control increases the risk for dehydration, hypotension, and target organ damage (e.g., myocardial infarction) that can result in life-threatening sudden incapacitation during performance of critical job tasks. Such members should be monitored at regular intervals to ascertain that blood glucose and blood hemoglobin A1C levels remain under control. Special attention should be paid to the occasional use of medications, including antibiotics, in members on oral hypoglycemic agents. The risk of symptomatic hypoglycemia in these individuals is increased but has not been quantified.

A.9.7  Theoretically, respiratory protection from this environment is afforded by SCBA use. Experience shows that SCBA are frequently taken off to improve visibility and that SCBA air supply is often not sufficient to last the entire time spent fighting a fire. Thus, performance of essential job tasks is regularly done for short periods of time in a noxious fire or hazardous materials environment with high carbon monoxide, noxious/toxic gases, and irritants. Working in this environment has added potential for increasing carbon monoxide levels, decreasing oxygen levels, and reducing oxygen delivery, and the extent of this reduction and resulting risk is directly related to the degree of dysfunctional gas exchange already present prior to the performance of these essential job tasks. It also has potential for acutely aggravating pre-existing airway hyperreactivity commonly found in patients with even mild asthma and other obstructive pulmonary conditions (bronchitis, etc.). Acute hyperreactivity in this environment is likely to induce immediate clinical asthma (bronchospasm and wheeze) with a significant increased work of breathing and gas exchange abnormalities. Respiratory insufficiency, no matter the cause, has the potential for arrhythmias, cardiac ischemia (oxygen delivery), decreased respiratory and cardiac function

(oxygen delivery to tissues), acidosis, and life-threatening sudden incapacitation.

A.9.7.2(3)  Asthma as defined by reversible bronchospasm can be a brief episode lasting days to months following irritant or infectious exposure. When this occurs without prior history, it most likely will resolve over the next few weeks or months. Asthma as a chronic condition is suspected when there is a clinical history of recurrent reversible bronchospasm or longstanding reversible bronchospasm. Like coronary artery disease, asthma is a disease with potential devastating consequence, on the fire ground or hazardous materials environment. When suspected, asthma can be confirmed by spirometry showing obstructive airway flow limitations with a positive bronchodilator response (>12 percent and 200 ml increase in $FEV_1$) or when spirometry is normal or minimally reduced, airway hyperreactivity can be demonstrated by abnormal provocative challenge testing to cold air, exercise, or methacholine (≥20 percent decline in $FEV_1$). Challenge testing is not a screening test and should not be performed in members or candidates without a history suggestive of asthma. Challenge testing should only be performed by an experienced specialist and should never be performed in members with severe pulmonary dysfunction since life-threatening bronchospasm can result. Response to bronchodilators in a laboratory helps to confirm the presence of asthma but should not be used to allow continued performance of essential job tasks on the fire ground or hazardous materials environment.

A.9.7.2(4)  A member with current or recent history of clinically evident reversible bronchospasm and persistent airway hyperreactivity is no different from a nonallergic asthmatic in their inability to safely perform the essential job tasks of fire fighting on the fire ground or hazardous materials environment. Two caveats exist. First, some members could have a distant history of allergic asthma, are unlikely to be exposed to this allergen again, or have successfully been desensitized by an allergist. These members, if asymptomatic off asthma medications for more than 5 years, can perform all essential job tasks with reasonable safety. If asthma is still suspected, then airway hyperreactivity can be assessed by provocative challenge testing. In this case, challenge testing should be to general irritants (cold air, methacholine, etc.) and not to specific allergens, as the risk for life-threatening asthma during a specific challenge test clearly outweighs the benefit. Second, members can have allergic sinus or skin conditions without a history or suspicion of clinical asthma. These members do not require provocative challenge testing unless asthma is suspected.

A.9.7.2(5)  Based on American Thoracic Society criteria, moderately severe chronic obstructive pulmonary disease is characterized by an $FEV_1/FVC$ ratio of 0.45 to 0.59 (absolute ratio rather than percent of predicted) and severe chronic obstructive pulmonary disease by an $FEV_1/FVC$ ratio of <0.45 (absolute ratio rather than percent of predicted) on spirometry. Additional tests that can be of value are lung volumes, diffusing capacity, chest radiograph, and chest CT scan. With moderate to severe chronic obstructive pulmonary disease, elevated respiratory workload and lack of respiratory reserve will not provide adequate gas exchange for the safe performance of essential job tasks. Working in this environment has the potential for increasing carbon monoxide levels, decreasing oxygen levels, and reducing oxygen delivery, and the extent of this reduction and resulting risk is directly related to the degree of dysfunctional gas exchange already present prior to the performance of these essential job tasks. It also has the likely potential for acutely aggravating pre-existing airway hyperreactivity commonly found in patients with chronic obstructive pulmonary diseases (bronchitis, etc.). Acute hyper-

reactivity in this environment can induce immediate or progressive clinical asthma (bronchospasm and wheeze) that can lead to sudden incapacitation from status asthmaticus and/or cardiac ischemia. In contrast, asymptomatic members with mild chronic obstructive pulmonary disease ($FEV_1$/FVC ratio of 0.60 to 0.79) should be able to safely perform the essential job tasks. However, if members with mild chronic obstructive pulmonary disease are symptomatic, especially during exercise or on the fire ground, then appropriate additional testing can be useful including pre- and post-spirometry, lung volumes, diffusion, exercise testing, and/or provocative challenge testing.

**A.9.7.2(11)** Members who are otherwise qualified can safely resume fire-fighting duties as long as they have recovered from their pneumothorax (with or without surgery), and their pulmonary function has returned to acceptable limits. Most patients with spontaneous pneumothorax have cysts or bullous disease from congenital or infectious etiology. Some have bullous disease due to chronic pulmonary disease. Usually, those with congenital or infectious cause will have pulmonary function tests that are compatible with the safe use of SCBA while those with chronic pulmonary disease can have pulmonary function tests that are not compatible with the safe performance of essential job tasks 1, 2, 3, 4, 5, and 7. Regardless of cause, many (10 percent to 20 percent) will have a recurrence on the same side unless surgically corrected. If pulmonary function allows for safe use of SCBA, surgical correction is not a prerequisite for returning to fire-fighting duty.

**A.9.7.2(13)** Significant pleural effusions should be referred for diagnostic tests, as new or increasing effusions can be a sign of cardiac, liver, or renal disease, pneumonia, empyema, tuberculosis, or cancer. These illnesses can compromise the ability to safely perform essential job tasks due to limitations of endurance or inability to safely wear SCBA. If not, then pulmonary function tests should be assessed. If moderate to severe restriction is present (FVC <60 percent of predicted with an $FEV_1$/FVC ratio >0.80) then the member may not be able to safely perform essential job tasks unless more complete evaluation of gas exchange and exercise capacity shows ability to exercise at a 12-METS level without exercise desaturation.

**A.9.8.2(6)** After acute infection has resolved, the fire fighter can return to work if weight, muscle strength, cardiac function, and function of other involved organs have returned to levels required for safe performance of essential job tasks. Concepts used within this document for each of these organ systems should be applied here.

**A.9.8.2(7)** After active infection has resolved (e.g., sputum AFB or sputum culture negative for 3 successive days) and the fire fighter is no longer contagious (usually within 2 weeks of successful treatment), the fire fighter can return to work but can only perform essential job tasks 1, 2, 3, 4, 5, 7, and 9 if weight, muscle strength, pulmonary function, and function of other involved organs have returned to acceptable levels for safe performance. Concepts used within this document for each of these organ systems should be applied here. A positive tuberculin (PPD) skin test without symptoms and with a normal chest radiograph indicates exposure, and latent infection without evidence for active infection does **not** prevent a fire fighter from performing essential job tasks. If conversion from negative to positive skin test status occurred within last 2 years, they are at increased risk for the development of active contagious tuberculosis and require either treatment or frequent monitoring for symptoms and by chest radiographs (annually

for 2 years or during evaluation of symptoms). Members on prophylactic treatment can perform all essential job tasks without restrictions. Treatment is a personal decision but in its absence, monitoring with chest radiographs at prescribed intervals is mandatory because the development of active disease is a public health hazard to other members and the public.

**A.9.8.2(8)** Hepatitis when not acute or when chronic but without symptoms and without significant liver dysfunction or other organ system dysfunction does not prevent the successful and safe performance of essential job tasks during fire fighting or EMS work. Hepatitis A when not acute is no longer a public health risk. Hepatitis B, C, and so forth, are bloodborne pathogens and are not a public health risk as universal precautions to prevent the spread of bloodborne infections are a mandatory part of all emergency operations. Treatment to prevent Hepatitis C from progressing to liver insufficiency or failure (cirrhosis) is now available and FDA approved. Members receiving this treatment need to be regularly evaluated to determine their ability to safely perform their essential job tasks. This combination drug therapy protocol can produce dehydration, fatigue, depression, anemia, thrombocytopenia (bleeding disorder), and so forth.

**A.9.8.2(9)** HIV without AIDS does not prevent the successful and safe performance of essential job tasks during fire fighting or EMS work. HIV is a bloodborne pathogen and is not a public health risk as universal precautions to prevent the spread of bloodborne infections are a mandatory part of all emergency operations. The fire fighter with AIDS but without significant organ dysfunction can be able to safely perform essential job tasks after careful evaluation. Treatment to prevent AIDS from occurring when HIV infection occurs or to control the progression of AIDS is available and FDA approved. Members receiving this treatment need to be regularly evaluated to determine their ability to safely perform the essential job tasks on the fire ground, during emergency operations, and when wearing protective clothing. This combination drug therapy protocol can produce dehydration, fatigue, depression, anemia, thrombocytopenia (bleeding disorder), and so forth.

**A.9.9** The personal protective ensemble and SCBA can place the fire fighter's spine at a biomechanical disadvantage due to added weight and altered center of gravity. Certain medications (narcotics and muscle relaxants) used to treat spinal conditions can frequently produce or worsen somnolence, discoordination, and disequilibrium. Neurologic dysfunction, regardless of cause, can produce sudden incapacitation, which when working in dangerous environments, can result in life-threatening injuries.

**A.9.10** Fire fighters with active, ongoing, or recurrent orthopedic disorders can have difficulty due to reduced motor strength, sensation, and flexibility as well problems with fatigue, coordination, gait, and equilibrium. These physical abilities are required to safely perform essential job tasks 1, 2, 4, 5, 6, 7, 8, and 13. The protective uniform and SCBA can place the fire fighter's involved extremity (upper or lower) at a biomechanical disadvantage due to added weight and altered center of gravity. Certain medications (narcotics and muscle relaxants) used to treat orthopedic conditions can produce or worsen somnolence, discoordination, and disequilibrium.

**A.9.12.1** The fire fighter works in hazardous environments, both on the fire ground and during other emergency operations. Heavy debris can fall on the fire fighter. The helmet offers some protection when it fits well and is worn properly. The fire fighter with a defect in the skull is more vulnerable to head trauma and life-threatening sudden incapacitation.

A.9.12.1(3)  Diseases of the eye such as retinal detachment, progressive retinopathy, optic neuritis (severe or progressive), macular degeneration, cataracts, and glaucoma can result in the failure to read placards and street signs or to see and respond to imminently hazardous situations. Evaluation of visual acuity and visual fields with consultation by an ophthalmologist is suggested.

Ophthalmological procedures such as radial keratotomy and repair of retinal detachment require sufficient time (1 to 2 weeks for radial keratotomy and Lasik-type surgery and 3 months for retinal detachment) to allow stabilization of visual acuity and to ensure that there are no post-surgical complications. Members should be cleared for duty by the ophthalmologic surgeon who understands the essential job tasks associated with fire fighting. These ophthalmological procedures can result in the failure to be able to read placards and street signs or to see and respond to imminently hazardous situations.

The fire service physician should also consider any color vision deficiency of the member in view of the color vision requirements of the member's specific job in a given fire department.

A.9.12.1(3)(a)  Far visual acuity is at least 20/40 binocular, corrected with contact lens or spectacles. Far visual acuity uncorrected is at least 20/100 binocular for wearers of hard contacts or spectacles. Successful long-term soft contact lens wearers (i.e., 6 months without a problem) are not subject to the uncorrected standard. Inadequate far visual acuity can result in the failure to be able to read placards and street signs or to see and respond to imminently hazardous situations.

A.9.12.1(3)(b)  Most persons with monocular vision, after a 6-month accommodation period, are able to function well. There is some loss of depth perception and peripheral vision. The loss of depth perception has not been shown to be of a type that will affect a member's ability to safely perform essential fire-fighting tasks. Some very specialized tasks can be difficult to safely perform, and the fire service physician should consider the depth of field deficiency of the individual and consider the depth of field requirements of the member's job in order to reach an individual determination. It should be noted that the FAA will award all classes of pilot's licenses to monocular pilots. The loss of peripheral vision is compensated for by increased scanning and head movements. There are studies that show some detriment of driving function in the driving lab. As of the writing of this section the DOT does not allow monocular persons to hold a CDL license. In view of this and the increased dependence on visual cues when driving emergency vehicles, monocular fire fighters should be restricted from driving fire apparatus and other emergency vehicles.

A.9.12.1(4)  Baseline and annual audiometry is performed on each fire fighter. This should be done in accordance with 29 CFR 1910.95, "Occupational Noise Exposure." The basics of this standard include:

(1) The first audiogram done (for members this will probably be done during their pre-placement exam) becomes the baseline audiogram.
(2) If subsequent audiograms are better than the baseline, then the best one becomes the baseline. All audiograms should be done with no exposure to industrial noise for 14 hours.
(3) Each subsequent audiogram is compared to the baseline audiogram (not to the previous year's) to determine if there is a threshold shift. This is an average loss of 10 dB or more at 2000 Hz, 3000 Hz, and 4000 Hz in either ear.

This number should be corrected for presbycusis by age tables [see Table A.9.12.1(4)(a) and Table A.9.12.1(4)(b)]. Thus, for each of the three frequencies the baseline reading is subtracted from the current reading, and the presbycusis correction is subtracted from this result. The results from the three frequencies are averaged and if this number is 10 or greater, then there is a threshold shift.

Table A.9.12.1(4)(a)  Age Correction Values in Decibels for Males

| Years | Audiometric Test Frequency (Hz) | | | | |
|---|---|---|---|---|---|
| | 1000 | 2000 | 3000 | 4000 | 6000 |
| ≤20 | 5 | 3 | 4 | 5 | 8 |
| 21 | 5 | 3 | 4 | 5 | 8 |
| 22 | 5 | 3 | 4 | 5 | 8 |
| 23 | 5 | 3 | 4 | 6 | 9 |
| 24 | 5 | 3 | 5 | 6 | 9 |
| 25 | 5 | 3 | 5 | 7 | 10 |
| 26 | 5 | 4 | 5 | 7 | 10 |
| 27 | 5 | 4 | 6 | 7 | 11 |
| 28 | 6 | 4 | 6 | 8 | 11 |
| 29 | 6 | 4 | 6 | 8 | 11 |
| 30 | 6 | 4 | 6 | 9 | 12 |
| 31 | 6 | 4 | 7 | 9 | 13 |
| 32 | 6 | 5 | 7 | 10 | 14 |
| 33 | 6 | 5 | 7 | 10 | 14 |
| 34 | 6 | 5 | 8 | 11 | 15 |
| 35 | 7 | 5 | 8 | 11 | 15 |
| 36 | 7 | 5 | 9 | 12 | 16 |
| 37 | 7 | 6 | 9 | 12 | 17 |
| 38 | 7 | 6 | 9 | 13 | 17 |
| 39 | 7 | 6 | 10 | 14 | 18 |
| 40 | 7 | 6 | 10 | 14 | 19 |
| 41 | 7 | 6 | 10 | 14 | 20 |
| 42 | 8 | 7 | 11 | 16 | 20 |
| 43 | 8 | 7 | 12 | 16 | 21 |
| 44 | 8 | 7 | 12 | 17 | 22 |
| 45 | 8 | 7 | 13 | 18 | 23 |
| 46 | 8 | 8 | 13 | 19 | 24 |
| 47 | 8 | 8 | 14 | 19 | 24 |
| 48 | 9 | 8 | 14 | 20 | 25 |
| 49 | 9 | 9 | 15 | 21 | 26 |
| 50 | 9 | 9 | 16 | 22 | 27 |
| 51 | 9 | 9 | 16 | 23 | 28 |
| 52 | 9 | 10 | 17 | 24 | 29 |
| 53 | 9 | 10 | 18 | 25 | 30 |
| 54 | 10 | 10 | 18 | 26 | 31 |
| 55 | 10 | 11 | 19 | 27 | 32 |
| 56 | 10 | 11 | 20 | 28 | 34 |
| 57 | 10 | 11 | 21 | 29 | 35 |
| 58 | 10 | 12 | 22 | 31 | 36 |
| 59 | 11 | 12 | 22 | 32 | 37 |
| ≥60 | 11 | 13 | 23 | 33 | 38 |

Source: 29 CFR 1910.95.

Table A.9.12.1(4)(b)  Age Correction Values in Decibels for Females

| Years | Audiometric Test Frequency (Hz) | | | | |
|---|---|---|---|---|---|
| | 1000 | 2000 | 3000 | 4000 | 6000 |
| ≤20 | 7 | 4 | 3 | 3 | 6 |
| 21 | 7 | 4 | 4 | 3 | 6 |
| 22 | 7 | 4 | 4 | 4 | 6 |
| 23 | 7 | 5 | 4 | 4 | 7 |
| 24 | 7 | 5 | 4 | 4 | 7 |
| 25 | 8 | 5 | 4 | 4 | 7 |
| 26 | 8 | 5 | 5 | 4 | 8 |
| 27 | 8 | 5 | 5 | 5 | 8 |
| 28 | 8 | 5 | 5 | 5 | 8 |
| 29 | 8 | 5 | 5 | 5 | 9 |
| 30 | 8 | 6 | 5 | 5 | 9 |
| 31 | 8 | 6 | 6 | 5 | 9 |
| 32 | 9 | 6 | 6 | 6 | 10 |
| 33 | 9 | 6 | 6 | 6 | 10 |
| 34 | 9 | 6 | 6 | 6 | 10 |
| 35 | 9 | 6 | 7 | 7 | 11 |
| 36 | 9 | 7 | 7 | 7 | 11 |
| 37 | 9 | 7 | 7 | 7 | 12 |
| 38 | 10 | 7 | 7 | 7 | 12 |
| 39 | 10 | 7 | 8 | 8 | 12 |
| 40 | 10 | 7 | 8 | 8 | 13 |
| 41 | 10 | 8 | 8 | 8 | 13 |
| 42 | 11 | 8 | 9 | 9 | 13 |
| 43 | 11 | 8 | 9 | 9 | 14 |
| 44 | 11 | 8 | 9 | 9 | 14 |
| 45 | 11 | 8 | 10 | 10 | 15 |
| 46 | 11 | 9 | 10 | 10 | 15 |
| 47 | 11 | 9 | 10 | 11 | 16 |
| 48 | 12 | 9 | 11 | 11 | 16 |
| 49 | 12 | 9 | 11 | 11 | 16 |
| 50 | 12 | 10 | 11 | 12 | 17 |
| 51 | 12 | 10 | 12 | 12 | 17 |
| 52 | 12 | 10 | 12 | 13 | 18 |
| 53 | 13 | 10 | 13 | 13 | 18 |
| 54 | 13 | 11 | 13 | 14 | 19 |
| 55 | 13 | 11 | 14 | 14 | 19 |
| 56 | 13 | 11 | 14 | 15 | 20 |
| 57 | 13 | 11 | 15 | 15 | 20 |
| 58 | 14 | 12 | 15 | 16 | 21 |
| 59 | 14 | 12 | 16 | 16 | 21 |
| ≥60 | 14 | 12 | 16 | 17 | 22 |

Source: 29 CFR 1910.95.

Audiometric pure tone threshold testing includes frequencies 500 Hz, 1000 Hz, 2000 Hz, 3000 Hz, 4000 Hz, and 6000 Hz. Tests are performed using audiometric instrumentation calibrated to ANSI S3.6.

Fire fighters should have adequate hearing in order to hear a victim cry for help, to hear a PASS alarm, to hear noises associated with imminent collapse, or noise associated with changes in the fire pattern. Hearing and the ability to localize sounds is crucial in a fire-fighting environment where smoke often minimizes visual cues and there is a high degree of background noise and stress-related distractions. Fire fighters should be able to hear fire department portable and vehicle radio communications. They should be able to hear, discriminate, and localize safety related acoustic cues such as air horns, sirens, screams, collapsing walls, beams, timbers, or gas leaks to safely perform their critical job tasks during fire suppression and fire rescue.

These critical job tasks need to be safely performed under conditions of extreme background noise and SCBA noise as typically found at the incident scene. The inability to hear sounds of low intensity or to distinguish voice from background noise can lead to failure to respond to imminently hazardous situations and thus lead to life-threatening sudden incapacitation to the member or others depending on the member.

Hearing aid use is **not** considered a reasonable accommodation for the following reasons:

(1) U.S. FDA regulations (21 CFR 801.420) require that all hearing aids be labeled with a statement that hearing aids do *not* restore normal hearing.
(2) Hearing aids are adjusted to restore ⅓ to ¼ the measured loss in pure tone frequency range of 250 to 6000 Hz (National Acoustic Labs). This allows for improved hearing of speech but will not restore ability to hear or discriminate acoustic cues (such as collapsing wall/timber, gas leaks, traffic sounds), or radio broadcasts that are essential safety requirements at a fire or rescue scene.
(3) Hearing aids seriously compromise the ability to localize acoustic cues so that the source of impending danger is confused and safety is imperiled.
(4) Hearing aids are not calibrated to function in areas of high background noise (fire scene, rescue scene, traffic), during radio transmissions.
(5) Hearing aids are not reliable after submersion or heavy exposure to water.
(6) If there is a threshold shift the AHJ must be notified. They are responsible for initiating evaluation of personal protective equipment (PPE) and engineering controls.
(7) If there is a threshold shift the member should be advised in writing and referral to an audiologist and/or an otologist should be made.
(8) If the threshold shift is determined to be permanent then this audiogram becomes the "revised baseline."

A.9.12.1(5)  Intact gait and balance are required to safely perform critical tasks such as climbing stairs, carrying heavy items (tools, equipment, victims, stretchers), climbing ladders, and walking on narrow/elevated/inclined areas (roofs). Fire fighter's balance can be further stressed by the need to safely perform these critical job tasks wearing personal protective clothing and SCBA.

Any symptomatic balance disturbance, vertigo, change of gait and coordination, or history of these that has not resolved completely should be fully investigated. Examples include but are not limited to Ménière's syndrome, severe labyrinthitis, and cerebellar syndromes. Current use of medications needs careful evaluation to be certain that condition is completely controlled and that the side effects of the medication do not impose additional unacceptable risks for the successful and safe performance of critical job tasks.

A.9.12.1(6)  The nasal, oropharyngeal, and dental structures should be of sufficient structure and function to allow the proper use and fitting of SCBA and other protective clothing and gear. These structures should allow sufficient function for proper nutrition, balance, communication, and respiration. Aphonia, severe dysphonia, or a speech pattern that prevents oral communication during fire or emergency operations should resolve or be corrected.

Anosmia (loss of smell) can interfere with the ability to safely perform critical tasks on the fire ground. Evaluation of anosmia is difficult as objective testing could not be available in all medical settings.

Recurrent sinusitis (severe, requiring repeated hospitalizations or repeat surgery) can interfere with the successful and safe performance of critical tasks due to inability to effectively wear SCBA and inability to safely perform other critical tasks during emergency operations due to limitations of pain, endurance, or respiration.

Severe and recurrent epistaxis can prevent successful and safe performance of critical tasks due to inability to wear SCBA on the fire ground.

Orthodontic and certain other maxillo-facial appliances or prostheses can preclude safe and effective use of protective equipment, compromise nutritional or hydration status, or ability to communicate.

Pharyngeal or laryngeal stenosis, mass or accessory tissues can interfere with speech, communication, or respiration. In which case, this will not permit the successful and safe performance of critical tasks on the fire ground and during emergency operations, especially when wearing SCBA and personal protective clothing.

A.9.13  Fire fighters with active, ongoing, or recurrent neurologic disorders can have difficulty following orders, communicating information, and working in a coordinated manner with workers, victims, and involved civilians (essential job tasks 11, 12, and 13). Fire fighters with neurologic disturbances can also have difficulty with fatigue, somnolence, cognitive function, motor strength, sensation, coordination, gait, and equilibrium, all required to safely perform essential job tasks. The fire fighter often is exposed to considerable stress (temperature, physical exertion, and psychological) during emergency operations. Stress conditions can exacerbate or highlight neurologic deficiencies when the fire fighter is performing essential job tasks rapidly during an emergency operation where there is little room for error and where such errors can have life-threatening consequences for fire fighter, colleagues, or victims. Removing oneself from the scene, even temporarily, can significantly impact on the success of the operation. Medications used to treat neurologic conditions can frequently produce or worsen somnolence, discoordination, and/or disequilibrium.

A.9.13.2(2)  Cerebral vascular insufficiency includes the spectrum of syndromes from transient ischemic attack to stroke, and its cause should be investigated. If due to arteriovenous malformation, cerebral aneurysm, or bleeding then see specific recommendations. If due to hypertension then this is evidence of end organ disease. Stroke does not permit safe performance of essential job tasks (1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13) since the physiological stress associated with strenuous physical exertion can increase the likelihood for new strokes leading to life-threatening sudden incapacitation. Cerebral vascular insufficiency can af-

fect control of respiration, cognitive abilities, communication, motor strength, sensation, coordination, and equilibrium. If stroke is due to embolic disease then risk factors (hypercoagulable state, collagen vascular disease, carotid vascular disease, patent foramen ovale, cardiac disease) need to be evaluated. Ability to safely perform essential job tasks is based on an evaluation of current neurologic status, treatment, and any contributory underlying conditions. (For example, Coumadin and other full-dose anticoagulant treatment regimens do not allow the safe performance of essential job task 8.)

A.9.13.2(3)  Multiple sclerosis and other demyelinating diseases may interfere with safe performance of essential job tasks 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 unless the member is free of clinical disease for 3 years and evaluation by a specialist concludes that cognitive function and neurologic exam are normal and the member is on no drugs that can impair job function. In considering performance of essential job tasks, the impact of the operational environment (heat, stress, activity, variable night shifts, etc.) on exacerbations should be considered and specifically addressed by the specialist and the medical officer.

With myasthenia gravis, essential job tasks 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 cannot be safely performed unless the member is free of clinical disease for 3 years and if after evaluation by a specialist it is concluded that cognitive function and exam are normal and the member has been free of disease exacerbations for 3 years and is off all drug treatment. In considering performance of essential job tasks, the impact of the operational environment (heat, stress, activity, variable night shifts, etc.) on exacerbations should be considered and specifically addressed by the specialist and the medical officer. The member cannot safely perform essential job tasks if evidence of respiratory muscle weakness or prior episode of respiratory muscle weakness in the last 5 years. The member cannot safely perform essential job tasks if on drug treatment for myasthenia including corticosteroids, cytotoxic drugs (e.g., Imuran), and/or plasmapheresis as these treatments indicate that disease is still active and likelihood for exacerbation and life-threatening sudden incapacitation exists during emergency operations.

A.9.13.2(4)  Epilepsy is defined as the presence of "unprovoked, recurrent seizures — paroxysmal disorders of the central nervous system characterized by an abnormal cerebral neuronal discharge with or without loss of consciousness." Generalized, complex, partial, simple epilepsy, or recurrent seizures, even those that do not impair consciousness, prevent safe performance of essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 because of the uncertainty regarding how much of the brain could be involved, and the risk of propagation to other regions of the brain, particularly in the highly epileptogenic environment of the fire ground.

Treatment of patients with epilepsy is only variably successful, with roughly 40 percent of patients attaining remission on anticonvulsant therapy. Remission is defined as 5 years without recurrence of seizure activity. Further complicating the fitness-for-duty issue is the fact that only 50 percent of patients who achieve remission do so without toxic side effects of the anticonvulsant drug.

Seizure disorder without epilepsy by history or EEG (as described in the previous paragraph). As much as 10 percent of the population will experience at least one seizure in a lifetime, whereas less than 1 percent of the population qualifies for a diagnosis of epilepsy. However, because of the life-threatening nature of this disorder on the fire ground or dur-

ing emergency operations, members with seizure but without epilepsy cannot safely perform essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 unless all of the following conditions are met:

(1) No seizures for 1 year off all anti-epileptic medication or 5 years seizure free on a stable medical regimen
(2) Neurologic examination is normal
(3) Imaging (CT or MRI scan) studies are normal
(4) EEG is normal, including provocative testing
(5) A definitive statement from a qualified neurological specialist that the member can safely perform these essential job tasks

Many conditions producing seizures in the pediatric age group are known to remit prior to adulthood, and many adults sustain a reactive seizure that can be attributed to a reversible, underlying precipitant. These circumstances do not necessarily represent an ongoing risk of sudden, unpredictable incapacitation of a member. After a provoked seizure, with the precipitant identified and alleviated, a member can be cleared for duty if the previous conditions (2) through (5) are met.

A.9.13.2(5)  The cause of cerebral bleed needs to be determined. If due to hypertensive bleed then this is evidence for target organ disease. Hypertension with target organ disease does not permit safe performance of essential job tasks 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 as the hypertension and stress associated with strenuous physical exertion can increase the likelihood for new bleeds and strokes leading to life-threatening sudden incapacitation due to central nervous system instability affecting control of respiration, cognitive abilities, communication, motor, sensory, coordination, and equilibrium.

Arteriovenous Malformation or Cerebral Aneurysm does not allow for the safe performance of essential job tasks 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 since hypertension and stress associated with strenuous physical exertion can increase the likelihood for acute rupture and stroke leading to life-threatening sudden incapacitation. Members can safely return to duty after evaluation by a neurosurgeon if resection was successful, exam and imaging studies are normal (except for surgical site), and EEG shows no epileptic activity off all anticonvulsant medications.

A.9.13.2(6)  Essential job tasks 1, 4, 6, 7, 8, 9, 10, 11, 12, and 13 may not be performed safely unless after evaluation by a specialist it is concluded exam is normal and imaging studies are normal. If trauma produced seizures then see recommendations for seizures in A.9.13.2(4).

A.9.14  Fire fighters perform individually and as a team. Fire fighters with active, ongoing or recurrent psychiatric and/or psychological conditions can have difficulty following orders, communicating information, and working in a coordinated manner with workers, victims, and involved civilians. The fire fighter with a personality disorder might not respond appropriately to command structure or adequately control his/her interpersonal behavior. Behavior that undermines command structure, group function, and/or group cohesion is not safe to the member or others performing essential job tasks. Fire fighters are exposed to gruesome tragedy during emergency operations, further exacerbating the stress of the job. Removing oneself from the scene, even temporarily, can significantly impact on the success of an emergency operation. Medications used to treat psychiatric or psychological conditions can produce or worsen somnolence, impair coordination, and predispose to heat stress.

A.9.15  Substance abuse interferes with cognitive functions, energy, command structure, communication, strength, sensation, gait, coordination, and equilibrium, which are all required to safely perform essential job tasks 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13. Visual abnormalities increase risk for auto accidents when driving departmental vehicles. Overall increased risk of dehydration, arrhythmia, and disequilibrium can be life threatening in a toxic/traumatic/stress environment. Fire fighters perform individually and as a team. The member works in a coordinated effort with others to safely perform the essential job tasks of fire fighting. Behavior that undermines command structure, group function, and/or group cohesion is not safe to the member or others performing essential job tasks. The fire fighter with substance abuse issues can be unable to handle the stress associated and produced by having to safely perform essential job tasks rapidly during an emergency operation.

## Annex B  Guide for Fire Department Administrators

*This annex is not a part of the requirements of this NFPA document but is included for informational purposes only.*

**B.1 Legal Considerations in Applying the Standard.** The consideration of an application or continued employment of a member based on medical or physical performance evaluations involves a determination that is not without legal implications. To this end, prior to making an adverse employment decision based on the current standard, the authority with jurisdiction may wish to consult with legal counsel.

**B.1.1 Legal Protections for Individuals with Handicaps or Disabilities.** The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq., and implementing regulations prohibit discrimination against those with handicaps or disabilities under any program receiving financial assistance from the federal government. The Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12101 et seq., also prohibits employment discrimination by certain private employers against individuals with disabilities. In addition, many states have enacted legislation prohibiting discrimination against those with handicaps or disabilities. Generally speaking, these laws prevent the exclusion, denial of benefits, refusal to hire or promote, or other discriminatory conduct against an individual based on a handicap or disability, where the individual involved can, with or without reasonable accommodation, perform the essential functions of the job without creating undue hardship on the employer or program involved.

Beginning in 1999, the United States Supreme Court has issued a series of decisions limiting the scope of the ADA. As a result, persons with certain kinds of impairments that are mitigated by corrective measures such as medication for high blood pressure or eyeglasses for myopia are not "disabled" under the ADA. See *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999); *Murphy v. United Parcel Service, Inc.*, 118 S. Ct 2133 (1999); and *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555 (1999). More recently the Supreme Court held that an impairment is not a disability covered by the ADA unless it severely restricts a person from doing activities that are of central importance to most people's daily lives. See *Toyota Motor Mfgr., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). These cases significantly limit the persons who can claim the protections of the federal ADA, but do not, by any means, eliminate the ADA as an important consideration in fire service–related employment decisions. Moreover, it should be borne in mind that separate disability

protections exist under laws of many states, and some of these laws have been interpreted to afford greater protections than that afforded by the ADA. See, for example, *Dahill v. Boston Department of Police*, 434 Mass. 233 (2001), where the Supreme Judicial Court of Massachusetts ruled that a corrective device to alleviate a disability is not relevant in determining whether someone is disabled under the state's disability law.

The disability discrimination laws, therefore, continue to be an important part of the legal framework that governs employment-related decisions. Although this standard has been developed with this in mind, these laws can, depending on the jurisdiction and the circumstances, affect the degree to which the authority having jurisdiction can implement the standard in an individual case. Users of this standard should be aware that, while courts, in assessing disability discrimination claims, are likely to give considerable weight to the provisions of a nationally recognized standard such as NFPA 1582 [see, for example, *Miller v. Sioux Gateway Fire Department*, 497 N.W.2d 838 (1993)], reliance on the standard alone may not be sufficient to withstand a challenge to an adverse employment decision.

**B.1.2 Legal Protections for Individuals Who Are Members of Protected Classes (Race, Sex, Color, Religion, or National Origin).** Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and implementing regulations by the Equal Employment Opportunity Commission (EEOC), prohibit discrimination in employment on the basis of race, sex, color, religion, or national origin (i.e., protected classes). Under Title VII, an "employer" is defined, generally, to mean a person with "15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." (42 U.S.C. § 2000e) Several federal jurisdictions have held that unpaid volunteers are not considered to be "employees" under Title VII.

Additionally, many states, cities, and localities have adopted similar legislation. Generally, physical performance or other requirements that result in "adverse impact" on members of a protected class (e.g., on the basis of gender) are required to be validated through a study in accordance with EEOC guidelines, if such requirements are to be relied on in making employment decisions. Under EEOC guidelines, a study validating employment standards in one jurisdiction can be transportable to another jurisdiction (and therefore used in lieu of conducting a separate study). However, specific preconditions must be met in this regard, and the authority having jurisdiction should seek the advice of counsel before relying on a transported validation study.

**B.1.2.1 Pregnancy and Reproduction.** Federal regulations, as well as many court decisions, including the U.S. Supreme Court's decision in *International Union, et al. v. Johnson Controls, Inc.* [499 U.S. 187, 111 S. Ct. 1196 (1991)], have interpreted the requirements of Title VII with respect to pregnancy and reproduction. The authority having jurisdiction should seek the advice of counsel in resolving specific questions concerning these requirements as well as other requirements that can be imposed by state or local laws.

**B.2 Determining Essential Job Tasks.** The medical requirements in this edition of the standard were revised based on the essential job tasks contained in Chapter 5 and Chapter 9. It is recognized that some fire-fighting functions and tasks can vary from location to location due to differences in department size, functional and organizational differences, geography, level of urbanization, equipment utilized, and other factors.

Therefore, it is the responsibility of each individual fire department to document, through job analysis, the essential job functions that are performed in the local jurisdiction.

There are a wide variety of job analytic techniques available to document the essential functions of the job of a member. However, at a minimum, any method utilized should be current, in writing, and meet the provisions of the Department of Labor regulations [29 CFR § 1630.2(n)(3)]. Job descriptions should focus on critical and important work behaviors and specific tasks and functions. The frequency and/or duration of task performance, and the consequences of failure to safely perform the task, should be specified. The working conditions and environmental hazards in which the work is performed should be described.

The job description should be made available to the fire department physician for use during the pre-placement medical examination for the individual determination of the medical suitability of applicants for member.

**B.3 Choosing a Fire Department Physician.** Several factors should be considered in choosing a fire department physician. There are relatively few physicians with formal residency training and certification in occupational medicine. The fire department physician should be qualified to provide professional expertise in the areas of occupational safety and health as these areas relate to emergency services. For the purpose of conducting medical evaluations, the fire department physician should understand the physiological and psychological demands placed on members as well as the environmental conditions under which members have to perform.

Knowledge of occupational medicine and experience with occupational health programs are essential for physicians not formally trained in occupational medicine.

The physician must be committed to meeting the requirements of the program, including appropriate record keeping. The physician's willingness to work with the department to continually improve the program is also important. Finally, the physician's concern and interest in the program and in the individuals in the program are vital.

The following are some of the many options for obtaining physician services:

(1) Physicians may be paid on a service basis or through a contractual arrangement.
(2) For volunteer departments, local physicians may be willing to volunteer their services for the program, with other arrangements for payment of laboratory testing, X-rays, and so forth.
(3) Some departments may utilize a local health care facility for medical care. However, in that case, the department should have one individual physician responsible for the program, record keeping, and so forth.
(4) The use of a military reserve or a National Guard unit.

**B.4 Coordinating the Medical Evaluation Program.** An individual from within the department should be assigned the responsibility for managing the health and fitness program, including the coordination and scheduling of evaluations and examinations. This person should also act as liaison between the department and the physician to make sure that each has the information necessary for decisions about placement, scheduling appointments, and so forth.

**B.5 Confidentiality.** Confidentiality of all medical data is critical to the success of the program. Members need to feel assured that the information provided to the physician will not

be inappropriately shared. No fire department supervisor or manager should have access to medical records without the express written consent of the member. There are occasions, however, when specific medical information is needed to make a decision about placement, return to work, and so forth, and a fire department manager should have more medical information for decision making. In that situation, written medical consent should be obtained from the member to release the specific information necessary for that decision.

Budgetary constraints can affect the medical program. Therefore, it is important that components of the program be prioritized such that essential elements are not lost. With additional funding, other programs or testing can be added to enhance the program.

### Annex C   Protocols for Evaluation of Fitness of Members

*This annex is not a part of the requirements of this NFPA document but is included for informational purposes only.*

**C.1 Annual Fitness Evaluation — NFPA 1583.** The following copyrighted material is extracted from Chapter 4 of NFPA 1583.

**C.1.1 General.**

**C.1.1.1** All members shall participate in a periodic fitness assessment under supervision of the department HFC and shall provide the HFC with data on which to base individual exercise prescription. [1583:4.1]

**C.1.1.2** The fitness assessment shall be conducted at least annually. [1583:4.1]

**C.1.2 Fitness Assessment.**

**C.1.2.1** All members shall be cleared for participation in the fitness assessment by the fire department physician. [1583:4.2]

**C.1.2.2** If a member has an acute medical problem or a newly acquired chronic medical condition, the fitness assessment shall be postponed until that person has recovered from this condition and presents to the fire department for review. [1583:4.2]

**C.1.3 Pre-Assessment Questionnaire.** The HFC shall administer to all members a pre-assessment questionnaire that seeks to identify contraindications for participation in the fitness assessment and department exercise training program. [1583:4.3]

**C.1.4 Fitness Assessment Components.** The annual fitness assessments shall consist of the following components:

(1) Aerobic capacity
(2) Body composition
(3) Muscular strength
(4) Muscular endurance
(5) Flexibility [1583:4.4]

**C.1.4.1 Sample Assessment Protocols for the Health-Related Components of Fitness.** The following examples of assessment protocols for health-related components of fitness vary in terms of ease of administration, safety, cost, and predictive value:

(1) Aerobic capacity
   (a) 1-mile walk
   (b) 1.5-mile run/walk
   (c) 12-minute run
   (d) Step test (various)

   (e) Stairclimbing machine
   (f) Cycle ergometer (various)
   (g) Treadmill (various)
(2) Percentage of body fat
   (a) Skinfold (various)
   (b) Circumference (various)
   (c) Bioimpedance (BIA)
   (d) Hydrostatic weighing
   (e) Body mass index (optional)
   (f) Waist-to-hip ratio (optional)
(3) Muscular strength
   (a) Handgrip dynometer
   (b) Static bicep curl with dynometer
   (c) Static leg press with dynometer
   (d) Bench press (1 rep maximum or percent of body weight)
   (e) Leg press (1 rep maximum or percent of body weight)
(4) Muscular endurance
   (a) Push-ups
   (b) Modified push-ups
   (c) Pull-ups
   (d) Bent knee sit-ups
   (e) Crunches given time
   (f) Crunches to cadence
(5) Flexibility
   (a) Sit and reach
   (b) Modified sit and reach
   (c) Trunk extension
   (d) Shoulder elevation [1583: A.4]

**C.2 Annual Fitness Evaluation — IAFF/IAFC Joint Labor-Management Fitness and Wellness Initiative.** The following copyrighted material is reprinted with permission.

**C.2.1 Fitness Evaluation Protocols for Members.**

**C.2.1.1** The following mandatory fitness protocols shall be used to determine the member's baseline level of fitness and to evaluate progress from year to year. Fitness evaluations shall be under the auspices of the fire department physician. The actual evaluations are permitted to be conducted by the fire department's fitness personnel. All data collected by the evaluator is to be held confidential and maintained in the member's confidential medical file. The evaluator can provide exercise prescriptions to encourage the members to maintain or improve their level of fitness.

There are many protocols currently available to measure the submaximal $VO_2$ levels of apparently healthy individuals. These protocols differ in evaluation equipment (i.e., treadmill, stairmill, step, and stationary bike), rate of increasing work output, degree of increasing work output, and final result. To increase the consistency of $VO_2$ measurements, as well as the accuracy of the data collected between members within and between participating fire departments, one of the two following submaximal protocols is to be used for measuring aerobic capacity. These are the Gerkin Treadmill Protocol and the FDNY Stairmill Protocol. Both protocols were specifically developed and validated to evaluate the sub-maximal aerobic capacity of members.

After continued evaluation and research by the IAFF/IAFC Wellness-Fitness Initiative's technical experts, it was determined that significant errors were occurring when past protocols were applied to a population that has different characteristics from those for which the evaluation was developed. For this reason, the Bruce and Balke Treadmill Protocols were

removed as evaluation protocols and as a means to collect data. Both Bruce and Balke were specifically tailored for less-fit populations to determine cardiovascular pathology and thus proved to be less accurate protocols for the general members population. The YMCA Stationary Bike Test Protocol was also removed since it consistently and grossly underestimated $VO_2$ for above average body size (i.e., most members). The Canadian Step Test was also removed since it relies on a single-stage exercise that was found to underestimate measurement of member's $VO_2$.

A maximal cardiopulmonary evaluation with an electrocardiogram (ECG) shall be permitted to be used to obtain $VO_2$ measurements. This medical evaluation shall only be conducted in a medical facility with proper monitoring by a physician and available resuscitation equipment.

The muscular endurance evaluations were also modified. In order to improve the accuracy of the evaluation and the data collection, the sit-and-hold evaluation was eliminated. The sit-up protocol was changed to a curl-up evaluation in order to ensure the safety of the participant and to improve the specificity of the evaluation. The push-up evaluation was modified to ensure uniformity in data collection.

The flexibility evaluation was modified to address the difference in limb length and/or differences in proportion between an individual's arm and legs.

The IAFF/IAFC Wellness-Fitness Initiative's technical experts have evaluated all equipment utilized in these fitness protocols. The technical experts found either accuracy, maintenance, or availability problems with some evaluation equipment. Manufacturer's information, product names, and model numbers are included in each protocol. Unless indicated, this equipment must not be substituted with other equipment. All equipment must be maintained and properly calibrated in accordance with the manufacturer's instructions.

Members must be fully recovered from the previous evaluation before proceeding to the next evaluation. The evaluation events can be sequenced to minimize the effects of previous evaluations on subsequent evaluation performance. If evaluations for aerobic capacity, muscular strength, muscle endurance, and flexibility are to be evaluated in one evaluation battery, the following sequence should be used:

(1) Resting heart rate and resting blood pressure
(2) Aerobic capacity
(3) Muscular strength
(4) Muscle endurance
(5) Flexibility

The following is a mandatory pre-evaluation procedure. It shall be conducted for all members prior to conducting the fitness evaluations:

(1) Review and confirm individual's current medical status. It is required that all members are medically cleared through this standard's medical evaluation within 12 (±3) months prior to any fitness evaluation.
(2) Notify members in advance of the scheduled time and place of physical fitness evaluations. The individual should understand the protocol and what is expected before, during, and after the evaluation, including start and stop procedures. Individual will be required to wear comfortable clothes and either sneakers or athletic shoes. All members must refrain from eating, drinking, smoking, and any physical activity prior to the evaluation to ensure accurate heart rate and blood pressure measurements.

(3) Obtain a resting heart rate and blood pressure prior to aerobic capacity evaluation. If resting heart rate exceeds 110 beats per minute and/or resting blood pressure exceeds 160/100 mm Hg, ask the individual to relax in a quiet place for 5 minutes and re-test. If the heart rate and/or blood pressure remain at these levels, cancel the fitness evaluation and refer the individual to the fire department physician. If the retest indicates a reduction in heart rate and blood pressure, the evaluation can be given. The aerobic capacity protocols also require that age (both protocols) and weight in kilograms (FDNY protocol only) be obtained prior to the evaluation.
(4) Review health status with the individual being evaluated. Contraindications for evaluations shall be reviewed, addressing any changes in the individual's health status since their last medical evaluation that would warrant deferring the evaluation, including:
    (a) Chest pain during or absence of physical activity
    (b) Loss of consciousness
    (c) Loss of balance due to dizziness (ataxia)
    (d) Recent injury resulting in bone, joint, or muscle problem
    (e) Current prescribed drug that inhibits physical activity
    (f) Chronic infectious disease (e.g., hepatitis)
    (g) Pregnancy
    (h) Any recent disorders that can be exacerbated by exercise
    (i) Any other reason why the individual believes that he or she should not be physically evaluated

### C.2.1.1.1 Aerobic Capacity.

*Treadmill.* Submaximal treadmill evaluations shall use the Gerkin Treadmill Protocol. The treadmill shall be a LifeFitness 9100HR or a commercial treadmill capable of obtaining a 15-percent grade and 10 mph. The fire department must verify that the treadmill is equivalent to the LifeFitness 9100HR. A Polar Heart Rate Monitor or equivalent shall be used for heart rate measurements and a stopwatch used for timing.

*Stairmill.* Submaximal stairmill evaluations shall use the FDNY Stairmill Protocol. The stairmill shall be a StairMaster 7000PT. A Polar Heart Rate Monitor or equivalent shall be used for heart rate measurements and a stopwatch used for timing.

*Treadmill.* Maximal treadmill evaluations shall use a continuous, multigrade medical cardiovascular protocol utilizing an electrocardiogram (ECG) for cardiac measurements. This evaluation must be under the direct supervision of a physician. The treadmill shall be a commercial treadmill capable of obtaining a 25-percent grade.

All aerobic capacity evaluation results must be recorded in milliliters of oxygen per kilograms of body weight per minute ($VO_{2max}$).

(1) Choose the aerobic capacity protocol and worksheet.
(2) Inform the fire fighter of all evaluation components.
(3) Ensure that the individual is in proper clothing and footwear, is comfortable, and understands all facets of the evaluation.
(4) Review all indicators for stopping the evaluation with the individual
(5) Place and secure heart rate monitor transmitter around individual's chest, in accordance with the manufacturer's instructions; evaluator shall hold or wear the heart rate monitor wrist receiver
(6) Measure the fire fighter's resting heart rate and resting blood pressure and record on the protocol worksheet

(7) Obtain and record weight (for FDNY protocol only) and age (for both protocols)

(8) Determine 85 percent of the fire fighter's estimated maximum heart rate, which will be the target exercise heart rate, using the following simple Karvonen Method equation:
Target exercise heart rate = .85 (220 – age)
*Example: The target exercise heart rate of a 40-year-old individual is: Target exercise heart rate = .85 (220 – 40) = 153*

(9) Record the target exercise heart rate on the protocol worksheet

### C.2.1.1.1.1 Submaximal Graded Treadmill Evaluation (Gerkin Protocol).

(1) Conduct pre-evaluation procedures.

(2) The individual being evaluated is instructed to straddle the treadmill belt until it begins to move. At approximately 1 mph, the individual is instructed to step onto the belt and the belt speed is increased to 3 mph at 0 percent grade. The individual warms up at 3 mph at 0 percent grade for 3 minutes. During the warm up, the individual is informed that the evaluation is submaximal and will terminate once their monitored heart rate exceeds the target exercise heart rate for 15 seconds. The individual is informed that the target exercise heart rate is 85 percent of their predicted maximal heart rate. The individual is advised that the evaluation is a series of 1-minute exercise stages, alternating between percent grade and speed (i.e., first minute percent grade is increased, second minute speed is increased, etc.). Inform the individual that if at anytime during the evaluation they experience chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should ask the evaluator to terminate the evaluation.

(3) The individual is informed that the belt speed will gradually increase to the starting speed of 4.5 mph and 0 percent grade, at which Stage 1 begins. The individual is permitted to either walk or run, whichever feels more comfortable.

(4) During the evaluation, the individual's heart rate is continuously monitored and the heart rate is recorded during the last quarter (15 seconds) of each stage. At the completion of the first minute (Stage 1: 4.5 mph at 0-percent grade), the grade should be increased to 2 percent. Subsequently, after every odd minute the grade will be increased an additional 2 percent. After every even minute the speed will be increased 0.5 mph. This will continue until the individual's heart rate exceeds their target exercise heart rate or demonstrates any of the criteria for early termination of the treadmill evaluation.

(5) Once the individual's heart rate exceeds the target exercise heart rate, the individual continues the evaluation for an additional 15 seconds. This 15-second period allows for the individual's heart rate to stabilize. During this stabilization period, the evaluation will remain at the stage where the target exercise heart rate is exceeded, with speed or grade unchanged. If the heart rate does not return to or below the target exercise heart rate the evaluation ends and the final evaluation stage will be recorded.

(6) If the evaluation is terminated early, the stage at which the evaluation is terminated and the reason for the termination is documented. For data collection, record that the evaluation was terminated.

(7) Once the individual exceeds their target exercise heart rate or reaches the eleventh minute of the evaluation, the evaluation is ended and the final stage is recorded.

(8) The individual is instructed to remain on the treadmill for a cool-down period for a minimum of 3 minutes at 3 mph, 0-percent grade. Continue to monitor the heart rate during the cool-down period. Record the heart rate after 1 minute of cool-down.

(9) Use the final stage and Table C.2.1.1.1.1 to establish $V_{O_{2max}}$. The Gerkin maximal graded exercise test protocol. *Source:* Richard Gerkin, MD, Director of Health Center, Phoenix Fire Department.

(10) Record the $V_{O_{2max}}$.

**Table C.2.1.1.1.1 Submaximal Treadmill Test Conversion**

| Stage | Time at Target Exercise | $V_{O_{2max}}$ (ml/kg·min) |
|---|---|---|
| 1.0 | 1:00 | 31.15 |
| 2.1 | 1:15 | 32.55 |
| 2.2 | 1:30 | 33.6 |
| 2.3 | 1:45 | 34.65 |
| 2.4 | 2:00 | 35.35 |
| 3.1 | 2:15 | 37.45 |
| 3.2 | 2:30 | 39.55 |
| 3.3 | 2:45 | 41.30 |
| 3.4 | 3:00 | 43.4 |
| 4.1 | 3:15 | 44.1 |
| 4.2 | 3:30 | 45.15 |
| 4.3 | 3:45 | 46.2 |
| 4.4 | 4:00 | 46.5 |
| 5.1 | 4:15 | 48.6 |
| 5.2 | 4:30 | 50.0 |
| 5.3 | 4:45 | 51.4 |
| 5.4 | 5:00 | 52.8 |
| 6.1 | 5:15 | 53.9 |
| 5.2 | 5:30 | 54.9 |
| 6.3 | 5:45 | 56.0 |
| 6.4 | 6:00 | 57.0 |
| 7.1 | 6:15 | 57.7 |
| 7.2 | 6:30 | 58.8 |
| 7.3 | 6:45 | 60.2 |
| 7.4 | 7:00 | 61.2 |
| 8.1 | 7:15 | 62.3 |
| 8.2 | 7:30 | 63.3 |
| 8.3 | 7:45 | 64.0 |
| 8.4 | 8:00 | 65.0 |
| 9.1 | 8:15 | 66.5 |
| 9.2 | 8:30 | 68.2 |
| 9.3 | 8:45 | 69.0 |
| 9.4 | 9:00 | 70.7 |
| 10.1 | 9:15 | 72.1 |
| 10.2 | 9:30 | 73.1 |
| 10.3 | 9:45 | 73.8 |
| 10.4 | 10:00 | 74.9 |
| 11.1 | 10:15 | 76.3 |
| 11.2 | 10:30 | 77.7 |
| 11.3 | 10:45 | 79.1 |
| 11.4 | 11:00 | 80.0 |

**C.2.1.1.1.2 Submaximal Stepmill Evaluation (FDNY Protocol).**

(1) Conduct pre-evaluation procedures. Obtain and record individual's age in years and weight (males only) in kilograms.

(2) The individual being evaluated is instructed to assume a starting position about two-thirds of the way up the stairs. The individual is instructed to temporarily grasp the handrails to reduce the possibility of losing balance when the stairs begin to move. The individual is also informed that holding or leaning on the handrails is not allowed once the evaluation begins since this will cause false overestimations of aerobic capacity.

(3) The evaluation will commence at Level 3 for a 30-second warm-up period. During this time, the individual is instructed to remove both hands from the handrail, establish a steady rhythm, and walk with their hands by their sides. The individual is informed that the evaluation is submaximal and will terminate in 3 minutes. The individual is advised that if at anytime during the evaluation they experience chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should ask the evaluator to terminate the evaluation.

(4) If the evaluation is terminated early, the time at which the evaluation terminated and the reason for the termination is documented. For data collection, record that the evaluation was terminated.

(5) At the conclusion of the warm-up, the stairmill will be set to Level 4, which begins the actual evaluation time. The individual will walk at a constant rate of 60 steps per minute for 3 minutes. Heart rate is measured during the final 15 seconds of the exercise and recorded.

(6) Upon completion of the evaluation, the individual is instructed to re-grasp the handrails, the stepping machine is shut off, and the individual is assisted off the apparatus.

(7) The following equations are used to establish $V_{O_{2max}}$:

Male $V_{O_{2max}} = 113.34 - 0.15$ (weight) $- 0.32$ (final heart rate) $- 0.54$ (age)

Female $V_{O_{2max}} = 88.22 - 0.31$ (final heart rate) $- 0.32$ (age)

(8) Record the $V_{O_{2max}}$.

Note: This protocol has been validated as accurate when final heart rate equals or is greater than 110 bpm.

**C.2.1.1.1.3** Hand grip strength evaluations shall use the following protocol. The hand grip dynamometer shall be a Jamar Hydraulic Hand dynamometer.

(1) Conduct pre-evaluation procedures.

(2) The individual being evaluated is instructed to towel hands to ensure they are dry. The individual is instructed to place dynamometer in the hand to be evaluated; the evaluator adjusts, ensuring that the bottom of the handle clip is adjusted to fit snug in the first proximal interphalangeal joint. The red peak-hold needle is rotated counterclockwise to the zero position. The individual is advised that the evaluation is a series of six measurements — three for each hand. The individual is informed that the isometric contraction (squeezing) required during this evaluation must be eased into and then released slowly, without swinging arm, pumping arm, or jerking hand. Inform the individual that if at anytime during the evaluation they experience chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.

(3) The individual is instructed to assume a slightly bent forward position, with elbow bent at a 90-degree angle, shoulder adducted and neutrally rotated, forearm and wrist in neutral position.

(4) The individual is instructed to squeeze with maximum strength 2 to 3 seconds while exhaling and then slowly release grip. The peak-hold needle will automatically record the highest force exerted.

(5) Measure both hands alternatively allowing three evaluations per hand. Reset the peak-hold needle to zero before obtaining new readings. List the scores for each hand to the nearest kilogram.

(6) Record the highest score.

**C.2.1.1.1.4** Leg strength evaluations shall use the Wellness-Fitness Initiative Protocol for Leg Strength. The leg dynamometer shall be the Jackson Strength Evaluation System or a commercial dynamometer system that is digital, incorporates dead load cells, and includes an adjustable chain, handlebar, and test platform. The fire department must verify that the dynamometer is equivalent to the Jackson Strength Evaluation System. A V-grip handlebar (chinning triangle) is required.

(1) Conduct pre-evaluation procedures.

(2) The individual being evaluated is instructed to towel hands to ensure they are dry. The individual is advised that the evaluation is a series of three measurements. The individual is informed that the isometric arm contraction required during this evaluation must be eased into and then released slowly, without swinging arm, pumping arm, or jerking hands. Inform the individual that if at anytime during the evaluation they experience back pain, chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.

(3) The individual is instructed to stand upon the dynamometer base plate, which has been placed on a level and secure surface, with feet spread shoulder width apart. The individual is instructed to hold the bar with a wide grip and bend their elbows (keeping their elbows to their sides) 90 degrees. Individual must stand erect without arching back.

(4) The instructor verifies that the arm/elbow joint angle is 90 degrees and adjusts the chain so that it is taut in this position.

(5) The individual shall be instructed not to shrug shoulders, bend back, or perform any other motion other than to contract arms and attempt to move the handlebar in a vertical direction.

(6) Instruct the individual to flex arms for a total of 3 seconds.

(7) After 3 seconds, instruct the individual to slowly relax arms and to remain at standing rest for 30 seconds.

(8) Once the individual has completed the 30-second recovery period begin the second evaluation. Repeat evaluation for the third time using the same procedure.

(9) List all scores. *Note: Digital readout will display the actual force, the highest peak force, and the average force achieved during the three evaluations.*

(10) Record the highest of the three trials to the nearest kilogram.

**C.2.1.1.1.5** Arm strength evaluations shall use the following protocol. The arm dynamometer shall be the Jackson Strength Evaluation System or a commercial dynamometer system that is digital, incorporates dead load cells, and includes an adjustable chain, handlebar, and test platform. The fire department must verify that the dynamometer is

equivalent to the Jackson Strength Evaluation System. A straight-grip handlebar is required.

(1) Conduct pre-evaluation procedures.
(2) The individual being evaluated is instructed to towel hands to ensure they are dry. The individual is advised that the evaluation is a series of three measurements. The individual is informed that the isometric leg extension required during this evaluation must be eased into and then released slowly, without bending back, swinging arm, pumping or bending arm, or jerking hand. Inform the individual that if at anytime during the evaluation they experience back pain, chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.
(3) The individual is instructed to stand upon the dynamometer base plate, which has been placed on a level and secure surface, with feet spread shoulder width apart. The individual is instructed to stand erect. The chain is then adjusted so the upper (inside) edge of the bottom cross member of the V-grip handlebar is at the top of the individual's kneecap. The evaluator verifies this position, ensuring the chain is taut.
(4) The individual is then instructed to hold the bar, look straight with head in the neutral position, fully extend arms, and maintain a straight back. The evaluator shall verify this position and ensure that the individual's hips are directly over their feet, with trunk and knees slightly bent.
(5) Instruct the individual to lift using their legs for a total of 3 seconds.
(6) After 3 seconds, instruct the individual to slowly relax arms and legs and to remain at standing rest for 30 seconds.
(7) Once the individual has completed the 30-second recovery period begin the second evaluation. Repeat the evaluation for the third time using the same procedure.
(8) List all scores. *Note: Digital readout will display the actual force, the highest peak force, and the average force achieved during the three evaluations.*
(9) Record the highest of the three trials to the nearest kilogram.

**C.2.1.1.1.6** Push-up muscle endurance evaluations shall use the Wellness-Fitness Initiative Protocol for Push-ups. Equipment used for this evaluation includes a 5 in. prop (i.e., cup, sponge), a metronome, and a stopwatch.

(1) Conduct pre-evaluation procedures.
(2) The individual is advised that the evaluation is a series of push-ups performed in a 2-minute time period. The individual is advised that the evaluation is initiated from the "up" position (hands are shoulder width apart, back is straight, and head is in neutral position). The individual is informed that they are not allowed to have their feet against a wall or other stationary item. Additionally, the individual is informed that the back must be straight at all times and they must push up to a straight arm position. The individual is instructed to continue performing push-ups in time with the cadence of the metronome, one beat up and one beat down. Inform the individual that if at anytime during the evaluation they experience chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.
(3) The evaluator places the 5-in. prop on the ground beneath the individual's chin and the individual must lower their body to the floor until the chin touches this object.

(4) The metronome should be set at a speed of 80, allowing for 40 push-ups per minute.
(5) The individual has a 2-minute time limit to complete a maximum of 80 push-ups.
(6) The administrator shall stop the evaluation when the individual:
   (a) Reaches 80 push-ups
   (b) Performs three consecutive incorrect push-ups
   (c) Does not maintain continuous motion with the metronome cadence
(7) Record the highest number of successfully completed push-ups.

**C.2.1.1.1.7** Curl-up muscle endurance evaluations shall use the Wellness-Fitness Initiative Protocol for Curl-ups. Equipment used for this evaluation includes a gym mat, a metronome, and a stopwatch.

(1) Conduct pre-evaluation procedures.
(2) The individual is advised that the evaluation is a series of curl-ups performed in a 3-minute time period. The individual is informed that the evaluation is initiated from the supine position with knees bent at a 90-degree angle, hands cupped over the ears or at the temples, and with hand and arm position maintained for the entire duration of the evaluation. The individual is advised that their feet will be secured by a bar or a second administrator, but the holding or bracing of the knees and or ankles is not allowed. The individual is instructed that the curl-up is initiated by flattening the lower back followed by actively contracting the abdominal muscles and then continuing the movement until the trunk reaches a 45-degree angle with respect to the floor. This is followed by curling down of the trunk with the lower back fully contacting the mat before the upper back and shoulders. A rocking or bouncing movement is not permitted and the buttocks must remain in contact with the mat at all times. The individual is instructed to continue performing curl-ups in time with the cadence of the metronome, one beat up and one beat down. Inform the individual that if at anytime during the evaluation they experience back pain, chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.
(3) The metronome is set at a speed of 60, allowing for 30 curl-ups per minute.
(4) The individual has a 3-minute time limit to successfully complete a maximum of 90 curl-ups.
(5) The administrator shall observe the evaluation from the side to ensure that each curl-up is performed correctly and shall stop the evaluation when the individual does any of the following:
   (a) Reaches 90 curl-ups
   (b) Performs three consecutive incorrect curl-ups
   (c) Does not maintain continuous motion with the metronome cadence
(6) Record the highest number of successfully completed curl-ups.

**C.2.1.1.1.8** Sit-and-reach flexibility evaluations shall use the Wellness-Fitness Initiative Sit and Reach Protocol. Equipment used for this evaluation shall be a Novel Acuflex I or equivalent trunk flexibility tester that compensates for variable arm and leg lengths.

(1) Conduct pre-evaluation procedures.

(2) The individual is advised that the evaluation is a series of three measurements that will evaluate the flexibility of the lower back, hamstring muscles, and shoulders. The individual is informed that the flexion required during this evaluation must be smooth and slow, as the individual advances the slide on the box to the most distal position possible. Inform the individual that if at anytime during the evaluation they experience back pain, chest pain, light-headedness, ataxia, confusion, nausea, or clamminess, they should terminate the evaluation.

(3) The individual is instructed to sit on the floor ensuring the head, upper back, and lower back are in contact with the wall. The individual is instructed to place legs together, fully extended. The sit and reach box with the sliding measurement guide is placed with the box flat against the feet.

(4) While maintaining head and upper/lower back contact with the wall, the individual is instructed to extend arms fully in front of their body with the right hand overlaying the left hand, with middle finger of each hand directly over each other. The rule is set to 0.0 in. at the tips of the middle fingers. The individual is then instructed to exhale slowly while stretching slowly forward, bending at the waist, and pushing the measuring device with the middle fingers. During the stretch, legs are to remain together and fully extended and hands are to remain overlaid. The stretch is held momentarily and the distance obtained. If the individual bounces, flexes knee, or uses momentum to increase distance, the evaluation is not counted.

(5) Instruct the individual to relax for 30 seconds. Once the individual has completed the 30-second recovery period begin the second evaluation. Repeat evaluation for the third time using the same procedure.

(6) Record the furthest distance from the three trials (rounded to the nearest ¼ in.) as the final score.

C.2.1.1.1.9 Fitness protocol equipment list:

(1) LifeFitness 9100HR Treadmill: for information and local distributor contact, LifeFitness, 10601 West Belmont Avenue, Franklin Park, IL 60131, Phone (847) 288-3300, fax (847) 288-3791, Website www.lifefitness.com.

(2) Jackson Strength Evaluation System with V-Grip Handlebar (chinning triangle): for information and local distributor contact, Lafayette Instrument, 3700 Sagamore Parkway North, P.O. Box 5729, Lafayette, IN 47903, Phone (765) 423-1505 or (800) 428-7545, fax (765) 423-4111, Website www.licmef.com (Note: The Jackson Strength Evaluation System includes a Jamar Hydraulic Hand Dynamometer).

(3) Jamar Hydraulic Hand Dynamometer: for information and local distributor contact, Jamar, Sammons Preston, 4 Sammons Court, Bolingbrook, IL 60440, Phone (800) 323-5547 (Note: The Jackson Strength Evaluation System includes a Jamar Hydraulic Hand Dynamometer).

(4) Novel Acuflex I Trunk Flexibility Tester: for information and local distributor contact, Novel Products Incorporated, Post Office Box 408, Rockton, IL 61072-0408, Phone (800) 323-5143, fax (815)624-4866, E-mail novelprod@aol.com.

(5) Polar Heart Rate Monitor: for information and local distributor contact, Polar Electro Inc., 370 Crossways Park Drive, Woodbury, NY 11797, Phone (800) 227-1314; Canada (888) 918-5043, fax (516) 364-5454, Website www.polarus.com.

(6) StairMaster StepMill 7000 PT: for information and local distributor contact, StairMaster Sports/Medical Products, L.P., 12421 Willows Road, NE, Suite 100, Kirkland, WA 98034, Phone (425) 823-1825, ext. 7605, fax (425) 821-3794, Website www.stairmaster.com.

## Annex D    Informational References

**D.1 Referenced Publications.** The following documents or portions thereof are referenced within this standard for informational purposes only and are thus not part of the requirements of this document unless also listed in Chapter 2.

**D.1.1 NFPA Publications.** National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

NFPA 1001, *Standard for Fire Fighter Professional Qualifications*, 2002 edition.

NFPA 1002, *Standard for Fire Apparatus Driver/Operator Professional Qualifications*, 2003 edition.

NFPA 1003, *Standard for Airport Fire Fighter Professional Qualifications*, 2000 edition.

NFPA 1006, *Standard for Rescue Technician Professional Qualifications*, 2003 edition.

NFPA 1021, *Standard for Fire Officer Professional Qualifications*, 2003 edition.

NFPA 1051, *Standard for Wildland Fire Fighter Professional Qualifications*, 2002 edition.

NFPA 1500, *Standard on Fire Department Occupational Safety and Health Program*, 2002 edition.

NFPA 1561, *Standard on Emergency Services Incident Management System*, 2002 edition.

NFPA 1583, *Standard on Health-Related Fitness Programs for Fire Fighters*, 2000 edition.

NFPA 1584, *Recommended Practice on the Rehabilitation of Members Operating at Incident Scene Operations and Training Exercises*, 2003 edition.

**D.1.2 Other Publications.**

**D.1.2.1 ANSI Publication.** American National Standards Institute, Inc., 11 West 42nd Street, 13th Floor, New York, NY 10036.

ANSI S3.6, *Specification for Audiometers*, 1996.

**D.1.2.2 U.S. Government Publications.** U.S. Government Printing Office, Washington, DC 20401.

Title 21, *Code of Federal Regulations*, Part 801.420.

Title 29, *Code of Federal Regulations*, Part 1910.95, "Occupational Noise Exposure," 1980.

**D.1.2.3 Additional Publications.**

*Journal of the American College of Cardiology*, October 1994.

*American Thoracic Society Guidelines Journal of Occupational and Environmental Medicine*, 2000.

**D.2 Informational References.** The following documents or portions thereof are listed here as informational resources only. They are not a part of the requirements of this document.

**D.2.1 Testing Protocols.**

American College of Sports Medicine, 1995. *Guidelines for Exercise Testing and Prescription*. Baltimore, MD: Williams & Wilkins.

Bilzon JFJ, Scarpello EG, Smith DV, Ravenhill NA, et al. "Characterization of the metabolic demands of simulated shipboard Royal Navy fire-fighting tasks." *Ergonomics* 2001; 44:766–780.

Gibbons RJ, Balady GJ, Beasley JW, et al. "ACC/AHA guidelines for exercise testing: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Exercise Testing)." *J Am Coll Cardiol* 1997; 30:260–311.

Gledhill N, Jamnik VK. "Characterization of the physical demands of firefighting." *Can J Sport Sci* 1992; 17:207–213.

Lemon PW, Hermiston RT. "The human energy cost of fire fighting." *J Occup Med* 1977; 19:558–552.

Malley KS, Goldstein AM, Aldrich, TK, Kelly, KJ, Weiden M, Coplan N, Karwa ML, and Prezant DJ. "Effects of fire fighting uniform (modern, modified modern and traditional) design changes on exercise duration in New York City firefighters." *Occup J.* Med 1999; 41:1104–1115.

Manning JE, Griggs TR. "Heart rate in fire fighters using light and heavy breathing equipment: simulated near maximal exertion in response to multiple work load conditions." *J Occup Med* 1983; 25:215–218.

O'Connell ER, Thomas PC, Lee D, Cady LD, et al. "Energy costs of simulated stair climbing as a job-related task in fire fighting." *J Occup Med* 1986; 28:282–285.

Sothmann MS, Saupe K, Jasenof D, Blaney J. "Heart rate responses of firefighters to actual emergencies." *J Occup Med* 1992; 34:797–800.

U.S. Preventive Services Task Force, 1996. *Guide to Clinical Prevention Services*, 2nd edition. Baltimore, MD: Williams & Wilkins, 3–14.

**D.2.1.1 Cancer Screening.**

Smith RA, Mettlin CJ, Davis KJ, Eyre H. "American Cancer Society guidelines for the early detection of cancer." *CA J Clin* 2000; Jan-Feb 50(1):34–49.

**D.2.1.2 Spinal Fusion and Its Impact on Adjacent Vertebral Level.**

Eck JC, Humphreys SC, Hodges SD. "Adjacent-segment degeneration after lumbar fusion: a review of clinical biomechanical and radiologic studies." *Am J Orthopedics* 1999; 28(6):336–340.

Lee CK. "Accelerated degeneration of the segment adjacent to a lumbar fusion." *Spine* 1988 March; 13(3):375–377.

**D.2.2 Cardiology.**

Alfred EN, Bleecker ER, Chaitman BR, Dahms TE, Gottlieb SO, Hackney JD, Pagano M, Selvester RH, Walden WM, Warren J. "Short-term effects of carbon monoxide exposure on the exercise performance of subjects with coronary artery disease." *N Engl J Med* 1989 Nov; 321(21):1426–1432.

Jouven X, Zureik M, Desmos M, Courbon D, Ducimetiere P. "Longterm outcome in asymptomatic men with exercise-induced premature ventricular depolarizations." *N Engl J Med* 2000 Sept 21; 343(12):826–833.

"Premature ventricular depolarizations and exercise" (editorial comment on E.N. Alfred reference). *N Engl J Med* 2000 Sept 21; 343(12):879–880.

Gibbons RJ, Balady GJ, Beasley JW, et al. ACC/AHA guidelines for exercise testing; a report of American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Exercise Testing). *J Am Coll Cardiol* 1997; 30:260–311)D.

**D.2.3 Asthma and Chronic Obstructive Pulmonary Diseases.**

Bousquet J, Jeffery PK, Busse WW, Johnson M, Vignola AM. "Asthma from bronchoconstriction to airways inflammation and remodeling." *Am J Respir Crit Care Med* 2000 May; 161(5):1720–1745.

Nadel JA, Busse WW. "Asthma." *Am J Respir Crit Care Med* 1998 Apr; 157(4 Pt. 2):S130–138.

Postma DS, Kerstjens HA. "Characteristics of airway hyperresponsiveness in asthma and chronic obstructive pulmonary diseases." *Am J Respir Crit Care Med* 1998 Nov; 158 (5 Pt. 2):S187–192.

Prezant, DJ, Weiden M, Banauch GI, McGuinness G, Rom WN, Aldrich TK, and Kelly KJ. "Cough and bronchial responsiveness in firefighters at the World Trade Center site." *N Engl J Med* 2002; 347:806–815.

Senior RM, Anthonisen NR. "Chronic obstructive pulmonary diseases (COPD)." *Am J Respir Crit Care Med* 1998 Apr; 157(4 Pt. 2):S139–147.

Sherman CB, Barnhart S, Miller MF, Segal MR, Aitken M, Schoene R, Daniell W, Rosentsock L. "Firefighting acutely increases airway hyperreactivity." *Am Rev Resp Dis* 1989 Jul; 40(1):185–190.

**D.2.4 Pulmonary Function Testing: Challenge Testing and Exercise Testing.**

American College of Sports Medicine, 1995. *Guidelines for Exercise Testing and Prescription*. Baltimore, MD: Williams & Wilkins.

American College of Occupational and Environmental Medicine Position Statement on Occupational Spirometry in the Occupational Setting. Townsend MC and the Occupational and Environmental Lung Disorder Committee. *Journal of Occupational and Environmental Medicine*. 2000; 42:228–245.

American Thoracic Society, Medical Society of the American Lung Association. "Guidelines for the evaluation of impairment/disability in patients with asthma." *Am Rev Resp Dis* 1993 Apr; 147(4):1056–1061.

American Thoracic Society. "Standardization of Spirometry." 1994 Update. *Am J Respir Crit Care Med* 1995 Sept; 152(3):1107–1136.

Crapo RO, Casaburi R, Coates AL, Enright PL, Hankinson JL, Irvin CG, MacIntyre NR, McKay RT, Wanger JS, Anderson SD, Cockcroft DW, Fish JE, Sterk PJ. "Guidelines for methacholine and exercise challenge testing — 1999." This official statement of the American Thoracic Society (ATS) was adopted by the ATS Board of Directors July 1999. *Am J Respir Crit Care Med* 2000 Jan; 161(1):309–329.

Crapo RO, Morris AH, Gardner RM. "Reference spirometric values using techniques and equipment that meet ATS recommendations." *Am Rev Resp Dis* 1981; 123:659–664.

Hankinson JL, Odencrantz JR, Fredan KB. "Spirometric reference values from a sample of the U.S. general population." *Am J Respir Crit Care Med* 1999; 159:179–187.

Knudson RJ, Lebowitz MD, Holberg CJ, Burrows B. "Changes in the normal maximal expiratory flow-volume curve with growth and aging." *Am Rev Resp Dis* 1983; 127:725–734.

**D.2.5 Tuberculosis.**

"Diagnostic standards and classification of tuberculosis in adults and children." This official statement of the American Thoracic Society (ATS) and the Centers for Disease Control and Prevention (CDC) was adopted by the ATS Board of Directors July 1999. This statement was endorsed by the Council of the Infectious Diseases Society of America (IDSA), Sept. 1999. *Am J Respir Crit Care Med* 2000 Apr; 161(4 Pt. 1):1376–1395.

"Targeted tuberculin testing and treatment of latent tuberculosis infection." This official statement of the American Thoracic Society (ATS) was adopted by the ATS Board of Directors July 1999. This is a joint statement of the ATS and the Centers for Disease Control and Prevention (CDC). This statement was endorsed by the Council of the Infectious Diseases Society of America (IDSA), Sept. 1999. *Am J Respir Crit Care Med* 2000 Apr; 161(4 Pt. 2):S221–247.

**D.2.5.1 Cancer Screening.**

Smith RA, Mettlin CJ, Davis KJ, Eyre H. "American Cancer Society guidelines for the early detection of cancer." *CA J Clin* 2000 Jan-Feb; 50(1):34–49.

**D.2.6** IAFF/IAFC *Joint Labor-Management Fitness-Wellness Initiative,* International Association of FireFighters, 1750 New York Ave. NW, Washington, DC.

**D.2.7** U.S. Department of Defense, Department of the Army Regulation 40-501 Medical Services Standards of Medical Fitness. Headquarters Department of the Army Washington, DC, 27 February 1998 edition.

**D.3 References for Extracts.** The following documents are listed here to provide reference information, including title and edition, for extracts given throughout this standard as indicated by a reference in brackets [ ] following a section or paragraph. These documents are not a part of the requirements of this document unless also listed in Chapter 2 for other reasons.

NFPA 1583, *Standard on Health-Related Fitness Programs for Fire Fighters,* 2000 edition.

# Index

© 2003 National Fire Protection Association. All Rights Reserved.

The copyright in this index is separate and distinct from the copyright in the document that it indexes. The licensing provisions set forth for the document are not applicable to this index. This index may not be reproduced in whole or in part by any means without the express written permission of NFPA.

## -A-

Abdominal organs and viscera .......... 6.10, 9.11, A.6.10; see also
    Gastrointestinal system
Administrators, guide for fire department ................ Annex B
Aerobic capacity ........................................ 8.2.1.1, C.2.1.1.1
AIDS ............................................... 9.8.2(9), A.9.8.2(9)
Alcohol .......................................................... 9.15, A.9.15
Allergic respiratory disorder ............... 9.7.2(4), A.9.7.2(4)
Americans with Disabilities Act ........................ A.6.1, B.1.1
Aorta, congenital or acquired lesions of ...................... 9.5.2(9)
Aortic aneurysm ................... 6.9.2.1(2), 9.5.2(1), A.6.9.2.1(2)
Aortic valve
    Insufficiency ................................................. 9.4.2(12)
    Stenosis ..................................................... 9.4.2(11)
Aphonia ............................................. 6.7.1(2), A.6.7.1(2)
Approved (definition) ............................... 3.2.1, A.3.2.1
Arthritis ........................... 9.10.2(14), 9.10.2(15), 9.10.2(17)
Asthma ....................... 6.8.1(7), 9.7.2(3), A.6.8.1(7), A.9.7.2(3)
Ataxias .............................................. 6.15.1(1), 9.13.2(1)
Atrial fibrillation or atrial flutter ............. 9.4.2(15), A.9.4.2(15)
Atrioventricular block ............................................ 9.4.2(17)
Audiology ...................... 7.6.5, A.6.1.1; see also Hearing
Authority having jurisdiction (definition) .............. 3.2.2, A.3.2.2
Axial skeleton ............................ see Spine and axial skeleton

## -B-

Blood and blood-forming organs .......................... 6.17, 9.17(8)
Bloodborne pathogen exposures ........................... A.7.11(11)
Blood sugar, control of ................... A.7.2.2(5); see also Diabetes
Blood tests ................................................. 7.6.3, A.6.1.1
Body composition evaluation ............. 8.1.2, A.8.1.2(1), A.8.1.2(3)
Body weight .............................................. 8.1.1, A.8.1.1
Breast ............................................. 7.6.1(6), 7.10, A.6.1.1

## -C-

Cancer ................................. 6.20, 9.13.2(7), 9.17, A.6.20.2
    Risk ................................................... A.7.2.2(5)
    Skin .............................................. 6.16.1(1), 9.17(9)
Candidates
    Definition ........................................ 3.3.1, A.3.3.1
    Medical evaluation ........................ see Medical evaluations
    Medical requirements ................ 4.1.7, 5.1.2, A.4.1.7
    Responsibilities of ......................................... 4.3
Cardiac hypertrophy ........................................ 9.4.2(20)
Cardiac pacemaker ...................... 6.9.1.1(7), A.6.9.1.1(7)
Cardiac valves, prosthetic ................................ 9.4.2(13)
Cardiomyopathy .......... 6.9.1.1(2), 6.9.1.1(5), 6.9.1.2(7), 9.4.2(3),
    9.4.2(5), A.6.9.1.1(2), A.6.9.1.1(5), A.6.9.1.2(7)
Cardiovascular system ................... see Heart; Vascular system
Carotid artery disease ........... 6.9.2.1(3), 9.5.2(2), A.6.9.2.1(3)
Category A medical conditions ................ see Medical conditions
Category B medical conditions ................ see Medical conditions
Cerebral aneurysm ................................ 6.15.1(7), A.9.13.2(2)
Cerebral arteriosclerosis ...... 6.15.1(2), 9.13.2(2), A.9.13.2(2)
Cerebral vascular insufficiency ........................... A.9.13.2(2)
Chemicals ................................................. 6.22, A.6.22.2
Chest radiographs (X-rays) ........................... 7.8, A.6.1.1
Chest wall .............................. 6.8, 9.7, A.6.8, A.9.7
Cholesterol, control of .................................... A.7.2.2(5)
Chronic obstructive airways disease ...................... 6.8.1(5),
    9.7.2(5), A.6.8.1(5), A.9.7.2(5)

Colonoscopy services, screening ........................... 7.13
Communicate, ability to ........... 9.1(12), A.6.3.1.2(2), A.6.3.1.2(3),
    A.6.3.2.2(2), A.6.7.1(1), A.6.7.1(2), A.6.7.2(5); see also
    Hearing
Confidentiality of medical and health information ............ 4.1.11,
    4.1.13, 4.1.14, 4.2.1, A.4.1.13
Congenital cardiovascular abnormality ..................... 6.9.1.2(8),
    9.4.2(19), A.6.9.1.2(8)
Congestive heart failure ............ 6.9.1.1(2), 9.4.2(2), A.6.9.1.1(2)
Contagious diseases ............................... see Infectious diseases
Coronary artery disease ...... 6.9.1.1(1), 9.4.1, 9.4.2(1), A.6.9.1.1(1)

## -D-

Defibrillator, automatic implantable ........................ 6.9.1.1(5),
    9.4.2(8), A.6.9.1.1(5), A.9.4.2(8)
Dementia ................................... 6.15.1(9), 9.13.2(9)
Demyelinating diseases ......................... 9.13.2(3), A.9.13.2(3)
Dental ............................... 6.6, 9.12.1(6), A.6.6.2, A.9.12.1(6)
Diabetes ....................... 6.18, 9.6.2(1), A.6.18.1(2), A.9.6.2(1)
Disabled persons ................................................ A.6.1, B.1.1
Drugs ................................. 6.22, 7.4.4, 9.15, A.6.22.2, A.9.15

## -E-

Ears ............................... 6.5, 7.6.1(2), 7.6.5, 9.8.2(3),
    9.12.1(4), A.6.1.1, A.6.5, A.9.12.1(4)
Edema, massive .......................................... 9.5.2(8)
Electrocardiograms (EKG) ............... 7.9, A.6.1.1, A.7.9.1, A.7.9.3
Emergency medical services (definition) ..................... 3.3.4
Endocarditis
    Acute ................... 6.9.1.1(3), 9.4.2(4), A.6.9.1.1(3)
    Chronic ..................... 6.9.1.2(9), 9.4.2(5), A.6.9.1.2(9)
Endocrine disorders ......... 6.18, 9.6, A.6.18.1(2), A.6.18.2(1), A.9.6
Epilepsy .............................. 6.15.1(8), 9.13.2(4), A.9.13.2(4)
Esophagus ........................................... 6.7, A.6.7
Essential job tasks .......... 4.1.5, 4.1.7, Chap. 5, 7.2.2(1), A.4.1.7
    Candidates, evaluation of ................ 6.1.1, 6.1.2, 6.2, A.6.1.1
    Definition ............................................ 3.3.5
    Members, evaluation of ............................. Chap. 9
        Cardiovascular disorders ........................ 9.4.2, A.9.4.2
        Endocrine and metabolic disorders ........... 9.6.2, A.9.6.2(1)
        Fire department physician roles .......................... 9.1
        Gastrointestinal tract and abdominal viscera ............. 9.11.2
        Head, eyes, ears, nose, neck, or throat .................... 9.12
        Infectious diseases ................. 9.8.2, A.9.8.2(6) to A.9.8.2(9)
        Lung, chest wall, and respiratory disorders ........ 9.7.2, A.9.7.2
        Medications .............................................. 9.16.2
        Neurologic disorders ........ 9.13.2, A.9.13.2(2) to A.9.13.2(6)
        Orthopedic disorders ..................................... 9.10.2
        Psychiatric and psychologic disorders ..................... 9.14.2
        Spine disorders ............................................ 9.9.2
        Substance abuse .......................................... 9.15.2
        Tumors ................................................... 9.17.2
        Vascular disorders ........................................ 9.5.2
    Restrictions from performance of specific tasks ....... 9.3, A.9.3.2
Evaluations ... see Fitness evaluation, annual occupational; Functional
    capacity evaluation; Medical evaluations
    Functional capacity evaluation (definition) ................ 3.3.9;
    see also Essential job tasks
    Heavy metal evaluation ..................................... 7.12

Exposure incidents .......... 5.1.3.1(3), 7.1.3, 7.2.2(2), 9.1(3), A.7.1.3;
    see also Hazardous materials and toxic substances,
    exposure to
  Bloodborne pathogen exposures ........................ A.7.11(11)
  Definition ............................................. 3.3.7
Extremities .......... 6.14, 9.10, A.6.14.2, A.9.10; see also Musculoskeletal
    system
Eyes ............... 6.4, 7.6.1(2), 9.12.1(3), A.6.1.1, A.6.4, A.9.12.1(3)

-F-

Fire apparatus or vehicles, operation of ...................... 9.1(10)
Fire department
  Guide for administrators ................................. Annex B
  Members ..................................... see Members
  Responsibilities .................... 4.1, 5.1.3, 7.1.1, 7.2.1, Annex B
Fire department physician ............... 4.1.3 to 4.1.6, 4.1.8 to 4.1.10,
    4.1.12, A.4.1.4, A.4.1.7; see also Medical evaluations
  Choosing ................................................. B.3
  Definition ............................................. 3.3.8
  Fire department, information from ....... 4.1.5, 4.1.6, 4.1.8, 5.1.3
  Qualifications .................................... 4.1.4, A.4.1.4
  Record-keeping and reports of .......................... 4.2.1, 4.2.3
  Responsibilities ....... 4.2, 7.1.3, 7.2.1, 7.5.3, 7.6.5.1,
    7.7.2, 7.8.2, 7.9.2, 7.10.2, 9.3, A.4.2.6, A.7.1.3, A.9.3.2
Fire-fighting tasks ..... 5.1.3.1(1), 9.1(1), 9.1(7) to 9.1(13), A.9.1(1);
    see also Rescue operations
Fitness evaluation, annual occupational ...................... 4.2.1(9),
    Chap. 8, A.4.1.13(2), C.1, C.2
Fitness programs ..........see Health-related fitness programs (HRFP)
Flexibility .............................. 8.2.1.4, A.6.3.2.2(3), C.2.1.1.1.8
Functional capacity evaluation (definition) ...................... 3.3.9;
    see also Essential job tasks

-G-

Gastrointestinal system ......................... 6.10, 7.6.1(7), 9.8.2(4),
    9.11, 9.17(6), A.6.1.1, A.6.10
Genitourinary system ....................... 6.11, 6.12, 7.6.1(8), 7.6.3,
    7.6.4, 9.8.2(5), 9.17(7), A.6.1.1, B.1.2.1

-H-

Hazardous materials and toxic substances, exposure to ....... 4.3(3),
    5.1.3.1(3), 7.2.2(2), 7.12, 9.1(3)
Head .................. 6.3.1, 7.6.1(2), 9.12, 9.13.2(6), 9.17(4), A.6.1.1,
    A.6.3.1.2(1) to A.6.3.1.2(3), A.9.12.1, A.9.13.2(6)
Health and fitness coordinator .......................... 4.1.10, C.1.1.1
  Definition ............................................. 3.3.10
Health and safety committee .................................... 4.2.4
  Definition ............................................. 3.3.11
Health and safety officer ...................................... 4.1.10
  Definition ............................................. 3.3.12
Health-related fitness programs (HRFP) ............... 4.2.1(9), 4.2.5,
    A.7.2.2(5)
  Definition ............................................. 3.3.13
Hearing ............... 6.5, 7.6.5, 9.12.1(4), A.6.1.1, A.6.5, A.9.8.2(3),
    A.9.12.1(4)
Heart .................... 6.9.1, 7.6.1(4), 7.9, 9.4, A.6.1.1,
    A.6.9.1, A.7.2.2(5), A.7.9.1, A.7.9.3, A.9.4
Heavy metal evaluation ........................................ 7.12
Hematologic malignancies .................................... 9.17(8)
Hepatitis ......... 6.10.2(4), 9.8.2(8), A.6.1.1, A.6.10.2(4), A.9.8.2(8)
  Virus screens and vaccinations ......................... 7.11(2),
    7.11(3), 7.11(7), A.7.11(11)
Hernia ........... 6.10.2(5), 7.6.1(9), 9.11.2(11), A.6.1.1, A.6.10.2(5)
HIV ................................................ 9.8.2(9), A.9.8.2(9)
  Screening and testing ....... 7.11(10), 7.11(11), A.6.1.1, A.7.11(11)
Hypercapnic disorders ........................................ 9.7.2(7)
Hypertension ............ 6.9.2.1(1), 9.4.2(18), 9.7.2(8), 9.16.2(5),
    A.6.9.2.1(1), A.7.2.2(5), A.9.4.2(18), A.9.13.2(2)
Hypotension ........................ 6.9.2.2(5), 9.5.2(6), A.6.9.2.2(5)
Hypoxemic disorders ................. 6.8.1(6), 9.7.2(6), A.6.8.1(6)

-I-

Immunizations ........................ 7.11, A.6.1.1, A.7.11(11)
Implementation of standard ................... 1.3, A.1.3.2, A.1.3.3
Incident scene rehabilitation ............................... 4.2.6, A.4.2.6
Infection control program .................................... 4.2.7
  Definition ............................................. 3.3.14
Infectious diseases .................. 9.8, A.9.8.2(6) to A.9.8.2(9)
  Exposure to ........................... 4.3(3), 5.1.3.1(3), 9.1(3)
  Screening ............................. 7.11, A.7.11(1), A.7.11(11)

-K-

Kidneys ........................................see Genitourinary system

-L-

Laboratory tests ..... 6.1.1, 7.6.2 to 7.6.5, 7.7 to 7.13, A.6.1.1, A.7.6.2
Larynx ............................................... 6.7, A.6.7
Legal considerations ........................................... B.1
Liver .......................................see Gastrointestinal system
Lungs (pulmonary system) ........ 6.8, 7.6.1(5), 7.7, 7.8, 9.7, 9.8.2(2),
    9.17(5), A.6.1.1, A.6.8, A.7.2.2(5), A.7.7.1, A.7.7.3, A.9.7;
    see also Tuberculosis
Lymphedema or lymphadenopathy ......................... 9.5.2(8)
Lymph nodes ................................. 7.6.1(10), 9.17(8), A.6.1.1

-M-

Malignant diseases ............................................see Cancer
Mammography ................................................ 7.10
Medical conditions ........................................... 9.2
  Category A ........................... 4.2.1(4), 6.2.1, 6.2.2
    Abdominal organs and gastrointestinal system .... 6.10.1
    Blood and blood-forming organs ..................... 6.17.1
    Chemicals, drugs, and medications .................. 6.22.1
    Definition ....................................... 3.3.15.1
    Dental ............................................. 6.6.1
    Ears and hearing ................................... 6.5.1
    Endocrine and metabolic disorders ..... 6.18.1, A.6.18.1(2)
    Extremities ........................................ 6.14.1
    Eyes and vision ............... 6.4.1, A.6.4.1(1) to A.6.4.1(3)
    Head and neck .............................. 6.3.1.1, 6.3.2.1
    Heart and vascular system ............. 6.9.1.1, 6.9.2.1, A.6.9.1.1,
      A.6.9.2.1
    Lungs and chest wall .................... 6.8.1, A.6.8.1
    Neurological disorders .......... 6.15.1, A.16.5.1(4), A.16.5.1(5)
    Nose, oropharynx, trachea, esophagus, and larynx ... 6.7.1,
      A.6.7.1(1), A.6.7.1(2)
    Psychiatric conditions ............................. 6.21.1
    Reproductive system ............................... 6.11.1
    Skin ............................................... 6.16.1
    Spine and axial skeleton ........................... 6.13.1
    Systemic diseases and miscellaneous conditions ...... 6.19.1
    Tumors and malignant diseases ..................... 6.20.1
    Urinary system ..................................... 6.12.1
  Category B ........................... 4.2.1(4), 6.2.1, 6.2.3
    Abdominal organs and
      gastrointestinal system ................... 6.10.2, A.6.10.2
    Blood and blood-forming organs ..................... 6.17.2
    Chemicals, drugs, and medications ............. 6.22.2, A.6.22.2
    Definition ....................................... 3.3.15.2
    Dental ..................................... 6.6.2, A.6.6.2
    Ears and hearing ........................... 6.5.2, A.6.5.2
    Endocrine and metabolic disorders ......... 6.18.2, A.6.18.2(1)
    Extremities ............................... 6.14.2, A.6.14.2
    Eyes and vision ..................... 6.4.2, A.6.4.2(1), A.6.4.2(2)
    Head and neck ........................... 6.3.1.2, 6.3.2.2,
      A.6.3.1.2(1) to A.6.3.1.2(3), A.6.3.2.2(1) to A.6.3.2.2(3)
    Heart and vascular system ............. 6.9.1.2, 6.9.2.2, A.6.9.1.2,
      A.6.9.2.2
    Lungs and chest wall ...................... 6.8.2, A.6.8.2
    Neurological disorders .................. 6.15.2, A.6.15.2(2)

Nose, oropharynx, trachea, esophagus,
    and larynx ............................... 6.7.2, A.6.7.2
Psychiatric conditions ........................................ 6.21.2
Reproductive system ......................................... 6.11.2
Skin .................................................. 6.16.2, A.6.16.2
Spine and axial skeleton ..................................... 6.13.2
Systemic diseases and miscellaneous conditions .......... 6.19.2,
    A.6.19.2(2)
Tumors and malignant diseases ................. 6.20.2, A.6.20.2
Urinary system ............................................... 6.12.2
Medical evaluations ............................ see also Medical history
Annual ..................... 7.1.2, 7.2.1, 7.6.2, A.7.6.2
    Components of ........................................... 7.4
    Purpose of ........................... 7.2.2, A.7.2.2(5)
    Timing of .............................................. 7.2.3
Baseline ...................... 7.1.2, 7.3.1, 7.3.2, 7.4.1
Candidates ................... 4.1.1, 4.1.2.1, 4.1.11, 4.2.1 to 4.2.3,
    4.3(1), Chap. 6, 7.3.2, Annex B
Coordination of program ...................................... B.4
Definition ................................................... 3.3.16
Fire department responsibilities ................. 4.1.1, 4.1.2, 4.1.8,
    4.1.9, 4.1.11, 7.1.1, Annex B
Members ...................... 4.1.1, 4.1.2, 4.1.8, 4.1.9,
    4.1.11, 4.2.1 to 4.2.3, 4.3(1), Chap. 7, Annex B
    Education regarding evaluation .................. 7.2, A.7.2.2(5)
OSHA standards .............................................. 7.1.4
Post illness, injury, occupational exposure,
    or absence ................................... 7.1.3, A.7.1.3
Records, results, reporting, and confidentiality .............. 4.1.11,
    4.2.1, 4.2.5, A.4.1.13(2)
Medical evaluator ..................... 7.5.3, 7.6.5.1, 7.7.2, 7.8.2, 7.9.2
Medical examinations (definition) ............ 3.3.17; see also Medical
    evaluations
Medical followup .......................................... 4.2.1(7), 7.5.2
Medical history ................... 6.1.1, 7.4.3, 7.5, A.4.1.13(1), A.6.1.1
Medically certified ....................... 4.2.1, 6.2.2, 6.2.3
    Definition .............................................. 3.3.18
Medications ........................... 6.22, 9.16, A.6.22.2
Members
    Definition ............................................. 3.3.19
    Essential job tasks ............................. see Essential job tasks
    Fitness evaluation ....... see Fitness evaluation, annual occupational
    Injury or illness, evaluation or intervention following ... 4.1.9
    Medical evaluations .......................... see Medical evaluations
    Medical requirements ..................... 4.1.7, 4.1.8, 5.1.2, A.4.17
    Responsibilities of ..................................... 4.3
    Temporary work restriction,
        alternate duty position during ................. 4.1.12
Metabolic disorders .......... 6.18, 9.6, A.6.18.1(2), A.6.18.2(1), A.9.6
Migraine .......................................... 6.15.2(2), A.6.15.2(2)
Mitral valve
    Insufficiency ...................................... 9.4.2(10)
    Stenosis .......................................... 9.4.2(9)
Multiple sclerosis ................................. 6.15.1(4), A.9.13.2(3)
Muscular endurance .................. 8.2.1.3, C.2.1.1.1.6, C.2.1.1.1.7
Muscular strength ................... 8.2.1.2, C.2.1.1.1.3 to C.2.1.1.1.5
Musculoskeletal system ..... 7.6.1(12), A.6.1.1; see also Axial skeleton;
    Extremities
Myasthenia gravis .......................... 6.15.1(5), A.9.13.2(3)
Myocarditis
    Acute ..................... 6.9.1.1(3), 9.4.2(4), A.6.9.1.1(3)
    Chronic .................. 6.9.1.2(9), 9.4.2(5), A.6.9.1.2(9)

-N-

Neck .............................. 6.3.2, 7.6.1(3), 9.12.1(2), 9.17(4),
    A.6.1.1, A.6.3.2.2(1) to A.6.3.2.2(3)
Neurological system ........................... 6.15, 7.6.1(11), 9.13,
    9.17.2(3), A.6.1.1, A.6.15, A.9.13
Nose .............. 6.7, 7.6.1(2), 9.12.1(6), A.6.1.1, A.6.7, A.9.12.1(6)

-O-

Obstructive lung disease ...... see Chronic obstructive airways disease
Occupational safety and health program (definition) .......... 3.3.20;
    see also Fitness evaluation, annual occupational;
    Health-related fitness programs (HRFP)
Oropharynx ....................................... 6.7, A.6.7
Orthopedic disorders ....................................... 9.10, A.9.10
OSHA standards ................................... 7.1.4, 7.6.5.2

-P-

Pacemaker ............................ 9.4.2(8), A.9.4.2(8)
Parkinson's disease ............................ 6.15.1(10), 9.13.2(8)
Performance (definition) .......... 3.3.21; see also Essential job tasks
Pericarditis
    Acute ...................... 6.9.1.1(3), 9.4.2(4), A.6.9.1.1(3)
    Chronic ................... 6.9.1.2(9), 9.4.2(5), A.6.9.1.2(9)
    Constrictive ........................................ 9.4.2(3)
Personal protective ensembles ...................... 4.1.8, 5.1.3, 5.1.4,
    9.1.1, 9.1(1), 9.1(3) to 9.1(5), 9.1(12), 9.12.1, 9.17(3),
    9.17(9), A.4.1.7, A.6.3.1.2(1) to A.6.3.1.2(3),
    A.6.3.2.2(2), A.6.6.2(2) to A.6.6.2(4), A.6.7.1(1),
    A.6.7.2(1), A.6.16.2(11), A.6.16.2(14), A.6.19.2(2),
    A.7.7.1, A.9.1(1), A.9.4, A.9.9, A.9.12.1, A.9.12.1(6)
Physical conditioning program .. 4.2.5; see also Health-related fitness
    programs (HRFP)
Physical examination ...................... 6.1.1, 7.6, A.6.1.1, A.7.6.2
Physician ........................... see Fire department physician
Pneumothorax ...................... 9.7.2(10), 9.7.2(11), A.9.7.2(11)
Pregnancy ............................ 6.11.2(1), B.1.2.1
Problem-solving ability .................................... 9.1(11)
Protected classes ......................................... B.1.2
Psychiatric conditions ............................... 6.21, 9.14, A.9.14
Pulmonary system ...................... see Lungs (pulmonary system)
Purpose of standard ........................................ 1.2, A.1.2.2

-R-

References .................................... Chap. 2, Annex D
Rehabilitation program .................................. 4.2.1(9), 4.2.5
Reports and records
    Candidate and member responsibilities ........................ 4.3
    Fire department physician responsibilities ............. 4.2.1, 4.2.3
    Fire department responsibilities .... 4.1.11, 4.1.13, 4.1.14, A.4.1.13
Reproductive system ......................... see Genitourinary system
Rescue operations ..... 5.1.3, 5.1.4, 9.1.1, 9.1(1), 9.1(6), A.9.1(1)
Respiratory disorders ..................................... 9.7, A.9.7

-S-

Scope of standard ..................................... 1.1, A.1.1.1
Search and rescue ............................... see Rescue operations
Self-contained breathing apparatus (SCBA) .......... 5.1.3, 6.16.1(2),
    9.1(1) to 9.1(3), 9.1(12), 9.7.2(2), 9.17(3), A.4.1.7,
    A.6.5, A.6.16.2(11), A.6.20.2(3), A.7.7.1, A.9.1(1), A.9.4,
    A.9.9, A.9.12.1(6)
Shall (definition) ......................................... 3.2.3
Should (definition) ....................................... 3.2.4
Skin .............. 6.16, 7.6.1(13), 9.8.2(1), 9.17(9), A.6.1.1, A.6.16.2
Specialized teams, medical requirements for .............. 5.1.4, 9.1.1
Spine and axial skeleton ................................. 6.13, 9.9, A.9.9;
    see also Musculoskeletal system
Spirometry .............................. 7.7, A.6.1.1, A.7.7.1
Stroke ............................. 6.15.1(2), A.9.13.2(2)
Substance abuse ...................... 6.22, 9.15, A.6.22.2, A.9.15
Supraventricular arrythmias .............. 6.9.1.2(2), 9.4.2(14),
    9.4.2(15), A.6.9.1.2(2), A.9.4.2(14), A.9.4.2(15)
Syncope, recurrent ...... 6.9.1.1(4), 9.4.2(7), A.6.9.1.1(4), A.9.4.2(7)
Systemic diseases and miscellaneous conditions .... 6.19, A.6.19.2(2)

-T-

Tachycardia ............................ 6.9.1.1(5), 6.9.1.2(2), 6.9.2.2(5),
      9.4.2(14), 9.5.2(6), A.6.9.1.1(5), A.6.9.1.2(2),
      A.6.9.2.2(5), A.9.4.2(14)
Team operations ......................................... 9.1.1, 9.1(13)
Thoracic outlet syndrome ..................................... 9.5.2(3)
Throat ...................... 7.6.1(2), 9.12.1(6), A.6.1.1, A.9.12.1(6)
Thrombophlebitis or thrombosis ............................. 9.5.2(5)
Tobacco use ......................................... 6.22.1.1, A.7.2.2(5)
Toxic substances ............ see Hazardous materials and toxic substances,
      exposure to
Trachea ......................................................... 6.7, A.6.7
Tracheostomy ............................... 6.7.1, 9.7.2(1), A.6.7.1(1)
Tuberculosis .................................... 9.8.2(7), A.9.8.2(7)
   Screen ................................ 7.11(1), A.6.1.1, A.7.11(1)
Tumors .................................. 6.20, 9.13.2(7), 9.17, A.6.20.2

-U-

Urinary system ............................... see Genitourinary system

-V-

Vascular system .................... 6.9.2, 7.6.1(4), 9.4, 9.5, 9.13.2(5),
      A.6.1.1, A.6.9.2, A.7.2.2(5), A.9.4, A.9.13.2(5)
Ventricular ectopy ............................................. 9.4.2(16)
Vision ............. 6.4, 7.6.1(14), 9.12.1(3), A.6.1.1, A.6.4, A.9.12.1(3)
Vital signs ............................................... 7.6.1(1), A.6.1.1

-W-

Weight ........................................... 8.1.1, A.7.2.2(5), A.8.1.1
Wolff-Parkinson-White (WPW) Syndrome ..... 9.4.2(14), A.9.4.2(14)



# Montgomery Fire and Rescue

**Bobby N. Bright**

Mayor

**John W. McKee**

Fire Chief

Montgomery City Council Members

Charles W. Jinright-President-1
James A. Nuckles-Pres.
Pro tem-4
Jim Spear-3

Tim Head-2

Janet T. May-3

Cornelius "CC"
Calhoun-5

Willie Cook-6

Martha Roby-7
Glen O. Pruitt,
Jr.-8

May 4, 2006

Firefighter E. J. Haynes
4501 Middlefork Road
Montgomery, AL    36106

Dear Firefighter Haynes:

On the third week of March, 2005, you went on leave until you could get the issue of your prescription drug use resolved between your physician and the City employed physician.   On May 30, 2005, having not resolved the issue, you went on leave without pay.   As of this date, the issue has not been resolved nor have you been in contact with us concerning your situation.

If you have not returned to work by May 22, 2006, as pursuant to Montgomery City-County Rules and Regulations, Rule IX, Section I, the Montgomery Fire Department will consider you to have resigned your position by job abandonment.

Yours very truly

J. W. McKee, Fire Chief

JWM:fb



EXHIBIT
F





(334) 241-2930
FAX: (334) 241-2611

P.O. BOX 1111, MONTGOMERY, ALABAMA 36101-1111

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


EDDIE J. HAYNES,

    Plaintiff,


    vs. CIVIL ACTION NO:  2:06-CV-1093-WKW


CITY OF MONTGOMERY, ALABAMA,

    Defendant.



DEPOSITION OF MICHAEL C. TURNER


The deposition of MICHAEL C. TURNER was
taken before Krista Price, September 25,
2007, at 1600 Forest Avenue, Montgomery,
Alabama 36106, commencing at 1:46 p.m.
pursuant to the stipulations set forth
herein:



DEFENDANT'S EXHIBIT
6

# BIRMINGHAM REPORTING SERVICE

Page 6

1      MICHAEL C. TURNER, DO,

2   having first been duly sworn, was examined

3   and testified as follows:

4

5      THE COURT REPORTER:   Usual

6   stipulations?

7      MR. MILLER:   That's fine.

8

9   EXAMINATION BY MR. MILLER:

10      Q   Would you state your name for the

11   record?

12      A   Michael Clark Turner.

13      Q   And are you a licensed physician in

14   the State of Alabama?

15      A   I am.

16      Q   Are you licensed to practice

17   osteopathy or medicine?

18      A   Osteopathy medicine, yes.

19      Q   All right.   Is your title Doctor of

20   Osteopathy?

21      A   Yes, it is.

22      Q   When were you licensed in the State

23   of Alabama?

# BIRMINGHAM REPORTING SERVICE

Page 47

1    Q   Going back to the visit on March

2   31st, 2005, did you do a physical exam on

3   that occasion?

4    A   Yes, sir.

5    Q   What did that reveal or let me

6   first ask if you would just describe what

7   you did as far as a physical exam is

8   concerned?

9    A   Basically vital signs were

10   obtained, basic lungs, cardiovascular,

11   abdomen.  And then he and I reviewed his

12   information from Dr. Palmer.

13    Q   As far as the physical exam itself,

14   was everything normal?

15    A   Within normal limits.

16    Q   Did you find any physical

17   limitations at that time?

18    A   No physical limitations as we would

19   describe it, no.

20    Q   And did you conclude that Mr.

21   Haynes was physically fit for duty as a

22   firefighter?

23    A   He was physically fit, yes.

# BIRMINGHAM REPORTING SERVICE

Page 62

1    sedative.

2        Q   Is it a narcotic drug?

3        A   It is not a narcotic.

4        Q   And when we say narcotic drug are

5    we -- are you using that in a sense it is

6    derived from an opium?

7        A   Opiate, yes.  Basically like a

8    Lortab, those type of things.

9        Q   Now I notice in your March 31st

10   office note you say these medication

11   effects could carry over to his duty time.

12   Do you see that?

13       A   Right.

14       Q   And you are indicating that there

15   is a possibility that they could, right?

16       A   Sure.

17       Q   And then later you say there are

18   safety issues for him driving a truck and

19   working on the fire line while under the

20   influence of these medications, though he

21   claims he does not take while on duty?

22       A   Right.

23       Q   You see that?   When you say safety

# BIRMINGHAM  REPORTING  SERVICE

Page 63

1    issues is that another way of saying that

2    you had a concern about that?

3        A   There is a concern, but there is

4    also a standard for that too.  The issue

5    is is he taking them or not.

6        Q   Okay.

7        A   I mean if he is taking them, then

8    he is not on the fire line.

9        Q   When you say he is not on the fire

10   line, you mean that you would not

11   recommend?

12       A   He did not meet standard for it.

13       Q   What standard are you referring to?

14       A   The National Fire Protection

15   Association.  And I think they have

16   probably been updated since his last one,

17   since this was done.

18       Q   But your testimony is that the

19   National Fire Protection Association

20   standard would not permit him to work on

21   the fire line while taking these

22   medications?

23       A   Yes.   I can explain in more detail

# BIRMINGHAM · REPORTING SERVICE

Page 64

1    but, yes.

2        Q   And you are referring again to the

3    Valium, the Gabitril and Lexapro?

4        A   Yes.

5        Q   And did you tell Mr. Haynes about

6    the National Fire Protection Association

7    standards?

8        A   I am not sure if I specifically

9    mentioned those. I mean he was aware of

10   the issue of it being between him being on

11   them and not being on them, the

12   medications.

13       Q   And he told you that he had never

14   never taken Valium or Gabitril while he

15   was on duty, didn't he?

16       A   That is what he told me.

17       Q   Did you believe him?

18       A   You have to. You also have to look

19   at how the medicine is prescribed.  And if

20   a doctor is prescribing it that way, then

21   he should write it that way.  He shouldn't

22   write it for every day.  But it is

23   prescribed every day.

# BIRMINGHAM REPORTING SERVICE

Page 65

1    Q  Well, Dr. Palmer said the Valium

2    was as needed basis, did he not?

3    A  He did.  But in his note he has it

4    one twice a day, number sixty.  So that

5    means he wrote it to be taken twice a day

6    every day with four refills.

7    Q  And in his March 4th, 2000 letter

8    he said he was instructed to take Valium

9    on  an as needed basis?

10    A  Right.  There is contradiction

11    between his letter and what he wrote on

12    his office note.

13    Q  When you talked Mr.  Haynes he said

14    he took it on an as needed basis, didn't

15    he?

16    A  He said he did, yes.

17    Q  And did not ever take it on duty?

18    A  That is what he said.

19    Q  It's correct is it not that the

20    National Fire Protection Association

21    standards are not -- they are not a

22    statute are they?  They are not a law?

23    A  They are a standard that the

# BIRMINGHAM REPORTING SERVICE

Page 85

1    Q   Okay.  And after that point when
2  did you next see Mr.  Haynes?
3    A   5/25/06.
4    Q   So that would be a year later
5  approximately?
6    A   I assume that's -- yeah, I guess.
7  (Whereupon, Plaintiff's Exhibit No. 15,
8  was marked for identification and the same
9  is attached hereto.)
10   Q   And is Plaintiff's 15 a rather poor
11 copy of your office note from that date?
12   A   It is a small copy, yes.  Not
13 poor.
14   Q   And the -- what was the purpose of
15 that examination or visit?
16   A   Fit for duty again.
17   Q   Okay.  Do you know who made that
18 appointment or how that came about?
19   A   It would have been through the City
20 or the fire department.
21   Q   And at this time you had not seen
22 Mr. Haynes in about a year?
23   A   Right.

# BIRMINGHAM REPORTING SERVICE

Page 86

1    Q   Did you do a physical exam on that
2    occasion?
3    A   No.  Basically went back just
4    through his history.  I mean that is what
5    we are dealing with again.
6    Q   Did you do vital signs?
7    A   We did do vital signs, sure.
8    Q   And you didn't find anything
9    abnormal?
10   A   His blood pressure may be a little
11   elevated that day, but whose wouldn't be
12   when you come in for this.
13   Q   Not for anything that would
14   disqualify him from working?
15   A   If we were looking for that, then
16   we would recheck him after he sat for
17   twenty minutes and he would, you know --
18   that would not be his final pressure right
19   there if that is what we were looking at.
20   Q   And you noted on that occasion in
21   your notes that he was still physically
22   fit for duty?
23   A   Uh-huh.

# BIRMINGHAM REPORTING SERVICE

Page 87

1    Q    But nothing had changed?

2    A    Right.

3    Q    Correct?  Meaning that he was still

4    taking Lexapro, Valium and Gabitril?

5    A    Right.

6    Q    And also it says Flexeril?

7    A    Uh-huh.

8    Q    What is that?

9    A    That is a muscle relaxer.

10   Q    So that is a -- he was taking fewer

11   medications perhaps or basically the --

12   A    Basically the same.

13   Q    The same, but with a different

14   muscle relaxer?

15   A    Right.

16   Q    And your concerned centered on

17   Lexapro, Valium and Gabitril, didn't it?

18   A    Yes.  And of course the Flexeril is

19   more potent than Skelaxin in causing

20   sleepiness, drowsiness, reaction times,

21   all those things.

22   Q    And it is a muscle relaxant?

23   A    Yes.

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

## BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE  (205) 322-8481

OF COUNSEL
L. DREW REDDEN

May 12, 2005

Mr. Walter Byars, City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

RE:     Eddie Haynes
        SS#:  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
        DOB: 8/17/70

Dear Mr. Byars:

This letter is written on behalf of Mr. Eddie Haynes, an employee for the last fifteen years as a firefighter with the Fire Department of the City of Montgomery. Mr. Haynes has on-going employment problems in the Fire Department and I am writing to request your help in resolving these problems and returning him to work.

Mr. Haynes has been seeing a psychiatrist, Dr. Clemmie Palmer, III, since November 2002 for anxiety. Dr. Palmer has prescribed certain medications, principally Valium and Gabitril, which Mr. Haynes has taken since November 2002 on an as-needed basis. Mr. Haynes worked continuously until March 15, 2005 when he was placed on leave for the City to investigate his medications and capacity to work. Mr. Haynes has at all times been able to work and has worked full time without difficulty. I understand he has had a good work record and his personnel file will support that.

Now, although two months have passed, Mr. Haynes is still on involuntary leave. The City is trying to force him to take Family and Medical Leave even though he is able to return to work and desperately needs to return to work to support himself and his family.

Mr. Haynes has recently supplied the City with two letters from Dr. Palmer. I have enclosed a copy of these letters, dated March 4, 2005 and April 14, 2005, for your information. Dr. Palmer unequivocally states that Mr. Haynes is able to work on his current medications and has no side effects on these medications. Dr. Palmer's March 4 letter states Mr. Haynes has no work restrictions and should continue to perform his duties at his current capacity. He states, "He has been stable on his current medication and working full time without difficulty." When the City was not

DEFENDANT'S
EXHIBIT
7

EXHIBIT
A

satisfied with that, Dr. Palmer wrote a second letter, dated April 14, 2005, stating that Mr. Haynes is able to work without taking Valium or Gabitril, and can perform his duties in his current capacity with no restrictions. Still, the City will not return Mr. Haynes to work.

Currently, Mr. Haynes is on leave, using his sick leave or annual leave time. However, that will soon run out. His superiors are now telling him that he must sign a request for Family and Medical Leave. Mr. Haynes does not desire Family and Medical Leave, because he is willing and able to return to work. He does not wish to take a leave without pay, because he needs to work to support himself and his family.

It appears to me that there is no justification for not allowing Mr. Haynes to return to work. While it appears the City perceives Mr. Haynes to be disabled, his work history and information from his doctor both demonstrate that he is able to work. The Americans with Disabilities Act requires an individualized assessment of Mr. Haynes and his ability to work, and that individualized assessment would dictate that he be returned to work.

Finally, I have enclosed a copy of an EEOC Charge of Discrimination recently filed by Mr. Haynes. It is hoped that this matter can be resolved, Mr. Haynes will be returned to work, and the EEOC Charge can be withdrawn if the City will restore the sick leave or annual leave time Mr. Haynes has been forced to take.

I would ask you to immediately investigate this matter and work with me in getting Mr. Haynes returned to work. By a copy of this letter to J.W. McKee, Fire Chief of the Fire Department, I am informing him of my letter to you and this request. Time is of the essence. Mr. Haynes does not know exactly how much more annual leave or sick time he has, but he has been lead to believe it will expire within the next two weeks. I would appreciate your investigating this and getting back to me well before that time.

Very Truly Yours,

REDDEN, MILLS & CLARK

Gerald L. Miller

GLM/mb
Enclosures

cc:    J.W. McKee, Fire Chief

**Return To Work/School**

Name: _Eddie Haynes_

~~was~~ *was* under my care from _3/24/05_ to _3/31/05_

and may be able to return to (work)/school on _To be_
_determined by_
_employer._

Limitations/Remarks: _____
_____
_____

Dr._____ oc/fac Phone (334) 261-4445

Address _1600 Forest Ave_     Date _7/27/05_
_Montgomery Al_ 36106

*Avelox*
moxifloxacin HCl Tablets

*Avelox I.V.*
moxifloxacin HCl in NaCl Injection

EEOC FORM 131 (5/01)

U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| | Eddie Haynes |
| MONTGOMERY FIRE DEPT.<br>D.S. Yelder, District III Chief<br>P. O. Box 1111<br>Montgomery, AL 36101 | THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>130-2005-04376 |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act          [X] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by   **13-JUN-05**   a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by                          to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by   **27-MAY-05**   to   **Debra B. Leo, ADR Coordinator, at  (205) 212-2033**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Booker T. Lewis,
Enforcement Supervisor

*EEOC Representative*

*Telephone:*   (205) 212-2115

Enclosure(s): [X] Copy of Charge

**Birmingham District Office**
**Ridge Park Place**
**1130 22nd Street, South**
**Birmingham, AL 35205**

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN  [ ] AGE  [X] DISABILITY  [ ] RETALIATION  [ ] OTHER

See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 12, 2005 | Bernice Williams-Kimbrough,<br>District Director | |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 130-2005-04376 |

_____ and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| Mr. Eddie Haynes | (334) 272-0317 | 08-17-1970 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4501 Middle Fork Road Montgomery, AL 36106 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Includes Area Code)* |
|---|---|---|
| MONTGOMERY FIRE DEPT | 201 - 500 | (334) 241-2400 |

| Street Address | City, State and ZIP Code |
|---|---|
| Post Office Box 1111, Montgomery, AL 36101 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 01-29-2003    Latest: 03-15-2005
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired by the above-named employer on April 4, 1990, as a fire fighter. Since January 29, 2003, and continuing I have been subjected to harassment and intimidation due to my being disabled. My employer has made an issue over the medication that I am required to take. I have further been subjected to adverse conditions of employment because I complained about the unfair treatment of Black employees. On March 15, 2005, I was forced to take leave while an investigation is being conducted into my medication.

I believe that I am being discriminated against because of my race, Black, my disability and in retaliation for having opposed practices made unlawful under Title VII of the Civil Rights Act of 1964, as amended and the American with Disabilities Act of 1990. White employees on medication are treated more favorably.

RECEIVED
EEOC

MAY – 9 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| May 09, 2005 _____ *Date*    _____ *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE (205) 322-8481

OF COUNSEL
L. DREW REDDEN

July 27, 2005

Mr. Walter Byars, City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111



RECEIVED
JUL 28 2005
CITY ATTORNEY'S
OFFICE

> **RE:**   Eddie Haynes
> SS#:   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
> DOB: 8/17/70

Dear Mr. Byars:

I wrote to you by letter dated May 12, 2005 regarding Mr. Eddie Haynes, a firefighter with the Fire Department of the City of Montgomery. A copy of that letter is enclosed for your convenience.

I have not received any response to that letter. Since that time, the annual leave and sick time of Mr. Haynes has expired and he has not been allowed to return to work by the City, nor is he being paid. I would reiterate that Mr. Haynes is willing and able to return to work, desires to return to work, and needs to work to support himself and his family.

On March 31, 2005 Mr. Haynes was seen by the City's doctor, Dr. Michael Turner, for what the City calls a "fitness for duty examination". It is my understanding it was Dr. Turner's opinion that Mr. Haynes was physically fit to return to duty and he communicated that to the City and stated that it was the City's decision whether to return him to work. I have enclosed, for your information, a Return to Work/School slip Mr. Haynes has obtained from Dr. Turner confirming that his return to work date is to be determined by the employer.



EXHIBIT

B

Since, as I stated in my May 12 letter, Mr. Haynes' psychiatrist says he is able to return to work with no restrictions, I fail to see why Mr. Haynes has not been returned to work. I would again ask you to investigate this situation, and assist in getting Mr. Haynes returned to work.

Very Truly Yours,

REDDEN, MILLS & CLARK

Gerald L. Miller

GLM/mb
Enclosures

cc:    J.W. McKee, Fire Chief
       Mr. Eddie Haynes

# WALTER R. BYARS

C I T Y   A T T O R N E Y
wbyars@ci.montgomery.al.us
tdavis@ci.montgomery.al.us



KIMBERLY O. FEHL
ASSISTANT CITY ATTORNEY
kfehl@ci.montgomery.al.us

WALLACE D. MILLS
ASSISTANT CITY ATTORNEY
wmills@ci.montgomery.al.us

August 1, 2005

Gerald L. Miller, Esq.
Redden, Mills & Clark
940 Financial Center
505 Twentieth Street North
Birmingham, Alabama 35203

  Re: Eddie Haynes
    SSN: 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
    DOB: 8/17/70

Dear Mr. Miller:

  I am in receipt of your letter dated July 27, 2005 regarding Mr. Haynes' employment with the Montgomery Fire Department. Please be advised that Mr. Haynes' current employment status is "leave without pay" as he has exhausted all of his annual leave and sick time. At this time, Mr. Haynes has not signed the FMLA paperwork.

  The inquiry into Mr. Haynes' prescription medication use was initiated by his memo to Chief M. F. Smith dated March 4, 2005 (a copy of which is attached hereto for your convenience). Mr. Haynes provided a copy of a letter from his personal physician, Clemmie Palmer, dated March 4, 2005 wherein Dr. Palmer states that Mr. Haynes is able to work on the "current medications Lexapro, Valium and Gabitril." Because Mr. Haynes listed nine medications in the March 4 memo (Ibuprofen, Lexapro, Gabitril, Hydrocodone, Diazepam, Cyclobenzaprine, Skelaxin, Meperidine and over the counter Benadryl) and Dr. Palmer had only addressed three medications, a determination was made that the city physician would need to assess the effects of all of the medications taken Mr. Haynes to determine if these medications might impair his ability to perform his job duties, specifically as a driver of Engine 14 and on the fire line.

  Dr. Michael Turner, one of the City's physicians, evaluated Mr. Haynes and states in his evaluation dated March 31, 2005 that Mr. Haynes reports the following medications: Lexapro, Gabitril, Ibuprofen, Skelaxin, Valium, DCN, Benadryl prn, and Hydrocodone. Dr. Turner further states: "Patient is physically fit to return to duty. The concerns come from the medications he is taking . . . These medications effects could carry over to his on duty time. Any drug screen performed would most likely be positive even when on duty. There are safety issues for him driving a truck and working on the fire line while under the influence of

**EXHIBIT**

_C_

these medications though he claims he does not take while on duty . . . Administrative decision is needed."

The City has never disputed that Mr. Haynes is physically fit for duty. The problem, however, arises with the medications he has listed as being current medications. His physician, Dr. Palmer, only addressed 3 of the 9 medications listed by Mr. Haynes and, in a recent unemployment appeals hearing, Mr. Haynes admitted that Dr. Palmer did not know about the other six medications (Hydrocodone, etc.) because Dr. Palmer had not prescribed those medications for Mr. Haynes.

The Fire Department has, on numerous occasions since March of this year, instructed Mr. Haynes to have his personal physician talk with Dr. Turner so that the two physicians can make a recommendation regarding Mr. Haynes' prescription medication use, and whether these medications affect his ability to safely perform his job duties as a firefighter. To date, Mr. Haynes has refused to follow-up and have his personal physician contact Dr. Turner.

While Dr. Turner did state in his evaluation that Mr. Haynes was physically fit for duty, he also stated that an administrative decision was needed regarding the safety issues for Mr. Haynes driving a truck and working on the fire line under the influence of these medications. This administrative decision cannot be made without Mr. Haynes making the necessary arrangements between his personal physician, Dr. Clemmie Palmer, and Dr. Turner, for a review and discussion of his prescription medication use. The burden of resolving the prescription medication use (the discrepancy between the 9 listed in his memo and the 3 addressed by Dr. Palmer) has rested solely with Mr. Haynes due to federal laws protecting health information (HIPAA).

In an effort to resolve the prescription medication issue, I have enclosed herewith several HIPAA compliant medical records release authorizations, as well as a general release, which will allow the City to collect the necessary medical records relating to the prescription medications listed in Mr. Haynes March 4, 2005 memo, and provide copies of same to Drs. Palmer and Turner. The release further allows Drs. Turner and Palmer to discuss with each other and with City representatives Mr. Haynes' prescription medication use and his ability to safely perform his job while taking these medications. Once the records have been received **from all prescribing doctors** and Drs. Turner and Palmer have reached a decision regarding Mr. Haynes ability to safely perform his job duties while taking these medications, then the administrative decision regarding Mr. Haynes' employment can be made.

If you have any questions or require additional information, please let me know

Sincerely yours,

Kimberly O. Fehl

KOF/nke
Enclosures
cc: Chief John McKee

2

TO:     M.F. Smith, District Chief

From:   E.J. Haynes, Firefighter

Date:   March 4, 2005

RE:     Engine 14 Driver


Dear Sir,

It is a pleasure as well as an honor to be chosen Driver of Engine 14.
I am more than willing if the City of Montgomery needs me to do so.
However, if there is someone else is more willing or highly qualified to drive
Engine 14, I will assist them as needed to be ready to take any assignment. I have
been driving the Fire Truck off and on for the last fourteen years and I am
currently the driver.

Being a Driver for Engine 14 I know I must inform you of my medications. The
medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4
mg. PRN(two –three times a week).
Medications that I take on my off days and on a as needed basis are Hydrocodone
5/500, Diazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50.,
and over the counter Benadryl for my sinus problem.

Again, thank you for your consideration for me being Engine 14 Driver. It is an
honor to be a Montgomery Firefighter and take on the duties of a dedicated
Fireman.



Respectfully,


E. J. Haynes, F/F Station 14

State of Alabama        )
Montgomery County  )

Before me, the undersigned, a Notary Public in and for said State and County, personally appeared **Eddie J. Haynes**, who is known to me, and after first being duly sworn by me deposes and states as follows:

1.     My name is Eddie J. Haynes and I am over the age of nineteen (19) years.

2.     In an attempt to resolve issues with my private physicians, which I have been unable to accomplish on my own, regarding my use of the prescription medications listed in a March 4, 2005 memo from me to District Chief M. F. Smith (attached hereto as Exhibit A) and whether these medications have any bearing on my ability to safely:  (a) drive a Montgomery Fire Department fire engine; and/or, (b) perform my duties as a firefighter on the fire line without jeopardizing my own safety or the safety of others, I hereby authorize the City of Montgomery to obtain my medical records as they relate to the prescription medications listed in the memo attached hereto as Exhibit A.

3.     I further authorize Dr. Michael Turner and Dr. Clemmie Palmer to review my medical records and discuss between themselves and with representatives of the City of Montgomery Fire Department and City Attorney's Office my prescription medication use and whether these medications have any bearing on my ability to safely drive a Montgomery Fire Department fire engine or perform my duties as a firefighter on the fire line without jeopardizing my own safety or the safety of others.

4.     I hereby disclose the names of the following physicians who have prescribed the medications listed on Exhibit A and have signed HIPAA compliant authorizations allowing the City Attorney's Office to obtain my medical records from these physicians.

_____          _____
(Doctor's Name)                           (Address)

_____          _____
(Doctor's Name)                           (Address)

_____          _____
(Doctor's Name)                           (Address)

_____          _____
(Doctor's Name)                           (Address)

_____          _____
(Doctor's Name)                           (Address)

_____          _____
(Doctor's Name)                           (Address)

_____
Eddie J. Haynes
(Initials Only)

Dated this the _____ day of _____, 2005.


_____
Eddie J. Haynes, Affiant


Sworn to and subscribed before me on this the _____ day of _____, 2005.


_____
Notary Public

(Seal)

My commission expires:

_____


_____
Eddie J. Haynes
(Initials Only)

## AUTHORIZATION FOR RELEASE OF PROTECTED HEALTH INFORMATION

TO: _____
    _____
    _____
    _____

I, **Eddie J. Haynes**, do hereby authorize and request that the above-named physician, hospital, healthcare facility, institution, firm or corporation disclose the following individually identifiable health information to any of the following persons:

1) City Attorney's Office, City of Montgomery, Alabama,
   103 N. Perry Street, Montgomery, Alabama 36104
   Attn: Kimberly O. Fehl, Esq.

2) Michael C. Turner, DO
   1600 Forest Avenue
   Montgomery, Alabama 36106

3) Clemmie Palmer, III, MD
   3090 Woodley Road
   Montgomery, Alabama 36116

All medical and healthcare information and records, including, but not limited to, doctors' notes, nurses' notes, office notes, summary sheets, emergency records, history and physicals, admission records, examination records, consultation records, surgeons' records, medication records, discharge summaries, x-ray reports, CAT scan reports, MRI reports, pathology reports, laboratory reports, personal notes, incident reports, test records and results, psychiatric records, psychological records, alcohol and substance abuse records, records regarding HIV, AIDS, hepatitis and sexually transmitted diseases, bills, claims, remittances, insurance records, consents for treatment, correspondence, memoranda, evaluations, writings of any kind of any other papers concerning any treatment, examination, periods or stays of hospitalization, confinement, diagnosis or other information pertaining to and concerning the physical or mental condition of:

Name: Eddie J. Haynes
Social Security No.: 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
Date of Birth: 08/17/1970

This authorization also includes the authority to inspect any and all such records. A copy of this Authorization may be used in place of, and with the same force and effect as, the original.

By providing this authorization:

- I understand that the purpose of the request is to allow the City Attorney's Office to provide legal services to the City of Montgomery, Alabama. I understand that the above-named healthcare provider or institution cannot condition treatment, payment, enrollment, or eligibility for benefits on my execution of this Authorization for the purposes specifically referenced herein.

- I understand that the health information to be released may be subject to redisclosure by the recipient of the health information and no longer be protected by state or federal privacy rules.

- I understand that I may revoke this Authorization at any time by notifying the above-named healthcare provider or institution and the City Attorney's Office for the City of Montgomery, Alabama in writing, but such revocation by me will have no effect on disclosures of information already made under this Authorization prior to the receipt of my revocation.

- I hold the above-named healthcare provider or institution, his/her/its employees, directors, officers, agents and representatives harmless from any and all damages which might result to me, my representatives, heirs, and/or assigns from the disclosure of this information to the City Attorney's Office for the City of Montgomery, Alabama.

- I understand that this Authorization is continuing is nature and is to be given full force and effect to release any and all of the foregoing information learned or determined after the date hereof until the expiration date noted below.

This Authorization will expire on _____/_____/_____ (DD/MM/YY).

_____

Signature of Individual or Individual's Representative          Date _____

_____

Printed Name of Individual's Representative (*If applicable*)

_____

Representative's Relationship to Individual (*If applicable*)

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

505 TWENTIETH STREET NORTH

BIRMINGHAM, ALABAMA 35203

TELEPHONE (205) 322-0457
FACSIMILE  (205) 322-8481

OF COUNSEL
L. DREW REDDEN

August 9, 2005

Kimberly O. Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

> **RE:  Eddie Haynes**
> **SS#:   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**
> **DOB: 8/17/70**

Dear Ms. Fehl:

As requested in your August 1, 2005 letter to me, I am returning to you the various release forms filled out and executed by Mr. Haynes. Please notice that I have taken the liberty of deleting certain unnecessary language in paragraph two of the general release form.

While I disagree with much of your August 1 letter and totally fail to understand why the City has proceeded and is proceeding in the manner that it is, Mr. Haynes does want to cooperate in any way that he can so that he can be returned to work.

Mr. Haynes and I both look forward to hearing from you with regard to the City's decision as soon as possible.

Very Truly Yours,

REDDEN, MILLS & CLARK

Gerald L. Miller

GLM/mb
Enclosures
cc:    Mr. Eddie Haynes

**EXHIBIT**

D

State of Alabama )
Montgomery County )

Before me, the undersigned, a Notary Public in and for said State and County, personally appeared **Eddie J. Haynes**, who is known to me, and after first being duly sworn by me deposes and states as follows:

1. My name is Eddie J. Haynes and I am over the age of nineteen (19) years.

2. I hereby authorize the City of Montgomery to obtain my medical records as they relate to the prescription medications listed in the memo attached hereto as Exhibit A.

3. I further authorize Dr. Michael Turner and Dr. Clemmie Palmer to review my medical records and discuss between themselves and with representatives of the City of Montgomery Fire Department and City Attorney's Office my prescription medication use and whether these medications have any bearing on my ability to safely drive a Montgomery Fire Department fire engine or perform my duties as a firefighter on the fire line without jeopardizing my own safety or the safety of others.

4. I hereby disclose the names of the following physicians who have prescribed the medications listed on Exhibit A and have signed HIPAA compliant authorizations allowing the City Attorney's Office to obtain my medical records from these physicians.

Thomas G. Wells, M.D.
(Doctor's Name)

4294 Lomac Street,
Montgomery, Alabama 36106
(Address)

Clemmie Palmer III, M.D.
(Doctor's Name)

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
(Address)

Theresa I. Brown, D.P.M.
(Doctor's Name)

348 St. Lukes Drive
Montgomery, Alabama 36117
(Address)

Michael C. Turner, DO
(Doctor's Name)

1600 Forest Avenue
Montgomery, Alabama 36106
(Address)

Eddie J. Haynes
(Initials Only)

Dated this the _8th_ day of _August_, 2005.

_[signature]_

Eddie J. Haynes, Affiant

Sworn to and subscribed before me on this the _8th_ day of _August_, 2005.

_[signature]_

Notary Public

(Seal)

My commission expires:

MY COMMISSION EXPIRES APRIL 23, 2007

_[signature]_

Eddie J. Haynes
(Initials Only)

TO:    M.F. Smith, District Chief

From:  E.J. Haynes, Firefighter

Date:  March 4, 2005

RE:    Engine 14 Driver


Dear Sir,

It is a pleasure as well as an honor to be chosen Driver of Engine 14.
I am more than willing if the City of Montgomery needs me to do so.
However, if there is someone else is more willing or highly qualified to drive
Engine 14, I will assist them as needed to be ready to take any assignment. I have
been driving the Fire Truck off and on for the last fourteen years and I am
currently the driver.

Being a Driver for Engine 14 I know I must inform you of my medications. The
medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4
mg. PRN(two –three times a week).
Medications that I take on my off days and on a as needed basis are Hydrocodone
5/500, Diazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50.,
and over the counter Benadryl for my sinus problem.

Again, thank you for your consideration for me being Engine 14 Driver.  It is an
honor to be a Montgomery Firefighter and take on the duties of a dedicated
Fireman.


Respectfully,


E. J. Haynes, F/F Station 14

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER
505 TWENTIETH STREET NORTH
BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE  (205) 322-8481

OF COUNSEL
L. DREW REDDEN

November 16, 2005

RECEIVED
NOV 17 2005
CITY ATTORNEY'S
OFFICE

Kimberly O. Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

   **RE:** Eddie Haynes
      SS#: 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
      **DOB:** 8/17/70

Dear Ms. Fehl:

  It has now been over three months since I forwarded to you all requested forms and authorizations executed by Mr. Haynes. We have still not received any decision from the City regarding his return to employment. In the meantime, he continues to receive no pay from the City. In fact, he was recently informed by a doctor that his insurance has been canceled.

  Enclosed is a letter dated October 20, 2005 that Mr. Haynes received regarding his insurance coverage. I do not know what the City's rules are concerning insurance coverage during an unpaid leave of absence, but I believe that under the circumstances of Mr. Haynes' situation, his insurance coverage should have been maintained. I do not understand why his insurance coverage was suddenly cut off without notice when he has not worked since March and has not received any pay since May.

  It is requested that Mr. Haynes' insurance coverage be restored to him. In fact, I again call upon the City to return Mr. Haynes to active employment.

       Very Truly Yours,

       REDDEN, MILLS & CLARK

       *Gerald L. Miller*

       Gerald L. Miller

GLM/mb
Enclosure
cc: Mr. Eddie Haynes



EXHIBIT
E



## City of Montgomery, Alabama

Finance Department
E. Lloyd Faulkner, Director

Bobby N. Bright
Mayor

Montgomery City Council Members

Charles W. Jinright—President    Willie Cook    Glen O. Pruet, Jr.
James A. Nackles—Pro tem    Tim Head    Martha Roby
Cornelius Calhoun    Janet Thomas May    Jim Spear

October 20, 2005


Eddie J. Haynes
4501 Middlefork Road
Montgomery, AL 36106


Dear Mr. Haynes:

When you are in a no pay status, you are responsible for keeping up your Blue Cross premiums, which is $77.50 every two weeks. Beginning with the third premium due date, you are also responsible for paying the City's portion of the premium, which is $222.50 every two weeks. This is in addition to the $77.50

Since you didn't receive a paycheck from August 5, 2005 through October 14, 2005 you owe the City of Montgomery $367.50 for your Blue Cross insurance.

Please contact me at 241-2674, to avoid cancellation of your Blue Cross coverage during that time. If you wish to make payment arrangements, please let me know.

Sincerely,

Thelma Goodwin
Employee Benefits Coordinator

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE (205) 322-8481

OF COUNSEL
L. DREW REDDEN

May 12, 2006

J. W. McKee, Fire Chief
Montgomery Fire and Rescue
P.O. Box 1111
Montgomery, AL 36101-1111

  RE: **Eddie Haynes**
    **SS#: 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**
    **DOB: 8/17/70**

Dear Chief McKee:

  This letter is in response to your May 4, 2006 letter to fire fighter Eddie J. Haynes. Contrary to your letter, which states that Mr. Haynes has not been in contact with the Montgomery Fire and Rescue Department concerning his employment situation, Mr. Haynes has been in contact with a number of persons in your department, including Chief Thomas.

  Additionally, I wrote Mr. Walter Byars, the City Attorney for the City of Montgomery, on May 12, 2005 asking him to investigate Mr. Haynes' situation and work with me in getting Mr. Haynes returned to work. I informed him Mr. Haynes is willing and able to return to work and has always been willing and able to work. I enclosed two letters from Dr. Clemmie Palmer, III stating that Mr. Haynes is able to work, he has no work restrictions, and he should continue to perform his duties at his current capacity with no restrictions.

  Enclosed is a return to work form signed by the City's doctor, Dr. Michael Tuner, dated July 27, 2005, which Mr. Haynes has previously supplied to the Fire Department. I supplied a copy of that return to work slip to Mr. Byars by letter dated July 27, 2005.

  On August 1, 2005 Assistant City Attorney Kimberly O. Fehl sent to me a number of medical authorization forms for Mr. Haynes to sign, so that the City could obtain

**EXHIBIT**

F

documents and other information from the doctors. Mr. Haynes signed these authorizations and I returned them to Ms. Fehl on August 9, 2005. I have heard nothing from her or anyone connected with the City since, even though I wrote Ms. Fehl again on November 1, 2005 inquiring about the status of this matter and requesting again that the City return Mr. Haynes to active employment.

Obviously, Mr. Haynes has not abandoned or resigned his job. He is willing and able to work, and has been willing and able to work at all times. It was the City who has refused to allow him to work.

I note that your letter requests that Mr. Haynes return to work by May 22, 2006. Please be advised that if we have not heard from you or Mr. Byars or Ms. Fehl to the contrary prior to that date, Mr. Haynes intends to report for duty on May 22, 2006.

Very truly yours,

REDDEN, MILLS & CLARK

Gerald L. Miller

GLM/rb
Enclosure
cc:   Mr. Eddie J. Haynes
      Walter Byars, Esq.
      Kimberly Fehl, Esq.

2

## Return To Work/School

Name: _Eddie Haynes_

~~was~~ was under my care from _3/24/05_ to _3/31/05_

and may be able to return to work/school on _To be determined by employer._

Limitations/Remarks: _____

_____

_____

Dr. _Michael C. ___ D.O./MD_ Phone (334) 261-4445

Address _1600 Forest Ave_    Date _7/27/05_
_Montgomery AL 36106_

**Avelox**
moxifloxacin HCl Tablets

**Avelox I.V.**
moxifloxacin HCl in NaCl Injection

## WALTER R. BYARS



wbyars@ci.montgomery.al.us
tdavis@ci.montgomery.al.us

KIMBERLY O. FEHL
CITY CHIEF ATTORNEY
kfehl@ci.montgomery.al.us

WALLACE D. MILLS
STAFF ATTORNEY
wmills@ci.montgomery.al.us

### MICHAEL D. BOYLE
ASSOCIATE ATTORNEY
mboyle@ci.montgomery.al.us

May 17, 2006

Gerald L. Miller, Esq.
940 Financial Center
505 Twentieth Street North
Birmingham, Alabama 35203

        *Re:*   *Eddie Haynes*

Dear Mr. Miller:

        I am in receipt of the copy of your letter to Chief McKee of May 12th.  The City has never disputed that Mr. Haynes is physically fit for duty.  As previously stated, the problem arises with Mr. Haynes' medications and safety issues they present for Mr. Haynes while driving a truck and working on the fire line under the influence of these medications.  As stated in my letter of August 1, 2005, Dr. Palmer only addressed 3 of the 9 medications that Mr. Haynes had told Dr. Turner that he was taking.

        Resolution of this matter remains with Mr. Haynes.  Mr. Haynes has been advised of what the City needs to resolve Dr. Turner's concerns.  The City originally requested Mr. Haynes to have his personal physician talk with Dr. Turner so that the two physicians could make a recommendation regarding Mr. Haynes' prescription medication use. Also, in an effort to resolve the prescription medication issue, we sent the medical authorization forms signed by Mr. Haynes to his respective doctors.  The records from Dr. Palmer's office were not received until January and we have had no cooperation, after many attempts, from the office of Teresa Brown.

        Before Mr. Haynes will be allowed to assume the duties of firefighter and drive a truck or be on the fire line, the prescription medication issue will need to be resolved.  Please advise Mr. Haynes that he will need to have proof that this matter is cleared and he is released by Dr. Turner upon his return to work on May 22nd.

        If you have any questions or require additional information, please let me know

                                Sincerely yours,

                                Kimberly O. Fehl

KOF/ms
cc: Chief John McKee

**EXHIBIT**

tabbies®

G

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

505 TWENTIETH STREET NORTH

## BIRMINGHAM, ALABAMA 35203

TELEPHONE (205) 322-0457
FACSIMILE  (205) 322-8481

OF COUNSEL
L. DREW REDDEN

May 22, 2006



Kimberly O. Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

> **RE:   Eddie Haynes**
> **SS#:   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**
> **DOB: 8/17/70**

Dear Ms. Fehl:

Eddie Haynes reported for work on May 22 in order to get the Fire Department to make an appointment for him to see Dr. Turner to be released for work.  He was informed that the City would not make such an appointment for him because the purpose was not a work injury but for release for duty.  He was told to contact Dr. Turner's office on his own to make the appointment and that he would have to pay for the appointment himself.

Mr. Haynes did contact Dr. Turner's office to make such an appointment, but has been told that Dr. Turner will not see him as a private patient because he has already been seen on referral by the City for this same matter.

Mr. Haynes now appears to be in a "catch 22."  The City will not authorize him to see Dr. Turner and make an appointment for him, and Dr. Turner will not see Mr. Haynes as a private patient.

Mr. Haynes has now received a memorandum from the Fire Department, a copy of which I have enclosed, stating that he has until June 5 to get a release from Dr. Turner.  It is requested that you intervene immediately in this situation and clear the way for Mr.



EXHIBIT

_H_

Haynes to see Dr. Turner to get released back for duty.

Very Truly Yours,

REDDEN, MILLS & CLARK

*Gerald L. Miller*

Gerald L. Miller

GLM/rb
Enclosure
cc:    Mr. Eddie Haynes

**MEMORANDUM**

**TO:**        Firefighter Eddie Haynes

**FROM:**    Deputy Fire Chief M. Jordan

**DATE:**    May 22, 2006

**RE:**        **Fit For Duty Status**

Per our conversation this morning during the meeting with you, Chief Walker, Chief Petrey and myself, I informed you that you would have to get a release from Dr. Turner on the medication that you are taking in order for you to return to duty as a Firefighter with the Montgomery Fire Department. As of this date, you will have till June 5th to get this matter of your prescription medication resolved or you will be subject to termination from the Montgomery Fire Department.

If you should have any questions regarding this matter, please do not hesitate to contact me.

MJ/sh

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

## BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE (205) 322-8481

OF COUNSEL
L. DREW REDDEN

May 31, 2006

Kimberly O. Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

JUN 1 2006

RE:   **Eddie Haynes**
      **SS#:   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**
      **DOB: 8/17/70**

Dear Ms. Fehl:

Mr. Haynes was finally allowed to see Dr. Turner. It did not appear to Mr. Haynes that you had forwarded to Dr. Turner the medical records of Dr. Palmer which you obtained by the medical authorization signed by Mr. Haynes. Dr. Turner's office note dated May 25, 2006 states, "Nothing has changed since his last evaluation. He is still physically fit for duty. He is still taking Lexapro, Flexeril, Valium 5 mg bid, and Gabitril. He does not take them while at work. The medications could effect his performance while on duty which involves driving a fire truck and working on the fire line. Why he would not need or take these medications for anxiety while on duty I do not understand. There must be an administrative decision with this case."

It appears to me that Dr. Turner and the City perceives Mr. Haynes to be disabled. However, the Americans With Disabilities Act requires an individualized assessment of Mr. Haynes and his ability to work. It does not appear that either Dr. Turner or the City has done an individualized assessment of Mr. Haynes and his ability to work. The two letters that Dr. Palmer has written have been ignored, and Dr. Palmer's medical records do not appear to have been reviewed. No neutral, independent medical examination or opinion has been obtained, to my knowledge. Both the City and Dr. Turner have ignored Mr. Haynes' work history that shows that he is able to work without any side effects from these medications. Instead, Dr. Turner simply says that these medications "could" effect his performance. All evidence shows they have not effected his performance.



EXHIBIT

I

I continue to believe the City would be making a serious mistake by terminating Mr. Haynes on June 5. I ask the City once again to reconsider its position in this matter.

Very Truly Yours,

REDDEN, MILLS & CLARK

*Gerald L. Miller*

Gerald L. Miller


GLM/rb
cc:    Mr. Eddie Haynes

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDDIE J. HAYNES,                    )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )    CASE NO.  2:06cv1093-WKW
                                    )
                                    )
CITY OF MONTGOMERY,                 )
ALABAMA                             )
                                    )
    Defendant.                      )

## AFFIDAVIT OF BARBARA M. MONTOYA

Before me, the undersigned authority, personally appeared Barbara M.

Montoya, who is known to me and who, being first duly sworn, deposed on oath,

and says as follows:

My name is Barbara M. Montoya.  I am over nineteen years of age.  I am

currently employed as the Director of the City-County of Montgomery Personnel

Department.  It is in that capacity that I state the following:

City-County of Montgomery Rules and Regulations, Rule IX, Section 1 states as

follows:

> Any employee wishing to leave the classified service in
> good standing shall file with the appointing authority, at
> least one week before leaving, a written resignation stating
> the effective date of the resignation and the reason for
> leaving. Such notice shall be promptly reported to the
> Personnel Director. The number of days less than seven (7)
> given as notice of resignation may be subtracted from
> accrued vacation leave and failure to comply with the
> procedures may be the cause for denying the person future
> employment. Unauthorized or unreported absence from



DEFENDANT'S
EXHIBIT
8
tabbies

work for a period of three (3) days or more may be considered by the appointing authority as a resignation.

Eddie Haynes date of separation from employment was June 12, 2006 for job abandonment with the City of Montgomery. Attached to my affidavit is a copy of the Personnel Form 10, Recommendation for Personnel Action.

Further Affiant saith not.

Barbara M. Montoya
Affiant

**SWORN TO AND SUBSCRIBED** before me this 3 day of December, 2007.

Karen B. Cason
Notary Public

(SEAL)

My Commission Expires 2-24-10

Form 10                                                                                    Submit in Triplicate

# CITY AND COUNTY OF MONTGOMERY
## PERSONNEL DEPARTMENT
## RECOMMENDATION FOR PERSONNEL ACTION

| Department/Division | MONTGOMERY FIRE DEPARTMENT | Date | 06/12/2006 |
|---|---|---|---|
| Name of Employee | EDDIE J HAYNES | Effective Date | 06/12/2006 |
| Social Security # | 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    Classification    FIRE FIGHTER | Job Code | 8010 |

JUN 6'06 AM 9:34 RCVD

Item 2 requires the signature of both department heads.

Items 2, 3, 4, 5, 6, 15 require approval of Personnel Director before action is official. Items 3, 4, 5, 7 must have copy of letter to employee attached. Item 8 should have copy of letter of resignation.

1. Transfer within department ..................... (  )
2. Transfer to another department .............. (  )
3. Demotion .................................................. (  )
4. Layoff ...................................................... (  )
5. Dismissal ................................................. (X)
6. Leave without pay .................................... (  )
7. Suspension .............................................. (  )
8. Resignation ... JOB ABANDOMENT. (X)
   BY

9. Retirement ................................................. (  )
10. Separation by death ................................. (  )
11. Expiration by Temporary Appointment ........ (  )
12. Return Leave Without Pay ......................... (  )
13. Return from Military Leave ......................... (  )
14. Change of Name ....................................... (  )
15. Change in Salary ...................................... (  )
16. _____ (  )

| ITEMS AFFECTED BY ACTION | FROM | TO |
|---|---|---|
| Department (Items 1 & 2) | | |
| Classification & Salary (Items 1, 2, 3) | | |
| Dates (Items 6 & 7) | | |
| Name (Item 14) | | |
| Amount (Item 15) | | |
| Other (Item 16) | | |

Funds are available    *E. Lloyd Faulkner*    Date 6/15/06
                        Disbursing Officer

## Explanation and remarks (Give reason for any action which is not self-explanatory)

EMPLOYEE DISMISSED EFFECTIVE 06/12/06 FOR JOB ABANDONMENT. TO REFLECT ON PAYROLL 06/23/06.

RULE IX SECTION I

(Signed) 1. *Bobby N. Wright*    Date JUN 1 4 2006
          MFB        Appointing Authority

2. _____    Date 6/12/06

3. _____    Date _____

4. *Barbara M. Montoya*    Date JUN 1 9 2006
   Personnel Director

PER 300-419
revised 4/10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **EDDIE J. HAYNES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO. 2:06cv1093-WKW** |
| | ) |
| | ) |
| **CITY OF MONTGOMERY,** | ) |
| **ALABAMA** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR  SUMMARY JUDGMENT**

Defendant, City of Montgomery, submits this Memorandum of Law in Support of Summary Judgment with evidentiary submissions, and states unto the Court the following:

**I.**

**PROCEDURAL BACKGROUND**

Plaintiff, Eddie Haynes ("Haynes"), a former firefighter with the City of Montgomery ("the City") sued the City alleging that he was put on involuntary leave due to medications he was taking, required to undergo a medical examination, and ultimately terminated because he was disabled or considered or perceived to be disabled.

Haynes filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first Charge of Discrimination was filed on May 9, 2005 alleging discrimination based on race, disability and retaliation and states the particulars as follows:

1

> *I was hired by the above-named employer on April 4, 1990, as a fire fighter. Since January 29, 2003, and continuing I have been subjected to harassment and intimidation due to my being disabled. My employer has made an issue over the medication that I am required to take. I have further been subjected to adverse conditions of employment because I complained about the unfair treatment of black employees. On March 15, 2005, I was forced to take leave while an investigation is being conducted into my medication.*
>
> *I believe that I am being discriminated against because of my race, black, my disability and in retaliation for having opposed practices made unlawful under Title VII of the Civil Rights Act of 1964, as amended and the American with Disabilities Act of 1990. White employees on medication are treated more favorably.*

*(DX 1, Charge of Discrimination No. 130 2005 04376).*

On August 8, 2006, Haynes filed an Amended Charge of Discrimination alleging discrimination based on race, disability and retaliation and states the following:

> *1. On May 9, 2005 I filed a Charge of Discrimination, Charge number 130-2005-04376, against the above employer. This Charge is an amendment to, and supplements, that Charge. I expressly reallege all allegations made in my previous charge dated May 9, 2005.*
>
> *2. Since the filing of my original Charge on May 9, 2005 I continued to be on involuntary leave from my employment until June 14, 2006, when the employer terminated my employment.*
>
> *3.    believe that I was subjected to discrimination, harassment, adverse conditions of employment, involuntary leave and termination in violation of the Americans with Disabilities Act of 1990 because the employer perceived or regarded me as being disabled.*

*(DX 2, Amended Charge of Discrimination No. 420 2006 04376).*

On November 8, 2006, the U.S. Department of Justice issued a Notice of Right to Sue Letter on both charges. *(DX 3, Notice of Rights to Sue, Charge No. 130 2005 04376 and DX 4, Notice of Rights to Sue, Charge No. 420 2006 04376).* Haynes filed this action on December 8, 2006,

pursuant to the Americans with Disabilities Act ("ADA"). *(Doc. 1).*

On January 2, 2007, the City filed an Answer with Affirmative Defenses *(Doc. 4).* The City contends that Haynes is not disabled nor was he considered and/or perceived to be disabled by anyone. The City may require fitness for duty assessments to address specific job-related concerns that are consistent with business necessity to perform the duties of a firefighter. The City also submits that Haynes voluntarily resigned and/or abandoned his job.

## II.

### NARRATIVE STATEMENT OF FACTS

Eddie Haynes was a firefighter assigned to Engine Company 14, a pumper truck, as a driver. *(DX 5, Jordan Affidavit).* On February 24, 2005, Captain Hackett, in a memo to District Chief Stoudenmier, requested a shift change moving Haynes to "A" shift as an assistant driver rather than remain on "C" shift as the only driver. *(DX 5, Jordan Affidavit).* Captain Hackett requested the change based on his concern that Haynes was extremely paranoid while driving Engine 14 and could possibly be impaired by the prescription drugs. *(DX 5, Jordan Affidavit).* Hackett, in his memo, refers to being told that Haynes had in previous years requested to be relieved from driving the truck, but there was no such request in his file. *(DX 5, Jordan Affidavit).* However, there was a memo in administration, regarding a verbal statement made by Haynes to Lt. R. Johnson that he did not feel comfortable driving the truck. *(DX 5, Jordan Affidavit).*

On March 4, 2005, Haynes sent a memo to District Chief Stoudenmier requesting to be relieved as the primary driver of Engine 14. *(DX 5, Jordan Affidavit).* Haynes said that he felt like he should inform Stoudenmier of all the prescription medications he was taking – a total of 9 different medications. *(DX 5, Jordan Affidavit).* Haynes also provided a letter from his psychiatrist,

3

Dr. Clemmie Palmer, stating that Haynes had no work restrictions and should continue to perform his duties at his current capacity. *(DX 5, Jordan Affidavit).* In his letter, Dr. Palmer cited three medications: Lexapro, Valium and Gabitril. *(DX 5, Jordan Affidavit).*

Haynes' request to be relieved as a driver on Engine 14 and the letter from Dr. Palmer were submitted for review to his superior officers. *(DX 5, Jordan Affidavit).* Assistant Chief C. E. Walker ("Walker"), a black male, is the Assistant Chief of the Fire Suppression Division for the Montgomery Fire Department. *(DX 5, Jordan Affidavit).* M. Jordan ("Jordan"), a black male, was the Deputy Fire Chief for the Montgomery Fire Department and was responsible for handling personnel matters for the Fire Department. *(DX 5, Jordan Affidavit).* Jordan is currently the Fire Chief for the Montgomery Fire Department. *(DX 5, Jordan Affidavit).*

Walker and Jordan met with Haynes to discuss his medications, Haynes' request to be relieved from duty as a driver, and Dr. Palmer's position that Haynes had no work restrictions and should continue performing his duties at his current capacity. *(DX 5, Jordan Affidavit).* After discussing the issue with Haynes, Jordan and the City's risk manager decided that Haynes should go to City physician, Dr. Michael C. Turner, for a "Fit for Duty" assessment to determine the effects of the medications on Haynes as it applied to his job responsibilities as a firefighter and truck driver. *(DX 5, Jordan Affidavit).* Dr. Turner performs the fitness for duty assessments for all new hires and on current Fire Department employees as required by the National Fire Protection Association ("NFPA") standards. *(DX 5, Jordan Affidavit)*

Dr. Turner examined Haynes on March 31, 2005, and determined that Haynes was physically fit for duty. *(DX 6, Turner Depo. p.47, lines 1-23).* However, Dr. Turner's assessment indicated concern regarding safety issues for Haynes while under the influence of the multiple

prescriptions that he was taking. *(DX 6, Turner Depo. p.47, lines 20-23).* More specifically, Dr. Turner stated in his evaluation dated March 31, 2005, ". . . these medication effects could carry over to his on duty time. Any drug screen performed would most likely be positive even when on duty. There are safety issues for him driving a truck and working on the fire line while under the influence of these medications though he claims he does not take while on duty." *(DX 5, Jordan Affidavit and DX 6, Turner Depo. p. 62, lines 9-21).* The NFPA standards do not permit Haynes to take these medications and work on the fire line. *(DX 6, Turner Depo. p. 63, line 3- p. 64, line 12).*

The City of Montgomery Fire Department uses National Fire Protection Association Rules and Regulations as a guideline for best practices. *(DX 5, Jordan Affidavit).* The City follows the standards in Chapter 10, NFPA 1500 *Standard on Fire Department Occupational Safety and Health Program*, which governs Medical and Physical Requirements. NFPA 1500 § 10.1.1 and 10.1.2 require that firefighters be medically evaluated and certified by the fire department physician, and that such medical evaluations must take into account the risks and functions associated with the individual's duties and responsibilities. *(DX 5, Jordan Affidavit).* NFPA 1500 §10.6 requires that the City have an officially designated physician who guides, directs and advises firefighters with regard to their health, fitness and suitability for various duties. *(DX 5, Jordan Affidavit).*

The City also follows the standards in NFPA 1582 *Standard on Comprehensive Occupational Medical Program for Fire Departments*, which governs Medical and Physical Requirements. NFPA 1582 governs fit for duty assessments, setting forth the responsibilities of the Department, the City physician and the firefighters. *(DX 5, Jordan Affidavit).*

NFPA 1582 also sets forth detailed requirements and criteria for the City physician to follow in performing fitness assessments. *(DX 5, Jordan Affidavit).* Dr. Turner is fully aware of these

standards and criteria and uses them in his fit for duty assessments. *(DX 5, Jordan Affidavit).* These criteria are very important in protecting the firefighters themselves, as well as the public at large, from situations where a firefighter's medical condition could affect his or her ability to safely respond to emergency operations. *(DX 5, Jordan Affidavit).* In the line of duty, firefighters are subjected to very high physiological, psychological and environmental demands, and the City has an obligation to ensure that each firefighter is capable of withstanding those pressures unique to emergency response and firefighting. *(DX 5, Jordan Affidavit).*

Haynes advised Dr. Turner that he did not take his Valium or Gabitril while on duty. *(DX 6, Turner Depo. p.64, lines 13-16).* However, Dr. Turner had to consider how the medication is prescribed. *(DX 6, Turner Depo. p.64, line 17- p. 65, line 18).* Haynes' medication was prescribed for every day. *(DX 6, Turner Depo. p.64, lines 17-23).* Haynes had also voluntarily disclosed medications that he was taking in his memo dated March 4, 2005. *(DX 5, Jordan Affidavit).*

Haynes went on paid leave from March 2005 until May 2005 and then went on unpaid leave because he had used all of his accrued leave. *(DX 5, Jordan Affidavit).* Haynes was always advised that he could return to work once he was certified fit for duty by Dr. Turner. *(DX 5, Jordan Affidavit).* Haynes was asked to have his Dr. Palmer contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking, versus the three Dr. Palmer mentioned in his letters. *(DX 5, Jordan Affidavit)* Haynes was represented by counsel and in correspondence was also advised that Haynes' physician should contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking. *(DX 7 A-I, Correspondence Compilation).* Dr. Palmer did not contact Dr. Turner. So, in an effort to help Haynes resolve the prescription medication issue, the City acquired medical authorizations from Haynes in an effort to get all of his

medical records from and provide copies to Dr. Palmer and Dr. Turner for their review and discussion. *(DX 7 A-I, Correspondence Compilation).*

Although Dr. Palmer provided a letter to the City stating that Haynes had no work restrictions or side effects on three medications, Dr. Turner was aware of other medications that Haynes was taking and knew what medications are permitted under NFPA standards. *(DX 5, Jordan Affidavit).* Dr. Turner advised that Haynes was physically fit for duty, but that the combined effect of the medications he reported taking caused safety concerns and required an administrative decision. *(DX 5, Jordan Affidavit).* Haynes was wanted back at work as a firefighter. *(DX 5, Jordan Affidavit).* Haynes had been with the Department for fifteen years. *(DX 5, Jordan Affidavit).* The objective in asking him to resolve the medications issue was not to fire Haynes. *(DX 5, Jordan Affidavit).* The objective was to get Haynes certified fit for duty and back to work. *(DX 5, Jordan Affidavit).* Despite the fact that Haynes refused to complete FMLA paperwork, the Fire Department kept Haynes' position open until June 2006, approximately 14 months. *(DX 5, Jordan Affidavit).*

On May 4, 2006, Fire Chief J.W. McKee sent Haynes a letter giving him until May 22, 2006, to resolve the issues of his prescription medication with Dr. Palmer and Dr. Turner to be released fit for duty. *(DX 5, Jordan Affidavit).* Haynes was also told that if he failed to return to work on May 22, 2006, that pursuant to City-County of Montgomery Rules and Regulations, Rule IX, Section I, he would be considered to have resigned from his job as a firefighter. *(DX 5, Jordan Affidavit).*

Haynes returned to Dr. Turner on May 25, 2006, for another fit for duty assessment. *(DX 5, Jordan Affidavit and DX 6, Turner Depo. p. 85, lines 1-3).* Haynes was still physically fit for duty. *(DX 6, Turner Depo. p. 86, lines 20-23).* However, nothing had changed since the evaluation a year earlier regarding his medications, with the exception that a different muscle relaxer that he was

prescribed. *(DX 5, Jordan Affidavit and DX 6, Turner Depo. p. 87, lines 1-23).*

Haynes' date of resignation by job abandonment with the City of Montgomery was effective June 16, 2006. *(DX 8, Montoya Affidavit).*

### III.

#### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of genuine issue of material fact.' *Id.* at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present evidence in support of some element of the case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the non-moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 586 (1986).

After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP.  Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of her case or there is the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115-16 (11th Cir. 1993).

Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56(c).

## IV.

### ARGUMENT

As set out above, Haynes filed a charge of discrimination on May 9, 2005, and an amended charge of discrimination on August 8, 2006, with the EEOC alleging race, disability and retaliation discrimination dating back to January 29, 2003.  The Complaint states that the suit is authorized and instituted pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C.§12101 *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.  *(Doc. 1, ¶ 3).*  However, the allegations in the Complaint are claims of discrimination based on disability only.  There are no race based claims of discrimination or allegations of discrimination that occurred prior to March 15, 2005.  The Complaint basically alleges violations of Haynes rights pursuant to the Americans with Disabilities Act.

Haynes contends the City considered and/or perceived him to have disability and violated the Americans with Disabilities Act by putting him on voluntary leave and requiring him to undergo a medical evaluation or fitness for duty examination.

9

Generally, an individual who seeks to make a claim under the ADA that he was discriminated against in the terms, conditions, and privileges of employment must show that he was a qualified individual with a disability and that his employer intentionally discriminated against him because of the disability. *See, e.g., Cash v. Smith,* 231 F.3d 1301, 1305 (11th Cir. 2000) ( "In order to establish a prima facie case of discrimination under the ADA, [a plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability.").

If an ADA plaintiff can satisfy a prima facie case of discrimination, then the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), comes into play. *See Carlson v. Liberty Mut. Ins. Co.,* No. 06-15417, 2007 WL 1632267, (11th Cir. June 7, 2007) (unpublished op.) (holding that burden-shifting analysis of *McDonnell Douglas Corp.* applies in ADA cases). Under this standard, the burden would shift to the defendant employer to offer a legitimate, nondiscriminatory reason for its employment decision. If it does so, the burden shifts back to the plaintiff to show that the proffered reason for the employer's decision was pretextual.

However, Haynes' claims are not only those of a general discrimination case, but one made pursuant to 42 U.S.C.A. § 12112(b)(6), under which an employer may use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity. 42 U.S.C.A. § 12112(b)(6).

Claims brought pursuant to § 12112(b)(6) are treated as disparate impact claims. *See Davidson v. America Online, Inc.,* 337 F.3d 1179, 1189 (10th Cir. 2003) (describing claims brought under § 12112(b)(6) as claims brought under a disparate impact theory); *Erickson v. Bd. of*

*Governors,* 207 F.3d 945, 949 (7th Cir. 2000) (explaining that § 12112(b)(6) defines criteria with disparate impacts as discrimination); *Boersig v. Union Elec. Co.,* 219 F.3d 816, 822 (8th Cir. 2000) (discussing § 12112(b)(6) claim as "invoking a disparate impact theory of ADA liability"); *Gonzales v. City of New Braunfels, Tx.,* 176 F.3d 834, 839 (5th Cir. 1999) (noting that the disparate impact theory of discrimination "has been adopted entirely by the ADA" and citing to § § 12112(b)(3) & (6)); *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1196 (7th Cir. 1997) (noting that disparate impact approach to proving discrimination is applicable to cases under the ADA and citing to § 12112(b)(6)); *and Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1179 n. 5 (6th Cir.1996) (describing § 12112(b)(6) cases as "analytically similar to Title VII disparate impact claims").

Under a disparate impact challenge to an employer's action, the plaintiff in an ADA case need not prove that the employer intended to discriminate. *Erickson,* 207 F.3d at 950. Instead, the ADA places the burden on the employer to show that its practice is "job-related for the position in question and is consistent with business necessity." 42 U.S.C.A. § 12112(b)(6) (West 2005); *Erickson,* 207 F.3d at 950. The Court of Appeals for the Fifth Circuit has explained that a plaintiff makes out an ADA claim of disparate impact discrimination by (1) identifying the challenged employment practice or policy, and pinpointing the employer's use of it; (2) demonstrating an adverse impact on himself or a group that falls within the protections of the ADA; and (3) demonstrating a causal relationship between the challenged practice and the disparate impact. *Gonzales,* 176 F.3d at 839 n. 26. The Court of Appeals for the Sixth Circuit has explained that in disparate impact cases, the employer bears the burden of proving that a particular job requirement is necessary, while the disabled individual always bears the burden of proving that he is "otherwise qualified" for the position in question. *Monette,* 90 F.3d at 1184.

11

A.   HAYNES IS NOT AN INDIVIDUAL WITH A DISABILITY

The ADA defines the term "disability" with respect to an individual as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2). Given the foregoing definition, an individual who seeks to state a claim under the ADA "must have an actual disability (subsection (A) [of 42 U.S.C.A. § 12102(2) ] ), have a record of a disability (subsection (B)), or be regarded as having one (subsection (C))." *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 478, 119 S.Ct. 2139, 2144 (1999).

In this case, although Haynes makes general allegations of a disability, there is no record of a physical or mental impairment that substantially limits one or more of the major life activities. Furthermore, Haynes does not argue that he has a physical or mental impairment that substantially limits one or more of the major life activities.  Haynes contends that he was not disabled.  Rather, Haynes contends he has a disability as defined by the Act because Defendants regarded him as having a physical limitation that substantially limits a major life activity.

However, Haynes must fail on his claim for discrimination under ADA.  Haynes does not have a disability.  Taking medication is not a disability.  Haynes was not subjected to unlawful discrimination. Haynes was merely required to meet the fitness for duty standards for a firefighter.

Under ADA, "[W]hen the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires ... that plaintiffs allege that they are unable to work in a broad class of jobs." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)); *see also Santiago Clemente v. Executive Airlines,* 213 F.3d 25, 32 (1st Cir. 2000) (stating that "to be substantially limited in the major life activity of working, [the plaintiff]

12

must be precluded from more than a particular job.")

When a plaintiff claims that the major life activity is working, the regulations are more specific about the meaning of "substantially." The plaintiff must be able to prove that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Case law has emphasized that the plaintiff must be precluded from more than one particular task or type of job to rise to the level of "substantially" limited. *See Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir. 2000).

It is clear from his EEOC charges and the Complaint that Haynes is confused on his standing as an individual with a disability as defined by the ADA. In the first EEOC charge Haynes claims that he has a disability. In the second EEOC charge, Haynes claims that the City regarded or perceived him to have a disability. In the Complaint, Haynes has alleged it all. However, Haynes was neither disabled nor regarded as disabled. As such, Haynes cannot sustain a suit under the provisions of the ADA.

In the first charge filed with the EEOC field in May 2005, Haynes contends that he is disabled however does not identify a disability.

> *Since January 29, 2003, and continuing I have been subjected to harassment and intimidation due to my being disabled. My employer has made an issue over the medication that I am required to take. I have further been subjected to adverse conditions of employment because I complained about the unfair treatment of black employees. On March 15, 2005, I was forced to take leave while an investigation is being conducted into my medication.*

> *I believe that I am being discriminated against because of my race, black, my disability and in retaliation for having opposed practices made unlawful under Title VII of the Civil Rights Act of 1964, as*

13

> *amended and the American with Disabilities Act of 1990. White*
> *employees on medication are treated more favorably.*

*(DX 1, Charge of Discrimination No. 130 2005 04376).*

In the Complaint, Haynes alleges:

> Defendant discriminated against Plaintiff by placing Plaintiff on
> involuntary leave on or about March 15, 2005 because Plaintiff has a
> record of having a physical or mental impairment that substantially
> limited one or more of his major life activities, or because Plaintiff
> was regarded by Defendant as having a mental or physical
> impairment that substantially limits or limited one or more of him
> major life activities, or because Plaintiff has a physical or mental
> impairment that substantially limits or limited one or more of his
> major life activities. *(Doc. 1, ¶¶ 9&14).*

Haynes alleges no specific physical or mental impairment in the EEOC charge or the

Complaint. From the EEOC charge, Haynes appears to base his claim of discrimination on the fact

that he is black and taking medication. There is no mention of harassment or intimidation or

discrimination of any type in his memo submitted on March 4, 2005, requesting that he no longer be

the driver for Truck 14, nor is there any mention of a physical or mental impairment in that memo.

Additionally, Haynes alleges that the City refused to allow him to come back to work despite

letters from Haynes' doctor stating that he was capable of working in his current capacity *(Doc. 1, ¶*

*6)*, thereby suggesting that the use of corrective measures to any disability he thinks he might have

would eliminate any limitations on performing his job. When corrective measures will allow an

individual whose impairment might constitute a disability to function identically to individuals

without a similar impairment, then that person is not disabled within the meaning of the ADA. *See*

*Sutton v. United Airlines, Inc.,* 527 U.S. 471, 488-89, 119 S.Ct. 2139, 2149 (1999) (holding that

"disability under the Act is to be determined with reference to corrective measures," and petitioners

whose visual limitations could be corrected with corrective lenses could not state a claim that they

14

were substantially limited in any major life activity).

Haynes has not identified any physical or mental impairment that will allow him to succeed as an individual with a disability protected by the ADA. Haynes does not have a physical or mental impairment that substantially limits or limited one or more of his major life activities nor is there a record of Haynes having a physical or mental impairment that substantially limited one or more of his major life activities. Therefore, Haynes is not disabled under the ADA.

**B.    HAYNES WAS NOT PERCEIVED AS DISABLED**

Because Haynes does not have an actual disability, Haynes' claim to the protections of the ADA hinges upon whether he can show that the City "regarded" him as having an impairment that substantially limits one or more of his major life activities.

Haynes filed an Amended Charge of Discrimination on August 8, 2006 alleging discrimination because the City perceived or regarded him as being disabled.

> *1. On May 9, 2005 I filed a Charge of Discrimination, Charge number 130-2005-04376, against the above employer. This Charge is an amendment to, and supplements, that Charge. I expressly reallege all allegations made in my previous charge dated May 9, 2005.*
>
> *2. Since the filing of my original Charge on May 9, 2005 I continued to be on involuntary leave from my employment until June 14, 2006, when the employer terminated my employment.*
>
> *3. believe that I was subjected to discrimination, harassment, adverse conditions of employment, involuntary leave and termination in violation of the Americans with Disabilities Act of 1990 because the employer perceived or regarded me as being disabled.*

*(DX 2, Amended Charge of Discrimination No. 420 2006 04376).*

Again, in his Complaint Haynes alleges:

> Defendant discriminated against Plaintiff by placing Plaintiff on involuntary leave on or about March 15, 2005 because Plaintiff has a

> record of having a physical or mental impairment that substantially limited one or more of his major life activities, or because Plaintiff was regarded by Defendant as having a mental or physical impairment that substantially limits or limited one or more of him major life activities, or because Plaintiff has a physical or mental impairment that substantially limits or limited one or more of his major life activities. *(Doc. 1, ¶¶ 9&14).*

42 U.S.C. § 12102(2)(C) provides that having a disability includes being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of such individual. *Sutton,* 527 U.S. at 489. The Supreme Court outlined two ways an individual could fit within this provision:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or
>
> (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

*Id.* at 489, 119 S.Ct. 2139.

To show that he was regarded as substantially limited in his ability to work, Haynes must "prove that [defendant] considered [him] as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills and abilities.' " *Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir.2000)

Thus, Haynes must demonstrate that the City had regarded him as either having a substantially limiting impairment that he did not have or that he had a substantially limiting impairment, when, in fact, the impairment is not so limiting. Haynes can do neither. Haynes does not have a physical or mental impairment and cannot show that the City perceived him to have a physical or mental impairment in the present case. The City never inquired as to why Haynes was

16

taking the medications.   The only issue relevant to the fitness for duty exam was Haynes' use of certain medications not permitted by the NFPA standards while on duty as a firefighter.

At best, Haynes' only evidence is that the City could have regarded him as substantially impaired in major life activity pertains to the life activity of working as a firefighter.   The life activity of working as a firefighter is not a broad range of jobs.  So, even if Haynes argued the City perceived him to be substantially impaired from working as a firefighter, his claim would fail under ADA.

Haynes was put on leave in March 2005 and remained on leave until June 2006.  There was never any reason that Haynes was not allowed to return to work other than not being certified fit for duty based on NFPA standards. *(DX 5, Jordan Affidavit).*

Haynes was never perceived or considered to be disabled.  Two years before he asked to be relieved from driving duty, Haynes advised his supervisors in January 2003 that he was on medication. *(DX 5, Jordan Affidavit).*  On that same day, Haynes was relieved from duty at 0900 hours and was allowed to return to work on the same shift at 1700 hours with a letter from Dr. Palmer that Haynes was able to work on the medications. *(DX 5, Jordan Affidavit).*  It was not until Haynes requested to be relieved from duty as primary driver from Truck 14 that he was sent for a fit for duty assessment. *(DX 5, Jordan Affidavit).*  Haynes, by the request in his memo, was putting the Fire Department on notice that he thought he may not be able to perform his duties as a firefighter. The subsequent fitness for duty assessment indicated that some of the medications Haynes was taking were not compliant with NFPA standards.

Haynes was asked to have his personal physician contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking, versus the three Dr. Palmer mentioned in his letters. *(DX 5, Jordan Affidavit)*  Haynes' attorney was also advised that Haynes' personal

physician should contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking. *(DX 7 A-I, Correspondence Compilation).*

Although Dr. Palmer provided a letter to the City stating that Haynes had no work restrictions or side effects on three medications, Haynes provided Dr. Turner with other medications that he was taking and Dr. Turner knew what medications are permitted under NFPA standards. *(DX 5, Jordan Affidavit).* Dr. Turner advised that Haynes was physically fit for duty, but that the combined effect of the medications he reported taking caused safety concerns and required an administrative decision. *(DX 5, Jordan Affidavit).* The City wanted Haynes to be able to return to work as a firefighter but only if it was safe for him and the public to do so. *(DX 5, Jordan Affidavit).*

Haynes' position was held open for fifteen months. Haynes was always advised that he could return to work once he was certified fit for duty by Dr. Turner. *(DX 5, Jordan Affidavit).*

The City never perceived Haynes to be disabled. The underlying condition that required medication was never at issue. The sole issue was whether the medications Haynes was using were acceptable for a firefighter by NFPA standards. Haynes has not identified any physical or mental impairment that he claims the City perceived him to have that will allow him to succeed as an individual with a disability protected by the ADA.

For the foregoing reasons, Haynes has failed to establish the first element of a prima facie case under the ADA by failing to come forward with evidence demonstrating that he is in the class of persons protected by the ADA. Therefore, Summary Judgment in favor of Defendant City of Montgomery is proper and all claims should be dismissed.

C.    **FITNESS FOR DUTY IS JOB RELATED BUSINESS NECESSITY**

If the Court determines that Haynes is an individual with a disability recognized under ADA,

the Court must next consider whether the City's protocol regarding the fit for duty assessment  is "job-related for the position in question and is consistent with business necessity."42 U.S.C.A. § 12112(b)(6).

In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849 (1971), the Supreme Court held that the business necessity defense in Title VII cases "placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question."*Id.* at 432, 91 S.Ct. at 854. With regard to employment tests, the Court also stated that with Title VII, Congress has commanded "that any tests used must measure the person for the job and not the person in the abstract." *Id.*at 436, 91 S.Ct. at 856.

In *Walker v. Jefferson County Home,* 726 F.2d 1554, 1558 (11th Cir. 1984), the Eleventh Circuit stated:

> In determining whether the employer has met its burden, the court looks at the amount of skill required for the position and the economic and human risks involved. "When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related."*Spurlock v. United Air Lines, Inc.,* 475 F.2d 216, 219 (10th Cir. 1972).

In *Spurlock v. United Air Lines, Inc.,* 475 F.2d 216, 219 (10th Cir. 1972), the Tenth Circuit considered risks to public health and safety when considering whether a particular standard is justified by business necessity and noted, "when ... the human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related." *Id.* at 219.With respect to the importance of the airline flight officer position, the court added, "The public interest clearly lies in having the most highly qualified

persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job." *Id.*

The same reasoning is applicable in the present case. The NFPA standards provide guidelines for medical care for both candidates seeking to become a firefighter and incumbents currently performing the task of firefighter. An incumbent firefighter is required to "[r]eport to the fire department physician any medical condition that could interfere with the ability of the individual to safely perform essential job tasks, such as illness or injury, use of prescription or nonprescription drugs, and pregnancy," NFPA §4.3(4).

The City follows the standards in NFPA 1582 *Standard on Comprehensive Occupational Medical Program for Fire Departments*, which governs Medical and Physical Requirements. NFPA 1582 governs the "Fit for Duty" assessments, setting forth the responsibilities of the Department, the City physician and the firefighters. *(DX 5, Jordan Affidavit).*

NFPA 1582 also sets forth detailed requirements and criteria for the City physician to follow in performing fitness assessments. *(DX 5, Jordan Affidavit).* These criteria are very important in protecting the firefighters themselves, as well as the public at large, from situations where a firefighter's medical condition could affect their ability to safely respond to emergency operations. *(DX 5, Jordan Affidavit).* In the line of duty, firefighters are subjected to very high physiological, psychological and environmental demands, and the City has an obligation to ensure that each firefighter is capable of withstanding those pressures unique to emergency response and firefighting. *(DX 5, Jordan Affidavit).*

Chapter 9 of NFPA 1582 gives the fire department physician detailed standards for determining fitness for duty. Dr. Turner, as the Montgomery Fire Department physician, is required under NFPA 1582, to carefully evaluate every firefighter's ability to safely perform his essential job

20

tasks in light of any medications that firefighter is taking. Here, Dr. Turner received information that Firefighter Haynes had asked to be relieved of driving responsibilities because of the nine medications he was taking. Dr. Turner conducted a medical examination pursuant to NFPA 1582, and determined that Haynes was physically fit but expressed concern that his medications might affect his ability to safely perform his job duties. Dr. Turner needed additional information from Dr. Palmer about why Dr. Palmer only listed three medications for Haynes, and the inconsistencies between how the medications were prescribed by Dr. Palmer, Dr. Palmer's letter stating Haynes was compliant, and how often Haynes reported he was taking them.

In *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999), Watson had been a police officer with the City of Miami Beach since 1984. In May or June 1995, the Commander of the Administration Bureau became increasingly concerned about what he perceived to be Watson's display of unusually defensive and antagonistic behavior towards his co-workers and supervisors. As a result, he began an investigation. Based on the investigation of Watson's pattern of conduct, the City relieved Watson of duty with pay and required him to undergo a fitness for duty evaluation.

Watson sued the City of Miami Beach under ADA. The United States District Court granted the City summary judgment and Watson appealed. The Court of Appeals, Black, Circuit Judge, held that: (1) officer failed to establish that city regarded him as having a mental impairment, and thus that it violated ADA by relieving him from duty pending a fitness for duty examination, and (2) assuming ADA's prohibition against certain medical inquiries and examinations applied to nondisabled employees, fitness for duty and tuberculosis examinations that officer was required to undergo were job-related and consistent with business necessity, and thus did not violate ADA.

In the present case, Haynes requested to be relieved from one of his primary job duties. It was not until that time that he was required to undergo a fitness for duty examination. Under NFPA

1582, the standards employed by the department physician are objective and clear. The reasons for performing these medical evaluations are explicitly set out, further assisting the department physician in tailoring his assessment closely to the essential job duties of firefighters.

There has been no discrimination against Haynes.  Haynes cannot impose his opinion, a vocational expert opinion, or the opinion of his private physician to refute Dr. Turner's knowledge of the fit for duty requirements as it relates to NFPA guidelines followed by the City of Montgomery Fire Department.  The Fire Department follows national standards and applies the requirements equally to all firefighter candidates and incumbent firefighters.  "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).

Assuming arguendo, that Haynes has made a prima facie showing as an individual with a disability under ADA, the City has shown that the fit for duty examination challenged by Haynes was job-related for the position of firefighter and consistent with business necessity.

### D.    HAYNES VOLUNTARILY RESIGNED AND/OR ABANDONED HIS JOB

After approximately fourteen months on leave, Haynes was advised that if he failed to return to work on May 22, 2006, that pursuant to Montgomery City-County Rules and Regulations, Rule IX, Section I, he would be considered to have resigned from his job as a firefighter.

Montgomery City-County Rules and Regulations, Rule IX, Section 1 states as follows:

> Any employee wishing to leave the classified service in good standing shall file with the appointing authority, at least one week before leaving, a written resignation stating the effective date of the resignation and the reason for leaving. Such notice shall be promptly reported to the Personnel Director. The number of days less than seven (7) given as notice of resignation may be subtracted from accrued vacation leave and failure to comply with the procedures may be the cause for denying the person future employment. Unauthorized or unreported absence from work for a period of three

(3) days or more may be considered by the appointing authority as a
resignation.

*(DX 8, Montoya Affidavit).* Haynes did not comply and was deemed to have resigned by job

abandonment on June 14, 2006. *(DX 8, Montoya Affidavit).*

# V.

## CONCLUSION

Conclusory allegations cannot interpose genuine issues of material fact into the litigation so

as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56(c).

Haynes has not identified any physical or mental impairment that will allow him to succeed

as an individual with a disability protected by the ADA. Haynes does not have a physical or mental

impairment that substantially limits or limited one or more of his major life activities nor is there a

record of Haynes having a physical or mental impairment that substantially limited one or more of

his major life activities.

Haynes was never perceived to be disabled. The underlying condition that required

medication was never at issue. The only issue was whether the medications Haynes was using were

permitted by NFPA standards. Haynes has not identified any physical or mental impairment that

will allow him to succeed as an individual with a disability protected by the ADA. Therefore,

Haynes cannot demonstrate a prima facie case under the ADA showing that he is in the class of

persons protected by the ADA.

Haynes requested to be relieved from one of his primary job duties. It was not until that time

that he was required to undergo a fitness for duty examination. Under NFPA 1582, the standards

employed by the department physician are objective and clear. The reasons for performing these

medical evaluations are explicitly set out, further assisting the department physician in tailoring his

assessment closely to the essential job duties of firefighters.

   Haynes cannot impose his opinion, a vocational expert opinion, or the opinion of his private physician to refute Dr. Turner's knowledge of the fit for duty requirements as it relates to NFPA guidelines followed by the City of Montgomery Fire Department.  The Fire Department follows national standards and applies the requirements equally to all firefighter candidates and incumbent firefighters.  "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions'." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991).

   Assuming arguendo, that Haynes has made a prima facie showing as an individual with a disability under ADA, the City has shown that the fit for duty examination challenged by Haynes was job-related for the position of firefighter and consistent with business necessity.

   Therefore, Defendant's Motion for Summary Judgment is due to granted.

   Submitted this 3rd day of December, 2007.

                                        /s/Kimberly O. Fehl
                                        Kimberly O. Fehl (FEH001)
                                        Allison H. Highley (HIG024
                                        Attorneys for City of Montgomery

OF COUNSEL:
City of Montgomery
Legal Division
Post Office Box 1111
Montgomery, AL  36101-1111
334.241.2050
FAX 334.241.2310

## **CERTIFICATE OF SERVICE**

I hereby certify that foregoing has been served upon the following by electronic filing/notification through CM/ECF with United States District Court Middle District of Alabama on this 3rd day of December, 2007:

> Gerald L. Miller, Esq.
> *REDDEN, MILLS, & CLARK*
> 940 Financial Center
> 505 North 20[th] Street
> Birmingham, AL  35203

> /s/ Kimberly O. Fehl
> Of Counsel