# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **EDDIE J. HAYNES,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **vs.** | )**CASE NO. 2:06-cv-1093-WKW** |
| | ) |
| **CITY OF MONTGOMERY, ALABAMA,** | ) |
| | ) |
| **DEFENDANT.** | ) |

### PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GERALD L.  MILLER (MIL039)
Attorney for Plaintiff
REDDEN, MILLS & CLARK, LLP
505 North 20th Street
940 Financial Center
Birmingham, Alabama 35203
(205) 322-0457

## TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    COUNTS ONE AND TWO - DISCRIMINATION BECAUSE OF
              DISABILITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. §12112(a)

42 U.S.C. §12102(2)

42 U.S.C. §12101(a)(7)

29 CFR § 1630.2 (r)

42 U.S.C. §1211(8)

 D'Angelo v.  ConAgra Foods, Inc.,  422 F.3d 1220 (11th Cir.  2005)

Reed v.  The Heil Co., 206 F.3d 1055 (11th Cir.  2000)

Swain v.  Hillsborough County School Board, 146 F.3d 855(11th Cir.  1998)

Murphy v.  United Parcel Service, Inc., 527 U.S. 516 (1999)

School Board of Nassau County v.  Arline, 480 U.S. 273 (1987)

Sutton v.  United Air Lines, Inc. , 527 U.S. 471 (1999)

Bragdon v.  Abbott, 524 U.S. 624 (1998)

Rigby v.  Springs Industries, Inc., 156 Fed.  Appx.  130 (11th Cir.  2005)

Pinckney v.  Potter, 186 Fed. Appx.  919 (11th Cir.  2006)

 Lowe v.  Alabama Power Company, 244 F.3d 1305 (11th Cir.  2001)

Gillen v.  Fallon Ambulance Service, Inc., 283 F.3d 11 (1st Cir.  2002)

Taylor v. Pathmark Stores, Inc. , 177 F.3d 180 (3rd Cir. 1999)

Rodriguez v. ConAgra Grocery Products Company, 436 F.3d 468 (5th Cir. 2006)

Wysong v. The Dow Chemical Company, 503 F.3d 441 (6th Cir. 2007)

Holiday v. City of Chattanooga, 206 F.3d 637 (6th Cir. 2000)

Riemer v. Illinois Department of Transportation, 148 F.3d 800 (7th Cir. 1998)

E.E.O.C. v. Browning - Ferris, Inc., 262 F.Supp.2d 577 (D. Md. 2002)

Deppe v. United Airlines, 2001 WL 902648 (N.D. Cal. 2001)

E.E.O.C. v. Texas Bus Lines, 923 F.Supp. 965 (S.D. Tex. 1996)

 Equal Employment Opportunity Commission v. The Heil Company, Civil Action
Number CV97-S-235-M (N.D. Al. February 24, 1998)

John Lee v. Pemco Aeroplex, Inc., Civil Action Number CV99-B-3125-S (N.D. Al.
September 13, 2001)


**B**.    **COUNT   THREE - PROHIBITED   MEDICAL   EXAMINATION   AND
       INQUIRY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. §12112(d)(4)

Fredenburg v. Contra Costa County Department of Health Services, 172 F.3d (9th
Cir. 1999)

Sullivan v. River Valley School District, 197 F.3d 804(6th Cir. 1999),
Cert. denied, 530 U.S. 1262 (2000)

Riechmann v. Cutler-Hammer, Inc., 95 F.Supp. 2d 1171 (D. Kan. 2000)

Belk v. Southwestern Bell Telephone Co., 194 F.3d 946 (8th Cir. 1999)

Tice v. Centre Area Transportation Authority 247 F.3d 506 (3rd Cir. 2001)

Lowe v. Alabama Power Co., 244 F.3d 1305 (11th Cir. 2001)

Roe v. Cheyenne Mountain Conference Resort, 920 F. Supp. 1153 (D. Colo. 1996)

Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999)

C.      **COUNT FOUR - QUALIFICATION STANDARD VIOLATION** . . . . . . . . 23

42 U.S.C. §12112(b)(6)

29 CFR §1630.2 (q)

Bates v. United Parcel Service, 465 F.3d 1069 (9th Cir. 2006)

Cripe v. City of San Jose, 261 F.3d 877 (9th Cir. 2001)

Morton v. United Parcel Services, Inc., 272 F.3d 1249 (9th Cir. 2001)

Bentivegna v. U.S. Dept. of Labor, 694 F.2d 619 (9th Cir. 1982)

D.      **EFFECT OF NFPA "STANDARDS"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

E.      **MR. HAYNES DID NOT VOLUNTARILY RESIGN AND/OR ABANDON HIS JOB** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Garrett v. University of Alabama at Birmingham Board of Trustees, ___ F.3d ___, 2007 WL 3378398(11th Cir., Nov. 15, 2007)

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## **I. INTRODUCTION**

This Memorandum Brief is submitted on behalf of the Plaintiff, Eddie J. Haynes, in opposition to the Motion for Summary Judgment filed by the Defendant City of Montgomery, Alabama. This case involves claims under the Americans with Disabilities Act. The complaint is in four counts and Defendant seeks summary judgment on all counts, but, surprisingly, fails to address all claims in the Complaint.

In a nutshell, Eddie Haynes, a Firefighter with the City of Montgomery for fifteen years, was placed on involuntary leave due to medications he was taking for Generalized Anxiety Disorder and was required to undergo a fitness for duty examination by the City's doctor. Despite the fact that Mr. Haynes was fully able to perform and was performing his job, was having no side effects from the medications, and presented letters from his treating physician stating that he was capable of working in his current capacity without restrictions, the City and its doctor refused to return him to work, continued him on involuntary, unpaid leave for over a year, and then terminated him. The City doctor found him physically fit for duty but expressed concerns about the possible side effects from the medications, and told the City it must make a decision whether to return Mr. Haynes to work. The City, in turn, refused to return Mr. Haynes to work until and unless he was released by the City doctor.

The Defendant, in its brief, unfortunately fails to present the facts in the light most favorable to the Plaintiff, as required at this summary judgment stage. Instead, the Defendant ignores some of the evidence and casts all of the evidence in the light most favorable to the City in order to give the appearance that there are no genuine issues of fact and it is entitled to judgment as a matter of law. When all of the evidence is considered, and when that evidence is viewed in the light most

favorable to Mr. Haynes, it is clear that under the facts and the applicable legal principles, summary judgment is due to be denied.

## II. STATEMENT OF FACTS

When the evidence is viewed in the light most favorable to the Plaintiff, the following facts are revealed.

From April 4, 1990 until he was involuntarily terminated effective June 14, 2006, Eddie J. Haynes worked as a Firefighter for the City of Montgomery, Alabama in its Fire Department (PX 1, Haynes Declaration ¶ 2). At all times he was fully capable of performing, and did perform all of the duties of a Montgomery Firefighter without difficulty and in a satisfactory manner (Id.).

On November 14, 2002, Mr. Haynes began seeing Dr. Clemmie Palmer, III, a psychiatrist in Montgomery, for anxiety. Dr. Palmer diagnosed him with Generalized Anxiety Disorder and prescribed several medications, specifically Valium (Diazepam), Gabitril, and Zoloft. Mr. Haynes began taking these medications and seeing Dr. Palmer on a regular basis, and continued to work, performing all of his duties as required, and having no side effects from any of the medications. (Id.¶3).

In January, 2003 Mr. Haynes was sent home by Lieutenant R.L. Johnson at Station 14 where he worked until he could present verification from his doctor of the medications he was taking and their side effects on him. (Id., ¶ 5). There is an issue of fact here in that the City claims Mr. Haynes had said he did not feel comfortable driving the fire truck. (DX 5, Jordan Affidavit). Mr. Haynes, however, denies ever telling anyone he was not comfortable driving the fire truck and states he did not feel uncomfortable driving the fire truck. (PX 1, Haynes Declaration, ¶4, 5).

At any rate, immediately upon being sent home, Mr. Haynes went to Dr. Palmer and explained the situation to him. Dr. Palmer faxed a letter to Chief Walker stating that he had been seeing Mr. Haynes since November 14, 2002, named his medications Zoloft, Valium and Gabitril, and stated Mr. Haynes had not had any side effects from those medications, had no work restrictions, should continue to perform his duties at his current capacity, and had been stable on those medications and working full-time without difficulty. Mr. Haynes was then allowed to report back to duty that same date. (PX1, Haynes Declaration, ¶6 and Exhibit A to Haynes Declaration).

Mr. Haynes continued working without incident until late 2004 when he wrote a letter on behalf of a fellow black Firefighter, who was having a conflict with two white officers at the fire station. Mr. Haynes, too, is a black Firefighter. (PX1, Haynes Declaration, ¶7).

On February 25, 2005 the Captain at Mr. Haynes station, Captain B.S. Hackett, told Mr. Haynes that he wanted to request that Haynes be transferred to another shift. The reason he expressed was to put Haynes in a situation where he would be less likely to drive the fire truck. Haynes told Hackett he had no problem driving the fire truck. (Id. ¶8). In fact, on February 10, 2005 Hackett had written an Employee Commendation Record concerning Mr. Haynes, stating, in part, "Firefighter Haynes has done a good job this trimester.... He performs all assignments when given to him. He is neat and punctual." (PX1, Haynes Declaration ¶8, and Exhibit B to Haynes Declaration).

Hackett had written a memo to his District Chief on February 24, 2005 requesting Haynes be transferred to another shift. In that memo Hackett states, "F/F Haynes is alert and does all that he is asked around the station but I do not feel confident in his mental status while driving Engine Fourteen. He will drive when asked but is overly cautious while he is driving. I understand that

-3-

caution while driving is important but being worried about other things while driving could cause a possible problem in the future." (Exhibit A to DX5, Affidavit of M. Jordan).

On February 28, 2005 Hackett again went to Haynes and stated that the administration downtown was insisting that he write a letter listing the medications that he takes. Haynes asked him why they wanted such a letter and Hackett stated he did not know. Haynes told Hackett he had no problem driving the fire truck and Hackett stated he knew that. Hackett said he had tried to explain all of that to the administration downtown, but they insisted that Haynes write such a letter (PX1, Haynes Declaration ¶9).

Mr. Haynes proceeded to write a letter, as the City insisted, listing his medications. In the letter Haynes listed all of the medications he had taken in the last six months. (Id. ¶10). The letter listed Ibuprofen, Lexapro, Gabitril, Hydrocodone, Diazepam, Cyclobenzaprine, Skelaxin, Meperidine, and Benadryl. The letter listed only Ibuprofen and Lexapro as being taken on a daily basis. (Exhibit C to PX 1, Haynes Declaration).

The City, in its Motion for Summary Judgment and supporting papers, claims Mr. Haynes in this letter asked to be relieved of the duty of driving the fire truck. The letter refutes that contention. To the contrary, Mr. Haynes did not request to be relieved of the duty of driving the fire truck in the letter or in any conversation with anyone. The letter begins, "It is a pleasure as well as an honor to be chosen Driver of Engine Fourteen. And I am more than willing if the City needs me to do so." The letter ends as follows: "Again, thank you for your consideration for me being Engine Fourteen Driver. It is an honor to be a Montgomery Firefighter and take on the duties of a dedicated Fireman." (PX1, Haynes Declaration ¶10 and Exhibit C to PX1).

At the same time Mr. Haynes submitted this letter, he also submitted another letter from Dr.

-4-

Palmer dated March 4, 2005.  In that letter Dr.  Palmer stated:

> Mr.  Eddie Haynes is able to work on the current medications
> Lexapro, Valium, and Gabitril.  He has not had any side effects on his
> current medications.  Mr.  Haynes is to take his medication as
> needed.  He was instructed to take Valium on an as needed basis.  Mr.
> Haynes has no work restrictions and should continue to perform his
> duties at his current capacity.  He has been stable on his current
> medication and working full time without difficulty.  If you have
> concerns please do not hesitate to call or write.

(PX1, Haynes Declaration ¶11 and Exhibit D to PX1).

Mr.  Haynes continued working, performing his regular duties and even driving the fire truck

without difficulty or incident until March 15, 2005.  On that date Assistant Chief Jordan informed

him he was being placed on sick leave pending an investigation of his medications and a

determination of whether he could perform his duties while taking those medications.  Jordan told

him the only way he would be able to return to work was if the City Risk Manager and the City

doctor released him to return to work.  He told Jordan he was able to drive the fire truck and perform

all the duties of a Firefighter and had been performing all of his duties.  Nevertheless, he was placed

on sick leave.  Initially his leave was paid due to sick time, but beginning in May, 2005 until his

termination in May, 2006, his leave was unpaid.  (PX1, Haynes Declaration ¶12).

On March 24, 2005 Mr.  Haynes was sent to the City doctor, Dr.  Michael Turner, for an

examination.  He advised Dr.  Turner of the medications he was taking and the doctors who

prescribed them, including Gabitril, Valium, and Lexapro prescribed by Dr.  Palmer.  Dr.  Turner

stated there was nothing he could do at that time without his medical records.  Mr.  Haynes signed

a medical authorization form for Dr.  Turner to obtain his records and he was rescheduled for March

31.  (PX1, Haynes Declaration ¶13; PX3, Turner Depo  p. 33-35 and Exhibit 5 to Turner Depo).

On March 28 Dr.  Palmer faxed Dr.  Turner an office note of Dr.  Palmer seeing Mr. Haynes

on March 28 and the March 4, 2005 letter described earlier. (PX3, Turner depo, p. 37-39). Dr. Palmer's office note informed Dr. Turner that he had diagnosed Mr. Haynes with Generalized Anxiety Disorder. (Exhibit 8 to Turner Depo).

Dr. Turner next saw Mr. Haynes for a fit for duty examination on March 31, 2005. He did a physical examination which revealed no physical limitations, and concluded Mr. Haynes was physically fit for duty as a Firefighter (PX3, Turner Depo p. 47). He did a drug screen which was negative (Id., p. 44-45). He reviewed Dr. Palmer's March 4 letter and discussed Mr. Haynes medications. (Id., p. 42-43). He understood the only medications Mr. Haynes was currently taking were Lexapro, Gabitril and Valium, and those were the only medications that concerned him. (Id., p. 55-56, 58-59). Mr. Haynes told him the only medication he took while on duty was Lexapro and he was having no side effects from any of the medications. (PX1, Haynes Declaration, ¶15). Dr. Palmer's March 4 letter confirmed he had not had any side effects on the medications and had been "stable on his current medication and working full time without difficulty." (Exhibit A to Turner Depo).

Six months earlier, on September 14, 2004 Dr. Turner had seen Mr. Haynes for a slight knee injury. At that time Dr. Turner learned Mr. Haynes was taking Zoloft, Valium and Gabitril, but he released him for regular duty. He did not notify the City of Montgomery that he had any concern about Mr. Haynes performing his duties as a Fireman while taking those medications. (PX3, Turner Depo, p. 19-23).

Nevertheless, Dr. Turner testified that on March 31 he indicated in his office notes which he sent to the City that he had some concerns. His office note states:

> Patient is physically fit to return to duty. The concerns come form
> the medications he is taking for his anxiety and joint pains. He is

> prescribed the Valium 5mg bid and Gabitril qd. The patient states he
> does not take any medications but the Lexapro while on duty. This
> logic made no sense to me that you would need to take the medicine
> on your days off while not under stress but not need it when in the
> most stressful situations. These medications effects could carry over
> to his on duty time. Any drug screen performed would most likely
> be positive even when on duty. There are safety issues for him
> driving a truck and working on the fire line while under the influence
> of these medications though he claims he does not take while on duty.
> The only way to prove it would see him taking the medication while
> on duty. Administrative decision is needed.

(Exhibit 9 to Turner Depo).

Dr. Turner testified his question was when Mr. Haynes was taking the medications. (PX3, Turner Depo, p.48). While in fact the Montgomery Fire Department has not adopted the National Fire Protection Association (NFPA) guidelines as binding (PX4, Defendant's Amended Response to Plaintiff's First Interrogatories, #4), Dr. Turner mistakenly believed the Montgomery Fire Department had adopted the NFPA standards and he based his conclusions on that understanding. (PX3, Turner Depo, p. 67, 96). He did not believe the NFPA standard would permit Mr. Haynes to work on the fire line while taking Valium, Gabitril and Lexapro. (Id. p. 63-64).

The issue for Dr. Turner was whether Mr. Haynes was taking these medications while on duty. He believed if he was taking them he did not meet the NFPA standard for working on the fire line. (Id., p. 63). Although he believed Mr. Haynes when he told him he had never taken Valium or Gabitril while on duty (Id., p. 64) and he acknowledged he had no reason not to believe Dr. Palmer's assessment that he had not had any side effects on the medications (Id., p. 54), he nevertheless would not release Mr. Haynes for work but instead concluded the City would have to make that decision. (Id., p. 49-51, 81).

Dr. Turner testified he never talked or attempted to talk to Dr. Palmer. (Id. p. 53). He

needed no further information from Mr. Haynes either. (Id., p. 51-52).

Dr. Turner testified his concerns came from the possible side effects of the medications. (Id. p. 55). He acknowledged, however, that the side effects or lack of side effects of medication can vary from individual to individual. He admitted it is possible one person might have a particular side effect from a medication and another person not have it. (Id. p. 57). He acknowledged there was only a possibility that if the medications were taken off duty, that their effects could carry over to duty time. (Id. p. 62). He indicated he would not have cleared Mr. Haynes for any job that involved driving a vehicle of any sort, working in a safety sensitive position or working on the fire line. (Id., p. 55, 63-64, 71-73). He acknowledged he did not look for or review any medical or scientific studies about the likelihood of side effects from taking Valium, Gabitril or Lexapro. (Id., p. 73-74). He did nothing to determine if Mr. Haynes was actually having any side effects from these medications. (Id., p. 78). He acknowledged a functional capacities evaluation could have been performed and would have measured Mr. Haynes' reflexes, reaction times, and other things that would test driving ability, but he did no such testing. He did no testing of the mental functioning of Mr. Haynes. (Id., p. 78-80).

Dr. Turner acknowledged that if Mr. Haynes had been prescribed these medications for a year and a half and had performed all of the duties of Firefighter during that time without any adverse effects, "You would have to take [that] into consideration." (Id., p. 101-02).

After the March 31 examination, Mr. Haynes inquired with various persons in the City of Montgomery Fire Department administration about coming back to work. He was told he could not come back to work until Dr. Turner cleared him. He talked to Dr. Turner's office on several occasions and they told him it was up to the City whether he could go back to work. (PX1, Haynes

Declaration ¶16).  The City began to pressure him to apply for leave under the Family and Medical

Leave Act.  He did not do so, telling them he was perfectly capable of working and wanted to come

back to work.  (Id.).

On April 14, 2005 Dr.  Palmer wrote another letter which Dr.  Turner received.  (PX3,

Turner Dep, p.  83; PX14 to Turner Depo).  In that letter Dr.  Palmer stated Mr.  Haynes was able

to work without taking Valium or Gabitril at all.  He repeated that Mr.  Haynes could perform his

duties in his current capacity with no restrictions.  Dr.  Turner and the City still would not release

Mr.  Haynes to work.  Dr.  Turner testified he still had an issue with the Lexapro (Id., p.  83-84).

[1]

Mr.  Haynes' attorney wrote several letters during 2005 and 2006 to the City attorneys for

the City of Montgomery asking that he be returned to work.  (Id., ¶17; DX 7 to Defendant's Motion

for Summary Judgment).

In letters dated August 1, 2005 and May 17, 2006 (Exhibits C and G to DX7) the City

Attorney erroneously put the blame on Mr.  Haynes or Dr.  Palmer, accusing them of failing to

cooperate.  The City Attorney claimed the problem was Dr.  Palmer's letter had only cleared Mr.

Haynes as to three of the medications, whereas in fact Dr.  Palmer's letter addressed the only three

medications that were an issue for Dr.  Turner.  The City Attorney claimed Dr.  Turner needed

further information or needed to talk to Dr.  Palmer when in fact Dr.  Turner never indicated such

to the City.  With the August 1, 2005 letter the City Attorney sent medical authorizations for Mr.

Haynes to sign so that his medical records could be obtained from his doctors.  Mr.  Haynes signed

---

[1]However, as stated previously, Dr.  Turner knew in September, 2004 that Mr.  Haynes
was taking Zoloft (as well as Valium and Gabitril), but yet released him for regular Firefighter
duty.  (PX3, Turner Depo, p.  19-23).  Lexapro and Zoloft are similar medications and belong to
the same family of medications.  They are not narcotics.  (Id., p.  59-60).

those authorizations and they were returned to the City.  (PX1, Haynes Declaration ¶17; Exhibit D

to DX7).  The City Attorney later received medical records from Dr.  Palmer but never forwarded

them to Dr.  Turner.  (DX7, Correspondence Compilation, Exhibit G; PX4, Defendant's Amended

Response to Plaintiff's First Interrogatories, #11; PX3, Turner Deposition, p.  51-52).

Fire Chief J.W. McKee finally sent Mr.  Haynes a letter dated May 4, 2006 stating if he had

not returned to work by May 22, 2006 he would be considered to have resigned his position by job

abandonment.  (PX1, Haynes Declaration, ¶18).  Mr.  Haynes reported to work on May 22, 2006 but

was sent home.  He asked the Fire Department to make an appointment for him to see Dr.  Turner

to be released for work.  He was finally allowed to see Dr.  Turner on May 25.  (Id., ¶19).

The appointment with Dr.  Turner on May 25, 2006 was very brief.  Dr.  Turner did not

perform a physical examination but asked again about Mr.  Haynes' medications.  Dr. Turner noted

nothing had changed.  Mr.  Haynes was still physically fit for duty but was still taking Lexapro,

Valium and Gabitril and also Flexeril, a muscle relaxer.  Mr.  Haynes told him he did not take them

while at work.  (PX1, Haynes Declaration ¶20; PX3, Turner Depo p.  85-88 and PX15 to Turner

Depo).

Dr.  Turner again felt the side effects of those medications "could" effect his performance

while on duty and noted the City would have to make a decision as to whether to return him to work

or not, due to the issue of whether or not he was taking the medication. (Turner Depo, p.  88-90).

As in the prior exam, Dr.  Turner did not consult any medical or scientific studies about the

likelihood of particular side effects from those medications, did not do or order a functional

capacities evaluation to see what the actual capabilities of Mr. Haynes were, and did not do any

testing or order any testing to determine his mental functioning, reflexes, reaction times, or driving

abilities. (Id., p. 88-89).

Mr. Haynes then received a letter from the City dated June 20, 2006 informing him that effective June 14, 2006 his employment status with the Montgomery Fire Department had been considered a voluntary resignation. (PX1, Haynes Declaration, ¶21). Mr. Haynes did not voluntarily resign or abandon his job. To the contrary, he informed the City of Montgomery Fire Department on numerous occasions that he desired to come back to work. He was never allowed to come back to work after March 14, 2005. (Id., ¶22).

Plaintiff has presented the testimony of a vocational expert, Mary House Kessler, by Declaration. (PX2, Declaration of Mary House Kessler, Ph.D.). In Dr. Kessler's opinion, Dr. Turner's perception of Mr. Haynes as unable to perform work in which he is exposed to hazardous conditions restricts him from a broad range of jobs. Dr. Turner's perception of Mr. Haynes as unable to perform hazardous work causes him to lose access to approximately 182,853 jobs within the state of Alabama. This is 45% of the jobs within the State for which the average person having Mr. Haynes' training, skills and abilities would be qualified to perform. Some of the classes and numbers of such jobs which Mr. Haynes' perceived disability would foreclose him from performing are:

Law Enforcement Workers  - 4,368

Police Officers - 8,417

Security Guards - 10,152

Emergency Medical Techs/Paramedics - 1,962

Firefighters  - 4,776.

(PX2, Declaration of Mary House Kessler ¶17).

-11-

### III. ARGUMENT

**A.     COUNTS ONE AND TWO - DISCRIMINATION BECAUSE OF DISABILITY**

This case is brought under the Americans with Disabilities Act (ADA).  Specifically, in Counts One and Two we contend the City violated the ADA by placing Mr.  Haynes on involuntary leave and then terminating him because of a perceived disability - possible side effects of medications prescribed for Generalized Anxiety Disorder.

The ADA mandates that an employer not discriminate against a qualified individual with a disability with regard to, among other things, discharge, compensation, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).  To establish a prima facie violation of the ADA, Mr.  Haynes need prove only that: (1) he is disabled; (2) he is a "qualified individual," and (3) he was discriminated against because of his disability. D'Angelo v.  ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir.  2005); Reed v.  The Heil Co., 206 F.3d 1055, 1061 (11th Cir.  2000).

As to the first prong, Mr.  Haynes has presented sufficient evidence to create a genuine issue of fact that he has a disability.  The ADA defines "disability" as, among other things, being regarded as having a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2).  See also D'Angelo, 422 F.3d at 1225.  A person is regarded or perceived as being substantially limited in the major life activity of working where he is perceived as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, but the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. D'Angelo, 422 F.3d at 1227.  The Eleventh Circuit has consistently treated working as a major life activity.  Id., p. 1226, 1227 n.  4.  The "class of jobs or broad range of jobs in various classes" language comes from the EEOC Regulations and has been

-12-

applied by the Eleventh Circuit.  See 29 CFR §1630.2(j)(3)(i).  See D'Angelo, at 1227.

A plaintiff is not required to provide a comprehensive list of jobs which he cannot perform to meet this requirement.  Swain v. Hillsborough County School Board, 146 F.3d 855, 858 (11th Cir. 1998).  The Interpretative Guidance to the EEOC Regulations under the ADA also indicate "an onerous evidentiary showing" is not required.  Evidence of general employment demographics that indicate the approximate number of jobs that an individual is excluded from is sufficient.  See 29 CFR part 1630, Appendix (interpreting Section 1630.2(j)).

It is undisputed that the City's doctor, Dr. Turner, regarded or perceived Mr. Haynes as being substantially limited in the ability to do jobs involving hazardous work due to the possible side effects of medications he is prescribed for Generalized Anxiety Disorder.  The testimony of Dr. Mary House Kessler establishes that this perception foreclosed Mr. Haynes from a broad range of jobs.  Specifically, it is her opinion that his perceived disability precludes his access to 182,853 jobs within the State of Alabama that he, or the average person having his training, skills and abilities, would be qualified to perform.  This evidence is undisputed and dispositive of the issue.

The United States Supreme Court has explained that "a person is regarded as disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, non-limiting impairment substantially limits one or more major life activities." Murphy v. United Parcel Service, Inc., 527 U.S. 516, 521-22 (1999).  These mistaken beliefs often "resul[t] from stereotypic assumptions not truly indicative of .... individual ability." See 42 U.S.C. §12101(a)(7).

The "regarded as" provision of the ADA is intended to combat the effects of erroneous perceptions that work to the disadvantage of persons regarded as having disabilities.  School Board of Nassau County v. Arline, 480 U.S. 273, 279 (1987).  The EEOC has explained that the purpose

-13-

of the regarded as prong is to cover individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities." 29 CFR part 1630, Appendix (interpreting Section 1630.2(l)).  In fact, the City and Dr.  Turner had a duty to make an individualized assessment of Mr. Haynes' present ability to safely perform the job and make a decision based on the most current medical knowledge and the best available objective evidence.  29 CFR §1630.2(r).

The City appears to argue it was not Mr.  Haynes' Generalized Anxiety Disorder that disqualified him from this large number of jobs, but the medication which he was prescribed to take.  In other words, the City argues it was the possible side effects of the medication that are at issue.  The United States Supreme Court, however, has rejected this argument, holding the two cannot be separated.  In Sutton v.  United Air Lines, Inc. , 527 U.S. 471, 481 (1999) the United States Supreme Court stated, "Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative- must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act."

Although it is not clear, the City may be arguing that it is insulated from liability because it relied on the opinion of Dr.  Turner.  The United States Supreme Court rejected a similar argument in Bragdon v.  Abbott, 524 U.S. 624, 649 (1998) stating, "As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession.  His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability."  Additionally, after both of his examinations of Mr. Haynes, Dr.  Turner expressly told the City that it was the City's decision whether to return Mr. Haynes to work.  There is evidence, then, that it was the City that made the ultimate decision, not

Dr. Turner, although the City relied on Dr. Turner's examination.

As stated above the second prong of a prima facie case is whether Mr. Haynes is a "qualified individual." Under the ADA, a "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the job. 42 U.S.C. §1211(8). See also D'Angelo, 422 F.3d at 1229. Here, the evidence creates at least an issue of fact as to whether Mr. Haynes can perform the essential functions of the Firefighter job. Mr. Haynes' own testimony is that he has performed the duties of a Firefighter for the City of Montgomery for fifteen years, without any incidents or accidents. He has testified he is fully able to perform his duties and has had no side effects from his medications. The City's own records show that he was performing satisfactorily. (See Exhibit A to PX 1, Declaration of Eddie J. Haynes.) The City says Mr. Haynes March 4, 2005 letter requested that he be relieved of the duty of driving the fire truck. The letter, in fact, does not say this. To the contrary, in the letter Mr. Haynes states he is "more than willing" to drive the fire truck if the City needs him to do so. (See Exhibit C to PX1, Haynes Declaration.) Dr. Palmer wrote two letters in the Spring of 2005 stating Mr. Haynes has had no side effects from his medications and was capable of performing his duties without restriction. There is certainly ample evidence Mr. Haynes was able to perform his duties as a Firefighter.

In D'Angelo, the Eleventh Circuit held that the employee's "own testimony and her prior job performance at Singleton create a genuine issue of material fact as to whether D'Angelo was able to perform the essential function of working around moving equipment, rendering summary judgment inappropriate on this point." D'Angelo, 422 F.3d at 1234 n.6. D'Angelo forecloses any argument by the City that it could be entitled to summary judgment on the basis that Mr. Haynes was not a qualified individual.

-15-

Having shown that the City regarded Mr. Haynes as disabled, and Mr. Haynes is a qualified individual with a disability, it necessarily follows that the third prong of the prima facie case is likewise established: the City unlawfully discriminated against Mr. Haynes because of his perceived disability. The evidence is without dispute that the City refused to return Mr. Haynes to work, leaving him on involuntary leave for more than a year, and ultimately terminated him solely because Dr. Turner had not released him to return to work. Dr. Tuner, in turn, would not release him and informed the City it must make a decision, solely because of the possible side effects from the medications Mr. Haynes was prescribed for Generalized Anxiety Disorder. Continuing Mr. Haynes on involuntary leave and then terminating him due to that perceived disability constituted unlawful discrimination.

The Eleventh Circuit faced a somewhat similar situation involving possible side effects of prescription medication in Rigby v. Springs Industries, Inc., 156 Fed. Appx. 130 (11th Cir. 2005). In Rigby, the defendant Springs Industries refused to hire Mr. Rigby because of the potential side effects of his use of Lortab to treat the pain that results from his diabetes or its complections. Springs Industries based its decision on the opinion of its company doctor "that there was no manufacturing job in the Piedmont area that Rigby could safely perform while taking Lortab." 156 Fed. Appx. at 132. The district court had granted summary judgment in favor of Springs Industries but the Eleventh Circuit reversed on the "regarded as" theory, holding the employer's perception of disability related to a class or broad range of jobs.

The Eleventh Circuit has found issues of fact in regarded as disability cases in other similar situations as well. In D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220 (11th Cir. 2005), the Eleventh Circuit found genuine issues of material fact existed as to whether an employee who

suffered from vertigo and was terminated was regarded as disabled by her employer, who felt, based on her own doctor's note, that she was unable to work around moving equipment. In <u>Pinckney v. Potter</u>, 186 Fed. Appx. 919 (11th Cir. 2006), the Eleventh Circuit held a fact question existed as to whether the employer regarded the plaintiff, an unsuccessful applicant for a mail handler position, as disabled, where the employer refused to hire him due to its doctors assessment that he had a moderate risk of incurring job-related injury or illness within the next six months due to a prior back and knee injury. Similar to Dr. Turner's assessment in the present case, the employer's doctor merely suggested that the job "might" aggravate the plaintiff's knee condition and did not suggest the plaintiff should be denied the job, something the employer decided based on the doctor's assessment. 186 Fed. Appx. at 926. The Court held a genuine issue of material fact was created from the opinions of the Plaintiff's own doctors that he was able to perform the job requirements and represented no direct threat to himself. <u>Id</u>. The similarity between the facts in <u>Pinckney</u> and the facts in the present case are obvious.

The Eleventh Circuit faced similar issues in <u>Lowe v. Alabama Power Company</u>, 244 F.3d 1305 (11th Cir. 2001). In <u>Lowe</u>, the Plaintiff was employed by Alabama Power for 21 years before suffering an injury requiring the amputation of both of his legs below the knees. He returned to work wearing prostheses, working in a warehouse position. The company doctor, nine months after a "cursory" examination, imposed a number of work restrictions, including prohibiting him from working at unprotected elevations and driving non-commercial vehicles. He was later denied a tool-room mechanic position and then demoted and his pay was cut. The district court granted summary judgment to Alabama Power because it had relied on its doctor's restrictions in denying Lowe the mechanic position. The district court found Alabama Power not liable because it held a good-faith

-17-

and honest belief that Lowe posed a direct threat to the safety of others.  244 F.3d at 1307-08.  The

Eleventh Circuit stated,

> To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer must point to particularized facts about the specific person's condition to support its decision.  In Bragdon v.  Abbott, the Supreme Court found that a good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective, scientific evidence.

Lowe, 244 F.3d at 1308.  The Court held the doctor's restrictions were improperly based, at least

in part, on his "assumption that all double amputees have the same limitations," were made without

determining "Lowe's actual capabilities through a physical examination or functionality test" and

were "not based, therefore, on particularized facts using the best available objective evidence as

required by the regulations."  Id. at 1309.   The Court therefore held that summary judgment for

Alabama Power had been improperly granted.

The similarities between Lowe and the instant case are striking.  Dr.  Turner acknowledged

he could have performed a functionality test to determine Mr.  Haynes' reflexes, reaction times,

alertness, and thinking ability, but chose not do so.  He based his opinions on the possible side

effects of Mr.  Haynes' medications, but ignored the information from Mr.  Haynes and his treating

physician that he had no side effects from the medications.  Dr.  Turner admitted the presence or

absence of side effects from medications vary from individual to individual.  He admitted he had no

evidence concerning the likelihood of side effects from the medications Mr.  Haynes had been

prescribed.  He admitted he did not even know whether Mr.  Haynes took two of the medications

while on duty, which was why he deferred the decision to the City.  His opinions were obviously

not based on a particularized assessment of Mr. Haynes' condition but were based on assumption

-18-

or speculation and not the best available objective or scientific evidence.

Other courts have denied summary judgment to an employer in similar circumstances. <u>See</u>, <u>e.g.</u>, <u>Gillen v.  Fallon Ambulance Service, Inc.</u>, 283 F.3d 11 (1st Cir.  2002) (fact issues existed as to whether employer and company doctor acted on basis of stereotyping in refusing to hire applicant, where doctor failed to seek any objective medical evidence of capabilities of applicant); <u>Taylor v. Pathmark Stores, Inc.</u> , 177 F.3d 180 (3rd Cir.  1999)(employer's innocent mistake regarding plaintiff's capacity to work is sufficient to subject it to ADA liability); <u>Rodriguez v.  ConAgra Grocery Products Company</u>, 436 F.3d 468 (5th Cir.  2006)(employer liable who did not assess effect of applicant's diabetes in individualized manner);<u>Wysong v.  The Dow Chemical Company</u>, 503 F.3d 441 (6th Cir. 2007)(reasonable fact finder could conclude employer perceived employee as disabled by refusing to release her to return to work due to concerns about safety risks in taking narcotic drugs while working on machine and fork lift); <u>Holiday v.  City of Chattanooga</u>, 206 F.3d 637 (6th Cir.  2000)(district court erred in accepting City doctor's report as dispositive evidence of plaintiff's alleged inability to serve as police officer where physician did not conduct individualized inquiry mandated by the ADA); <u>Riemer v.  Illinois Department of Transportation</u>, 148 F.3d 800 (7th Cir. 1998) (employer liable for disregarding treating physician's assurance and reassigning Plaintiff based on recommendations of employer's doctor); <u>E.E.O.C.  v.  Browning - Ferris, Inc.</u>, 262 F.Supp.2d 577 (D.  Md.  2002)(reasonable jury could find employer violated ADA by relying exclusively on company doctor's opinion  which was not based on most current medical knowledge or best available objective evidence); <u>Deppe v.  United Airlines,</u> 2001 WL 902648 (N.D. Cal. 2001) (fact issue raised because, although employer's doctor stated plaintiff was unable to return to work, plaintiff's own doctor felt otherwise); <u>E.E.O.C.  v.  Texas Bus Lines</u>, 923 F.Supp.  965 (S.D. Tex.

-19-

1996) (employer liable under ADA when it relied on its doctor's erroneous opinion not based on objective medical testing or finding).

Additionally, this case is similar to the decisions of Judge Lynwood Smith in <u>Equal Employment Opportunity Commission v. The Heil Company</u>, Civil Action Number CV97-S-235-M (N.D. Al. February 24, 1998)(copy attached) and the decision of Judge Sharon Lovelace Blackburn in <u>John Lee v. Pemco Aeroplex, Inc.</u>, Civil Action Number CV99-B-3125-S (N.D. Al. September 13, 2001)(copy attached). We would ask this Court to review those decisions, follow the reasoning of Judge Blackburn and Judge Smith, and deny the City's Motion for Summary Judgment on Mr. Haynes' claims in counts one and two of his Complaint that he was placed on involuntary leave and terminated because of his perceived disability.

## B.    COUNT THREE - PROHIBITED MEDICAL EXAMINATION AND INQUIRY

In Count Three, we contend the City violated 42 U.S.C. § 12112(d)(4) by exceeding the scope of a permissible medical examination or inquiry, and continuing Mr. Haynes on involuntary leave and later terminating him because of the examination and inquiry.

42 U.S.C. §12112(d)(4) provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such an employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." The employer has the burden of proving business necessity and job-relatedness. <u>Fredenburg v. Contra Costa County Department of Health Services</u>, 172 F.3d 1176, 1182 (9th Cir. 1999).

In this case, the City can not meet this high standard of showing the scope of the fitness for

-20-

duty examinations was job-related.  The requirement of job-relatedness requires that any medical examination or inquiry must be restricted to discovering whether the employee can perform the essential functions of the job.  <u>Sullivan v. River Valley School District</u>, 197 F.3d 804, 811-12 (6th Cir. 1999), <u>cert. denied</u>, 530 U.S. 1262 (2000); <u>Riechmann v. Cutler-Hammer, Inc.</u>, 95 F.Supp. 2d 1171, 1185-87 (D. Kan. 2000); <u>Belk v. Southwestern Bell Telephone Co.</u>, 194 F.3d 946, 951 (8th Cir. 1999).  As the Third Circuit said in <u>Tice v. Centre Area Transportation Authority</u> 247 F.3d 506, 515 (3rd Cir. 2001),  "[A]n examination that is 'job-related' and 'consistent with business necessity' must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue."

    <u>Lowe v. Alabama Power Co.</u>, 244 F.3d 1305 (11th Cir. 2001), discussed earlier in this brief, although not expressly based on 42 U.S.C . §1211(d)(4), is consistent with this principle.  The medical examination there violated the Americans with Disabilities Act because the doctor relied on generalities and assumptions and did not restrict the examination to whether the employee could actually perform the essential job functions.

    In the instant case, Dr. Turner's two examinations are not shown to be job-related because he admittedly would not clear Mr. Haynes for work even though he did not find he was unable to perform the essential job functions.  He based his opinion on "possible" side effects of medication, rejecting all of the objective evidence that Mr. Haynes had no side effects from his medications and admitting that some patients have side effects, while others do not.  The scope of the examination was not job-related because it was not limited to the present ability of Mr. Haynes to perform the job.  Additionally, an employer may not require its employees to disclose all legal, prescription medications they use.  <u>Roe v. Cheyenne Mountain Conference Resort</u>, 920 F. Supp. 1153 (D.

Colo. 1996).

Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999), cited by the City, is of no help to the City. We do not challenge the decision of the City of Montgomery to send Mr. Haynes for a fitness for duty evaluation, as did the Plaintiff in Watson. Instead, our argument is simply that the City violated 42 U.S.C. §12112(d)(4) by exceeding the scope of a permissible medical examination or inquiry, and continuing Mr. Haynes on involuntary leave and later terminating him because of that examination and inquiry. In contrast, the Plaintiff in Watson challenged the City's decision to order him to complete a fitness for duty examination.

In Watson, the police officer "had overreacted in many situations," there had been various incidents and grievances, and the City had good cause to send Watson for a fitness for duty examination. 177 F.3d at 934-35. The City relieved Watson of duty with pay, required him to undergo a fitness for duty evaluation, and returned him to work eight days later, after the evaluation. Id., at 934. Here, in contrast, Mr. Haynes was sent for a fitness for duty evaluation and was kept on unpaid leave for more than a year and then terminated, not because he could not perform the essential job functions, but because of "possible" side effects of the medication, with Dr. Turner all the while rejecting all of the evidence that Mr. Haynes was suffering no such side effects and with Dr. Turner conducting no testing whatsoever to determine whether Mr. Haynes was suffering from any side effects and whether Mr. Haynes was able to perform the duties of his position. The facts in Watson are not at all similar to the facts in the instant case.

### C.    COUNT FOUR - QUALIFICATION STANDARD VIOLATION

Count Four of the Complaint alleges the City violated 42 U.S.C. §12112(b)(6) by using

-22-

qualifications standards that screen out or tend to screen out individuals with a disability. The statute provides such standards are unlawful unless the standard is shown to be job-related for the position in question and is consistent with business necessity. 42 U.S.C. §12112(b)(6). Dr. Turner's standard was that a person cannot be employed by the City as a Firefighter who is prescribed certain prescription drugs which he felt have "possible" side effects. That standard violates the ADA because it excludes persons taking such drugs who do not have such side effects and who are able to do the job.

The EEOC regulations provide that "qualifications standards" include "medical, safety and other requirements...which an individual must meet in order to be eligible for the position held or desired." 29 CFR §1630.2(q). According to the EECO in its Interpretive Guidance on Title I of the Americans with Disabilities Act, found in the Appendix to Part 1630 of the CFR, in the portion relating to Section 1630.10, "The purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job. It is to ensure that there is a fit between job criteria and an applicant's [or employee's] actual ability to do the job." The EEOC also says, "This provision is applicable to all types of selection criteria, including safety requirements...."Id.

There is substantial evidence in this case that Mr. Haynes is fully able to perform the job of Firefighter. In fact, there is no evidence that he is not capable of performing the job. Dr. Turner never found that he was not capable of performing the job, or that he was having side effects from his medication that would prevent him from performing the job, but instead disqualified him because of "possible" side effects. He ignored the statements of Mr. Haynes and his treating physician, that he had taken these medications for over two years without any side effects and had performed his

job satisfactorily for 15 years without any incidents or difficulties.  The courts have uniformly held that such blanket disqualifications not based on actual ability to perform the job, but based simply on blanket criteria or fears or stereotypes, violate the Americans with Disabilities Act, particularly Section 12112(b)(6).  See, e.g., Bates v.  United Parcel Service, 465 F.3d 1069 (9th Cir. 2006) (blanket exclusion of individuals from driver positions who cannot pass particular hearing test violates 42 U.S.C. §12112(b)(6)); Cripe v.  City of San Jose, 261 F.3d 877 (9th Cir.  2001) (blanket exclusion of police officers with neck and back injuries violates 42 U.S.C. §12112(b)(6)); Morton v.  United Parcel Services, Inc., 272 F.3d 1249 (9th Cir.  2001)(blanket exclusion of persons with hearing impairment violated ADA); Bentivegna v.  U.S. Dept. of Labor, 694 F.2d 619 (9th Cir. 1982) (blanket exclusion of applicants with diabetes whose blood sugar was not consistently below a certain level violated Rehabilitation Act).

**D.     EFFECT OF NFPA "STANDARDS"**

The Defendant in its brief places great reliance on the NFPA (National Fire Protection Association) "standards."  The City repeatedly asserts that it uses the NFPA standards as a guideline and that Dr.  Turner follows the NFPA standards.  The City also repeatedly asserts that Dr.  Turner was aware of the NFPA standards and "some" of the medications Mr.  Haynes was taking do not comply with the NFPA standards.  Interestingly, the City never identifies which of the medications it contends are prohibited by the NFPA.  The City also does not explain exactly how it contends the NFPA standards provide it an absolute defense to this case.  The NFPA "standards" provide no defense to the City for several reasons.

First, Dr.  Turner himself acknowledged the NFPA is not a governmental body and does not

-24-

have the authority to make laws or governmental regulations.  (PX3, Turner Depo, p.  66-67).  He

acknowledged the NFPA does not override the Americans with Disabilities Act and if there were

a conflict between the two, the ADA would override the NFPA.  (Id., p.  68-69).  He testified he was

not aware of any governmental statute or regulation that would prohibit a person taking the

medications Mr.  Haynes was taking from working as a Firefighter or in a public safety job.  (Id.,

p.  70-71).

     The NFPA itself acknowledges the requirements of the ADA override the NFPA standards.

Section B.1.1 of Annex B to NFPA 1582 (Exhibit E to DX5, Affidavit of M. Jordan), states, in part:

> The Americans with Disabilities Act ... also prohibits employment
> discrimination by certain private employers against individuals with
> disabilities.  In addition, many states have enacted legislation
> prohibiting discrimination against those with handicaps or
> disabilities....
>
> The disability discrimination laws, therefore, continue to be an
> important part of the legal framework that governs employment-
> related decisions.  Although this standard has been developed with
> this in mind, these laws can, depending on the jurisdiction and the
> circumstances, affect the degree to which the authority having
> jurisdiction can implement the standard in an individual
> case...[R]eliance on the standard alone may not be sufficient to
> withstand a challenge to an adverse employment decision.

For the reasons explained at length elsewhere in this Brief, the City's treatment of Mr.  Haynes

violated the ADA.  The NFPA provides no defense to the City.

     Secondly, Dr.  Turner blindly applied his understanding of the NFPA standards as if they

were mandatory.  He would not clear Mr.  Haynes to return to work simply because he believed the

NFPA standards would not permit it.  He believed the City had adopted the NFPA standards as

mandatory.  In fact, in its answers to interrogatories in this case, the City has specifically admitted,

"Also, the Montgomery Fire Department looks to the National Fire Protection Association Rules and

Regulations as a guideline for best practices, but has not adopted them in their entirety so they are not binding on the Montgomery Fire Department." (PX4, Defendant's Amended Response to Plaintiff's First Interrogatories, number four).

Dr. Turner was very clear in his deposition that he would not clear Mr. Haynes to return to work simply because of his understanding of the NFPA standards:

> Q.    But your testimony is that the National Fire Protection Association standard would not permit him to work on the fire line while taking these medications?
>
> A.    Yes.  I can explain in more detail but, yes.
>
> Q.    And you are referring again to the Valium, Gabitril and Lexapro?
>
> A.    Yes.

(PX3, Turner Depo, p.  63-64)

> Q.    Did you do anything to determine if Mr.  Haynes was actually having any side effects from these medications?
>
> A.    No.
>
> Q.    Did you do any test to determine his mental functioning?
>
> A.    Not - -no.  No specific tests, besides reading that his psychiatrist feels that he is able to perform his normal duties.
>
> Q.    Okay.  But other than reading that, in your examination of him, you didn't do any testing - -
>
> A.    No.
>
> Q.    - - of his mental functioning?
>
> A.    No.
>
> Q.    Did you do any testing on his reflexes?
>
> A.    No.

Q.      Or his reaction time?

A.      Huh-uh.

Q.      Did you do any testing of his driving ability?

A.      No.

Q.      Why did you not do any of those things?

A.      Because by the standard, if he is on these medications, it stops right there.

Q.      Okay.

A.      I mean that is the whole issue.  It stops right there.

(Id., p. 78-79).

Q.      Did the fire – who was the fire chief in 2004?

A.      That would have been McKey.

Q.      And he has since retired, correct?

A.      Yes.

Q.      Did McKey tell you that the City of Montgomery had adopted the NFPA standards?

A.      As I recall.

Q.      That is your understanding?

A.      That is my understanding.

Q.      And you - - basically the conclusion and opinions that you have expressed today about Mr.  Haynes are based on your understanding that the City of Montgomery adopted that standard?

A.      Right.

(PX3, Turner Depo, p. 96).  It is clear from Dr.  Turner's testimony that he would not clear Mr.

Haynes for work because he believed the City had adopted the NFPA standards as mandatory.  In

fact, he was mistaken, and the City had not.

Finally, Dr. Turner was mistaken in his understanding of the NFPA standard. He apparently believed the NFPA prohibited one working as a Firefighter from taking either Valium, Gabitril, or Lexapro. This is shown most clearly by the fact that when Mr. Haynes submitted a letter to him from Dr. Turner stating that he could work without taking Valium or Gabitril, Dr. Turner still refused to return him to work because he was taking Lexapro. (PX3, Turner Depo, p. 83-84). A careful reading of NFPA 1582 (which apparently neither Dr. Turner nor the City has read carefully) does not preclude a Firefighter from taking Lexapro. Dr. Turner testified Lexapro is an antidepressant, or antianxiety medication similar to Zoloft and belongs to the category of medications known as Serotonin Reuptake Inhibitors. It is not an anticonvulsant or a narcotic. (PX3, Turner Depo, p. 59-60). NFPA 1582 does not prohibit the taking of Serotonin Reuptake Inhibitors. See NFPA Section 9.16.2 (Exhibit E to DX5, Affidavit of M. Jordan).

Thus, not only has the City never considered NFPA 1582 mandatory, if it were mandatory it does not override the ADA but is subject to the constraints of the ADA, and even if it were mandatory, it does not justify Dr. Turner's and the City's failure to return Mr. Haynes to work when he could have worked taking only one medication, Lexapro, which is not prohibited by the NFPA.

### E.    MR. HAYNES DID NOT VOLUNTARILY RESIGN AND/OR ABANDON HIS JOB

The City briefly argues that Mr. Haynes voluntarily resigned or abandoned his job as a matter of law. The City cites no legal authority for that proposition, but instead relies on a rule from the Montgomery City-County Rules and Regulations which states that an unauthorized or unreported absence from work for a period of three days or more "may" be considered as a resignation. The

City says it considered Mr. Haynes to have resigned after he had been on leave for 14 months when it advised him if he failed to return on May 22, 2006 he would be considered to have resigned. It should first be noted that the City's argument, at best, would apply only to Count Two of the Complaint and would not bar the other counts which are based, in part, on placing Mr. Haynes on leave and keeping him on leave for the 14 month period of time.

More fundamentally, however, the record simply does not support the conclusion that Mr. Haynes voluntarily resigned or abandoned his job. In his Declaration, Mr. Haynes says that he was involuntarily placed on sick leave by Assistant Chief Jordan on March 15, 2005 and was told the only way he would be able to return to work was if the City Risk Manager and the City Doctor released him to return to work. (PX1, Haynes Declaration, ¶12). After submitting to the fit for duty examination by Dr. Turner (Id.,¶13-15), Mr. Haynes repeatedly inquired with the City and Dr. Turner's office about coming back to work. He expressed his desire on numerous occasions to return to work, but was always told he could not return until Dr. Turner released him. (Id., ¶16). His attorney wrote several letters to the City attorneys during 2005 and 2006 asking that he be returned to work but he was still not allowed to return. (Id., ¶17). When he received the letter dated May 4, 2006 stating if he had not returned to work by May 22, 2006 he would be considered to have resigned his position by job abandonment, he reported to work on May 22, 2006 but was sent home. (Id., ¶18-19). He was then allowed to see Dr. Turner for another fit for duty exam on May 25, 2006 and Dr. Turner told him nothing had changed. (Id., ¶19-20). His attorney again wrote the City attorney asking the City to reconsider its position and return Mr. Haynes to work. The next contact Mr. Haynes had was to receive a letter informing him that his employment status with the Montgomery Fire Department had been considered a voluntary resignation. (Id., ¶21). Mr. Haynes

-29-

never at any time informed anyone with the City of Montgomery or City of Montgomery Fire Department that he was resigning or abandoning his job. To the contrary, he informed the City of Montgomery Fire Department on numerous occasions that he desired to come back to work, and his attorney did as well. He was never allowed to come back to work after March 14, 2005. He did not voluntarily resign or abandon his job. His employment was involuntarily terminated. (Id., ¶22).

In light of this evidence, there is no way it can be said as a matter of law that Mr. Haynes voluntarily resigned or abandoned his job. See Garrett v. University of Alabama at Birmingham Board of Trustees, __ F.3d ___, 2007 WL 3378398(11th Cir., Nov. 15, 2007)(Plaintiff's testimony that supervisor told her she could not stay in her job and must transfer created a genuine issue of material fact as to whether plaintiff voluntarily requested transfer).

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,


 /s/ Gerald L. Miller
Gerald L. Miller(MIL039)
Attorney for Plaintiff, Eddie J.  Haynes

**OF COUNSEL**:
REDDEN, MILLS & CLARK, LLP
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457


## CERTIFICATE OF SERVICE

        I hereby certify that on January 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Allison H.  Highley
Kimberly O.  Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

                         /s/ Gerald L. Miller
                        OF COUNSEL

-31-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN LEE                              )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        CASE NO. CV-99-B-3125-S
                                      )
PEMCO AEROPLEX, INC.                  )
                                      )        **ENTERED**
        Defendant.                    )
                                      )                SEP 1 3 2001

## MEMORANDUM OPINION

Currently before the court are Defendant Pemco Aeroplex, Inc.'s Motion for Summary

Judgment and Plaintiff John Lee's Motion for Partial Summary Judgment. Plaintiff John Lee

("plaintiff" or "Lee") asserts claims of disability discrimination against Pemco Aeroplex,

Inc ("defendant" or "Pemco"), under the Americans With Disabilities Act of 1990, 42 U.S.C. §

12101, *et seq*. ("ADA") and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. (Pl. Compl. ¶ 3.)

Upon consideration of the record, the submission of the parties, the arguments of counsel,[1] and

the relevant law, the court is of the opinion that both Motions are due to be denied.

## FACTUAL STATEMENT

Pemco is engaged in the business of aircraft overhaul and modification, and employs

approximately 1400 people. All applicants for employment at Pemco must first fill out an

application at the Alabama State Employment Office ("ASEO"), wherein they list their job

---

[1] At oral argument, the court expressed its inclination to grant defendant's motion for
summary judgment. However, after further consideration of the relevant law, the court is of the
opinion that genuine issues of material fact preclude summary judgment

36

experience, training, education, etc. The ASEO interviews the applicant to determine what type(s) of jobs the applicant qualifies for and seeks. When the need arises to hire employees, Jim Hardin ("Hardin"), the Employment Recruiter and Compliance Manager at Pemco informs the ASEO of Pemco's need for people in a certain position. If the ASEO determines that a particular applicant is a good candidate for the position Pemco seeks to fill, the ASEO sends the applicant to Pemco for an interview. If Pemco decides to hire the applicant, then the applicant receives an offer of employment contingent on the results of a physical examination and drug screening performed by a physician, pursuant to a contractual relation with Pemco. If the physician approves the applicant for employment for that particular position and the applicant passes the drug test, Pemco employs the applicant.

In early to mid 1998, plaintiff sought employment at Pemco, and completed the ASEO application. The ASEO sent plaintiff to Pemco for an interview for a fiberglass laminator position on September 15, 1998. When he arrived, he was told that the position had already been filled. Sometime in early March, 1999, David Page at Pemco contacted plaintiff about interviewing for a depainter position. On March 5, 1999, Page interviewed plaintiff for the position and offered him the job conditioned upon plaintiff passing a physical examination. Later that day, Pemco sent plaintiff to Dr. Steve Hankins, at Carraway Methodist Medical Center.

After the examination, Dr. Hankins telephoned Don Driggers, Pemco's Manager of Program Safety, and informed him that he would not recommend plaintiff for the depainter position. Driggers testified that nothing else was said in this conversation. Driggers then informed Page of the doctor's decision, and Page decided not to hire plaintiff. Page testified that

2

this decision was based on Pemco's corporate policy providing that applicants who are not recommended for employment for a particular job cannot be hired for that job.

Plaintiff had previously undergone carpal tunnel release surgeries on each wrist: one in 1993, and the other in 1995. It is undisputed that plaintiff truthfully told Dr. Hankins that he had been performing jobs requiring repetitive work with his hands since his surgeries and had experienced no problems. Dr. Hankins's examination revealed that everything was normal, including plaintiff's wrists. Dr. Hankins did not perform a functional capacities evaluation, which would have assessed plaintiff's ability to perform the job for which he was being considered. Based solely on plaintiff's history of carpal tunnel syndrome, Dr. Hankins recommended that plaintiff not be hired for the depainter position. Dr. Hankins's finding and recommendations state:

> It is my medical opinion that the individual will be [at] risk of reinjury with repetitive work. Even if screening was done and [patient's] results were negative, the risk is still high for reinjury with repetitive work. I would not recommend this individual performing the duties of a depainter.

Dr. Hankins testified that he felt that plaintiff should not do repetitive work for more than half the work day. Page, Pemco's Manager of Training, testified that there is no job at Pemco that would not require repetitive work with hands for more than half the work day. Dr. Mary Kessler, a vocational expert, states that a perception of plaintiff as being unable to perform repetitive work would restrict him from working a broad range of jobs. Such a perceived disability would preclude access to 98,878 jobs in the Birmingham metropolitan area and 489,784 jobs in Alabama. On a percentage basis, such a perceived disability would decrease his access to jobs in Alabama from thirty-six percent of the jobs in the state, with no perceived

3

disability, to only thirteen percent of the jobs, with his perceived disability.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)

## DISCUSSION

A plaintiff advancing a claim of employment discrimination under the ADA must make a prima facie case establishing that (1) he has a disability, (2) he is a qualified individual, that is, able to perform the essential functions of the employment position that he holds or seeks with or

without reasonable accomodation, and (3) the defendant unlawfully discriminated against him because of the disability. *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11 th Cir. 2000). The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or, (C) being regarded as having such impairment. *See Hilburn v. Murata Electronics N.A., Inc.*, 181 F.3d 1220, 1226 (11 th Cir. 1999)(citing 42 U.S.C. § 12102(2)). An impairment is not a disability unless it substantially limtis one or more of the major life activities. "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). With respect to the major life activity of working, the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

In its Motion for Summary Judgment and Brief in Support, defendant argues that plaintiff has not established a prima facie case of disability discrimination because he does not have a disability under the ADA. Plaintiff admits that he has no actual disabling physical or mental impairment under 42 U.S.C. § 12102(2)(A), and there is not sufficient evidence to support a finding that plaintiff has a record of disability under 42 U.S.C. § 12102(2)(B). Thus, plaintiff is not disabled under 42 U.S.C. § 12102(2) unless he can show that he is being regarded as having an impairment that substantially limits one or more of his major life activities.

Plaintiff has presented sufficient evidence upon which a reasonable jury could find that Dr. Hankins regarded plaintiff as being disabled. Under the ADA, Pemco is liable not only for its own discriminatory treatment of a qualified applicant or employee, but also for participating

5

in a contractual or other arrangement or relationship that has the effect of subjecting a qualified

applicant or employee with a disability to discrimination. 42 U.S.C § 12112(b)(2). The

regulations provide:

> Accordingly, it would be a violation for an employer to participate
> in a contractual relationship that results in discrimination against
> the employer's employees with disabilities in hiring . . . This
> provision applies whether or not the employer or other covered
> entity intended for the contractual relationship to have the
> discriminatory effect.

29 C.F.R. § 1631.6. This ADA provision applies to contractual relations between the employer

and health-care provider for performing post-offer physical examinations. *Holiday v. City of*

*Chattanooga*, 206 F.3d 637, 640-41 (7th Cir. 2000)(holding that the district court erred in

holding that the employer had a right to rely on an independent doctor's unsubstantiated and

cursory medical opinion and in treating the doctor's opinion as having settled the question of

whether the applicant was qualified for the job). Under the ADA, the employer has a duty to

make an individualized determination about the applicant's ability to perform the job for which

he is being considered, and cannot relieve itself of that duty by contracting out the performance

of it to a third-party. *Id.* at 644-45. Dr. Hankins's report creates a *question of fact* as to whether

plaintiff was qualified to perform the essential functions of the depainter job. *See id.* at 645.

Because plaintiff has presented evidence by which a reasonable jury could find that Dr.

Hankins and Pemco regarded him as being disabled, Pemco's Motion for Summary Judgment is

due to be denied. Because there is a genuine issue of material fact, Plaintiff's Motion for Partial

Summary Judgment is also due to be denied.

## CONCLUSION

Based on the foregoing, the court is of the opinion that Defendant Pemco Aeroplex, Inc.'s

Motion for Summary Judgment and Plaintiff John Lee's Partial Motion for Summary Judgment

are due to be denied. An Order in accordance with this Memorandum Opinion will be entered

contemporaneously herewith.

DONE this 13th day of September, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

93 FEB 23 PM 3:29

U.S. DISTRICT COURT
N.D. OF ALABAMA

EQUAL EMPLOYMENT OPPORTUNITY    )
COMMISSION,                      )
                                 )
        Plaintiff,               )
                                 )
vs.                              )    Civil Action No. CV97-S-235-M
                                 )
THE WEIL COMPANY,                )    ENTERED
                                 )
        Defendant.               )
                                      FEB 24 1998

ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED that plaintiff's motion for summary judgment is GRANTED on the following issues: (1) satisfaction of the prerequisites to suit; and, (2) proof that Tracey Padgett was "regarded as" substantially limited in the major life activity of working. Plaintiff's motion for summary judgment is DENIED on the issue of whether Padgett was a "qualified individual" with a disability. Defendant's motion for summary judgment is DENIED.

DONE this the 23rd day of February, 1998.

United States District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

59 FEB 23  PM 3: 24

U. S. DISTRICT COURT
N.D. OF ALABAMA

EQUAL EMPLOYMENT OPPORTUNITY        )
COMMISSION,                          )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )      Civil Action No. CV97-S-235-M
                                     )
THE HEIL COMPANY,                    )                    ENTERED
                                     )
        Defendant.                   )                 FEB 2 4 1998

## MEMORANDUM OPINION

The Equal Employment Opportunity Commission commenced this
action on behalf of a third party, Tracey Padgett. Allegedly, the
Heil Company "regarded" Mr. Padgett as disabled and terminated his
employment in violation of the Americans with Disabilities Act of
1990, 42 U.S.C. §§ 12101 et seq. The action is before this court
on a motion for partial summary judgment by the EEOC and a motion
for summary judgment by the Heil Company. Upon consideration of
the pleadings, briefs, and evidentiary submissions, this court
concludes plaintiff's motion is due to be granted in part, but
denied in part; and, defendant's motion is due to be denied.

## I.  FACTS

The Heil Company's Fort Payne, Alabama facility manufactures
certain components of garbage trucks. Tracey Padgett worked at
that facility from April 24, 1990 until April 4, 1993. He welded
the sides and floors of garbage containers.  (Plaintiff's
deposition at 64.)  Such duties required bending, stooping,

30

lifting, crawling, and working in awkward positions.   (Genelin
deposition at 20.)

During January of 1993, Mr. Padgett injured his back while
preparing for work, and the resulting pain caused him to miss
several days of work. He was examined by Dr. Donald Deinlein, who
diagnosed two herniated discs.  Dr. Deinlein released Padgett to
return to work with no restrictions after two weeks of therapy.
(Deinlein deposition at 19.)

Even so, the Heil Company required Padgett to obtain a second
evaluation from Dr. Timothy Decker, a doctor of osteopathy who
allegedly was more familiar with job requirements at the Heil
plant.[1]  (Genelin deposition at 32; Padgett deposition at 100.)
Dr. Decker refused to release Padgett to return to work, because
the lifting, bending, and twisting requirements of the welder
position allegedly placed him in danger of further injury.  (Decker
deposition at 11, 13-14.)  Subsequently, Padgett secured releases
to return to work with no restrictions from two neurosurgeons, Dr.

_____

[1]There are indications in the record that Dr. Decker was Heil's "company
physician":

   We had an informal arrangement with [Dr. Decker] in which he
   agreed to see patients if we sent them to him when they had a
   worker's comp injury[:] to review any injuries as we had described
   before that would have occurred off duty and before they came back
   to work[:] to come out to our plant periodically to walk through for
   a couple of things. To familiarize himself with what's going on in
   the plant, the jobs themselves specifically and then also to advise
   us with regard to medical supplies, the training of our emergency
   medical people and the compliance with emergency medical laws out
   there.

[Danner deposition at 15-16.]  Under that "informal arrangement," Dr. Decker
treated all Heil employees who suffered on-the-job injuries (Decker deposition
at 9), and human resources manager Linda Ellis identified him as Heil's "company
doctor."  (Ellis deposition at 24.)

2

Zenko Hrynkiw and Dr. Randolph George. (Hrynkiw deposition at 15-16; George deposition at 10.) Nevertheless, defendant persisted in its refusal to allow Padgett to work. That refusal was based solely on Dr. Decker's evaluation. The Heil Company's plant manager, Kevin Genelin, conferred with Dr. Decker and concluded there were no positions at the Heil Company facility that Padgett could perform. (Genelin deposition at 56, 75, 100-01.) Human resources manager Linda Ellis concurred in that conclusion, because the lifting, pushing, and pulling requirements of plant jobs foreclosed continued work by Padgett. (Ellis deposition at 41, 52, 53.)

Thus, on April 4, 1993, Padgett was "laid off" for lack of work he could safely perform, and because no accommodations could be identified. (Genelin deposition at 69-70; Ellis deposition at 41.) The Heil Company stresses that Padgett's employment was not "terminated," because he retained certain "recall rights," which might allow preferences in hiring if a job ever became available within his alleged restrictions. (Danner deposition at 29-30.)

Since his "lay off," Padgett has worked in other manual labor jobs, including welder positions. (Padgett deposition at 16-18, 27-58.) He currently is employed as a welder, in a position which requires welding pumps and hoists, and installing plumbing on trucks. (Id. at 51-52.) He subsequently has lifted pieces of steel weighing 75 pounds and used a crane to move steel walls. (Id. at 55-56.)

3

Defendant's corporate representative, Jack Danner (the Heil
Company's corporate director of human resources), testified that
Padgett's restrictions, as communicated by Dr. Decker, limited his
work to performing clerical or office jobs. (Danner deposition at
46, 47.)    Specifically, Padgett allegedly can not perform the
following jobs at Heil's Fort Payne plant: machine operator,
mounter, painter, grinder, washer, maintenance worker, or welder
assembler.  (Id. at 56-59.)  Padgett effectively is foreclosed from
approximately 99% of the positions at the facility.  (Id. at 60.)

Human resources manager Linda Ellis testified that there were
no jobs Padgett could perform, including clerical jobs.   (Ellis
deposition at 53-54.)

Plant manager Kevin Genelin believed that Padgett only could
work in an office position, sitting at a desk, in a position that
required very limited bending or stooping.  (Genelin deposition at
97-99.)

Vocational specialist Mary House Kessler, Ph.D., interviewed
and evaluated Padgett on July 15, 1997.  (See plaintiff's exhibit
16.)    She concluded that Heil's job description for the welder
position placed its exertional requirements in a "medium" category.
(Plaintiff's exhibit 16 at 6.)   She also found that Padgett's
limitations, as perceived by defendant, prevented him from working
in the broad ranges of heavy, medium, and light jobs.  (Id. at 7.)
As perceived by defendant, Padgett only could work in approximately
3% of all jobs in the state.  (Id.)

4

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment not only is proper, but "shall be rendered
forthwith if the pleadings, depositions, answers to interrog-
atories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact
and that the moving party is entitled to judgment as a matter of
law. ..."   (Emphasis supplied.)  The movant bears the initial
burden of showing the court, by reference to materials on file,
that no genuine issues of material fact exist to be decided at
trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604
(11th Cir. 1991).  The moving party discharges this burden by
"showing" or "pointing out" to the court that there is an absence
of evidence to support the non-moving party's case.  *Jeffery v.
Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per
curiam*).  Rule 56 permits the movant to discharge this burden with
or without supporting affidavits.  *Celotex*, 477 U.S. at 324, 106
S.Ct. 2553.  When the moving party has discharged its burden, the
non-movant must go beyond the pleadings and designate specific
facts showing there is a genuine issue for trial.  *Jeffery*, 64 F.3d
at 593.

In deciding whether the moving party has met its burden, the
court is obligated to draw all inferences from the evidence
presented in the light most favorable to the non-movant and, also,

5

to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

6

### III.  DISCUSSION

#### A.  Prerequisites to Suit

The EEOC seeks summary judgment on the legal issue of its right to commence the present action.

> If within thirty days after a charge is filed with the Commission ..., the Commission has been unable to secure from respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent ... named in the charge.

42 U.S.C. § 2000e-5(f)(1).  Defendant does not dispute that the prerequisites to the EEOC's commencement of this action have been met.

Tracey Padgett filed a charge of discrimination by Heil with the EEOC on July 19, 1993.  (Plaintiff's exhibit 1.)  The EEOC issued a determination on the merits of that charge, and attempted to conciliate the dispute between Padgett and the Heil Company. (Defendant's answers to requests for admissions ¶¶ 1, 4, 5.)  The EEOC determined that conciliation efforts were unsuccessful on September 5, 1996 (plaintiff's exhibit 3), and commenced this action on January 29, 1997.  This court thus finds that the prerequisites to suit by the EEOC have been met, and the EEOC is entitled to partial summary judgment on that issue.

#### B.  ADA Discrimination

Congress passed the Americans with Disabilities Act for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Congress sought "to

7

assure equality of opportunity, full participation, independent
living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8).
To achieve those purposes, the Act commands that

> no covered entity shall discriminate against a qualified
> individual with a disability because of the disability of
> such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Thus, the EEOC bears the burden of proving, by a preponderance
of the evidence, that defendant intentionally discriminated against
Padgett because of a disability. That can be done either by direct
or circumstantial evidence.   In this action, the EEOC contends
there is direct evidence of disability discrimination, because
Heil found there were no jobs at its facility which Padgett could
perform.  (Plaintiff's brief in support of summary at 21.)  Indeed,
Heil relied upon Dr. Decker's refusal to release Padgett for work
when it decided to lay him off.   (Genelin deposition at 55-56;
Ellis deposition at 23-24, 40-41.)

The EEOC relies upon precedent based upon Title VII of the
Civil Rights Act of 1964 to argue that, when a plaintiff produces
direct evidence of a discriminatory animus for the challenged
employment decision, the burden shifts to a defendant to prove that
discrimination did not occur.  (Id. (citing Nall v. Trust Co., 946
F.2d 905 (11th Cir. 1991).)  Unlike Title VII cases in which race
or gender will almost never be an acceptable reason for an

8

employment decision, however, the ADA permits an employer to make a decision based upon a disability, so long as the disability is not the sole reason for the decision. *See Mitchell v. Crowell*, 975 F. Supp. 1440, 1446-47 (N.D. Ala. 1997) (Rehabilitation Act case); *Monette*, 90 F.3d at 1180. In other words, an employer may consider an employee's disability in making an adverse job decision, when the employer determines that the employee is not "qualified," with or without reasonable accommodation, to perform the essential functions of the job position that employee holds or seeks. *Monette*, 90 F.3d at 1180.

> To sum up, if the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:
>
> 1) The plaintiff bears the burden of establishing that he or she is "disabled."
>
> 2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.
>
> 3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Monette*, 90 F.3d at 1186.    The EEOC, therefore, must prove that Padgett was disabled, and that he was "otherwise qualified" for the position of welder.

9

1.  **Disability**

The ADA defines the concept of "disability" in a manner that includes any individual:

    (A) who has a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of such individual, or

    (B) who has a *record of* such an impairment, or

    (C) who is *regarded as having* such an impairment.

*See* 42 U.S.C. § 12102(2). In this action, the EEOC proceeds under the third prong of that definition, and argues that Padgett was "regarded as having" "a physical or mental impairment that substantially limits one or more of [his] major life activities."

The EEOC Interpretive Guidance lists three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

    (1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

    (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

    (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(1), at 404. The EEOC focuses upon the first category, and claims that Padgett's herniated discs constitute an impairment which is <u>not</u> substantially limiting, but

10

which defendant perceived as substantially limiting Padgett's major life activity of working.

The determination of whether an employer "regarded" an employee as substantially limited in the ability to work is a mixed question of law and fact. *Bridges v. City of Bossier*, 92 F.3d 329, 333 (5th Cir. 1996). "The underlying factual question is how many and which jobs involve [plaintiff's perceived restrictions]," while "[t]he legal issue presented ... is whether disqualification from [those] jobs involving [plaintiff's restrictions] constitutes a substantial limitation on the major life activity of working." *Id.* at 333, 334.

In resolving the factual issue, the EEOC must present specific evidence that Padgett's restrictions, as perceived by the Heil Company, prevented him from performing either an entire class of jobs, or a broad range of jobs in various classes. *See id.* at 333 ("we can rule out most of the jobs listed by [plaintiff] because of a lack of record evidence. [Plaintiff] points to no record evidence that law enforcement personnel are routinely exposed to extreme trauma, and we find none").

Once the court determines "how many and which jobs" involve Padgett's perceived restrictions, it must determine if disqualification from those jobs would constitute a substantial limitation on the major life activity of working. *Id.* at 334.

To meet its burden on the factual issue, the EEOC relies upon the testimony of defendant's employees and Dr. Mary House Kessler.

11

The Heil Company's corporate representative, Jack Danner, testified
that, based upon his knowledge of Padgett's restrictions, Padgett
could not perform 99% of the job's at its facility, and was limited
to clerical and office positions. (Danner deposition at 4, 56,
60.) Linda Ellis, defendant's human resources manager, testified
there were no jobs in the plant that Padgett could perform,
including clerical work. (Ellis deposition at 52-53.) Rather, she
believed Padgett was limited to light work with his hands. (Id. at
54.) Finally, plant manager Kevin Genolin testified that Padgett
could perform no jobs in the plant, and was limited to performing
office work. (Genelin deposition at 84.)

Dr. Mary House Kessler relied upon Jack Danner's testimony
during her evaluation of Mr. Padgett:

> The Heil Company perceived Mr. Padgett as unable to
> perform the job duty for his employment as a welder after
> his injury. In his deposition, Mr. Jack Danner listed
> jobs which Mr. Padgett was not able to perform. They
> included the very heavy job of maintenance worker, the
> heavy job of machine operator, the medium job of painter,
> and the light job of grinder. It is my conclusion,
> therefore, that Mr. Danner perceived Mr. Padgett as
> unable to perform any type of work above that of the
> sedentary level.

> . . .

> With the perception of his back injury, he was perceived
> as having lost the ability to perform the broad ranges of
> heavy, medium and light jobs. The perception of Mr.
> Padgett's inability to perform work which requires him to
> bend and crouch frequently also restricts him from
> working in a broad range of jobs. If Mr. Padgett is
> unable to bend or crouch frequently, he loses access to
> 21,078 additional jobs within the classes of light,
> medium, and heavy. Many of the jobs to which Mr. Padgett
> is perceived as unable to perform require the same or

12

similar training. Representative classes and numbers of
jobs requiring the same or similar training are as
follows:

machinist 9,916
percision [sic] grinders, fitters, and sharpeners 386
sheet metal workers 2,940
mechanics and repairers 9,311

...

Mr. Padgett is able to perform approximately forty-five
percent (45%) of the jobs within the state of Alabama
with his ability to perform a full range of heavy,
medium, light, and sedentary jobs. When he is perceived
to have lost access to heavy, medium, and light jobs with
no sustained bending or crouching, he is perceived as
being disabled from most of those jobs and has the
residual ability to perform little more than three
percent (3%) of the jobs in the state.

(Plaintiff's exhibit 16 at 6-7.)    That evidence resolves the

factual issue of "how many and which jobs" involve Padgett's

perceived restrictions.

In response to plaintiff's argument, and in support of its own

motion for summary judgment, defendant makes three arguments that

Padgett was not "regarded as" disabled. First, defendant states

that "[n]ot everyone who is unable to perform functions of their

jobs is considered 'disabled.'" (Brief in opposition to summary

judgment at 2.)    This court is not certain how that argument

helps to determine if Padgett was "regarded as" disabled.

Nevertheless, the cases cited by defendant affirm summary judgment

when plaintiff fails to present sufficient evidence of a perceived

disability.  See Burgard v. Super Valu Holdings, Inc., No. 96-1199,

1997 WL 278974 at *3 (10th Cir. May 27, 1997)(unpublished opinion);

13

similar training. Representative classes and numbers of jobs requiring the same or similar training are as follows:

machinist 9,916
percision [sic] grinders, fitters, and sharpeners 386
sheet metal workers 2,940
mechanics and repairers 9,311

. . .

Mr. Padgett is able to perform approximately forty-five percent (45%) of the jobs within the state of Alabama with his ability to perform a full range of heavy, medium, light, and sedentary jobs. When he is perceived to have lost access to heavy, medium, and light jobs with no sustained bending or crouching, he is perceived as being disabled from most of those jobs and has the residual ability to perform little more than three percent (3%) of the jobs in the state.

(Plaintiff's exhibit 16 at 6-7.) That evidence resolves the factual issue of "how many and which jobs" involve Padgett's perceived restrictions.

In response to plaintiff's argument, and in support of its own motion for summary judgment, defendant makes three arguments that Padgett was not "regarded as" disabled. First, defendant states that "[n]ot everyone who is unable to perform functions of their jobs is considered 'disabled.'" (Brief in opposition to summary judgment at 2.) This court is not certain how that argument helps to determine if Padgett was "regarded as" disabled. Nevertheless, the cases cited by defendant affirm summary judgment when plaintiff fails to present sufficient evidence of a perceived disability. See Burgard v. Super Valu Holdings, Inc., No. 96-1199, 1997 WL 278974 at *3 (10th Cir. May 27, 1997) (unpublished opinion);

*Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319-20 (8th Cir. 1996); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727-28 (5th Cir. 1995). Unlike the plaintiffs in those cases, however, the EEOC has here supplied this court with substantial evidence demonstrating that Padgett was "regarded as" disabled by the Heil Company.

Next, defendant argues that "an employer's belief that an employee is unable to perform one task with adequate safety margins does not establish per say [sic] that the employer regards the employee as having a substantial limitation to work in general." (Defendant's brief in opposition to summary judgment at 2 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993).) The sentence following that contention is self-defeating: "plaintiff was precluded from a welder's position, and from those in grinding, painting, fabrication, and mount shop." (*Id.*) Thus, defendant's own argument reinforces the idea that it regarded plaintiff as unable to perform a broad range of jobs in various classes.

Finally, defendant argues that it did not regard Padgett as substantially limited in the major life activity of working, because "the opinion of the then-plant manager as to Padgett's abilities was confined to jobs in the Heil plant that Padgett was qualified for." (*Id.* (emphasis supplied).) Plant manager Kevin Genelin's testimony establishes that he regarded Padgett as able to perform only clerical jobs, however. (Genelin deposition at 84.) Even though Genelin's testimony was limited to the Heil Company

14

plant, it is sufficient to determine that the Heil Company regarded Padgett as unable to perform a broad range of jobs.

This court therefore finds defendant's arguments unpersuasive. Moreover, plaintiff has presented unrebutted vocational evidence and testimony from defendant's employees establishing that the Heil Company perceived Padgett as foreclosed from employment in the broad ranges of heavy, medium, and light duty work. In resolving the legal issue, this court finds that disqualification from the broad ranges of heavy, medium, and light duty work would constitute a substantial limitation on the major life activity of working. Consequently, this court finds that Tracey Padgett was "regarded as" disabled, and plaintiff is entitled to partial summary judgment on the issue of Padgett's disability.

2. Was Padgett a "Qualified Individual"?

Plaintiff also seeks summary judgment on the issue of Padgett's status as a "qualified individual": i.e., one who could perform the essential functions of the job he holds or seeks, with or without reasonable accommodation being made by the employer.[2] Defendant makes no explicit argument that Padgett was not a "qualified individual," but claims that Padgett was a "direct

---

[2] 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). See also 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

15

threat": *i.e.*, one whose condition threatened his own safety.[3] Such an argument challenges Padgett's qualifications. *See Rizzo v. Children's World leaning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996)("An employee who is a direct threat is not a qualified individual with a disability"); *Jones v. New York City Housing Authority*, No. 96-7203, 1996 WL 537915 (2d Cir. Sept. 24, 1996)(plaintiff "was not otherwise qualified" when he posed a direct threat); *Najera v. State of California-Prison Industry Authority*, No. 94-55937, 1995 WL 309884 at *3 (9th Cir. May 22, 1995)(plaintiff "was not qualified to return because he posed a danger to PIA employees").

The Eleventh Circuit holds that "[a]n employer may fire a disabled employee if the disability renders the employee a 'direct threat' to his own health or safety." *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)(emphasis supplied). Moreover, "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." *Id.*

The EEOC regulations provide the following instruction for determining whether an employee poses a "direct threat."

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the

---

[3]"The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

    (1)   The duration of the risk;

    (2)   The nature and severity of the potential harm;

    (3)   The likelihood that the potential harm will occur; and

    (4)   The imminence of the potential harm.

29 C.F.R. § 1630.2(r). In addition, the EEOC's Interpretive Guidance provides the following insight:

An employer is also permitted to require that an individual not pose a direct threat of harm to his or her own safety or health. If performing the particular functions of a job would result in a high probability of substantial harm to the individual, the employer could reject or discharge the individual unless a reasonable accommodation that would not cause an undue hardship would avert the harm. . . .

The assessment that there exists a high probability of substantial harm to the individual, like the assessment that there exists a high probability of substantial harm to others, must be strictly based on valid medical analyses and/or on other objective evidence. This determination must be based on individualized factual data, using [the four factors of 29 C.F.R. § 1630.2(r)], rather than on stereotypic or patronizing assumptions and must consider potential reasonable accommodations. Generalized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability. . . .

29 C.F.R. Pt. 1630, App. § 1630.2(r), at 409.

To carry its burden of demonstrating that Padgett was not a direct threat, the EEOC relies upon the testimony of three

17

physicians who treated Padgett. Dr. Zenko Hrynkiw testified that Padgett's neurological exam was normal, which was "as good as it gets." (Hrynkiw deposition at 20.) Thus, Dr. Hrynkiw "felt that he should be able to do whatever he did ...." (*Id.*)

Dr. Donald Deinlein concluded that Padgett "was capable ... of doing what he normally did." (Deinlein deposition at 22.)

Dr. Randolph George testified that Padgett was at a "fairly low risk" of injuring himself in a light duty job, and "the chances would be low" that Padgett would injure himself in a medium duty position. (George deposition at 19, 20.)

In response, the Heil Company relies upon the testimony of Dr. Timothy Decker, who believed that Padgett "was at a significant risk of substantial harm." (Decker deposition at 21; see also the statutory definition of "direct threat" at note 3 *supra*.) Dr. Decker testified to three of the four factors suggested by the EEOC regulations:

   (1)  the duration of the risk would continue "[u]ntil [Padgett's] back was fixed" by surgical intervention. (*Id.* at 23-24.)

   (2)  the nature and severity of the potential harm involved potential "permanent and irreversible spinal cord or nerve root damage." (*Id.* at 21-22.)

   (3)  the likelihood of harm was "high." (*Id.* at 25.)

Dr. Decker offered no testimony on the imminence of harm upon Padgett's return to work, but considered Padgett's employment

18

"risky," with further injury "highly certain." (Id. at 27, 28, 29.)

This court takes a jaundiced view of Dr. Decker's testimony, because he is a family practitioner who lacks an M.D.   When placed on the scales of evidence. Dr. Decker's opinion on the necessity of surgery is heavily outweighed by those of two neurosurgeons (Dr. Hrynkiw and Dr. George) and an orthopedic surgeon (Dr. Deinlein). Moreover, it appears that Dr. Decker's opinion was not based completely on concern for Padgett's health: rather, he had at least one eye cocked in the direction of potential liability for both himself and the Heil Company.[*]

Thus, if this court could assess credibility and weigh evidence, it would find the present issue in favor of the EEOC; but, it cannot.  Mize v. Jefferson City Board of Education, 93 F.3d 739, 742 (11th Cir. 1996)("It is not the court's role to weigh conflicting evidence or make credibility determinations")  Rather, this court must view the credibility of witnesses, and all other evidence, in a light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505,

---

[*]Dr. Decker gave the following deposition testimony:

I have met with these specialists before, and when you tell them, or when they come up they see, then they understand, but you have to understand their perspective.  They don't want to be in court, either.  You know, they don't want to say, "No, you can't go to work."  You know, it all has to stop somewhere and, basically, at my gate, and I do it to protect the patient.  Ultimately, they can do whatever they have to do to try ad get the job, but I know my liability if I put them back and they get hurt, and the employer's liability.  If you knowingly put a patient to work with a herniated disk and he sneezes wrong and he blows the disk out, who's liable? The employer is liable.

(Decker deposition at 40-41 (emphasis supplied).)

19

2513, 91 L.Ed.2d 202 (1986). Consequently, this court finds there
is conflicting medical testimony creating genuine issues of
material fact on Padgett's status as a "direct threat" to his own
safety.    Thus, this court cannot grant summary judgment for
plaintiff or defendant on the issue of Padgett's qualifications for
the position of welder.

### IV.  CONCLUSION

For the foregoing reasons, this court concludes that the EEOC
is entitled to summary judgment on the following issues: (1)
satisfaction of the prerequisites to suit; and, (2) proof that
Padgett was "regarded as" substantially limited in the major life
activity of working.  Plaintiff's motion for summary judgment is
due to be denied on the issue of whether Padgett was a "qualified
individual" with a disability.   Defendant's motion for summary
judgment is due to be denied.

DONE this the 23rd day of February, 1998.


United States District Judge

20