## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **EDDIE J. HAYNES,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **vs.** | )**CASE NO. 2:06-cv-1093-WKW** |
| | ) |
| **CITY OF MONTGOMERY, ALABAMA,** | ) |
| | ) |
| **DEFENDANT.** | ) |

### PLAINTIFF'S EVIDENTIARY SUBMISSION IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, Eddie J. Haynes, and submits the following evidence in opposition to Defendant's Motion for Summary Judgment:

1.    PX 1, Declaration of Eddie J. Haynes, with exhibits attached.

2.    PX 2, Declaration of Mary House Kessler, Ph.D., with exhibit attached.

3.    PX 3, Deposition of Michael C. Turner, taken September 25, 2007, with exhibits attached.

4.    PX 4, Defendant's Amended Response to Plaintiff's First Interrogatories.


/s/ Gerald L. Miller_____
GERALD L. MILLER (MIL039)
Attorney for Plaintiff

**OF COUNSEL:**
REDDEN, MILLS & CLARK, LLP
505 North 20th Street
940 Financial Center
Birmingham, Alabama 35203
(205) 322-0457

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Allison H.  Highley
Kimberly O.  Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111


/s/ Gerald L.  Miller
OF COUNSEL

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| EDDIE J. HAYNES, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | )CASE NO. 2:06-cv-1093-WKW |
| | ) |
| CITY OF MONTGOMERY, ALABAMA, | ) |
| | ) |
| DEFENDANT. | ) |

## DECLARATION OF EDDIE J. HAYNES

1.     My name is Eddie J. Haynes and I am the Plaintiff in the above-styled case.
I am over nineteen years of age and make this sworn Declaration based on my own personal
knowledge.

2.     I was hired by the City of Montgomery, Alabama in its Fire Department as a
Firefighter on April 4, 1990. I worked continuously as a Firefighter in the Montgomery Fire
Department until I was involuntarily terminated effective June 14, 2006, although I was on
involuntary leave from March 15, 2005 until June 14, 2006. At all times I was fully capable
of performing, and did perform except while on involuntary leave, all of the duties of a
Montgomery Firefighter without difficulty and in a satisfactory manner.

3.     On November 14, 2002 I began seeing Dr. Clemmie Palmer, III, a psychiatrist
in Montgomery, for anxiety. At that time Dr. Palmer diagnosed me with Generalized
Anxiety Disorder and prescribed several medications for me to take, specifically Valium
(Diazepam), Gabitril, and Zoloft. I began taking these medications and seeing Dr. Palmer

1



PLAINTIFF'S
EXHIBIT
1

on a regular basis, and continued to work, performing all of my duties as required, and having no side effects from any of these medications.

4.    I was trained to operate and drive a fire truck. I did drive the fire truck on many occasions, but was normally not the principal driver on my shift. I never had any accidents or difficulty driving the fire truck. I never at any time asked to be relieved from the duty of driving the fire truck. I never told anyone that I was not comfortable driving the fire truck.

5.    In 2002 and 2003 and for some period of time prior to that, I was working at Station 14, District III. A number of my fellow firefighters there and superiors knew about the medication that I was taking. In January, 2003 I was sent home by Lieutenant R.L. Johnson at Station 14 until I could present verification from my doctor of the medications I was taking and their side effects on me. I repeat that I did not request to be relieved from my duties or from driving the fire truck and did not feel uncomfortable driving the fire truck. Nevertheless, I was sent home.

6.    I immediately, on the same date, went to Dr. Palmer and explained the situation to him. Dr. Palmer faxed a letter to Chief C.E. Walker of the Montgomery Fire Department, of which I received a copy. A true and correct copy of that letter is attached as Exhibit A. Dr. Palmer's letter, dated January 28, 2003, stated that he had been seeing me since November 14, 2002, named my then-current medications Zoloft, Valium, and Gabitril, stated I had not had any side effects to those medications, I had no work restrictions and should continue to perform my duties at my current capacity, and had been stable on those

2

current medications and working full-time without difficulty. I was then allowed to report back to duty that same date.

7. In 2004 and early 2005 I was still working at Station 14. In late 2004 I wrote a letter on behalf of a fellow black Firefighter, Sgt. L.M. Hartwell, who was having a conflict with two white officers at the station. I, too, am a black Firefighter.

8. On February 25, 2005 the Captain at Station 14, Cpt. B.S. Hackett, told me that he wanted to request that I be transferred to another shift. The reason he expressed was to put me in a situation where I would be less likely to drive the fire truck. I told him I had no problem driving the fire truck. I did not feel uncomfortable driving the fire truck and never requested not to drive the fire truck. I was performing all of my duties in a satisfactory way. Attached as Exhibit B is a true and correct copy of an Employee Commendation Record of which I received a copy, dated February 10, 2005 from Cpt. Hackett. The document states, in part, "Firefighter Haynes has done a good job this trimester....He performs all assignments when given to him. He is neat and punctual."

9. On February 28, 2005 Cpt. Hackett again came to me and stated that the administration downtown was insisting that I write a letter listing the medications that I take. I asked him why they wanted such a letter and he stated he did not know. I told him I had no problem driving the fire truck and he stated he knew that. He said he had tried to explain all of this to the administration downtown, but they insisted that I write such a letter.

10. On March 4, 2005 I wrote a letter, as requested, to District Chief M.F. Smith. A true and correct copy of that letter is attached as Exhibit C. In that letter I did not request

3

to be relieved of the duty of driving the fire truck. To the contrary, the letter begins, "It is a pleasure as well as an honor to be chosen Driver of Engine 14. And I am more than willing if the City of Montgomery needs me to do so." In the letter I went on to inform the City of my current medications and all the medications that I had taken in the last six months. I ended the letter as follows: "Again, thank you for your consideration for me being Engine 14 Driver. It is an honor to be a Montgomery Firefighter and take on the duties of a dedicated Fireman."

11.     At the same time I submitted this letter, I also submitted another letter from Dr. Clemmie Palmer dated March 4, 2005. A true and correct copy of that letter is attached as Exhibit D. In that letter Dr. Palmer stated:

> Mr. Eddie Haynes is able to work on the current medications Lexapro, Valium, and Gabitril. He has not had any side effects on his current medications. Mr. Haynes is to take his medication as prescribed. He was instructed to take Valium on an as needed basis. Mr. Haynes has no work restrictions and should continue to perform his duties at his current capacity. He has been stable on his current medication and working full time without difficulty. If you have concerns do not hesitate to call or write.

12.     I continued working, performing my regular duties, and even driving the fire truck without difficulty or incident until March 15, 2005. On that date I was taken to meet with Assistant Chief M. Jordan and Assistant Chief Green. In that meeting Assistant Chief Jordan informed me that I was being placed on sick leave pending an investigation of the medications that I take and a determination of whether I can perform my duties while taking these medications. I was told the only way I would be able to return to work was if the City

4

Risk Manager and the City doctor released me to return to work. I told Assistant Chief Jordan and Assistant Chief Green that I was able to drive the fire truck and perform all of the duties of a Firefighter and had been satisfactorily performing all of my duties. Nevertheless, I was placed on sick leave. Initially my leave was paid due to sick time, but beginning in May, 2005 until my termination in May, 2006, my leave was unpaid.

13.    On March 24, 2005 I was sent to Dr. Michael Turner, the City doctor, for an examination. I advised Dr. Turner of the medications that I was taking and the doctors who prescribed them. Dr. Turner stated there was nothing he could do at this time without my medical records. I signed a medical authorization form for him to obtain my records. A true and correct copy of the medical authorization I signed is attached as Exhibit E.

14.    On March 29, 2005 I was asked to meet with Assistant Chief M. Jordan again. This time, Assistant Chief Walker was present. Assistant Chief Jordan told me that it was important that I get off of my medication. He stated if something happened to me, my wife might decide to sue the City of Montgomery. I told him that I do not take my medications while on duty. He stated that the only way I could work for the City of Montgomery Fire Department was to be off of the medications. He told me I needed to think about my situation.

15.    My next appointment with Dr. Turner was March 31, 2005. On that occasion, Dr. Turner or his assistant took my vital signs and listened to my heart and breathing. I told him of the medications that I was taking. I told him that the only medication that I took while on duty was Lexapro. He had Dr. Palmer's letter dated March 4, 2005 in front of him

5

and some other records from Dr. Palmer. I told him I was having no side effects from my medications and was able to fully perform the duties of a firefighter, including driving the fire truck and working on the fire line. I told him that the medications that Dr. Palmer had prescribed were for my anxiety condition. I told him I had never had seizures. Dr. Turner was already aware of some of the other medications such as Skelaxin because he had prescribed them for me to take temporarily because of a slight knee injury. At the end of my examination and discussion with Dr. Turner, he told me that the City would have to make the decision as to whether or not I could return to work. He did not ask me for any further information and did not say that he needed any information from Dr. Palmer or any other doctor.

16.    From that point on, over the next several months, I had several conversations with various persons in the City of Montgomery Fire Department administration. I was inquiring about coming back to work and I kept being told that I could not come back to work until Dr. Turner cleared me. I talked to Dr. Turner's office on several occasions and they told me it was up to the City whether I could go back to work. The City began to pressure me to apply for leave under the Family and Medical Leave Act. I did not do so, because I told them that I was perfectly capable of working and wanted to come back to work and needed to come back to work to support my family. I expressed my desire on numerous occasions to return to work, but was always told that I could not return until Dr. Turner released me.

17.    My attorney wrote several letters during 2005 and 2006 to the City attorneys

for the City of Montgomery asking that I be returned to work. I received copies of these letters and responses from the City attorneys for the City of Montgomery which always refused to allow me to return to work. At one point, the attorney for the City of Montgomery sent medical authorizations to my attorney for me to sign so that they could obtain my medical records from my doctors. I signed those authorizations and they were returned to the City Attorney. I was still not allowed to return to work.

18.    Finally, I received a letter dated May 4, 2006 from then Fire Chief J.W. McKee. A true and correct copy of that letter is attached as Exhibit F. That letter stated that if I had not returned to work by May 22, 2006 the Montgomery Fire Department would consider me to have resigned my position by job abandonment.

19.    I reported to work on May 22, 2006. I was not allowed to work and was sent home. I asked the Fire Department to make an appointment for me to see Dr. Turner to be released for work. I was initially told the City would not make such an appointment because the purpose was not a work injury but for release for duty. After my attorney wrote a letter to the City Attorney asking that I be allowed to see Dr. Turner to get released to return to work, I was then allowed to see Dr. Turner on May 25, 2006.

20.    My appointment with Dr. Turner on May 25, 2006 was very brief. Dr. Turner did not give me a physical examination but asked me again about my medications. I told him I was still taking Lexapro, Valium, Gabitril, and now Flexaril, but do not take them while at work. Dr. Turner told me I was physically fit for duty but nothing had changed since my last evaluation. He said the City of Montgomery must decide whether to return me

to work or not.

21.    After that visit, my attorney again wrote the City Attorney asking the City to reconsider its position and return me to work. The next contact I had, or, to my knowledge my attorney had, with anyone was when I received a letter dated June 20, 2006 informing me that effective June 14, 2006 my employment status with the Montgomery Fire Department had been considered a voluntary resignation. A true and correct copy of that letter is attached as Exhibit G.

22.    I never at any time informed anyone with the City of Montgomery or City of Montgomery Fire Department that I was resigning or abandoning my job. To the contrary, I informed the City of Montgomery Fire Department on numerous occasions that I desired to come back to work, and my attorney did as well. I was never allowed to come back to work after March 14, 2005. I did not voluntarily resign or abandon my job. My employment was involuntarily terminated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _4th_ day of __January__, 2008.

Eddie F. Haynes

8

FROM :                         FAX NO. : 3342603272

## Palmer Psychiatric Services, PC
## Clemmie Palmer III, MD

3090 Woodley Road, Suite A
Montgomery, Al 36116

Phone 334 280-3230
Fax 334 280-3272

January 28, 2005

Chief C.E. Walker
Montgomery Fire Department
Fax: 241-2417

RE: Eddie Haynes
DOB: 8/17/1970

Dear Chief Walker:

Mr. Eddie Haynes is able to work on the current medication Zoloft, Valium and Gabitril.
He has not had any side effects to his current medications. Mr. Haynes is to take his
medication as prescribed. He was instructed to take Valium on an as needed basis. Mr.
Haynes has no work restrictions and should continue to perform his duties at his current
capacity. I have been seeing him since November 14, 2002 and he has been stable on his
current medication and working full time without difficulty. If you have any questions or
concerns do not hesitate to call or write.

Cordially,

cc: Lt. Ricky Johnson
284-7924



# EMPLOYEE COMMENDATION RECORD

EMPLOYEE: E.J. Haynes                    POSITION: Fire Fighter

SUPERVISOR: B.S. Hackett, Captain        DEPT: Fire

DATE OF COMMENDATION: February 10, 2005

REASON FOR COMMENDATION: (Description of performance or conduct - give specific facts, background information, dates and times)

Firefighter Haynes has done a good job this trimester. He knows his territory and stays abreast of his SOP's. He works will with others and is a good team member. Firefighter Haynes's experience is demonstrated on and off the fire scene. He performs all assignments when given to him. He is neat and punctual.

_B.S. Hackett, Capt_
Supervisor

February 10, 2005
Date

My signature indicates that the above matters were discussed with me on
and that I received a copy of this form.

February 10, 2005
(Month Day Year)

Employee Signature

ATTACH ADDITIONAL SHEETS AS REQUIRED


PLAINTIFF'S
EXHIBIT
B

TO:     M.F. Smith, District Chief

From:  E.J. Haynes, Firefighter

Date:   March 4, 2005

RE:     Engine 14 Driver

Dear Sir,

It is a pleasure as well as an honor to be chosen Driver of Engine 14.
I am more than willing if the City of Montgomery needs me to do so.
However, if there is someone else is more willing or highly qualified to drive
Engine 14 I will assist them as needed to be ready to take any assignment. I have
been driving the Fire Truck off and on for the last fourteen years and I am
currently the driver.

Being a Driver for Engine 14 I know I must inform you of my medications. The
medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4
mg. PRN(two –three times a week).
Medications that I take on my off days and on a as needed basis are Hydrocodone
5/500, Diazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50.,
and over the counter Benadryl for my sinus problem.

Again, thank you for your consideration for me being Engine 14 Driver. It is an
honor to be a Montgomery Firefighter and take on the duties of a dedicated
Fireman.

Respectfully,

E. J. Haynes, F/F Station 14

PLAINTIFF'S
EXHIBIT
C

 **Palmer Psychiatric Services, PC**
Clemmie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:     (334) 280-3230
Fax:        (334) 280-3272
Email: CPalm94@aol.com

March 4, 2005

RE: Eddie Haynes
DOB 06/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work on the current medications Lexapro, Valium, and
Gabitril. He has not had any side effects on his current medications. Mr. Haynes is to
take his medication as prescribed. He was instructed to take Valium on an as needed
basis. Mr. Haynes has no work restrictions and should continue to perform his duties
at his current capacity. He has been stable on his current medication and working full
time without difficulty. If you have concerns do not hesitate to call or write.

Cordially,

CP/nb



**Southeastern Industrial & Family Medicine Associates**

## AUTHORIZATION FOR USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

**Patient Identification:**
Printed Name: _Eddie Haynes_     Date of Birth: _8-17-70_

Address: _4501 Middle Frz Rd_    _Montgomery AL 36106_

Social Security#: _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_    Home Phone: _272-0317_    Cell: _____

**Information To Be Released – Covering the Periods of Health Care:**

From (date) _____ to (date) _____
From (date) _____ to (date) _____

**Please check type of information to be released:**

| | | | |
|---|---|---|---|
| [X] Entire Medical Record | { } Pathology Reports | { } Hospital Records | [X] X-Ray Reports |
| { } History & Physical Exams | [X] Consultation Reports | { } Progress Notes | { } X-Ray Films |
| [X] Lab Test Results/Reports | [X] Office Visit Notes | [X] Operative Reports | { } ER Records |
| [X] Medications | { } Other: (specify)_____ | | |

**Purpose of Request:**

| | | | |
|---|---|---|---|
| [X] Treatment | [X] Consultation | { } Patient Requested | { } Billing or Claims Payment |

**Person or Facility Authorized to Receive Information:**
**Southeastern Industrial & Family Medicine Associates, LLC**
**1600 Forest Avenue**
**Montgomery, Alabama 36106**
**Telephone: (334)261-4445 Fax: (334)261-4448**

**Drug and/or Alcohol Abuse, and/or Psychiatric, and/or HIV/AIDS Records Release:**
I understand that if my medical or billing record contains information in reference to drug and/or alcohol abuse, psychiatric care, sexually transmitted Disease, Hepatitis B or C testing, and/or other sensitive information, I AGREE to its release as part of the requested information.

Check One: [X] YES    { } NO    _____ Initials

I understand that if my medical or billing record contains information in reference to HIV/AIDS (Human Immunodeficiency Virus/Acquired Immuno-Deficiency Syndrome) testing and/or treatment, I AGREE to its release as part of the requested information:

Check One: { } YES    { } NO    _____ Initials

**Time Limit & Right to Revoke Authorization:**
Except to the extent that action has already been taken in reliance on this authorization, at any time I can revoke this authorization by Submitting a notice in writing to the facility Privacy Officer. This authorization is effective for _____ months after date signed.

**Signature of Patient or Personal Representative Who May Request Disclosure:**

I understand that _____ may not condition my treatment on whether I sign this authorization form unless specified above under Purpose of Request. I can inspect or copy the protected health information (PHI) to be used or disclosed. I authorize Southeastern Industrial & Family Medicine to use and disclose the PHI specified above.

Signature: _X_____    Date: _3-24-05_
Authority to sign if not patient: _____

Re-disclosure:
I understand the information disclosed by this authorization my be subject to re-disclosure by the recipient and will no longer be protected by HIPAA the facility, its employees, officers and physicians are hereby released from any legal responsibility or liability for disclosure to the extent indicated


PLAINTIFF'S EXHIBIT E



# Montgomery Fire and Rescue

**Bobby N. Bright**
Mayor

**John W. McKee**
Fire Chief

Montgomery City Council Members

Charles W. Jinright-
President--
James A. Buckler-Fire-
Pro tem--
Jim Spear-s

Tim Heed-s

Janet T. May--

Cornelius "CC"
Calhoun-s

Willie Cook--

Martha Roby--
Glen O. Pruitt,
Jr.--

May 4, 2006

Firefighter E. J. Haynes
4501 Middlefork Road
Montgomery, AL   36106

Dear Firefighter Haynes:

On the third week of March, 2005, you went on leave
until you could get the issue of your prescription
drug use resolved between your physician and the
City employed physician.   On May 30, 2005, having
not resolved the issue, you went on leave without
pay.   As of this date, the issue has not been
resolved nor have you been in contact with us
concerning your situation.

If you have not returned to work by May 22, 2006,
as pursuant to Montgomery City-County Rules and
Regulations, Rule IX, Section I, the Montgomery
Fire Department will consider you to have resigned
your position by job abandonment.

Yours very truly

J. W. McKee, Fire Chief

JWM:fb



(334) 241-2930
FAX (334) 241-2911



PLAINTIFF'S
EXHIBIT
F



# Montgomery Fire and Rescue

**Bobby N. Bright**
*Mayor*

**John W. McKee**
*Fire Chief*

Montgomery City Council Members

Charles W. Jinright—President—
James A. Neathkes— Pres. Pro tem—
Jim Spear—
Tim Head—
Janet T. May—

Cornelius "CC" Calhoun—
Willie Cook—
Martha Roby—
Glen O. Pruitt, Jr.—

June 20, 2006

Mr. Eddie J. Haynes
4501 Middleford Road
Montgomery AL  36106

Dear Eddie:

This letter is to inform you that effective June 14, 2006, your employment status with the Montgomery Fire Department has been considered a voluntary resignation.

Please turn in all Fire Department property (such as uniforms and firefighting equipment that may be in your possession) to our Fire Department Supply facility at 507 North California Street as soon as possible.

MJ/sh





PLAINTIFF'S
EXHIBIT
G

## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **EDDIE J. HAYNES,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **vs.** | )**CASE NO. 2:06-cv-1093-WKW** |
| | ) |
| **CITY OF MONTGOMERY, ALABAMA,** | ) |
| | ) |
| **DEFENDANT.** | ) |

### DECLARATION OF MARY HOUSE KESSLER, PH.D.

1.     My name is Mary House Kessler. I am over nineteen years of age. The facts and opinions I state in this Declaration are made based on my education, training and experience, my personal interview and vocational evaluation of Eddie J. Haynes, and are based on the documents I have reviewed and considered as set forth in this Declaration.

2.     I have a Bachelor of Arts Degree in Psychology, a Masters Degree in Education in Counselor Education, and a Doctorate Degree in Counselor Education with emphasis in Rehabilitation Counseling. I am in private practice in Homewood, Alabama as a Licensed Professional Counselor and Vocational Specialist and Life Care Planner. I serve as a vocational expert for the Social Security Administration, Bureau of Hearings and Appeals and have testified as a vocational expert in Social Security cases for approximately six years. My education, training and experience are further set forth in my Curriculum Vitae which is attached to this Declaration as Exhibit A.


PLAINTIFF'S EXHIBIT

3.    Mr. Eddie J. Haynes was referred to me by his attorney, Gerald L. Miller, for a vocational evaluation which I conducted on September 11, 2007. Mr. Miller requested that I address Mr. Haynes' perceived disability and his ability to perform his former job as a Firefighter.

4.    Mr. Haynes was early for his appointment on September 11, 2007. He was cooperative throughout the ninety-minute interview.

5.    Mr. Haynes, who is a thirty-seven-year-old man, began taking medication for his anxiety in 2002. On January 28, 2003, Dr. Clemmie Palmer, Ill, stated that Mr. Haynes was able to work on his current medication and was to take his medication as prescribed. Dr. Palmer said that Mr. Haynes had not had any side effects from his medications and had no work restrictions. He said that Mr. Haynes had been his patient since November 14, 2002, and had been stable on the medication and working full-time without difficulty. On September 13, 2004, Mr. Haynes had a knee injury and was placed on light duty until December 3, 2004, when he was placed at maximum medical improvement by Dr. Wells. In a letter of March 4, 2005, Dr. Palmer once again stated that Mr. Haynes was able to work on his medications, had not experienced side effects, and was working under no restrictions. He said that Mr. Haynes was able to perform his duties and was able to work full-time without difficulty.

6.    On March 31, 2005, Dr. Michael Turner released Mr. Haynes as physically fit to return to duty. In his statement, the concerns he apparently had stemmed from the

Page 2

medications that Mr. Haynes was taking for anxiety and joint pain. Although Mr. Haynes had explained that he did not take any medication except Lexapro while on duty, Dr. Turner said that Mr. Haynes's logic made no sense to him. He said that the effects from the medications could carry over into Mr. Haynes' work and that a drug screen performed would "most likely be positive even when on duty."

7.    A hair analysis drug test was performed on Mr. Haynes on March 31, 2005, which was negative for all drugs, according to the report. On April 5, 2005, Dr. Turner determined that the drug screen had been negative. On April 14, 2005, Dr. Palmer once again stated that Mr. Haynes was able to work without taking the Valium or Gabitril and could perform his duties in the current capacity without restrictions.

8.    In his deposition of September 25, 2007, Dr. Turner said that when he examined Mr. Haynes on March 31,2005, his physical examination had been within normal limits and there were no physical limitations at that time. He stated that he could not release Mr. Haynes to return to his job as a firefighter. He stated that his concerns about Mr. Haynes, at that time, came from possible side effects from his medications. He described the side effects to include increased sweating and dehydration; dizziness; sleepiness or drowsiness; and disorientation. He also stated that he would not have cleared Mr. Haynes to drive any type of equipment while taking his medications. Further, he said that he had concerns about Mr. Haynes working on the fire line while taking the medications because of the drowsiness, dizziness, sleepiness, and heat-stress related issues. He stated that his

Page 3

concerns about Mr. Haynes working on the fire line were because it was a very strenuous job, both physically and mentally. However, he stated that he could not answer a question regarding whether Mr. Haynes could perform any type of strenuous job.

9.      Mr. Haynes stated in his interview that he had been taking medication for his anxiety since 2002. He reported that he was on light duty for his knee pain for approximately three or four weeks, hut his injury had healed and he had been released to return to full duty as far as his knee injury was concerned. However, he stated that he was not allowed to return to work unless he was off of all of his medication for his anxiety.

10.     At the time of the interview, Mr. Haynes was working for the Jackson Hospital as a security guard. He monitored detectors and checked for weapons as people came into the hospital. He was required to watch hospital monitors and to make rounds. He said that he occasionally had to lift patients and was performing heavy work there.

11.     Concurrent with his work at Jackson Hospital, Mr. Haynes stated that he was working for the Victory Land Dog Track as a security guard approximately fifteen hours a week. Previously, he worked as a security guard at the Senate Building for a year. He also worked for the History and Archives Building in security for three or four months before being transferred to the senate building. He helped build houses for individuals at times after leaving the fire department.

12.     Mr. Haynes worked for the Montgomery Fire Department for fifteen years as a firefighter and first responder. He responded to medic runs, car accidents, gunshot

wounds, and all types of medical calls as well as all firefighting calls. He drove the fire truck and never had any accidents. Apparently, no disciplinary actions were ever taken against him in his work. He was responsible for assisting in yard work, cleaning the fire department, and participating in monthly inspections and continuing education. He said that he was required to lift and carry a dummy weighing more than a hundred pounds, climb stairs with it, and perform other tasks in the exercises. He reportedly always passed his exercises and evaluations without difficulty.

13.    The only other type of work that Mr. Haynes reported was that of working in fast food and bagging groceries.

14.    Mr. Haynes continued to have negative drug tests. His psychiatrist reportedly wrote letters indicating that Mr. Haynes was able to work at full duty without restrictions and without difficulty. On February 10, 2005, Mr. Hackett, Captain of the fire department, stated that Mr. Haynes had done a good job that trimester, worked well with others, and was a good team member. He said that Mr. Haynes' experience was demonstrated on and off the fire scene. On February 24, 2005, Mr. Hackett stated in a letter to Mr. Stoudenmier, District Chief, that firefighter Haynes was alert and did all that he was asked to do around the station. However, Chief Hackett stated that he did not feel confident in Mr. Haynes' mental status when driving the fire engine. He said that Mr. Haynes was overly cautious while driving and his concern could cause a "possible problem in the future."

15.    Dr. Palmer, the psychiatrist treating Mr. Haynes, and the psychiatrist who

prescribed his medications, has stated several times that Mr. Haynes has no work restrictions and could perform his duties as a firefighter. However, Dr. Turner has reported that although Mr. Haynes was physically fit to return to duty, there were concerns regarding the medications he was taking for anxiety and joint pain. Dr. Turner stated that there were safety issues for Mr. Haynes driving the fire truck and working on the fire line, even though Mr. Haynes had reported that he did not take these medications while on duty. Further, it is my understanding that Mr. Haynes was not allowed to return to his former job of firefighter without a complete release from Dr. Turner.

16.    Mr. Haynes is presently performing work which requires him to work under hazardous conditions as a security officer. He stated that he has had no problems in his work in security, nor did I see any indication that he had encountered any problems in performing his job of firefighter or as a fire truck driver.

17.    With his education, experience and training, Mr. Haynes has access to approximately 404,362 jobs within the State of Alabama. Of those jobs, 182,853 jobs require Mr. Haynes to work with exposure to hazardous conditions, operating machinery, hazardous equipment, and/or unprotected heights. The perception of Mr. Haynes' inability to perform work in which he is exposed to work with these conditions restricts him from a broad range of jobs. If Mr. Haynes is perceived as unable to perform hazardous work, he loses access to approximately 182,853 jobs within the State of Alabama, or 45 percent of the jobs within the State for which the average person having Mr. Haynes' training, skills and

Page 6

abilities would be qualified. Many of the jobs within the State which Mr. Haynes has been perceived as unable to perform require the same or similar training, education, and experience as his previous work. Representative classes and numbers of such jobs in the state requiring the same or similar training, education, and experience are as follows:

| | |
|---|---|
| law enforcement workers | 4,368 |
| police officers | 8,417 |
| security guards | 10,152 |
| emergency medical techs/paramedics | 1,962 |
| firefighters | 4,776 |

18.    Although Mr. Haynes was perceived as having a disability that precluded him from the classes and ranges of jobs noted, he continues to work in jobs requiring him to be exposed to hazardous conditions. Therefore, the perception of his inability to perform work which exposes him to these conditions, such as driving vehicles and working on the fire lines has precluded him from being able to perform his career which he performed for fifteen (15) years before being denied the opportunity to return to the work he had performed taking the same or similar medications since 2002.

19.    The following data was considered in forming my opinions regarding Mr. Eddie J. Haynes:

information gathered from the 9/11/07 interview with Mr. Haynes;
return-to-work certificates from Dr. Turner;
office notes from Dr. Turner from 2004 through 2006;
letters from Dr. Palmer from 2003 through 2005;
drug testing results on Mr. Haynes from 2002 through 2005;
an MRI from Dr. Hahn taken 11/23/04;
a letter from Mr. Haynes written 03/04/05;

excerpts from the Deposition of Dr. Michael Turner taken 9/25/07;
a Commendation Record by Capt Hackett regarding Mr. Haynes;
a letter from Capt. Hackett to District Chief Stoudenmier of 02/24/05;
letters to Mr. Haynes from the Montgomery Fire & Rescue Dept. written in
    May and June of 2006;
information from The Dictionary of Occupational Titles, U.S. Dept. Of Labor, 1991;
job data for the State of Alabama from the computer program OASYS;
job data from the Occupational Employment Quarterly, compiled by U.S. Publishing;
job information from The Classification of Jobs 2000, published by Elliott &
    Fitzpatrick, Inc., 1999.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct.

Executed on this $3nd$ day of __January__, 2008.

Mary House Kenly Pd
Mary House Kessler, Ph.D.

MARY HOUSE KESSLER, Ph. D.
Licensed Professional Counselor
Certified Life Care Planner

2610 19th Street South
Homewood, AL 35209
(205) 870-3701
Fax: 879-1658

**VITAE**

EDUCATION:

| | |
|---|---|
| Ph.D.: | University of South Carolina, 1978 |
| Major: | Counselor Education with emphasis in Rehabilitation Counseling |
| Cognate: | Special Education |
| | |
| M.Ed.: | University of South Carolina, 1974 |
| Major: | Counselor Education |
| | |
| B. A.: | St. Andrews Presbyterian College, 1967 |
| Major: | Psychology |

Completed 140 hours of post-graduate training in Life Care Planning through the University of Florida and Intellicus, 1993-1995

WORK EXPERIENCE:

Vocational Expert for Social Security Administration, Bureau of Hearings and Appeals, April 1980 to June 1983 and July 2004 to present. Duties include: knowledge of current jobs in state; job analysis; and federal hearing testimony as a vocational expert.

Licensed Professional Counselor with emphasis in brief therapy, August 1997 to present. Includes counseling for situational changes and creating options.

Vocational Specialist and Life Care Planner, Private Practice, February 1985 to present. Services include: complete vocational analysis (with a vocational disability rating, if desired); life care plans for individuals with catastrophic injuries; consultation with attorneys and insurance adjusters; personal counseling; report writing; depositions; and court testimony when required.

Rehabilitation Specialist, C.A.R.E. Clinic, Lakeshore Rehabilitation Hospital, September 1983 to February 1985. Duties included: coordination of complete medical and vocational evaluation of clients at Lakeshore Hospital; writing and submitting the evaluation report; and court testimony when required.


EXHIBIT
A

Mary House Kessler, Ph.D.
Page Two

**WORK EXPERIENCE:**
(Continued)

Coordinator of Research and Materials Development. School Advisory Council Assistance Project, University of South Carolina, September 1980 to May 1983. Responsibilities included: developing and submitting training and research grants; planning and implementing research projects; statewide consultation with school administrators, teachers, and parents; coordinating and managing professional publication activities; designing instruments and tabulating results of evaluation of all project training; conducting training statewide; attending professional meetings; and editing the School Advisory Council News.

Adjunct Instructor, College of Education, University of South Carolina, 1977 to 1980-81. Courses taught included: Introduction to Rehabilitation Counseling; Communication Skills; Introduction to Educational Psychology; and Educational Measurement.

Coordinator, Pacific Rehabilitation Continuing Education Program, January 1979 to February 1980. Responsibilities included: development of long-term training grant for the Department of Vocational Rehabilitation in Hawaii, Guam and Trust Territory of the Pacific; direction and management of the program; assessing rehabilitation continuing education needs; developing, administering, and evaluating the program; planning and implementing the development of the Resource Lab for rehabilitation services; and supervising the program personnel.

Instructor, Department of Education, University of South Carolina, September 1978 to December 1978. Worked with the Assistant Dean of Academic Affairs, Dr. John Dolly. Responsibilities included: scheduling for the College of Education; assistance with research grant development; development and implementation of College of Education participating in university-wide activities; and faculty meeting attendance.

Mary House Kessler, Ph.D.
Page Three

WORK EXPERIENCE:
(Continued)

Graduate Assistant, University of South Carolina, 1977 to 1978. Responsibilities included: assistance with education and training in the Rehabilitation Service Work Evaluation Laboratory; compiling and giving presentations on work evaluation to classes in the College of Education; and establishing a library of available materials on work evaluation and adjustment.

Vocational Rehabilitation Counselor, South Carolina Department of Vocational Rehabilitation, Columbia, South Carolina, October 1968 to January 1977. Responsibilities included: vocational and personal rehabilitation counseling; writing plans for clients' rehabilitation process; vocational surveys; job placement; follow-up; and attending both hospital and vocational rehabilitation treatment teams and staff meetings.

Vocational Rehabilitation Evaluator, South Carolina Department of Vocational Rehabilitation, Columbia, South Carolina, September 1967 to September 1968. Duties included: group and individual vocational and psychological testing; writing work evaluation reports; and attending vocational rehabilitation staff meetings.

PUBLICATIONS:

Kessler, Mary S. Anxiety and the work-handicapped individual's pursuit of work. Carolina Counselor. Columbia, SC: University of South Carolina, 1978.

Kessler, Mary S. and Milligan W. Lloyd. Effect of age and disability-onset on self-esteem and anxiety in wheelchair-bound individuals. Rehabilitation Psychology, 1979, 26 (3) 105-112.

Kessler, Mary House and McClam, Tricia. High anxiety, low self-esteem; Some techniques for helping. Education Unlimited, 1981, 3 (4), 17 - 18.

Mary House Kessler, Ph.D.
Page Four

PUBLICATIONS:
(Continued)

McClam, Tricia and Kessler, Mary House. Human services programs: A look at graduates. Journal of College Placement, 1982, 62 (2), 44 - 46.

Jackson, Mary C. and Kessler, Mary House. School Advisory Councils: A bridge between school and community. Journal of Educational Communication, 1983, 6 (2), 18 - 19.

Jackson, Mary C. and Kessler, Mary House. Citizen participation in education. In G. Miller and G. Nemeth (Eds.) A Consumer's Guide to the Public Schools. Springfield, IL; Charles C. Thomas, 1983.

Kessler, Mary House (Ed.) School Advisory Council News. Published five times yearly, 1981 - 1983.

McClam, Tricia and Kessler, Mary House. Relationship between anxiety and attitudes toward disabled persons. Human Service Education, 1987, 8 (2), 37 - 43.

Kessler, Mary House. (1993, April). Physical impairment. Benefits Bugle: Alabama State Bar Workers' Compensation Law Section Newsletter. 2, 1. p.1.

Kessler, Mary House. Diversifying Rehabilitation Services. The Rehabilitation Professional, 1995, 3 (4), 8 and 23.

Kessler, Mary House. (1996, September). Credential for Vocational Experts. Benefits Bugle: Alabama State Bar Workers' Compensation Law Section Newsletter. 6,1. p. 2 & 3.

LICENSES AND
CERTIFICATIONS:

Became Licensed Professional Counselor in the State of Alabama in 1983. Licensed by the Alabama Board of Examiners in Counseling. #433

Mary House Kessler, Ph.D.
Page Five

| | |
|---|---|
| **LICENSES AND CERTIFICATIONS:** (Continued) | Became Certified Rehabilitation Counselor in 1975/84. Certified by the National Commission on Rehabilitation Counselor Certification. #18071 |

Became Certified Disability Management Specialist in 1985. Certified by the National Disability Management Specialists Commission. #01727

Became Certified Life Care Planner in 1996. Certified by the Commission on Health Care Certification. #0053

Became Certified Practitioner of Neuro-Linguistic Programming in 2001. Certified by the American Board of Neuro-Linguistic Programming.

Became certified in Clinical Hypnosis in 2006. Certified by the American Society of Clinical Hypnosis. #R9270

**PROFESSIONAL ORGANIZATIONS:** Member of: National Rehabilitation Association, Alabama Rehabilitation Association, Workers' Compensation Claims Association of Alabama, Amputee Coalition of America, International Association of Rehabilitation Professional, Alabama Association of Rehabilitation Professionals, International Association for Regression Research and Therapies, and American Society of Clinical Hypnosis.

**COMMITTEE SERVICES:** Served as Vice President of AARPPS in 1985. In this position I was responsible for coordinating our monthly meetings and speakers.

Served as chairperson of the Ethics and Standards Committee of AARPPS, 1983 to 1988. During that time, I helped to formulate the procedures to be used by the organization in the event of ethical charges.

Mary House Kessler, Ph.D.
Page Six

COMMITTEE
SERVICE:
(Continued):

Served as chairperson of AARPPS Research and Training
Committee in 1991 and 1992. In this capacity, I coordinated
our annual seminar.

Served as Co-chairperson of AARPPS Fund Raising
Committee in 1996.

Served as member of the Scholarship Committee for Kids'
Chance from 1993 to 2005.

PRESENTATIONS:

Have made presentations about vocational rehabilitation to
the following: UAB graduate-level Introduction to
Rehabilitation class, 1985; Rives and Peterson Law Firm,
1987; Underwriters Adjusting Company Seminar for Claims
Representatives, 1987; Bessemer Bar Association Seminar,
1988; Alabama Hospital Association Fund Workers'
Compensation in Alabama Seminar, 1990; Alabama Bar
Institute's Arguing Damages Seminar, 1992; three seminars
give by Alabama Department of Industrial Relations, 1995;
Life Care Planning Conference, 1996; Workers'
Compensation for the General Practitioner, 1997, 1998 and
1999; the Vocational Evaluation and Counseling Seminar of
NARPPS, 1997; and AARPPS, 1998; Case Management
Society of America, 2005.

CONTINUING
EDUCATION:

Have attended programs and seminars for continuing
education units each year. Some of the seminars include:
Vocational Expertise/Labor Market Access and Wage Loss,
1985; An Integrated Approach to Rehabilitation of
Industrially Injured Individuals - Hand Amputee and Back,
1985; Workers' Compensation in Alabama - Insurance,
Rehabilitation and the Future, 1986; Life Care Planning for
Catastrophic Injuries and Innovations in Private Practice,
1987; Labor Market Access Plus, 1989; Wage Loss, 1989;
Advanced Life Care Planning for Traumatic Head Injury,
1989; Post-Traumatic Stress Disorder, 1990; Cumulative

Mary House Kessler, Ph.D.
Page Seven

CONTINUING
EDUCATION:
(Continued)

Trauma Disorders, 1991; Reflex Sympathetic Dystrophy, 1992; Managing Chronic Pain, 1993; The Use of Pump Implants and Stimulators for Chronic Pain, 1993; Ethics in Rehabilitation, 1995; Brief Counseling 1995; Rehabilitation Technology, 1996; Life Care Planning Conference, 1996 and 1997; Brief Therapy Training, 1997, 2000, and 2001; Regression Therapy Training, 1997 and 1999; Transformational Hypnotherapy Training, 1997; Death and Dying, 1999; Understanding Anger, 1999; Life Care Planning Seminars, 1996 through 2000; Issues in Chronic Opioid Therapy in the Pain Patient, 2001; Special Advanced Forensic Program, 2001; Stress and Disease, 2001; Advanced Neuro-Linguistic Programming, 2001; Hypnotherapy, 2001; Time Line Therapy, 2001; Ethics and the Therapeutic Relationship, 2001; Case Management and Rehabilitation Update, 2002; Reaching the Gold Standards in Pain Practice, 2002; Assessment and Management Issues in Chronic Pain, 2002; Pain Management in Primary Care Medicine, 2003; AARP Annual Seminar, 2004 - 2006; American Society of Clinical Hypnosis Training - Basic, Intermediate and Advanced, 2005 and 2006; Life Care Planning: Clinical Application Review, 2006; Hypnosis and the Medical Practice, 2006.

BIRMINGHAM REPORTING SERVICE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


EDDIE J. HAYNES,

   Plaintiff,


   vs. CIVIL ACTION NO:  2:06-CV-1093-WKW


CITY OF MONTGOMERY, ALABAMA,

   Defendant.



DEPOSITION OF MICHAEL C. TURNER


   The deposition of MICHAEL C. TURNER was
taken before Krista Price, September 25,
2007, at 1600 Forest Avenue, Montgomery,
Alabama 36106, commencing at 1:46 p.m.
pursuant to the stipulations set forth
herein:

ORIGINAL

Land Title Building • Suite 205 • 600 North 20th Street • Birmingham, Alabama 35203


PLAINTIFF'S
EXHIBIT
3

BIRMINGHAM REPORTING SERVICE

```
 1              A P P E A R A N C E S

 2

 3    Appearing for the Plaintiff:

 4        REDDEN, MILLS & CLARK

 5        BY:   Gerald L. Miller

 6        940 Financial Center

 7        505 20th Street North

 8        Birmingham, Alabama 35203-3209

 9

10

11    Appearing for the Defendant:

12        CITY OF MONTGOMERY

13        BY:   ALLISON H. HIGHLEY

14        City of Montgomery Legal Department

15        P.O. Box 1111

16        Montgomery, Alabama 36101

17

18

19

20

21    Reported By:

22        Krista Price

23        Certified Shorthand Reporter
```

1                        INDEX

2     EXAMINATION BY:                    PAGE:

3         Mr. Miller..................6

4         Ms. Highley...............97

5         Mr. Miller...............99

6                      EXHIBITS

7     Plaintiffs Exhibits      Page:

8           No. 1..................15

9           No. 2..................17

10          No. 3..................19

11          No. 4..................23

12          No. 5..................31

13          No. 6..................36

14          No. 7..................36

15          No. 8..................39

16          No. 9..................41

17          No. 10& 11.............44

18          No. 12................45

19          No. 13................46

20          No. 14................83

21          No. 15................85

22          No. 16................90

23          No. 17................92

Page 4

1        S T I P U L A T I O N S

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their

5    respective counsel, that the deposition of

6    MICHAEL C. TURNER may be taken before

7    Krista Price, Certified Shorthand

8    Reporter, and Notary Public, State of

9    Alabama at Large, at 1600 Forest Avenue

10   Montgomery, Alabama, on September 25, 2007

11

12       IT IS FURTHER STIPULATED AND AGREED

13   that the signature to and the reading of

14   the deposition by the witness is waived,

15   the deposition to have the same force and

16   effect as if full compliance had been had

17   with all laws and rules of Court relating

18   to the taking of depositions.

19

20       IT IS FURTHER STIPULATED AND AGREED

21   that it shall not be necessary for any

22   objections to made by counsel to any

23   questions, except as to the form or

**BIRMINGHAM REPORTING SERVICE**

Page 5

1   leading questions, and that counsel for

2   the parties may make objections and assign

3   grounds at the time of trial, or at the

4   time said deposition is offered in

5   evidence, or prior thereto.

6

7       IT IS FURTHER STIPULATED AND AGREED

8   that notice of filing of the deposition by

9   the Commissioner is waived.

10

11

12                  *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

BIRMINGHAM REPORTING SERVICE

1            MICHAEL C. TURNER, DO,

2    having first been duly sworn, was examined

3    and testified as follows:

4

5        THE COURT REPORTER:    Usual

6    stipulations?

7        MR. MILLER:    That's fine.

8

9    EXAMINATION BY MR. MILLER:

10        Q    Would you state your name for the

11    record?

12        A    Michael Clark Turner.

13        Q    And are you a licensed physician in

14    the State of Alabama?

15        A    I am.

16        Q    Are you licensed to practice

17    osteopathy or medicine?

18        A    Osteopathy medicine, yes.

19        Q    All right.    Is your title Doctor of

20    Osteopathy?

21        A    Yes, it is.

22        Q    When were you licensed in the State

23    of Alabama?

**BIRMINGHAM REPORTING SERVICE**

    **A**  I would of first been licensed in '99 after my first year of internship.

    **Q**  And have you been licensed to practice in Alabama continuously since that time?

    **A**  Yes.

    **Q**  Could you just briefly tell us about your educational background?

    **A**  I attended medical school at Des Moines University, which was in Des Moines, Iowa, that was from '94 to '98. Attended Montgomery family medicine residency program from '98 to 2001 where I did both internship and residency.  Board certified with family medicine in 2001 until December of 2008.

    **Q**  Is that board -- you said board certification in family medicine?

    **A**  Yes.

    **Q**  And who certifies you?  Who issued that certification?

    **A**  That is the board  -- medical board.

1    **Q**  How are you employed now?

2    **A**  I am employed here at Southeastern

3  Industrial Family Medicine.  I am the

4  owner.

5    **Q**  And for the record, that is in

6  Montgomery, Alabama?

7    **A**  Yes.

8    **Q**  Could you tell us how osteopathy

9  differs from what I might call regular

10  medicine?

11    **A**  A lot of the -- really the only

12  difference at this point in time is the

13  difference of training in the manipulation

14  that the whole body system is

15  interrelated.  You don't just treat one

16  system at a time.  So there is also that

17  manipulation aspect also.

18    **Q**  You're not employed by the City of

19  Montgomery, are you?

20    **A**  No.

21    **Q**  But you do perform services for the

22  City of Montgomery?

23    **A**  I do.

Q    What services do you perform?

A    I see their workers' compensation patients.   There is also a couple of other doctors that do that also.

Q    You mean a couple of other doctors here or --

A    No.   A couple in the City of Montgomery.

Q    Are you the only doctor at Southeastern right now?

A    Yes, I am.

Q    And you say you see their workers' comp patients?

A    Uh-huh.

Q    Do you also perform fitness for duty examinations?

A    I do.

Q    What other -- are there other things that you do for the City of Montgomery?

A    Also perform firefighter physicals for their pre-employment also.

Q    How long have you been performing

Page 10

services for the City of Montgomery?

    **A**  Six years.

    **Q**  Do you have a written agreement
with the City?

    **A**  I think initially with Corbin
Ulmer. I was in his practice and that is
where it all began. He was killed in a
car accident. I was in that practice and
that practice was closed. It continued
with me.

    **Q**  That was another doctor?

    **A**  Yes.

    **Q**  And would you say that name again?

    **A**  Corbin Ulmer.

    **Q**  U-L-M-E-R?

    **A**  Yes, sir.

    **Q**  And was he a part of Southeastern
Industrial and Family Medicine?

    **A**  No.

    **Q**  Now, I may be a little bit
confused. At the present time since you
have been the owner of Southeastern, have
you had a written agreement with the City

BIRMINGHAM REPORTING SERVICE

Page 11

1  of Montgomery?

2       **A**  I believe there is one in place,

3  yes.

4       **Q**  Is it to provide  --

5       **A**  It is to provide services, yeah.

6       **Q**  Provides what service or specifies

7  what services you will provide and I guess

8  how you will be compensated for that?

9       **A**  I am not sure about that aspect of

10 it.

11      **Q**  On what basis are you compensated

12 by the City of Montgomery?

13      **A**  You mean the fee schedule?

14      **Q**  Well, I guess when you see workers'

15 comp patients are you paid by a workers'

16 comp insurance company or paid by the

17 City?

18      **A**  By the City of Montgomery through a

19 -- they have a standard we go by on the

20 rate.

21      **Q**  What about fitness for duty

22 examinations, how -- are you paid a

23 certain amount for the service?

Page 12

1      **A**   Yes.

2      **Q**   What is a fitness for duty
3   examination?

4      **A**   Fitness for duty examination is an
5   evaluation of an employee to see if they
6   are able to perform their job duties as
7   prescribed.

8      **Q**   And when you do a fitness for duty
9   examination do you do a standard physical
10  exam or does it vary depending on the
11  patient or job?

12     **A**   It will vary depending on the
13  patient, the job, the injury or the
14  situation you are dealing with.

15     **Q**   Okay.   And how long have you been
16  performing fitness for duty examinations
17  for the City of Montgomery?

18     **A**   I don't know if I can give you an
19  exact year.   But as long as I have been
20  serving them in this capacity, that long
21  at least.   Six years.

22     **Q**   How many patients would you say you
23  see on an average day?

BIRMINGHAM REPORTING SERVICE

Page 13

1    **A**   Probably average of probably around
2    thirty-five.

3    **Q**   And, Doctor, you understand that we
4    are here on a case that involves Eddie
5    Haynes?

6    **A**   Yes.

7    **Q**   What if anything have you done to
8    prepare for this deposition today?

9    **A**   I obtained his records and looked
10   over them.

11   **Q**   Okay.   Have you talked to any of
12   the lawyers from the City of Montgomery?

13   **A**   Just as in reference to what time
14   and meeting here.

15   **Q**   Okay.   No other -- no substantive
16   conversation about Mr. Haynes with them
17   in preparing for the deposition?

18   **A**   No, sir.

19   **Q**   In preparing for the deposition,
20   did you talk to anyone from the City of
21   Montgomery Fire Department?

22   **A**   No, sir.

23   **Q**   Do you have a recollection as we

Page 14

1    sit here today of what Mr. Haynes looks

2    like?

3         **A**   Yes.

4         **Q**   What do you recall that Mr.  Haynes

5    looks like?

6         **A**   Pleasant African American man,

7    average weight, height, just general

8    description that is what I remember of

9    him.

10        **Q**   Okay.   And you have your office

11   notes and records here with you in front

12   of you?

13        **A**   Yes.

14        **Q**   And I believe you have some other

15   records that you have obtained along the

16   way?

17        **A**   Yes, sir.

18        **Q**   That is from other doctors perhaps?

19        **A**   Two other physicians.

20        **Q**   And who are those?

21        **A**   Dr. Clemmie Brown and Dr. Thomas

22   Wells.

23        **Q**   Is that doctor -- did you say

1   Clemmie Palmer and --

2        **A**   Palmer, I am sorry.

3        **Q**   And Dr. Thomas Wells?

4        **A**   Yes.

5        **Q**   Do you remember anything about Mr.

6   Haynes that are not in your records or in

7   the records of the other doctors?

8        **A**   Not that stands out to me.

9        **Q**   Let's go off the record for just a

10   minute, Dr. Turner.

11   (Whereupon, a brief discussion was had off

12   the record.)

13        **Q**   I think we have agreed that we will

14   mark as Plaintiff's Exhibit 1 to this

15   deposition a copy of your entire office

16   chart so to speak on Mr. Haynes; is that

17   correct?

18        **A**   That's correct.

19   (Whereupon, Plaintiff's Exhibit No. 1,

20   was marked for identification and the same

21   is attached hereto.)

22        **Q**   And your office can get with the

23   court reporter and take care of that?

1      **A**   Yes.

2      **Q**   That will be Exhibit 1.   And are

3   those records kept in the ordinary course

4   of business of Southeastern?

5      **A**   They are.

6      **Q**   And is it the regular practice of

7   Southeastern to keep records of that sort?

8      **A**   Certainly.

9      **Q**   When -- or have you seen Eddie

10   Haynes as a patient?

11      **A**   As a --

12      **Q**   In the role of doctor/patient, did

13   you see him?

14      **A**   Yes.

15      **Q**   When was the first time that you

16   saw Mr.  Haynes?

17      **A**   First visit I have seen Mr.  Haynes

18   was 9/14 of 2004.

19      **Q**   And did he have an appointment or

20   was this a walk-in or how did that come

21   about?

22      **A**   He -- they had to schedule him an

23   appointment. I mean he had an injury.

 1      **Q**   And the City of Montgomery would
 2   have scheduled that appointment?
 3      **A**   Yeah, or the fire department or
 4   whoever sent him in, yes.
 5   (Whereupon, Plaintiff's Exhibit No. 2,
 6   was marked for identification and the same
 7   is attached hereto.)
 8      **Q**   Let me show you what I will mark as
 9   Plaintiff's Exhibit 2, which is a poor
10   copy.
11      **A**   Okay.
12      **Q**   Let me ask you if this is a copy of
13   a record from your chart.  You may be able
14   to find a better copy of it in there. I
15   believe it is dated September the 14th,
16   2004, though it is hard to read.
17      **A**   Yeah.  I need to go get her to
18   print these out for me because they are
19   not in this stack.   The return to work
20   slips are not. But that is a part of the
21   record, yes.  It is in the computer.
22      **Q**   Well, when we talked earlier about
23   the entire chart, what I was intending was

Page 18

1   that everything be Exhibit 1 to the

2   deposition.

3        **A**   Right.

4        **Q**   And whether it be in a computer  --

5        **A**   Right.

6        **Q**   -- or hard copy.   So this -- do

7   you recognize Plaintiff's Exhibit 2?

8        **A**   Yes, I do.

9        **Q**   And is it a City of Montgomery

10  physician authorization and treatment

11  report?

12       **A**   It is.

13       **Q**   Is this something that a patient or

14  a city employee typically brings with them

15  to your office?

16       **A**   Yes.

17       **Q**   And it is filled out and signed or

18  at least the top part by the City?

19       **A**   Yes.

20       **Q**   In this case by the fire

21  department?

22       **A**   Right.

23       **Q**   And then do you fill out the bottom

Page 19

1    part after you have seen the patient?

2        A   Yes, sir.

3        Q   And is it somehow transmitted back

4    to the City?

5        A   Yes.

6        Q   How does it get back to the City?

7        A   Usually we fax a copy from here and

8    we keep the original and send them with a

9    copy.

10       Q   And on that -- this form, you

11   explained briefly what the diagnosis is

12   for the patient and the treatment and

13   whether he can return to duty or not?

14       A   Yes.

15   (Whereupon, Plaintiff's Exhibit No. 3, was

16   marked for identification and the same is

17   attached hereto.)

18       Q   Let me show you what I have marked

19   as Plaintiff's Exhibit 3 and ask if that

20   is a copy of your office notes for Mr.

21   Haynes' September 14, 2004 visit?

22       A   It is.

23       Q   What was the purpose of that visit?

1    **A**   He had a new injury to the left
2    knee.

3        **Q**   And this was a workers' comp
4    injury?

5        **A**   Yes.

6        **Q**   Did you take a medical history on
7    that occasion?

8        **A**   Yes.

9        **Q**   What was that history?

10       **A**   Do you want --

11       **Q**   Let me just ask it this way:   Did
12   he tell you that he was taking Zoloft,
13   Valium and a seizure prescription?

14       **A**   Yes.

15       **Q**   Do you recall what the seizure
16   prescription was?

17       **A**   Well, I can assume from what I know
18   of his records that I know what it is,
19   yes.

20       **Q**   And what do you believe?

21       **A**   It would have been Gabitril.

22       **Q**   What did he tell you about his work
23   history on that occasion?

1    **A**   Of how he injured his knee or what
2    do you mean?
3        **Q**   Did he tell you he was employed by
4    the City of Montgomery Fire Department as
5    a fireman?
6        **A**   Yes.
7        **Q**   And had been so employed for
8    fourteen years?
9        **A**   Yes.
10       **Q**   Can you tell me just basically what
11   you did in that examination?
12       **A**   Basically examined his knee and
13   then made a plan at that time.
14       **Q**   Okay.   What did you find when you
15   examined his knee?
16       **A**   No evidence of edema.   Negative
17   Drawer and Lachman's and McMurray's.   Mild
18   tenderness over the medial knee.
19       **Q**   Could you tell us layman what all
20   those things mean?
21       **A**   First, simply looking for some
22   edema, obvious swelling, which we didn't
23   see. A drawer and Lachman are tests that

BIRMINGHAM REPORTING SERVICE

Page 22

1   you are testing the stability of the knee.

2   Also McMurray testing stability and if

3   there is any pain presented for possible

4   meniscal problems.

5       Q   And you didn't find any lack of

6   stability?

7       A   No.

8       Q   And then you said mild tenderness

9   over the medial knee?

10      A   Uh-huh.

11      Q   What part of the knee is that?

12      A   That is the inside part of the

13  knee.

14      Q   Okay.  And what was your

15  assessment?

16      A   Knee sprain.

17      Q   And what was your plan?

18      A   Placed him on over-the-counter

19  Advil and instructed him on ice and let

20  him continue with his regular activities.

21      Q   What is the active ingredient in

22  Advil?

23      A   You mean Ibuprofen?

**BIRMINGHAM REPORTING SERVICE**

1      Q   Is that --

2      A   Advil, yes, sir is Ibuprofen

3   generic.

4      Q   It is basically the same thing as

5   Ibuprofen?

6      A   Yes.

7      Q   Did you release him for regular

8   duty?

9      A   Yes.

10      Q   After that visit, did you notify

11   the City of Montgomery that you had any

12   concern about him performing his duties as

13   a fireman while taking any of these

14   medications that he reported or that you

15   prescribed?

16      A   I did not.

17      Q   Okay.   When is the next time you

18   saw Mr. Haynes?

19      A   Appears to be November the 9th of

20   2004.

21   (Whereupon, Plaintiff's Exhibit No. 4,

22   was marked for identification and the same

23   is attached hereto.)

**BIRMINGHAM REPORTING SERVICE**

Page 24

1    **Q**   I will show you what I have marked
2    as Plaintiff's Exhibit 4.   Is that a copy
3    of your office note for that November 9th,
4    2004 visit?
5        **A**   It is.
6        **Q**   What was the purpose of that visit?
7        **A**   Follow up on the knee injury.
8        **Q**   And would you just tell us
9    generally what happened in that visit and
10   as a result of that visit?
11       **A**   Basically stated he was still
12   having pain. He was having some problem
13   with his exercises and was unable to do
14   squats.   Examined him again.   Placed him
15   on medications.   Scheduled him for some
16   physical therapy and placed him on light
17   duty.
18       **Q**   What were the medications that you
19   placed him on?
20       **A**   Placed him on Motrin and Skelaxin.
21       **Q**   And was that eight hundred
22   milligram tablets of Motrin?
23       **A**   Yes.

BIRMINGHAM REPORTING SERVICE

Page 25

1       **Q**   One tablet orally three times a day

2   for ten days?

3       **A**   Yes.

4       **Q**   So would that have been twenty-four

5   hundred milligrams of Motrin?

6       **A**   Correct.

7       **Q**   Per day?

8       **A**   Yes.

9       **Q**   And is Motrin the same thing as

10  Ibuprofen?

11      **A**   Yeah.

12      **Q**   This was a little stronger dose of

13  Motrin than he would of gotten over the

14  counter?

15      **A**   Sure.

16      **Q**   And then you also prescribed

17  Skelaxin?

18      **A**   Uh-huh.

19      **Q**   Is that a muscle relaxant?

20      **A**   It is.

21      **Q**   And you prescribed that for ten

22  days as well?

23      **A**   Uh-huh.

BIRMINGHAM REPORTING SERVICE

Page 26

1      **Q**   What was the purpose of the
2    Skelaxin?
3      **A**   Just to help relax the muscles
4    around the knee.  And I was going to send
5    him for PT.  So they work you pretty hard
6    when you do that.
7      **Q**   Okay.   And you said you placed him
8    on light duty at that point?
9      **A**   Yes.
10      **Q**   What was the reason for that?
11      **A**   Because his knee was bothering him
12    with his activities and if it is bothering
13    him doing his activities, that will
14    certainly possibly hinder him or endanger
15    him working on the fire line.
16      **Q**   And would you have notified the
17    City of Montgomery through one of these
18    authorization forms or some other way that
19    he was placed on light duty?
20      **A**   Yes, sir.
21      **Q**   And when was the next occasion that
22    you saw Mr.  Haynes?
23      **A**   11/15 of 2004.

Page 27

1      **Q**   And tell us the purpose for that
2    visit?

3      **A**   A follow up after the knee pain
4    that he is still having after physical
5    therapy.  He was still having some pain.
6    He wasn't having pain with exercise.  It
7    was only after exercising now.   Examined
8    him.  Basically same assessment and
9    continue with physical therapy and then
10   recheck him again in a week.

11     **Q**   And you continued him on the same
12   medications --

13     **A**   Yes.

14     **Q**   -- as well?

15     **A**   Yes.

16     **Q**   And continued him on light duty?

17     **A**   Yes.

18     **Q**   Then when was the next time you saw
19   Mr.  Haynes?

20     **A**   11/22/04.

21     **Q**   And what was the purpose of that
22   visit?

23     **A**   Follow up of the left knee injury

Page 28

1  again.

2      Q   And tell us just basically what

3  happened on that visit?

4      A   He had finished his second week of

5  physical therapy.   Not quite a hundred

6  percent but doing better but he was still

7  having a little pain immediately to

8  palpation of the knee.   So at that time,

9  I ordered an MRI of his knee.

10     Q   Okay.   And did you continue him on

11 light duty at that point?

12     A   Yes.

13     Q   You said you ordered an MRI.   Will

14 you tell us lay folks sort of what that

15 is?

16     A   Simple terms a fancy x-ray to give

17 you a picture of the cartilage of the

18 knee, the ligaments of the knee.

19     Q   And did you get some sort of report

20 on the MRI that was done?

21     A   Yes.

22     Q   What did it show?

23     A   That MRI showed some degeneration

BIRMINGHAM REPORTING SERVICE

Page 29

1    and questionable tear of the medial

2    meniscus, also noted a cyst there on the

3    MRI.

4        Q   So what did you do as a result of

5    the MRI report?

6        A   After seeing these results, I

7    wanted him to be re-evaluated further by

8    an orthopedist.

9        Q   And did you recommend one or make

10   an appointment for him to go see one?

11       A   Yes, we did.

12       Q   Who was that?

13       A   It was Dr. Wells.

14       Q   And did you at some point receive

15   some type of report from Dr. Wells?

16       A   Yes.

17       Q   And would you tell us what that was

18   and when?

19       A   The letter date is December 3rd of

20   2004.   And his evaluation by Dr. Wells was

21   done on 12/03 of '04.

22       Q   And basically what did he report to

23   you?

1     **A**   He reviewed his MRI.   He said he

2   only had some minimal tenderness around

3   the medial joint line.   He did x-rays.

4   They were considered normal for his age.

5   He didn't think that his meniscus

6   pathology was symptomatic enough to

7   warrant surgery.   Any questions to read

8   by Dr. Warren.   He was continuing with

9   his medications.   He wanted to use the

10   ice.   And he could return to his normal

11   activity at that time.   Just to restrict

12   some of his activity off the job he states

13   there.   And then return back to see him in

14   six weeks if needed.

15     **Q**   So was he returned to full duty at

16   that time?

17     **A**   That is what it looks like, yes.

18     **Q**   It looks like a reference to

19   Indocin, I-N-D-O-C-I-N in Dr. Wells'

20   report.   Was that a medicine that Dr.

21   Wells had prescribed?

22     **A**   Yes.

23     **Q**   Or is that another name for

1    something you prescribed?

2        **A**  I think it is a medicine he

3    prescribed. It is not what I prescribed.

4    It is still an anti-inflammatory

5    medication.

6        **Q**  Okay.  But is it similar to Advil

7    or Motrin?

8        **A**  It would be similar, yes, it would

9    be.

10       **Q**  Now after that time when is the

11   next time that you saw Mr.  Haynes?

12       **A**  On 3/24/05.

13   (Whereupon, Plaintiff's Exhibit No. 5,

14   was marked for identification and the same

15   is attached hereto.)

16       **Q**  Is Plaintiff's Exhibit 5 a copy of

17   your office notes from that visit?

18       **A**  Yes, sir.

19       **Q**  What was the purpose of this visit?

20       **A**  He was sent in by the fire

21   department for a fit for duty evaluation.

22       **Q**  And from looking at your records

23   that I have seen, I didn't see -- I didn't

BIRMINGHAM REPORTING SERVICE

Page 32

1    see I don't believe an authorization like

2    we looked at before. Do you know whether

3    there would be one for this visit?

4        **A**   For a return to work or a  --

5        **Q**   For a fitness for duty?

6        **A**   Sometimes there are and sometime

7    there aren't because you are not -- you

8    need more information sometimes.

9    Sometimes they are not sent back at that

10   time because you don't have all the

11   information.

12       **Q**   Okay.   But what I am asking you is

13   did Mr.  Haynes bring with him some form

14   from the City when he came in to see you

15   on March the 24th?

16       **A**   I assume he did.

17       **Q**   Did you have any conversation with

18   anyone from the City before this visit on

19   March the 24th?

20       **A**   I don't recall.

21       **Q**   You don't recall any conversation?

22       **A**   No, I don't.

23       **Q**   Would it be typical or atypical to

Page 33

1   have a conversation, a verbal conversation

2   with someone from the City before they

3   send you a patient for a fitness for duty

4   exam?

5       **A**   Usually they may not specifically

6   talk to me, but they will contact someone

7   in the office and then try to have all the

8   records and everything coordinated to be

9   here, but no discussion about the

10  situation.

11      **Q**   No substantive discussion?

12      **A**   No, no.

13      **Q**   So, you wouldn't of had any

14  subtantive information about Mr.  Haynes

15  prior to the March the 24th visit as it

16  relates to the fitness for duty?

17      **A**   Not unless I had medical records on

18  him.  And then I would, you know, see what

19  he had listed there as to what we would be

20  looking at.

21      **Q**   Did you do a physical exam on Mr.

22  Haynes on March the 24th?

23      **A**   24th all we did was obtain vital

1    signs.  We did not have medical records at

2    that time.  So we were to reschedule him.

3        **Q**   Okay.   Were the vital signs

4    normal?

5        **A**   Sure, within normal limits.

6        **Q**   But you said he didn't have medical

7    records with him at that time?

8        **A**   Huh-uh.

9        **Q**   So for that reason you rescheduled?

10       **A**   Yes.

11       **Q**   Do you remember any of your

12   discussion with Mr. Haynes on the 24th

13   that's not -- other than what's reported

14   in your notes?

15       **A**   Nothing besides what's in the

16   notes, no.

17       **Q**   And your notes reflect that he told

18   you medication that he was taking,

19   correct?

20       **A**   Uh-huh.

21       **Q**   And he said that those had been

22   prescribed by Dr.  Wells, Palmer and

23   Teresa Brown?

BIRMINGHAM REPORTING SERVICE

Page 35

1    **A**  Yes.

2      **Q**  You mentioned medical records.  Did

3    Mr.  Haynes sign an authorization for

4    release of records  --

5      **A**  Uh-huh.

6      **Q**  -- on that date?

7      **A**  See if I can find the date, yes.

8      **Q**  And is that Plaintiff's Exhibit 6?

9      **A**  Yes.

10     **Q**  And that was in your file, right?

11     **A**  Yes, sir.

12     **Q**  And did that release authorize you

13   to receive medical records that you -- any

14   medical records that you needed or desired

15   on Mr.  Haynes?

16     **A**  Yes, sir.

17     **Q**  So after the visit on the 24th and

18   the signing of that release, did you

19   obtain medical records on Mr.  Haynes?

20     **A**  We did obtain records.   I don't

21   know if they are right after that or not.

22   We do have records from Wells -- and I

23   mean we do have records.  So  --

BIRMINGHAM REPORTING SERVICE

Page 36

1    Q   Okay.  Can we go off the record for
2    just a minute?
3    (Whereupon, a brief discussion was had off
4    the record.)
5        Q   Back on the record.   Let me show
6    you some things and let's see if we can
7    figure out maybe what records you have got
8    shortly after March -- the March 24th
9    visit.
10       A   Okay.
11   (Whereupon, Plaintiff's Exhibits No. 6 and
12   7,  were marked for identification and the
13   same are attached hereto.)
14       Q   Let me show you what I have marked
15   as Plaintiff's Exhibit 7 that I haven't
16   seen in your chart today.   But does that
17   appear to be a fax from Dr. Palmer's
18   office to your office?
19       A   Yes, sir.
20       Q   So does it appear from that
21   document that Dr. Palmer faxed you or your
22   office some information on March the 28th,
23   2005?

**BIRMINGHAM REPORTING SERVICE**

 1    **A**   Yes, sir.

 2    **Q**   That was four days after the visit

 3  on the 24th?

 4    **A**   Yes, sir.

 5    **Q**   And it says that he faxed you four

 6  pages including the cover sheet?

 7    **A**   Yes, sir.

 8    **Q**   Now, before I mark it, you have got

 9  in front of you three pages that were

10  clipped together, don't you, that appear

11  to be from Dr. Palmer?

12    **A**   Yes, sir.

13    **Q**   Are these the records that you

14  think would have been faxed to you by his

15  office on April -- excuse me, on March

16  28th, 2005?

17    **A**   I assume so.  I questioned the last

18  one if it was April the --

19    **Q**   Okay.  That couldn't have been,

20  could it?

21    **A**   Unless he could foresee the future.

22    **Q**   Well, looking at it, the first two

23  pages have the --

1      **A**   Right, have the fax, yes.

2      **Q**   Show that they were faxed to your

3    office on March the 28th, don't they?

4      **A**   Right, they do.

5      **Q**   And then the April 14th letter

6    doesn't show that, does it?

7      **A**   I don't see that, no.

8      **Q**   So would it be your opinion that

9    these first two documents that are -- have

10   a fax date of March the 28th were faxed to

11   you on that date?

12     **A**   Yes.

13     **Q**   And if -- or since Plaintiff's

14   Exhibit 7 says that there were four

15   including the cover sheet  --

16     **A**   Then there should be another one.

17     **Q**   -- there should be another one,

18   shouldn't there?

19     **A**   Yes.

20     **Q**   Do you know right now what it was?

21     **A**   I don't.

22     **Q**   Let me go ahead and mark -- Off the

23   record.

**BIRMINGHAM REPORTING SERVICE**

Page 39

1    (Whereupon, a brief discussion was had off

2   the record.)

3       **Q**   Doctor, I have marked as

4   Plaintiff's Exhibit 8 the two sheets that

5   we discussed earlier that have the fax

6   information that is showing they were

7   faxed from Dr. Palmer to you on March the

8   28th, 2005; is that correct?

9       **A**   That's correct.

10   (Whereupon, Plaintiff's Exhibit No. 8,

11   was marked for identification and the same

12   is attached hereto.)

13      **Q**   And these came from your office

14   records?

15      **A**   Yes.

16      **Q**   And that consisted of an office

17   note of Dr. Palmer seeing Mr.  Haynes on

18   March the 28th, 2005?

19      **A**   Yes.

20      **Q**   And also a letter signed by Dr.

21   Palmer dated March 4th, 2005 concerning

22   Mr.  Haynes?

23      **A**   Correct.

BIRMINGHAM REPORTING SERVICE

Page 40

1    MS. HIGHLEY: I am sorry.  What was
2    the date on the letter?
3    MR. MILLER: March 4th, 2005.
4    **Q** And would it be correct that you
5    are not sure as we sit here right now
6    whether the other records that you have
7    were received during this time period or
8    not?
9    **A** Talking about the orthopedic
10   records?
11   **Q** Right.
12   **A** Hard to say because it came by mail
13   and it was done December 3rd.  So we
14   dictated it, so it is hard to say.
15   **Q** And there is a -- there is one
16   record in Dr. Wells' record that is dated
17   in April, which was after the time period
18   that we are talking about, correct?
19   **A** For a separate issue, yes.
20   **Q** All right.  And when was the next
21   time you saw Mr. Haynes?
22   **A** March 31st of '05.
23   **Q** And how did that visit come about?

1    Who had scheduled that?

2        **A**   It would have come through the City

3    or the fire department.

4    (Whereupon, Plaintiff's Exhibit No. 9,

5    was marked for identification and the same

6    is attached hereto.)

7        **Q**   Is Plaintiff's Exhibit 9 a copy of

8    your office notes from that March 31st,

9    2005 visit?

10       **A**   It is.  Yeah, it just looks

11   different printed.   It is the same.

12       **Q**   It is the same copy?

13       **A**   It is a correct copy.  It is just

14   condensed, so not everything is in line

15   like it is on here.

16       **Q**   And this was the visit that you

17   wanted to have after you had obtained some

18   medical records on Mr. Haynes?

19       **A**   Correct.

20       **Q**   And again, the purpose of this

21   visit again was a fitness for duty

22   examination?

23       **A**   (Witness nods head.)

Page 42

1    **Q**   Under medical where it says past

2    medical slash surgical history, do you see

3    that?

4        **A**   Yes.

5        **Q**   It has reported medications?

6        **A**   Uh-huh.

7        **Q**   And then it has medical.   Where

8    did that information come from?

9        **A**   Patient.

10       **Q**   Okay.   So he reported to you the

11   various medications that he was taking?

12       **A**   Yes.

13       **Q**   And he reported the medical history

14   to you?

15       **A**   Yes.

16       **Q**   Which included anxiety?

17       **A**   Right.

18       **Q**   As well as left knee injury slash

19   pain and a right foot injury?

20       **A**   Yes.

21       **Q**   And did you -- on March 31st did

22   you review letters and medications from

23   his treating physicians?

BIRMINGHAM REPORTING SERVICE

1           **A**   Yes.

2           **Q**   What letters did you review?

3           **A**   These by Dr. Palmer, yeah.

4           **Q**   That would be -- well, when it says

5    letters plural, did you review the March

6    4th letter?

7           **A**   Right.

8           **Q**   Which is the second page of

9    Plaintiff's Exhibit 8?

10          **A**   You would not have seen that on

11   that, no  --

12          **Q**   Well, yeah, sure.

13          **A**   Yeah, I was thinking April.

14          **Q**   That was the letter he had written

15   about three weeks before?

16          **A**   Yes, sir.

17          **Q**   And you did review that?

18          **A**   Yes, sir.

19          **Q**   And when you said letters plural,

20   do you know what other letter you might

21   have or you did review on from treating

22   physicians?

23          **A**   Well, Dr. Wells would be the only

Page 44

1   other one.

2       **Q**   And you said reviewed medications
3   from treating physicians.  Did you
4   actually review -- what did you actually
5   -- did you actually review medication
6   bottles?

7       **A**   Well, asked him.  And then what the
8   letters say.

9       **Q**   Okay.   Relied on what the letters
10  said as far as the medications?

11      **A**   That's the best way to know.

12      **Q**   Okay.   Did Mr.  Haynes receive a
13  drug test on that date as well?

14      **A**   That, I don't know.

15  (Whereupon, Plaintiff's Exhibit No. 10 and
16  11 were marked for identification and the
17  same are attached hereto.)

18      **Q**   All right.  Let me show you show
19  you what I have marked as Plaintiff's
20  Exhibit 10 and 11.   What is Plaintiff's
21  Exhibit 10 and 11?

22      **A**   These are -- Exhibit 10 is the
23  psychometrics hair test report for Mr.

Page 45

1    Haynes.

2        Q   And that's what was collected March

3    31st, 2005 on this visit?

4        A   Yes.

5        Q   And in layman's terms this was a

6    drug test?

7        A   Yes.

8        Q   Or drug screening?

9        A   Sure.

10       Q   And is Plaintiff's Exhibit 11 a

11   memo to the City of Montgomery reporting

12   the results of that same drug test?

13       A   That is true.

14       Q   And does it show both of these that

15   it was a negative drug test?

16       A   Yes.

17   (Whereupon, Plaintiff's Exhibit No. 12,

18   was marked for identification and the same

19   is attached hereto.)

20       Q   And let me ask you if Plaintiff's

21   Exhibit 12 shows that your office had also

22   done a drug test on Mr.  Haynes on

23   September 24th, 2004?

**BIRMINGHAM REPORTING SERVICE**

Page 46

1      **A**   Yes.

2      **Q**   And was it negative as well?

3      **A**   It was.

4      **Q**   Plaintiff's Exhibit 13 is again

5   another memo to the City reflecting that

6   -- the negative results of that blood test

7   on September 24, 2004?

8          MS. HIGHLEY:  12.

9      **A**   12?  Exhibit 12, yes.

10     **Q**   All right.  Exhibit 12.  And that

11  was about roughly six months prior to the

12  March  --

13     **A**   Yes.  I think that would have been

14  on his initial injury, his injury.

15  (Whereupon, Plaintiff's Exhibit No. 13,

16  was marked for identification and the same

17  is attached hereto.)

18     **Q**   And is Plaintiff's Exhibit 13 a

19  report of a drug test on Mr.  Haynes that

20  was done in January 2002?

21     **A**   It is.

22     **Q**   And it was negative as well?

23     **A**   Yes, sir.

Page 47

1    **Q**  Going back to the visit on March

2    31st, 2005, did you do a physical exam on

3    that occasion?

4        **A**  Yes, sir.

5        **Q**  What did that reveal or let me

6    first ask if you would just describe what

7    you did as far as a physical exam is

8    concerned?

9        **A**  Basically vital signs were

10   obtained, basic lungs, cardiovascular,

11   abdomen.  And then he and I reviewed his

12   information from Dr. Palmer.

13       **Q**  As far as the physical exam itself,

14   was everything normal?

15       **A**  Within normal limits.

16       **Q**  Did you find any physical

17   limitations at that time?

18       **A**  No physical limitations as we would

19   describe it, no.

20       **Q**  And did you conclude that Mr.

21   Haynes was physically fit for duty as a

22   firefighter?

23       **A**  He was physically fit, yes.

Page 48

1   Physically fit.

2       **Q**   And looking at your office notes,

3   you don't say in those notes that he

4   cannot return to the job as a firefighter,

5   do you?

6       **A**   I do not specifically say that, no.

7   There are some questions there, yes.

8       **Q**   You said you had some concerns,

9   right?

10      **A**   Well, there are concerns. I mean

11  there are standards that you have to at

12  least look at.   The question with him was

13  when is he taking these medications and

14  when is he not taking these medications.

15  And that is a big issue.   When you look at

16  how Dr. Palmer prescribed it, it is every

17  day.   And then you have a patient telling

18  you it is not every day.   So those --

19  that's an issue.

20      **Q**   Okay.   And you end your notes

21  saying administrative decision is needed?

22      **A**   Uh-huh.

23      **Q**   Is that what it says?

BIRMINGHAM REPORTING SERVICE

Page 49

1      **A**   Yes.

2      **Q**   What did you mean by that?

3      **A**   Well, basically by standards if he
4  is on these medications every day, he is
5  not going to be able to be a fireman.
6  The question comes down to whether or not
7  he is truly on his medication every day or
8  he is not.   Yet somebody can say I am not
9  an alcoholic and still, you know, drink on
10  the days they are off.   That doesn't make
11  sense.   To be on medication and then one
12  day not take them for thirty-six hours and
13  then take them again -- and there will be
14  some carry over effects.   If he is on them
15  every day, then he does not have the
16  standard to drive the fire truck like he
17  wants to. So that is why there is an
18  administrative decision as to whether this
19  is -- you know, how do you deal with that?
20  That is tough.

21      **Q**   But just to clarify, when you say
22  administrative decision is needed, you are
23  referring to the City of Montgomery?

1          **A**   Fire department, yeah.

2          **Q**   Needing to make a decision on what

3     to do?

4          **A**   Yeah.

5          **Q**   Whether to return him to work or

6     not?

7          **A**   Yeah.

8          **Q**   You didn't make that or express

9     that decision in your notes, did you?

10         **A**   I did not.   It probably should

11    have been a little more clear.   If he is

12    on the medicines, then he can't do it.

13         **Q**   After you saw Mr. Haynes on March

14    the 31st, did you make any written report

15    or recommendation to the City?

16         **A**   Besides what's here, not that I

17    recall.

18         **Q**   Okay.   Did you transmit when you

19    say what's here, are you referring to the

20    office notes?

21         **A**   Yes, yes.

22         **Q**   Did you actually send those office

23    notes to the City?

Page 51

1        **A**   They would have been sent, yes.

2        **Q**   That would have been your report?

3        **A**   Yes.

4        **Q**   After March the -- after the March

5    31st visit did you talk to anyone at the

6    City about Mr. Haynes?

7        **A**   I don't recall.

8        **Q**   Do you know John Carnell?

9        **A**   I do.

10       **Q**   Who is he?

11       **A**   He is risk manager for the City of

12   Montgomery.

13       **Q**   Did you talk to him after the March

14   31st visit?

15       **A**   I may have.   I don't specifically

16   remember a conversation, but I may have.

17       **Q**   Did you ask the City for any

18   further information about Mr. Haynes?

19       **A**   No.

20       **Q**   Did you ask Mr. Haynes for any

21   further information?

22       **A**   Not that I know of.

23       **Q**   Were you expecting Mr. Haynes to

1    provide you any further information?

2        **A**    No.

3        **Q**    Do you -- we have a letter here in

4    the record from Dr. Clemmie Palmer.  Do

5    you know Dr. Palmer?

6        **A**    Only know of Dr. Palmer. I don't

7    personally know Dr. Palmer.

8        **Q**    Do you know him to be a

9    psychiatrist in the City of Montgomery?

10       **A**    Yes.

11       **Q**    And you did review his March 4,

12    2005 letter?

13       **A**    Yes.

14       **Q**    Could you just read that for the

15    record?

16       **A**    Sure.   Mr.  Eddie Haynes is able

17    to work on the current medications,

18    Lexapro, Valium and Gabitril.  He has not

19    had any side effects on these current

20    medications. Mr.  Haynes is to take his

21    medication as prescribed. He was

22    instructed to take Valium as an as needed

23    basis. Mr. Haynes has no work restrictions

Page 53

1    and should continue to perform his duties

2    at his current capacity.  He has been

3    stable on his current medication and

4    working full time without difficulty.   If

5    you have any concerns, do not hesitate to

6    call or write.  Cordially, Clemmie Palmer.

7        Q   Did you ever talk to Dr. Palmer

8    about Mr. Haynes?

9        A   I did not.

10       Q   Did you ever attempt to talk to Mr.

11   Palmer about Mr.  Haynes?

12       A   I did not.

13       Q   Did you ever write Dr. Palmer a

14   letter about Mr.  Haynes?

15       A   No.

16       Q   I believe you said you don't know

17   Dr. Palmer personally?

18       A   No.

19       Q   Do you know him by reputation?

20       A   Not really.

21       Q   And have you had other patients who

22   have been treated by Dr. Palmer?

23       A   Not that I recall.

Page 54

1    **Q**   Have you ever referred any patients

2    to Dr. Palmer?

3        **A**   Not that I recall.

4        **Q**   Did you believe when you reviewed

5    Dr. Palmer's letter, did you believe what

6    he said in his letter that Mr. Haynes has

7    not had any side effects on his current

8    medications?

9        **A**   I had no reason not to believe him.

10       **Q**   Okay.   And did you understand Dr.

11   Palmer had been Mr. Haynes' physician for

12   some period of time?

13       **A**   Sure.

14       **Q**   Did you recall how long that had

15   been?

16       **A**   No.

17       **Q**   Would that have been something you

18   would of asked Mr. Haynes?

19       **A**   Not necessarily.

20       **Q**   Okay.   As Mr. Haynes' treating

21   physician, would Dr. Palmer have been in a

22   better position to know whether Mr.

23   Haynes was having side effects from his

BIRMINGHAM REPORTING SERVICE

1   medications than you would of been?

2       **A**   Possibly.  But there are standards

3   that I have to go by that he is not aware

4   of.

5       **Q**   Okay.   Do the -- did your concerns

6   about Mr.  Haynes come from possible side

7   effects from the medications?  Is that

8   what it boiled down to?

9       **A**   Certainly.  What these medications

10  can do in a safety sensitive, you know,

11  position that he has.

12      **Q**   Okay.   When you said what they can

13  do, are you talking about the side effects

14  --

15      **A**   Sure.

16      **Q**   -- of the medications?

17      **A**   Sure.

18      **Q**   And which medications was it that

19  concerned you?

20      **A**   Well, certainly all of those in

21  combination concern you, being a

22  firefighter.  The Lexapro, basically you

23  are going to have possibility for

BIRMINGHAM REPORTING SERVICE

Page 56

1   increased sweating, dehydration.  So

2   wearing a suit, wearing scuba gear is, you

3   know, going to preclude him to that. The

4   Valium, you are going to have possible

5   dizziness, somnius, disorientation, the

6   same with the Gabitril. So those certainly

7   are things that have to be readily

8   considered when you are driving a fire

9   truck.

10      **Q**   For Valium you mentioned the

11  possibility of dizziness and then you said

12  somnius --

13      **A**   Yeah, it means sleepy.

14      **Q**   Possibility of sleepiness or

15  drowsiness?

16      **A**   Drowsiness, sure.

17      **Q**   And then you said possibility of

18  disorientation?

19      **A**   Uh-huh.

20      **Q**   And the same possibilities with the

21  Gabitril?

22      **A**   Gabitril. And how they might

23  interact.  That is something you -- I

1    don't know that you can put a, you know,

2    definite finger on.

3        **Q**   Would that -- would the interaction

4    between the medications, would that vary

5    from individual to individual?

6        **A**   Certainly could.

7        **Q**   And can the side effects or lack of

8    side effects of one particular medication

9    vary from individual to individual?

10       **A**   They can.

11       **Q**   In other words, one person might

12   have a particular side effect from a

13   medication and another person not have it?

14       **A**   It is possible.

15       **Q**   Did you tell Mr. Haynes that you

16   were concerned about the Lexapro?

17       **A**   I believe I voiced my concerns

18   about all of his medications.

19       **Q**   When you say all, you mean Lexapro,

20   Valium and Gabitril?  Are you including

21   Ibuprofen and Benadryl or what?

22       **A**   Well, you know if you are on a --

23   Benadryl, he is not taking that on a --

Page 58

1   you know -- am I worried about it?  Maybe.
2   But that is not something he is prescribed
3   on a daily basis.
4       **Q**  Okay.  Are there -- well, are
5   there any other medications that concern
6   you other than the Valium, the Gabitril
7   and the Lexapro?
8       **A**  Not out of these prescribed by Dr.
9   Palmer, no. I mean I would have concerns
10  if is was constantly taking Skelaxin or a
11  pain medicine, but he has denied that, so
12  --
13      **Q**  Skelaxin was one that you
14  prescribed?
15      **A**  Initially, yes.  Yes.  And at this
16  point he really probably wasn't taking it.
17  Just a list of medications that he had
18  been on.
19      **Q**  All right.  So looking at the March
20  31st, 2005 office note, which is
21  Plaintiff's Exhibit 9 I believe, those
22  medications listed under medication
23  history aren't necessarily all medications

1    he was taking at that time?

2        **A**   No.   Because he had said he wasn't

3    taking the Lortab any more and those

4    medications that he had been given by

5    Wells for his knee pain.

6        **Q**   And when you say Lortab, which one

7    of those is that?

8        **A**   That is Hydrocodone.

9        **Q**   Okay.   And the DCN?

10       **A**   Darvocet.

11       **Q**   Did he say he wasn't taking that?

12       **A**   He said he wasn't taking that.

13       **Q**   And what about the Ibuprofen, was

14   he taking that?

15       **A**   Not that I recall.

16       **Q**   And was he still taking the

17   Skelaxin?

18       **A**   Not that I recall.

19       **Q**   So other than the Lexapro, Gabitril

20   and Valium, there was not anything else he

21   was regularly taking, was there?

22       **A**   Right.

23       **Q**   And of course he told you that the

Page 60

1    only one he was taking while he was on

2    duty was the Lexapro?

3         **A**   Right.

4         **Q**   Is that an antidepressant?

5         **A**   It is antidepressant, antianxiety

6    medication.

7         **Q**   Is it similar to Zoloft?

8         **A**   It would be similar, yes.

9         **Q**   Is it of the same family?

10        **A**   It is an SSRI, Serotonin reuptake

11   inhibitor.

12        **Q**   Is that the family or category of

13   medicine or medication that it would

14   belong to?

15        **A**   Yes.

16        **Q**   Is that distinguished from

17   something like an anticonvulsant or

18   narcotic?

19        **A**   Yes.

20        **Q**   What type of medication is

21   Gabitril?

22        **A**   It is a nepcotic acid derivative.

23        **Q**   Did you say nepcotic?  Can you

BIRMINGHAM REPORTING SERVICE

Page 61

1  spell that for us?

2      **A**  N-e-p-c-o-t-i-c acid derivative.

3  Used many times as anticonvulsive

4  medication.  And certainly some

5  psychiatrists use those in anxiety

6  disorders also.

7      **Q**  Is that what Mr.  Haynes told you

8  that he -- Dr. Palmer was prescribing it

9  for was anxiety?

10     **A**  Yes.  He wasn't taking it for

11 seizures or anything like that.

12     **Q**  That is something you would of

13 questioned him about I assume?

14     **A**  Yes.

15     **Q**  And you were told it was not for

16 seizures?

17     **A**  Right.  Because he said he didn't

18 take it every day.

19     **Q**  So is Gabitril a narcotic drug?

20     **A**  No.

21     **Q**  What type of drug is Valium?

22     **A**  It is a benzodiazapine as a class,

23 also described as an anxiolytic I guess

BIRMINGHAM REPORTING SERVICE

Page 62

1    sedative.

2         **Q**   Is it a narcotic drug?

3         **A**   It is not a narcotic.

4         **Q**   And when we say narcotic drug are

5    we -- are you using that in a sense it is

6    derived from an opium?

7         **A**   Opiate, yes.  Basically like a

8    Lortab, those type of things.

9         **Q**   Now I notice in your March 31st

10   office note you say these medication

11   effects could carry over to his duty time.

12   Do you see that?

13        **A**   Right.

14        **Q**   And you are indicating that there

15   is a possibility that they could, right?

16        **A**   Sure.

17        **Q**   And then later you say there are

18   safety issues for him driving a truck and

19   working on the fire line while under the

20   influence of these medications, though he

21   claims he does not take while on duty?

22        **A**   Right.

23        **Q**   You see that?   When you say safety

Page 63

1  issues is that another way of saying that

2  you had a concern about that?

3      **A**   There is a concern, but there is

4  also a standard for that too.  The issue

5  is is he taking them or not.

6      **Q**   Okay.

7      **A**   I mean if he is taking them, then

8  he is not on the fire line.

9      **Q**   When you say he is not on the fire

10  line, you mean that you would not

11  recommend?

12      **A**   He did not meet standard for it.

13      **Q**   What standard are you referring to?

14      **A**   The National Fire Protection

15  Association.  And I think they have

16  probably been updated since his last one,

17  since this was done.

18      **Q**   But your testimony is that the

19  National Fire Protection Association

20  standard would not permit him to work on

21  the fire line while taking these

22  medications?

23      **A**   Yes.   I can explain in more detail

**BIRMINGHAM REPORTING SERVICE**

Page 64

1  but, yes.

2     **Q**  And you are referring again to the

3  Valium, the Gabitril and Lexapro?

4     **A**  Yes.

5     **Q**  And did you tell Mr.  Haynes about

6  the National Fire Protection Association

7  standards?

8     **A**  I am not sure if I specifically

9  mentioned those. I mean he was aware of

10  the issue of it being between him being on

11  them and not being on them, the

12  medications.

13     **Q**  And he told you that he had never

14  never taken Valium or Gabitril while he

15  was on duty, didn't he?

16     **A**  That is what he told me.

17     **Q**  Did you believe him?

18     **A**  You have to. You also have to look

19  at how the medicine is prescribed.  And if

20  a doctor is prescribing it that way, then

21  he should write it that way.  He shouldn't

22  write it for every day.  But it is

23  prescribed every day.

1     **Q**   Well, Dr. Palmer said the Valium
2   was as needed basis, did he not?
3     **A**   He did.  But in his note he has it
4   one twice a day, number sixty.  So that
5   means he wrote it to be taken twice a day
6   every day with four refills.
7     **Q**   And in his March 4th, 2000 letter
8   he said he was instructed to take Valium
9   on  an as needed basis?
10    **A**   Right.  There is contradiction
11  between his letter and what he wrote on
12  his office note.
13    **Q**   When you talked Mr.  Haynes he said
14  he took it on an as needed basis, didn't
15  he?
16    **A**   He said he did, yes.
17    **Q**   And did not ever take it on duty?
18    **A**   That is what he said.
19    **Q**   It's correct is it not that the
20  National Fire Protection Association
21  standards are not -- they are not a
22  statute are they?  They are not a law?
23    **A**   They are a standard that the

Page 66

1   Montgomery Fire Department goes by in

2   their pre-employment and evaluations.

3       **Q**   My question was they are not a

4   governmental statute, are they?

5       **A**   I don't know that they are

6   governmental statute.   I know they are

7   the standards that the Montgomery Fire

8   Department goes by.

9       **Q**   They are not a governmental

10  regulation, are they?

11      MS. HIGHLEY:   Object to the form of

12  the question.

13      **Q**   Well, let me ask you this:

14      **A**   I don't know the best way to answer

15  that question.

16      **Q**   And we refer it to as NFPA, don't

17  we?

18      **A**   Uh-huh.

19      **Q**   You are familiar with that?

20      **A**   Yeah.

21      **Q**   The NFPA is not a governmental

22  body, is it?

23      **A**   No.

Page 67

1      **Q**   They don't have the authority to
2   make laws, do they?
3         **A**   Not to make laws.
4      **Q**   Or governmental regulations if they
5   are not a governmental entity, can they?
6      **A**   Yeah, but they certainly can set
7   standards.  And if you adopt the
8   standards, you have to be consistent
9   throughout.
10      **Q**   Is it your understanding that the
11   City of Montgomery Fire Department has
12   adopted the NFPA standards?
13         **A**   Yes.
14      **Q**   Would your opinions be different if
15   you were aware that the City of Montgomery
16   had not adopted the NFPA standards?
17      **A**   Would my opinions in the
18   evaluation?
19      **Q**   The opinions that you have
20   expressed that the standards -- that Mr.
21   Haynes couldn't meet standards?
22      **A**   Well, you can't meet a standard if
23   there is not a standard.  So that's a gray

Page 68

1    area.   I could say one thing and another

2    doctor can say something else and another

3    can say another thing. One may not have a

4    concern.   One may not understand what

5    they do.

6        **Q**  Is it your understanding that the

7    NFPA standards would override the

8    Americans With Disabilities Act?

9        MS. HIGHLEY:  Object to the form of

10   the question.

11       **A**  I don't know what disability he

12   would have.

13       **Q**  All right.   But my question is is

14   it your understanding that the NFPA

15   standards override the Americans With

16   Disabilities Act?

17       MS. HIGHLEY: Object to the form.

18       **A**  Doesn't override it, but you're --

19   comparing an apple to an orange.   That

20   makes no sense.

21       **Q**  If -- isn't it true if there were a

22   conflict between the two, that Federal Law

23   as expressed in the Americans With

1　Disabilities Act --

2　　　　MS. HIGHLEY: Object to the form of
3　the question.

4　　**Q**　-- would override the NFPA?

5　　**A**　I am certain it would.

6　　**Q**　Are you aware of any governmental
7　statute or governmental regulation that
8　would prohibit a person taking Valium,
9　Gabitril or Lexapro from driving a
10　vehicle?

11　　**A**　Well, if you are talking you know--
12　what do you mean government?  I mean you
13　are getting into The Department of
14　Transportation.  There are certainly
15　limitations certainly.

16　　**Q**　Okay. Are you referring to things
17　like requirements for a commercial
18　vehicle?

19　　**A**　Sure.

20　　**Q**　Commercial driver's license?

21　　**A**　Sure.  Sure.

22　　**Q**　But are you aware -- is there any
23　governmental statute or governmental

BIRMINGHAM REPORTING SERVICE

1    regulation that would prohibit a person

2    taking Valium, Gabitril or Lexapro from

3    driving any vehicle?

4        **A**   Not that I am -- not in his

5    situation, no.

6        **Q**   Okay.   And as far as driving a

7    fire truck, are there any statutes that

8    you are aware of that would prohibit a

9    person from taking one of these

10   medications from driving a fire truck?

11       **A**   A federal regulation statute or a

12   --

13       **Q**   A statute -- a governmental

14   statute or regulation?

15       **A**   Not that I know of.

16       **Q**   Is there any governmental statute

17   or governmental regulation that would

18   prohibit a person from taking one of these

19   medications from working as a firefighter?

20       **A**   That, I don't know.

21       **Q**   Is there any governmental statute

22   or governmental regulation that would

23   prohibit a person --

BIRMINGHAM REPORTING SERVICE

1          MS. HIGHLEY: Object to the form of

2     the question.

3        Q   -- taking one of these medications

4     from working in a public safety job?

5        A   That, I don't know.

6        Q   Now you refer in your March 31st

7     notes, you use the word driving a truck --

8     safety issues for him driving a truck?

9        A   Uh-huh.

10       Q   Do you see that?

11       A   Yes.

12       Q   Would you have cleared Mr.  Haynes

13    for any job that involved driving a

14    vehicle of any sort?

15       A   At this point, there would have

16    been -- even if I was doing for a DOT

17    physical or something like that, is that

18    what you mean?  Then I would have -- yeah,

19    I would have reservations and he probably

20    would not be cleared at this time.

21       Q   I guess what I am asking is would

22    you have had the same issue if it was

23    driving a -- a vehicle that was not a fire

Page 72

1   truck?   Was it the fact that it was a
2   fire truck that had -- was a determining
3   factor?   Would you have cleared him for
4   driving a different kind of truck other
5   than a fire truck?
6       **A**   I am not following -- I mean under
7   federal regulations if I am doing that
8   type of physical, no.   It will not be
9   cleared. There is a lot of issues there.
10      **Q**   You mention also there in your
11  notes working on the fire line?
12      **A**   Uh-huh.
13      **Q**   What was it about working on the
14  fire line that concerned you?
15      **A**   First of all, combination of these
16  medicines, if he is, you know, on these
17  medications.   You have got his drowsiness,
18  sleepiness, dizziness, you know, heat,
19  stress related issues.
20      **Q**   I guess what I am asking about is
21  what is it about the environment of the
22  fire line that concerns you?
23      **A**   It is a very strenuous job.

1      **Q**   Okay.   You mean physically
2   strenuous?

3      **A**   Physically and mentally.

4      **Q**   Would you have cleared him for any
5   type of strenuous job or would you have
6   disqualified him for all strenuous
7   activities?

8      **A**   I think it is impossible to answer
9   that question because I don't know if he
10   is truly taking the medicine every day
11   like he says he is prescribed or he is
12   not.   But you have still got a carry over
13   effect.

14      **Q**   In writing your office notes about
15   Mr.   Haynes after the fitness for duty
16   examination, did you review any medical
17   studies or any scientific studies about
18   the likelihood of side effects from taking
19   Valium, Gabitril or Lexapro?

20      **A**   Just my basic knowledge of those
21   medications and the side effects.

22      **Q**   Right.   But what I am not -- I am
23   not asking you about your basic knowledge?

1      **A**   I did not review anything else
2    besides using my basic knowledge for those
3    things.

4      **Q**   Okay.   But so in other words to be
5    clear, in writing your office notes, which
6    you then sent to the City of Montgomery,
7    you didn't review any medical studies or
8    scientific studies?

9      **A**   No.

10     **Q**   Do you have any studies in your
11   office that deal with that subject about
12   the likelihood of particular side effects
13   from Valium or Gabitril or Lexapro?

14     **A**   I don't know that I have any
15   studies.

16     **Q**   Have you ever seen any studies like
17   that?

18     **A**   I have no idea. I mean not that I
19   recall off the top of my head. I mean I
20   have not looked for any.

21     **Q**   Are you aware of any studies that
22   deal with how likely it is or not that a
23   person taking Valium or Gabitril or

BIRMINGHAM REPORTING SERVICE

Page 75

1   Lexapro will have some particular side

2   effect?

3        **A**   No.

4        **Q**   Are you aware of any medical

5   studies or scientific studies that measure

6   or test the capabilities of persons taking

7   Valium or Gabitril or Lexapro?

8        **A**   No.

9        **Q**   And I guess the next to last

10  sentence of your office notes from March

11  31st you said the only way to prove it was

12  seeing him taking the medication while on

13  duty.   Do you see that?

14       **A**   Yes.

15       **Q**   By that did you mean the only way

16  to prove whether he was taking it while,

17  those medications while on duty, would be

18  --

19       **A**   To observe it.   Right.   Pretty

20  much, yeah.

21       **Q**   Is that what you are trying to say

22  there?

23       **A**   Yeah.

Page 76

1    **Q**   What is a functional capacities
2    screening or screener?
3    **A**   Functional, what do you mean?   Are
4    you talking about like a functional
5    capacity evaluation?  Is that what you are
6    talking about?
7    **Q**   Yeah.  I have heard the term
8    functional -- I have heard the term
9    functional capacity screener.  Are you
10   familiar with that term?
11   **A**   I am not familiar with that term.
12   **Q**   You are familiar with the
13   functional capacities evaluation?
14   **A**   Sure.
15   **Q**   All right.
16   **A**   And I have just never heard them
17   called a screener.
18   **Q**   All right.   And I -- you know, you
19   would know a lot more than I would.  I was
20   just assuming that the screener would be
21   like a precursor to the actual evaluation
22   or something like that?
23   **A**   Not always.   Depending on the

BIRMINGHAM REPORTING SERVICE

1    situation.

2         **Q**   Okay.

3         **A**   I mean --

4         **Q**   Well, let's just -- let me just ask

5    you about functional capacity evaluations

6    and those are referred to as an FCE a lot

7    of times?

8         **A**   Uh-huh.

9         **Q**   What is that?

10        **A**   It is an evaluation done usually

11   with either a physical or occupational

12   therapist.  Several tests are performed

13   depending on the specific therapist or the

14   place where they are sent.   Looking at

15   their ability to do certain tasks ranging

16   from grip strengths, lifting, bending,

17   squatting, pushing, pulling, their blood

18   pressure as those things are performed, if

19   they state that they are having any pain

20   complications and then it -- in their

21   formula it gives you a validity score as

22   to whether or not the patient is honest in

23   their assessment and what they truly

**BIRMINGHAM REPORTING SERVICE**

Page 78

1    perform.

2       **Q**   Is it basically a series of actual

3    physical tests and testing to see if a

4    patient has the physical capacities or

5    maybe even mental capacities to do certain

6    things?

7       **A**   Sure.

8       **Q**   Was that done for Mr. Haynes?

9       **A**   No.

10      **Q**   Did you do anything to determine if

11   Mr. Haynes was actually having any side

12   effects from these medications?

13      **A**   No.

14      **Q**   Did you do any test to determine

15   his mental functioning?

16      **A**   Not -- no.  No specific tests,

17   besides reading that his psychiatrist

18   feels that he is able to perform his

19   normal duties.

20      **Q**   Okay.  But other than reading

21   that, in your examination of him, you

22   didn't do any testing --

23      **A**   No.

**BIRMINGHAM REPORTING SERVICE**

Page 79

1      Q   -- of his mental functioning?

2      A   No.

3      Q   Did you do any testing of his

4    reflexes?

5      A   No.

6      Q   Or his reaction times?

7      A   Huh-uh.

8      Q   Did you do any testing of his

9    driving ability?

10     A   No.

11     Q   Or any kind of test that would

12   measure driving ability?

13     A   No.

14     Q   Why did you not do any of those

15   things?

16     A   Because by the standard, if he is

17   on these medications, it stops right

18   there.

19     Q   Okay.

20     A   I mean that is the whole issue.  It

21   stops right there.

22     Q   Would those -- I mean if they were

23   appropriate for anybody to do those

Page 80

1   things, would it have been appropriate for
2   you to do them or for the City to do those
3   things?
4       A   To perform?
5       Q   Actual testing of driving ability
6   let's say?
7       A   If it was deemed necessary, then it
8   could be performed.
9       Q   By who?
10      A   By me.
11      Q   And you have the ability to do
12  testing of reaction times and reflexes?
13      A   Well, reflexes I mean we could --
14  if we had to have a functional capacity
15  evaluation and test all those things, they
16  could certainly be tested.
17      Q   So a functional capacities
18  evaluation could test the person's
19  reflexes and reaction times?
20      A   It would see the speed with which
21  he performed certain tasks, yes. Of course
22  it depends on if he is on medications or
23  not, which we don't know.  And would the

Page 81

1   test be accurate.

2       **Q**   What did you tell Mr.  Haynes at

3   the end of his examination on March 31st?

4       **A**   That there was going to have to be

5   further decision due to the situation what

6   is stated and what is, you know  --

7       **Q**   A decision by the City?

8       **A**   Yes.  Because if he is on them,

9   there is no question, there is no chance.

10  But you run a risk there.  You do. If he

11  took Valium at night and then came to work

12  the next morning, how can he not be

13  affected.

14      **Q**   Well, that would depend on how he

15  reacted to the medication, correct?

16      **A**   Well, possibly.

17      **Q**   People react in different ways to

18  medications?

19      **A**   Possibly. That is why there is a

20  standard though.

21      **Q**   After the March 31st examination

22  did you talk to anyone verbally with the

23  City about it?

Page 82

1        **A**   I don't recall.

2        **Q**   Do you recall whether or not you
3    talked to John Carnell?

4        **A**   I don't.   I may have.   I don't
5    recall.

6        **Q**   Do you recall whether you talked to
7    anyone in the City attorney's office?

8        **A**   No.

9        **Q**   No means you didn't or you don't
10   recall?

11       **A**   I did not talk to anybody in the
12   City attorney's office. I know that.

13       **Q**   Was it significant to you that Dr.
14   Palmer stated that Mr.  Haynes had not had
15   any side effects from his medications?

16       **A**   It is.

17       **Q**   Like I mean, I take it from your
18   testimony it didn't matter because of the
19   standards?

20       **A**   Well, due to the standards, I mean
21   --

22       **Q**   Would that be correct?

23       **A**   Yes.

1    **Q**  It did matter?

2    **A**  Well, it matters, but there is

3    still a standard that is in effect.   If

4    he is taken off the medications and not on

5    them, that is fine. There is no problem.

6    (Whereupon, Plaintiff's Exhibit No. 14,

7    was marked for identification and the same

8    is attached hereto.)

9    **Q**  Let's -- my next one will be 14.

10   You do have Plaintiff's Exhibit 14 in your

11   chart, do you not?

12   **A**  I do.

13   **Q**  Appears to be a letter from Dr.

14   Palmer dated April 14?

15   **A**  Correct.

16   **Q**  And in -- so, you received that at

17   some point from Dr. Palmer?

18   **A**  Uh-huh.

19   **Q**  And that letter he says that Mr.

20   Haynes is able to work without taking

21   Valium or Gabitril?

22   **A**  Uh-huh.

23   **Q**  Would that be significant to you?

1       **A**   It is.  But he still has his

2   prescriptions sitting there at the

3   pharmacy.  And he sill has them prescribed

4   every day.  And if he doesn't take them,

5   we don't have an issue with that. We still

6   have an issue with the Lexapro and the

7   heat problem.  But we don't have an issue.

8       **Q**  And did you testify earlier what

9   kind of medication Lexapro is?

10      **A**  A Serotonin reuptake inhibitor.

11      **Q**  After March 31st, 2005, when did

12   you next see Mr. Haynes?

13      **A**  April the 12th.

14      **Q**  Okay.   And what was the purpose of

15   that visit?

16      **A**  This time he came back in

17   complained that his knee was acting up

18   again and it bothered him.

19      **Q**  And what did you do at that point?

20      **A**  At that time, I changed the

21   medications, put him on a little Celebrex

22   and rescheduled him to see Dr. Wells

23   again.

Page 85

1    **Q**  Okay.  And after that point when
2    did you next see Mr.  Haynes?
3        **A**  5/25/06.
4        **Q**  So that would be a year later
5    approximately?
6        **A**  I assume that's -- yeah, I guess.
7    (Whereupon, Plaintiff's Exhibit No. 15,
8    was marked for identification and the same
9    is attached hereto.)
10       **Q**  And is Plaintiff's 15 a rather poor
11   copy of your office note from that date?
12       **A**  It is a small copy, yes.  Not
13   poor.
14       **Q**  And the -- what was the purpose of
15   that examination or visit?
16       **A**  Fit for duty again.
17       **Q**  Okay.  Do you know who made that
18   appointment or how that came about?
19       **A**  It would have been through the City
20   or the fire department.
21       **Q**  And at this time you had not seen
22   Mr. Haynes in about a year?
23       **A**  Right.

Page 86

1      **Q**   Did you do a physical exam on that
2   occasion?

3      **A**   No.   Basically went back just
4   through his history.   I mean that is what
5   we are dealing with again.

6      **Q**   Did you do vital signs?

7      **A**   We did do vital signs, sure.

8      **Q**   And you didn't find anything
9   abnormal?

10     **A**   His blood pressure may be a little
11  elevated that day, but whose wouldn't be
12  when you come in for this.

13     **Q**   Not for anything that would
14  disqualify him from working?

15     **A**   If we were looking for that, then
16  we would recheck him after he sat for
17  twenty minutes and he would, you know --
18  that would not be his final pressure right
19  there if that is what we were looking at.

20     **Q**   And you noted on that occasion in
21  your notes that he was still physically
22  fit for duty?

23     **A**   Uh-huh.

Page 87

1      **Q**   But nothing had changed?

2      **A**   Right.

3      **Q**   Correct?  Meaning that he was still

4   taking Lexapro, Valium and Gabitril?

5      **A**   Right.

6      **Q**   And also it says Flexeril?

7      **A**   Uh-huh.

8      **Q**   What is that?

9      **A**   That is a muscle relaxer.

10      **Q**   So that is a -- he was taking fewer

11   medications perhaps or basically the --

12      **A**   Basically the same.

13      **Q**   The same, but with a different

14   muscle relaxer?

15      **A**   Right.

16      **Q**   And your concerned centered on

17   Lexapro, Valium and Gabitril, didn't it?

18      **A**   Yes.  And of course the Flexeril is

19   more potent than Skelaxin in causing

20   sleepiness, drowsiness, reaction times,

21   all those things.

22      **Q**   And it is a muscle relaxant?

23      **A**   Yes.

Page 88

1      **Q**   And he said that he did not take
2    them while at work?

3      **A**   Right.

4      **Q**   And you still felt that it could
5    that those -- the side effects -- would it
6    be fair to say you felt the side effects
7    of those medications could affect his
8    performance while on duty?

9      **A**   Certainly.

10     **Q**   In stating that, again like the
11   prior time, did you consult any medical
12   studies or scientific studies about the
13   likelihood of particular side effects from
14   those particular medications?

15     **A**   No.

16     **Q**   Did you do an -- or did you order a
17   functional capacities evaluation for Mr.
18   Haynes to see what his actual capabilities
19   were?

20     **A**   No.

21     **Q**   Did you do any testing or order any
22   testing to determine his mental
23   functioning?

1        **A**   No.

2        **Q**   Or his reflexes?

3        **A**   No.

4        **Q**   Or his reaction times?

5        **A**   No.

6        **Q**   Or his driving abilities?

7        **A**   No.

8        **Q**   And then again, on March -- no --

9     let me strike that.  On May 25th, 2006 did

10    you again say there must be an

11    administrative decision with this case?

12       **A**   Right.

13       **Q**   Meaning the City had to decide

14    whether to return him to work?

15       **A**   The fire department or the City due

16    to this issue of whether or not he is

17    taking this medication or not. If he is,

18    then there is not a question with it.

19       **Q**   And when you say the fire

20    department or the City, the fire

21    department is part of the City, right?

22       **A**   Sure.

23    (Whereupon, Plaintiff's Exhibit No. 16,

Page 90

1     was marked for identification and the same

2     is attached hereto.)

3          **Q**   Is Plaintiff's Exhibit 16 a

4     certificate to return to work from your

5     office for Mr.  Haynes dated after this

6     visit which is May 25, 2006?

7          **A**   Yes.

8          **Q**   And that came from your office?

9          **A**   Yes.

10         **Q**   And it was authorized by you?

11         **A**   Yes.

12         **Q**   And it says he would be able to

13    return to work to be --

14         **A**   To be determined by employer.

15         **Q**   -- to be determined by employer?

16         **A**   Yeah.

17         **Q**   TBD by employer?

18         **A**   Yes.

19         **Q**   Which means to be determined by

20    employer?

21         **A**   Sure.

22         **Q**   And that was accurate, right?

23         **A**   Yes.

Page 91

1    **Q**   Was there any information or

2    anything that you asked Mr. Haynes for

3    that on May the 25th, 2006 that he didn't

4    give you?

5        **A**   No.

6        **Q**   Was there any further information

7    you needed from Mr. Haynes?

8        **A**   Not any further than I already had.

9        **Q**   Or any further information you

10   needed from any of his doctors?

11       **A**   Not if he says he is taking those

12   medications still.

13       **Q**   When you had -- you had the

14   information you needed, right?

15       **A**   Right.

16       **Q**   You didn't ask for any further

17   information from Mr. Haynes or from the

18   City, did you?

19       **A**   No.

20       **Q**   Have you ever seen a job

21   description or description of duties for

22   the City of Montgomery firefighter

23   position?

1    **A**  Yes, I do believe so.

2    (Whereupon, Plaintiff's Exhibit No. 17,

3    was marked for identification and the same

4    is attached hereto.)

5    **Q**  Does Plaintiff's Exhibit 17 appear

6    to be a listing of duties for the

7    firefighter position for the City of

8    Montgomery Fire Department?

9    **A**  I couldn't tell you for sure, I

10   mean --

11   **Q**  Let's -- I will represent that it

12   is a document that  --

13   **A**  It is not the whole document.

14   **Q**  Well, I will represent it is a

15   document that was presented or produced to

16   me during the course of this case by the

17   City of Montgomery Fire Department.

18   **A**  Okay.

19   **Q**  If you will review that for a

20   minute, I am just going to ask you if

21   there is anything in here about driving a

22   fire engine as a duty.

23   **A**  What was your question again?

**BIRMINGHAM REPORTING SERVICE**

Page 93

1      **Q**   Is there anything on Plaintiff's
2    Exhibit 17 that mentions firefighting as
3    being a duty?  I mean, excuse me.  That
4    mentions driving as being a duty of a
5    firefighter?

6      **A**   Not specifically, no.

7      **Q**   In your fitness for duty
8    examinations of Mr.  Haynes did you
9    consider whether the firefighter job could
10   have been modified so that Mr.  Haynes
11   could have performed it?   Did you ever
12   consider that?

13     **A**   Yes. I went by the standard.   By
14   the standard there is certain things he
15   can't do.  And then you have to take into
16   consideration the effect of the medicine
17   for the heat exhaustion, the heat stress
18   that is involved.  And when you do that,
19   then that eliminates most of the other
20   standards.   Even the newer standards have
21   gone to say when you are on those
22   medications none of them you can do.

23     **Q**   When you examined Mr. Haynes on

1   March 31st, 2005 and wrote your office
2   notes, did you consult the standard that
3   day when you wrote the note?
4       **A**   I am sure I did.
5       **Q**   And did you consult it again on May
6   25, 2006?
7       **A**   I would think so.
8       **Q**   And you are referring to an NFPA
9   standard?
10      **A**   Yes.
11      **Q**   Can you site the standard for me
12  that you were referring to?
13      **A**   I have the one that they were under
14  at that time.
15      **Q**   And what is -- what is the site of
16  it?
17      **A**   I brought it for you.    Let's see
18  -- what do you mean by the site of it?
19  What do you mean?
20      **Q**   Well, off the record.
21  (Whereupon, a brief discussion was had off
22  the record.)
23      **Q**   I will just look at it.

Page 95

1       **A**   Okay.

2       **Q**   And the document that you have

3    given me at the top says NFPA 1582,

4    correct?

5       **A**   Yes.

6       **Q**   And it says at the top May 2003

7    ROP?

8       **A**   Correct.

9       **Q**   What does ROP mean?

10      **A**   I don't know.

11      **Q**   And every page of it is marked

12   draft, correct?

13      **A**   Right.

14      **Q**   So this appears to be a draft of

15   NFPA 1582?

16      **A**   Uh-huh.

17      **Q**   And is this the version that you

18   you would of consulted in  --

19      **A**   Yes.

20      **Q**   -- in March of 2004 when you -- or

21   after you examined Mr. Haynes?

22      **A**   Right.

23      **Q**   And where did you get this draft?

Page 96

1      **A**   The fire department has provided

2    those as they adopt the standards.

3      **Q**   Did the fire -- who was the fire

4    chief in 2004?

5      **A**   That would have been McKey.

6      **Q**   And he has since retired, correct?

7      **A**   Yes.

8      **Q**   Did McKey tell you that the City of

9    Montgomery had adopted the NFPA standards?

10      **A**   As I recall.

11      **Q**   That is your understanding?

12      **A**   That is my understanding.

13      **Q**   And your -- basically the

14    conclusion and opinions that you have

15    expressed today about Mr. Haynes are

16    based on your understanding that the City

17    of Montgomery adopted that standard?

18      **A**   Right.

19      **Q**   Have you ever seen any record

20    stating that the City of Montgomery or the

21    City of Montgomery Fire Department had

22    adopted that standard?

23      **A**   Not that I know of.

Page 97

1      **Q**   Okay.   I think that's all I have.
2   Thank you.
3
4   EXAMINATION BY MS. HIGHLEY:
5      **Q**   I just have a couple.   Dr. Turner,
6   if you could thinking back to all of the
7   drugs that we have talked about Mr.
8   Haynes being prescribed today   --
9      **A**   Uh-huh.
10      **Q**   -- would you characterize any of
11   them as cocaine?
12      **A**   No.
13      **Q**   Would you characterize any of them
14   as opiates?   Other than the Hydrocodone
15   that you have already identified
16      **A**   No.   Other than the Hydrocodone,
17   no.
18      **Q**   Would you classify any of those
19   drugs as PCP?
20      **A**   No.
21      **Q**   Would you classify any of those as
22   amphetamines?
23      **A**   No.

**BIRMINGHAM REPORTING SERVICE**

1    **Q**  And would you classify any of those

2    as marijuana?

3        **A**  No.

4        **Q**  In the letters -- the two letters

5    from Dr. Palmer, would the source of

6    information for Dr. Palmer have likely

7    been the patient?  Is that where Dr.

8    Palmer probably got his information?

9        MR. MILLER: I object to the form as

10   to what most likely the source.

11       **A**  I am not sure I understand the

12   question.

13       **Q**  In the letter where Dr.  Palmer

14   states that Eddie Haynes has not

15   experienced any side effects, where would

16   that information have come from?

17       **A**  Come from the patient.

18       **Q**  And is it possible that Eddie

19   Haynes was lying?  Was it possible?

20       **A**  It is possible.

21       **Q**  I think that's it.   That is all I

22   have.

23   EXAMINATION BY MR. MILLER:

1      **Q**   Isn't it correct also, Doctor, that

2    a doctor evaluates what he sees when the

3    patient is in front of him for an

4    examination?

5      **A**   Yes.

6      **Q**   In particularly a psychiatrist will

7    evaluate the mood and level of

8    consciousness and interview behavior and

9    speech and thought process and thought

10   content of a patient?

11     **A**   Sure.

12     **Q**   And your -- the notes that you had

13   from Dr. Palmer indicated that he

14   evaluated those things when he saw Mr.

15   Haynes, didn't he?

16     **A**   Yes.

17     **Q**   And you would expect that he would

18   do that as a psychiatrist, wouldn't you?

19     **A**   Sure.

20     **Q**   And if Dr. Palmer had seen Mr.

21   Haynes and the Valium and the Gabitril had

22   been prescribed by Dr. Haynes(sic) since

23   2002, from 2002 up until the spring of

BIRMINGHAM REPORTING SERVICE

Page 100

1    2005, then he would of had a considerable

2    period of time to observe Mr.  Haynes,

3    would he not?

4        **A**   I assume so if you -- you said Dr.

5    Haynes.  You mean Dr. Palmer?

6        **Q**   Dr. Palmer?

7        **A**   Okay.  I assume so.  Does it

8    state that he had seen him that long?

9        **Q**   Well, we don't have that in front

10   of us.  But assuming that there was

11   evidence that Dr. Palmer had seen Mr.

12   Haynes since November of 2002 --

13       **A**   Uh-huh.

14       **Q**   -- then he would of had a

15   considerable period of time to observe him

16   and his side effects or lack there of on

17   these medications, would he not?

18       **A**   Maybe so.  I mean he is not with

19   him every day.  So you wouldn't know.

20       **Q**   But he would of -- if he saw him

21   say monthly, he would of had a

22   considerable number of times to observe

23   him, would he not?

1     **A**   Yeah.

2          MS. HIGHLEY: Object to the form of

3     the question.

4     **A**   Still based on a lot on the

5     patients subjective findings.

6     **Q**   And I guess the best source of

7     information on what -- or how these

8     medications were affecting Mr.  Haynes and

9     if he was having any side effects, the

10    best source of that information would be

11    observations of Mr.  Haynes on the job,

12    wouldn't it?

13    **A**   Yes.  But would you take that

14    chance if he is on those medicines?

15    **Q**   All right.   Would it be

16    significant to you if Mr.  Haynes had been

17    prescribed these medications for over two

18    years, but let's say for a year and a half

19    by Dr. Palmer and had worked in the duties

20    doing all the duties of a firefighter

21    during that period of time without any

22    adverse effects --

23         MS. HIGHLEY:  Object to the form.

BIRMINGHAM REPORTING SERVICE

Page 102

1 **Q** -- would that be significant to

2 you?

3   MS. HIGHLEY: Object to the form of

4 the question.

5 **A** You would have to take it into

6 consideration.

7 **Q** That's all.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    C E R T I F I C A T E

2

3      State of Alabama

4      Jefferson County

5

6          I hereby certify that the above and

7      foregoing deposition was taken down by me

8      in stenotype and the questions and answers

9      thereto were transcribed by means of

10     computer-aided transcription, and that the

11     foregoing represents a true and correct

12     transcript of the testimony given by said

13     witness upon said hearing.

14         I further certify that I am neither of

15     counsel, nor of kin to the parties to the

16     action, nor am I in anywise interested in

17     the result of said cause.

18

19

20                        Krista Price

21

22

23

Eddie Haynes 6340                                                                    9/24/2007

# 1 Note 9/14/2004 2:46:00 PM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 9/14/2004 02:46PM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: New injury-(L) knee pain.

## Past medical/surgical history
### Reported History:
> *Reported medications:* Taking medication Zoloft; Valium prn; seizure Rx prn. A recent immunization for tetanus Done in military; date unknown; pt feels within time frame.
> *Physical trauma:* Physical trauma 9/13/2004 Pt states he was getting in the car after getting food for the fireman and twisted his (L) knee. No previous injury to knee. Is still able to walk, stoop, etc but just feels pain in this knee--dc.

## Personal history
*Work:* Work history Employed for COM Fire Dept as Fireman x 14 years.

## Physical findings
### Vital signs:
> • SBP 130/85 mmHg.
No evidence of edema, negative Drawer, Lachman and McMurray. Mild tenderness over medial knee.

## Assessment
> Michael C. Turner, DO made the following assessments
> • Knee sprain

## Allergies
> An allergy Cipro.

## Plan
Patient may take OTC Advil, ice as directed. He may continue with regular duty and return as needed.



# 1 11/9/2004 11:10:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 11/09/2004 11:10AM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: F/up knee injury

## Past medical/surgical history
### Reported History:
*Reported medications:* Medication history Valium; Zoloft.
*Physical trauma:* Physical trauma 9/14/2004 Pt here for reck of (L) knee injury. States his knee has never really stopped hurting. States his knee really begans hurting after he exercises and/or runs. Also states he is unable to do squats. Never had P.T. ---dc.

## Personal history
*Work:* Work history Employed by COMFD x 15 years.

## Physical findings
### Vital signs:
| Vital Signs/Measurements | Value |
|---|---|
| PR | 84 bpm |
| Blood pressure | 132/84 mmHg |

Negative drawer, Lachman and McMurray by exam. Mild pain with valgus strain. No evidence of edema.

## Assessment
Michael C. Turner, DO made the following assessments
Knee joint pain.

## Allergies
An allergy Cipro.

## Plan
Michael C. Turner, DO ordered the following therapy
• Physical therapy evaluation

Motrin 800 mg tablet. SIG: 1 TAB orally 3 times a day for 10 day(s) 3 times a day. Dispense: 30 TAB. Refill: 0.
Skelaxin 800 mg tablet. SIG: 1 TAB orally 2 times a day for 10 day(s) 1 after work and 1 at bedtime.. Dispense: 20 tab(s). Refill: 0.
Patient is placed on medications and is schedukled for PT. He is placed on light duty and we will recheck in one week.

# 1 11/15/2004 3:37:00 PM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 11/15/2004 03:37PM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: F/up (L) knee injury.

## History of present illness
Eddie Haynes is a 34 year old male.
• Knee joint pain which is improving.

Pt here for f/up of (L) knee injury. States his knee still has pain; usually no pain with exercise; only has pain after exercising. Has not started back running yet. Has gone to P.T; they recommend continuing x one more week qod.--dc.

## Personal history
*Work:* Work history Employed by COMFD x 15 years

## Physical findings
### Vital signs:
| Vital Signs/Measurements | Value |
| --- | --- |
| PR | 92 bpm |
| Blood pressure | 140/86 mmHg |

On exam patient has medial knee pain, negative Lachman and Drawer, questionable McMurray.

## Plan
Patient is to continue with meds and PT. Recheck in one week.

# 1 11/22/2004 9:55:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 11/22/2004 09:55AM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: F/up (L)knee injury.

## History of present illness
    Eddie Haynes is a 34 year old male.
    • Knee joint pain which is failing to change as expected.

Pt here for reck of (L) knee injury. Has completed P.T. Was told by therapist that it would probably take time for his knee to get back to 100%. Was also instructed by therapist to get back into his exercise routine; was told to do this gradually. Was also told not to be surprised if knee was sore and/or painful. Pt notes that after sitting for a while, he has a little trouble with weight-bearing. Finished P.T. Friday---dc.

## Personal history
*Work:* Work history Employed by COMFD.

## Physical findings
### Vital signs:
    • SBP 140/76 mmHg.
On exam patient has pain with valgus stress and pain medially to palpation, no laxity of the knee.

## Plan
    Michael C. Turner, DO ordered
    • An MRI of any joint of the lower extremity
Patient still having pain medially with some clicking as he goes from a sitting to a standing position. Obtain a MRI and follow up with results.

# 1 11/30/2004 11:19:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 11/30/2004 11:19AM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: F/up (L) knee injury.

## History of present illness
    Eddie Haynes is a 34 year old male.
    • Knee joint pain which is improving.

Pt here for f/up of (L) knee knjury. Also here to get MRI results- - -dc.

## Physical findings
Patient still has pain at medial joint line. MRI shows degeneration and questionable tear of medial meniscus. A cyst is also noted on the MRI.

## Plan
Patient is scheduled for furthere evaluation with ortho at this time. Continue with light duty.

# 1 3/24/2005 1:38:00 PM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 3/24/2005 01:38PM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: Fit for duty.

## Past medical/surgical history
### Reported History:
> *Reported medications:* Taking medication Ibuprofen; Gabitril; Valium; Lexapro; Demerol; Darvocet N 100; Benadry prn allergies; Skelaxin.
>
> Pt states that these Rx's are prescribed by Drs. Wells, Palmer and Teresa Brown....

## Subjective
Pt here for Fit for Duty exam. Pt states that his (L) knee bothers him off and on.

Pt presently on multiple medications. Does not want to reveal reasons at this time for all of his medications. States he wants this left confidential between he and his other doctors....dc.

## Physical findings
### Vital signs:

| Vital Signs Measurements | Value |
|---|---|
| PR | 96 bpm |
| Blood pressure | 120/78 mmHg |
| Weight | 201 lbs |

## Plan
Patient was instructed to have medical records whith but he does not so we will reschedule him when we have received his release of records.

# 1 3/31/2005 1:35:00 PM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 3/31/2005 01:35PM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: Fit for duty

## History of present illness
Eddie Haynes is a 34 year old male.

Pt states he is here to have his medication checked for his job. He was here the other day and that we were to find out about some records concerning his medications

## Past medical/surgical history
### Reported History:
*Reported medications:* Medication history: Lexapro, Gabitril,Ibuprofen, Skelaxin, Valium, DCN, Benedryl prn, Hydrocodone.
*Medical:* Reported medical history: L. knee injury/pain, R. foot injury, anxiety,

## Personal history
*Work:* Work history Pt is employed by COMFD x 15 yrs.

## Physical findings
### Vital signs:
| Vital Signs Measurements | Value |
| --- | --- |
| Blood pressure | 142/92 mmHg |
| Weight | 198 lbs |

### Lungs:
° Respiration rhythm and depth was normal.  ° Clear to auscultation.
### Cardiovascular system:
*Heart Rate And Rhythm:* ° Normal.
*Murmurs:* ° No murmurs were heard.
### Abdomen:
*Auscultation:* ° Abdominal auscultation revealed no abnormalities.
Reviewed letters and medications from treating physicians. Patient has no physical limitations. He states he does not take his medications while on duty.

## Allergies
Cipro. Reaction(s): Itching, Rash. Identified: Unknown.

## Plan
Patient is physically fit to return to duty. The concerns come form the medications he is taking for his anxiety and joint pains. He is prescribed the Valium 5mg bid and Gabitril qd. The patient states he does not take any medications but the Lexapro while on duty. This logic made no sense to me that you would need to take the medicine on your days off while not under stress but not need it when in the most stressful situations. These medications effects could carry over to his on duty time. Any drug screen performed would most likely be positive even when on duty.
There are safety issues for him driving a truck and working on the fire line while under the influence of these medications though he claims he does not take while on duty. The only way to prove it would see him taking the medication while on duty. Administrative decision is needed.

# 1 4/12/2005 9:10:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 4/12/2005 09:10AM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: F/up (L) knee injury

## History of present illness
    Eddie Haynes is a 34 year old male.
    • Knee joint pain which is failing to change as expected

Pt here for f/up of (L) knee injury that happened 09/13/04. States his knee is always stiff. Has good days and bad days. States he does not have pain of this extremity on a daily basis; may be pain-free x one week, then may have pain for one week.....dc

## Personal history
*Work:* Work history Employed by COMFD x 15 years

## Physical findings
Patient has stiffness when he wakes and after exercise. Pain medially to palpation. Reviewed Dr. Wells notes and previous MRI

## Plan
Patient has been on Motrin and had some GI upset. I am going to put him on Celebrex and reschedule to see Dr. Wells

# ENCOUNTER SUMMARY

| | | | |
|---|---|---|---|
| **Patient Name:** Haynes, Eddie J. | | **Date:** | 04/12/2005 |
| **Chart No:** | | **Doctor of Record:** | Multiple Exist |
| **Phone:** | (334) 272-0317 | **Examiner:** | Michael Turner |
| **Age:** | 37 yrs | | |

**Chief Complaint:** ? on blue form

**General Notes:** Pt states that the Dr. put him back to work full duty but states he has another case still pending, please call @ 657-1853-ldh

Pt called back to advise that MD released him to rtw full duty for his knee only, the other case is still pending the COM and is a seperate issue. Pt verbalized understanding-ldh

**Current Problems:**

| Description | Identified | Status | Category | Condition |
|---|---|---|---|---|
| Knee Sprain | 09/14/2004 | | diagnostic | |
| Joint Pain, Localized In The Knee | 11/09/2004 | | diagnostic | |

# 1 Note 5/25/2006 9:05:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970, Encounter Date and Time: 5/25/2006 09:05AM, Examiner: Michael C. Turner, DO

## Chief complaint
The Chief Complaint is: Fit for duty.

## Past medical/surgical history
### Reported History:
No past medical history reported.
*Reported medications:* No recent immunization for tetanus.
*Physical trauma:* Physical trauma Pt states that he is here for a fit for duty to go back to the fire department. -kb.
Shoulder surgery in 2000.

## Personal history
*Work:* Work history Pt employed with COM.

## Physical findings
### Vital signs:

| Vital Signs Measurements | Value |
| --- | --- |
| Blood pressure | 140/98 mmHg |
| Weight | 213 lbs |

## Assessment
Fit for Duty.

## Allergies
No allergies.

## Plan
Nothing has  essentially changed since his last evaluation.  He does deny taking the Lortab anymore.  He is still physically fit for duty.  He is still taking Lexapro, Flexeril, Valium 5mg bid, and Gabitril.  He does not take them while at work.  The medications could effect his performance while on duty which involves driving a fire truck and working on the fire line.  Why he would not need or take these medications for anxiety while on duty I do not understand.  There must be an administrative decision with this case.

Southeastern Industrial & Family Medicine Associates

**AUTHORIZATION FOR USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION**

**Patient Identification:**

Printed Name: _Eddie Odums_          Date of Birth: _8-17-70_

Address: _14501 Middle Fork Rd._  _Montgomery Al. 36116_

Social Security#: _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_     Home Phone: _272-0317_     Cell: _____

**Information To Be Released - Covering the Periods of Health Care:**

From (date) _____ to (date) _____
From (date) _____ to (date) _____

**Please check type of information to be released:**

| | | | |
|---|---|---|---|
| [X] Entire Medical Record | [ ] Pathology Reports | [ ] Hospital Records | [X] X-Ray Reports |
| [ ] History & Physical Exams | [X] Consultation Reports | [ ] Progress Notes | [ ] X-Ray Films |
| [X] Lab Test Results Reports | [X] Office Visit Notes | [X] Operative Reports | [ ] ER Records |
| [X] Medications | [ ] Other (specify) _____ | | |

**Purpose of Request:**

| | | | |
|---|---|---|---|
| [X] Treatment | [ ] Consultation | [ ] Patient Requested | [ ] Billing or Claims Payment |

**Person or Facility Authorized to Receive Information:**

Southeastern Industrial & Family Medicine Associates, LLC
1600 Forest Avenue → 160 Forest Ave.
Montgomery, Alabama 36106    Monty. Al.  36106
Telephone: (334)261-4445 Fax: (334)261-4448

FILE

**Drug and/or Alcohol Abuse, and/or Psychiatric, and/or HIV/AIDS Records Release:**
I understand that if my medical or billing record contains information in reference to drug and/or alcohol abuse, psychiatric care, sexual y transmitted Disease, Herpes o B or C testing, and/or other sensitive information, I AGREE to its release as part of the requested information.

Check One: [ ] YES   [ ] NO   _____ Initials

I understand that if my medical or billing record contains information in reference to HIV/AIDS (Human Immunodeficiency Virus/Acquired Immuno-Deficiency Syndrome) testing and/or treatment, I AGREE to its release as part of the requested information.

Check One: [ ] YES   [ ] NO   _____ Initials

**Time Limit & Right to Revoke Authorization:**
Except to the extent that action has already been taken in reliance on this authorization, at any time I can revoke this authorization by Submitting a notice in writing to the facility Privacy Officer. This authorization is effective for ____ months after date signed.

**Signature of Patient or Personal Representative Who May Request Disclosure:**

I understand that _____ may not condition my treatment on whether
I sign this authorization form unless specified above under **Purpose of Request**. I can inspect or copy the protected health information (PHI) to be used or disclosed. I authorize Southeastern Industrial & Family Medicine to use and disclose the PHI specified above.

Signature: X _____                         Date: _5 24 05_
Authority to sign if not patient:

**Re-disclosure:**
I understand the information disclosed by this authorization my be subject to re-disclosure by the recipient and will no longer be protected by HIPAA. The facility, its employees, officers and physicians are hereby released from any legal responsibility or liability for disclosures to the extent indicated and authorized.

Haynes, Eddie
69022  12-03-04
T. Wells cont.

**HAYNES, EDDIE J.**
**69022**
**12-03-04**
**DR. WELLS**
**C**

Eddie Haynes is seen back in the office today on 12-03-04. His problem now is an on-the-job injury on 09-13-04 when he twisted his knee while getting into an automobile. He has seen Dr. Turner who sent him to rehab. He has noted a click in his knee, this is not painful. Over the last week or so he relates that he is much improved and this could be because of the Indocin that we placed him on for his plantar fasciitis, most likely is.

MRI: A MRI has been performed and shows a questionable tear of the body of the meniscus.

PHYSICAL EXAM: On exam he has no effusion. He has only minimal tenderness along the medial joint line. This is not at all marked, just a tiny bit. He has only minimal discomfort on McMurray's testing. He has no laxity on varus or valgus stress and no pain on varus or valgus stress. He has no pain in the popliteal fossa. He has a negative Lachman's test and a negative patellofemoral inhibition test.

X-RAYS: X-rays are made in the office today, AP, lateral, and obliques, plus a sunrise. These are considered normal for age 34.

PLAN: We do not think Mr. Haynes medial meniscus pathology is symptomatic enough to warrant surgical intervention nor does he. This may be an over read by Dr. Delbert Juan. We are having him continue on his Indocin. We want him to use ice massage to his knee and to now resume his normal activity at work though he may restrict his activity somewhat off the job. We will see him back in the office in 6 weeks only if needed. We think he will be able to call and cancel the appointment. At this point we anticipate no significant permanent impairment and we think he will have reached maximum medical improvement with the completion of his Indocin. We would like for him to take this a total of 3 weeks.
TGW:rg      12-06-04
CC: Dr. Michael Turner – Thank You

1-4-05 T. Wells OD OTL · TW.
1-14-05 T Wells OD
3-29-05 T Well Rescheduled.
4-4-05 T Wells P planter fasciitis

69022  11-23-04
T. wells cont.

**HAYNES, EDDIE J.**
**69022**
**11-23-04**
**DR. WELLS**
**C**

Eddie Haynes is seen back in the office today on 11-23-04. He is continuing to have pain at the plantar fascia attachment onto the os calci's.

**PHYSICAL EXAM:** He is tender to palpation in this area and desires to have an injection.

**PLAN:** We have treated him in a vigorous fashion in the past for plantar fasciitis on the left and then had to inject. We are going to be a little more aggressive and inject him today with 40 mg of Depo-Medrol. However, we want him to continue with all of his other modalities to include ice, heat, never going barefooted, physical therapy, and Motrin 600 mg, 1, 3 times a day. We will see him back in the office in 6 weeks.
TGW:rg        11-24-04
•

11-24-04  T. wells

**HAYNES, EDDIE**
**69022**
**11-24-04**
**DR. WELLS**
**C**

Eddie Haynes is seen back in the office today on 11-24-04. His pain has been significant since our injection. We wanted to just bring him back in and look at his heel.

**PHYSICAL EXAM:** It is not engorged and not erythematous, it is just painful and throbs when he puts his foot down. I do not think we have an excessive bleed and I do not think we have an infection.

**PLAN:** He was taking Lortab. We are going to place him on Demerol 50 mg tabs, 1 to 2 every 3 to 4 hours and Darvocet for mild pain. We are also placing him on Indocin, which he has taken previously, 1, 3 times a day. If he has any problems such as headache, blurred vision, indigestion, or diarrhea then he will stop the medication. He has returned to work today, light duty. We are going to send him home to elevation and to ice. We will see him back at his regular appointment unless he has some problems for which he will come back haste post haste.
TGW:rg        11-29-04
•

12-3-04 T. Wells ① here on the job - Sept 13 ½ e. Turning
Click not getting into auto  #, Turner - Rehab,
not painful.



**Orthopaedic Surgery**
Thomas G. Wells, M.D.
D.D. Thornbury, M.D.
G. Robert Burton, III, M.D.

**Hand Surgery and Orthopaedic Surgery**
Edward E. Palmer, Jr., M.D.

**Spine Surgery and Orthopaedic Surgery**
Timothy A. Holt, M.D.

J.J. O'Callaghan
Business Manager

March 6, 1997

Kirven Ulmer, M.D.
1801 Pine Street, Suite 101
Montgomery, AL  36106

RE:  Eddie J. Haynes
CHART #:  69022

Dear Kirven:

Thank you for referring Eddie Haynes to us.  He is a 26 year old fellow who has been having heel pain for approximately eight weeks duration.  He sustained an injury on-the-job jumping directly onto this.  He is painful at the attachment of the plantar fascia onto the os calcis and on the medial aspect of his heel.  He does have pes planus.

You have treated him in the usual fashion consisting of physical therapy and anti-inflammatory medications.  They have provided him with an insert.  He has been on Naprosyn.  We are going to increase this to Indocin 25 mg one, three times a day.  Hopefully, he can take this.  Drug precautions which are headache, blurred vision, indigestion and diarrhea are given.

We are continuing with the physical therapy.  We want him to use warm soaks first thing in the morning and again at night.  We are continuing with the physical therapy, ultra sound and taping. We want him to decrease his activity.  He is a fireman and has been continuing to work.  We are going to restrict his activity with no climbing and no running.  We do not want to inject.  We are not thinking in terms of surgical intervention.

Sincerely,

Thomas G. Wells, M.D.

TGW:cbp    T:3/10/97

4294 Lomac Street - P.O. Box 235003 - Montgomery, Alabama 36123-5003 - (334) 274-9000

**HAYNES, EDDIE J.**
**69022**
**04-04-05**
**DR. WELLS**
C

Eddie Haynes is seen back in the office today on 04-04-05. This is a 34-year-old male who is again having pain in the right plantar fascia as it attaches onto the os calci's. He relates that this has been present for about 2 weeks.

SOCIAL HISTORY: He is a firefighter for the Montgomery Fire Department.

CURRENT MEDICATION: Medication is as listed.

PLAN: We have treated him in the past with an injection, which was quite painful. We are holding off therefore on the injection. We are placing him on Indocin, which he has taken without consequence; this is 25 mg, 1, 3 times a day. We want him to use warm soaks in the morning and ice massage at night. We are sending him to physical therapy. Our protocol for plantar fasciitis is given. We will see him back in the office in 3 weeks.
TGW:rg      04-05-05
•

6-13-97 · T. Wells...no show

5.04  T Wells  ® heel pain: *(illegible handwritten notes)*

**HAYNES, EDDIE J.**
69022
11-05-04
DR. WELLS
C

Eddie Haynes is seen back in the office today on 11-05-04. He is again having pain. It is his right heel, not his left one. We have treated him in the distant past, 1997, for left heel pain. He relates that about 2 months ago he jumped off the back of a truck and following this he began having pain in his heel and this has persisted. He has seen a podiatrist who has injected his heel and this did not help. He has pain first thing in the morning.

PHYSICAL EXAM: He is tender over the medial aspect of the sole of his heel at the attachment of the plantar fascia onto the os calci's.

X-RAYS: X-rays are made and we do not see a fracture of the os calci's and we do not see a spur.

IMPRESSION: Plantar fasciitis. *Right*

PLAN: We have treated him in a vigorous fashion previously and then finally injected him. We do not want to inject today though he did get significant benefit previously. We are going to try our conservative, non-operative treatment first. He has no history of peptic ulcer disease, hiatal hernia, or reflux. Consequently, we are going to place him on Motrin 600 mg, 1, 3 times a day. We want him to use warm soaks first thing in the morning. He is to never go barefooted. He is to use ice massage at night and we are sending him to physical therapy. We will see him back in the office in 3 weeks and if not improved we will consider an injection at that point, hopefully this will not be the case. If he is doing great he will call and cancel the appointment.
TGW:rg     11-08-04

23-04  T. Wells

24-04  T. Wells  *(illegible)*

*Rules, Eddie*
*69022*
*S-M Twells*

**4-8-97**      **Haynes, Eddie**      **69022**      **Dr. Wells**

Seen back in the office today.    Bone scan does not show a
fracture.    I believe we're dealing with persistent plantar
fasciitis.  We've injected today with .25 cc. of Xylocaine, .5
cc. of Celestone.   I want him to use ice over the next 3 days.
We want him to continue in therapy.  We'll see him back in the
office in 3 weeks.   If he fails to respond, then I think we
need to think in terms of surgical intervention.   Hopefully,
this will not be the case.   He has not had custom fabricated
longitudinal arch supports.    This may be in order before
surgical intervention.  He's markedly flat footed.

TGW:al    T: 4-11-97

*37-97 Twells ,*

**4-29-97**      **Haynes, Eddie**      **69022**      **Dr. Wells**

Seen back in the office today, relating that the injection was
of great value for several weeks, however, the pain is again
coming back.   He is tender over the plantar fascia attachment
to the Os Calcis.     Eddie may come to eventual surgical
intervention, however, one last conservative approach will be
custom fabricated longitudinal arch supports with a plastizote
cutaway for his plantar fascia attachment onto the Os Calcis.
This will be done by Mrs. Donna Robertson in Hoover, AL.

We'll see him back in the office in 3 weeks.  He's been off all
anti-inflammatory agents for a week.  He was on Indocin. We're
now placing him on Ibuprofen, 400 mg. 2 at breakfast, 2 at
lunch and 2 at supper.  He is still going to physical therapy.
He will continue his light duty status for another month.
However, if he continues to be painful, I think we need to go
ahead and operate so that he can return to his normal activity.
We'll see what our arch supports do.  On return in 3 weeks, if
he is still having problems, we'll place him on the surgery
schedule.

TGW:al    T: 5-1-97

**5/20/97**      **HAYNES, EDDIE**      **69022**      **Dr. Wells**

Seen back in the office today.  He just got his inserts.  He is no
longer going to physical therapy.  He really didn't realize that he
should.  He states that he's still having some discomfort but it's
much improved.  He'd sort of like to have an injection again.  We
certainly don't want to do that.  We want him to follow all the
protocol that has been established for him.  We're going to
continue with the restricted activity for 2 weeks then back to his
regular job in 2 weeks.  We'll see him back in the office in 6
weeks.

TW:cbn    T:5/22/97

Haynes, Eddie
69022
6-97 TW ells

Monty Fire Dept
Seen by Ulmer in several occasions
- P.T.
- ultram -naproysn

3/6/97        **HAYNES, EDDIE JAMES**           69022      Dr. Wells

Seen in the office today.  Letter to Dr. Ulmer. M W
TW:cbp    T:3/10/97                                  J-1 L

3-24-97 Darvocet N 100g - disp 33- ÷ -÷, Po q 3-4
h prn  pain called to Adams - 264-3496 - per
Dr. P's orders -

6-97 TW ells
Bone scan (feet) Thurs Apr 3 @ 11$\frac{30}{}$ /am

4-2-97 Bone Scan approved by Thelma BPB


**4-1-97**        **Haynes, Eddie**        **69022**    **Dr. Wells**

Seen back in the office today.  No real improvement except for
his pain in the morning, first thing, is not in excess.  He is
tender at the attachment of the plantar fascia onto the Os
Calcis, rather exquisitely so.  He has marked pes planus and
some pronation.  This fellow may come to surgical intervention.
 He jumped down on this approximately 8 weeks ago.  He does not
have a heel spur.  He has no evidence on our plain films that
he has a fracture.

We're going to get a bone scan, limited, of the lower
extremity.  We'll see him back in the office as soon as this is
done.  I will inject him and fabricate a custom longitudinal
arch support before we consider surgery.  He is not being taped
today because he said it was just too tight.  It doesn't matter
whether it's tight or loose, it still does not substantially
change his pain.              TGW:al    T: 4-3-97

327



**ALABAMA ORTHOPAEDIC**
**SPECIALISTS, P.A.**

THOMAS G. WELLS, M.D.
Orthopaedic Surgery and Arthroscopic Surgery

D.D. THORNBURY, M.D.
Foot & Ankle and Orthopaedic Surgery

EDWARD E. PALMER, JR., M.D.
Hand Surgery and Orthopaedic Surgery

STEVEN A. BARRINGTON, M.D.
Joint Replacement and Orthopaedic Surgery

CHARLES W. HARTZOG, JR., M.D.
Sports Medicine and Arthroscopic Surgery

G. DEXTER WALCOTT, JR., M.D.
Sports Medicine and Arthroscopic Surgery

MICHAEL E. DAVIS, M.D.
Spine Surgery and Orthopaedic Surgery

RONALD P. O'NEAL, MPH, CHE
Administrator

W. SCOTT GULLEY, CPA
Controller

December 03, 2004

Michael C. Turner, D.O.
Southeastern Industrial & Family Medicine Associates, LLC
1600 Forest Avenue
Montgomery, AL 36106

*w|v*

Re: Eddie J. Haynes
Chart #: 69022

Dear Dr. Turner:

Thank you for kindly referring Eddie J. Haynes to me for evaluation. Enclosed is
a copy of today's office notes with my evaluation and recommendation.

I appreciate you allowing me to participate in this patient's care. If you have any
questions or if I can be of any further assistance to you, please do not hesitate to contact
my office.

Sincerely,

Thomas G. Wells, M.D.

TGW:rg

Enclosure

**HAYNES, EDDIE J.**
**69022**
**12-03-04**
**DR. WELLS**
C

Eddie Haynes is seen back in the office today on 12-03-04. His problem now is an on-the-job injury on 09-13-04 when he twisted his knee while getting into an automobile. He has seen Dr. Turner who sent him to rehab. He has noted a click in his knee, this is not painful. Over the last week or so he relates that he is much improved and this could be because of the Indocin that we placed him on for his plantar fasciitis, most likely is.

MRI: A MRI has been performed and shows a questionable tear of the body of the meniscus.

PHYSICAL EXAM: On exam he has no effusion. He has only minimal tenderness along the medial joint line. This is not at all marked, just a tiny bit. He has only minimal discomfort on McMurray's testing. He has no laxity on varus or valgus stress and no pain on varus or valgus stress. He has no pain in the popliteal fossa. He has a negative Lachman's test and a negative patellofemoral inhibition test.

X-RAYS: X-rays are made in the office today, AP, lateral, and obliques, plus a sunrise. These are considered normal for age 34.

PLAN: We do not think Mr. Haynes medial meniscus pathology is symptomatic enough to warrant surgical intervention nor does he. This may be an over read by Dr. Delbert Juan. We are having him continue on his Indocin. We want him to use ice massage to his knee and to now resume his normal activity at work though he may restrict his activity somewhat off the job. We will see him back in the office in 6 weeks only if needed. We think he will be able to call and cancel the appointment. At this point we anticipate no significant permanent impairment and we think he will have reached maximum medical improvement with the completion of his Indocin. We would like for him to take this a total of 3 weeks.

TGW:rg      12-06-04
CC: Dr. Michael Turner – Thank You
•

script 11/09/04[Page 1 of 1]

9095



**Specialty Services:**

⊐ Lymphedema Management**
⊐ FCE
⊐ FCE with Impairment Measurements
⊐ Work Rehabilitation
⊐ Hand Therapy*
⊐ Women's Health Services**

**Procedures/ Modalities:**

⊐ Aquatic Therapy
⊐ Back School
⊐ Orthotics

Name: Eddie Agner
Diagnosis: Knee Pain
Next Dr. Appt. Date/Time:

☑ Consult: Evaluate & Treat

qd X 1 wk

11/09/04 @ 1:30

**Helpful Hints:**

• Bring your physician referral on your first visit
• Wear loose fitting shorts and too shirts each visit.
• Expect each visit to last from 1½ to 2 hours.
• Insurance Counseling available.

If you cannot attend a scheduled appointment, simply call ahead and we will be happy to reschedule.

**10 Convenient Locations**
(see map on back)

1801 Pine Street, Suite 102
Montgomery, AL 36106
334-262-6161 / Fax 334-834-1706
Behind Jackson Hospital

1725 Pine Street - Jackson Hospital
Montgomery, AL 36106
334-293-9156 / Fax 334-293-6221
Therapy Annex

Industrial Rehab
1801 Pine Street, Suite 202
Montgomery, AL 36106
334-262-6000 / Fax 334-353-1006
Behind Jackson Hospital

3198 Normandie Drive
Montgomery, AL 36111
334-286-6677 / Fax 334-286-6644
Behind Baptist M.C. South

464 St. Lukes Drive**
Montgomery, AL 36117
334-244-6868 / Fax 334-244-6861
Across from Baptist M.C. East

1824 Glynwood Drive
Prattville, AL 36066
334-361-4711 / Fax 334-361-6219
Glynwood Business Park

Hand & Specialty Clinic*
4134 Carmichael Court
Montgomery, AL 36106
334-244-4668 / Fax 334-244-6776
Turn on Carmichael Ct.
across from Co. Center

100 Rumbling Waters Drive
Wetumpka, AL 36092
334-614-4466 / Fax 334-614-4424
Behind Domino's Pizza

100 Adams Street
Greenville, AL 36037
334-382-6366 / Fax 334-382-6484
Old Alabama Power Building

1118-B U.S. Hwy 231
Troy, AL 36081
334-666-5021 / Fax 334-666-0429
Beside Taco Bell

I certify that therapy services for the above named patient are required, medically necessary and authorized by me.

_____  M D      11/09/04
Physicians Signature              Date

prog note 11/15/04[Page 1 of 1]

9381

**REHAB ASSOCIATES**

**PROGRESS REPORT**

PATIENT: Eddie Haynes          PHYSICIAN: Turner

DIAGNOSIS: (L) knee sprain          DATE: 11/15/04

**ESTABLISHED GOALS INCLUDED:**

- ☑ Increase range of motion
- ☑ Increase strength
- ☐ Increase general fitness/endurance
- ☑ Decrease swelling/pain
- ☑ Increase/Decrease joint mobility
- ☐ Correct Biomechanical Dysfunction
- ☑ Improve Functional Capacity in:
  - ☐ Weight Bearing
  - ☐ Work Activities
  - ☐ Sport Activities
  - ☐ ADL
- ☑ Education
- ☐ Other

**RESULTS OF TREATMENT**

**Comments:**
Pt. cont. to progress c̄ PT. Able to
hi additional strengthing exs. Tch
discomfort. Still c̄ло tenderness over
med aspect of (L) knee but this is sig.
↓d. Strength - S/S c̄ knee ✓/ but still
c̄ difc occasional p̄ c̄ elliptical ex.

**Recommendations:**
Cont. QD x 1 wk h̄
cont. strengthing ∠d ex progression
advancing athletic program and elliptical
trainer to tolerate running
**Therapist:** Brent D / - PPT ATL

**PHYSICAL THERAPY REFERRAL FORM**

**I have read the above progress report and would request that my patient:**
- ☐ Continue with present treatment/rehabilitation.
- ☐ Have an isokinetic evaluation.
- ☐ Have a Functional Capacity Evaluation.
- ☐ Please call me concerning this patient.
- ☐ Be discharged from Physical Therapy.
- ☑ Continue with present treatment program and make the following revisions:

good X 1 wk

_____
Physician          11/15/04
Date

White – Rehab Associates Copy      Canary – Physician Copy      Pink – Rehab Associates Copy



**Integrated Magnetic Imaging**

| | |
|---|---|
| **Date:** | 11/23/04 |
| **Patient:** | Haynes, Eddie |
| **DOB:** | 08/17/70 |
| **Physician:** | M. Turner |
| **Tech:Chang Nguyen,RDMS RT (R) (MR)** | |
| **Chart #:** | S112304-1 |
| **Tape:** | |
| **Indication:** | Knee pain. |

**SCAN:** MRI of the left knee.

**TECHNIQUE:** Multiplanar, multipulse MRI of the left knee was completed in the usual manner without difficulty.

**FINDINGS:** The patient has no evidence of significant meniscus tear. There is a small degenerative signal in the periphery of the body of the medial meniscus. In addition, the patient has a proximal tibial metaphyseal cyst or enchondroma centrally. Cruciate ligaments, collateral ligaments are intact.

Likewise, the extensor tendons have a normal appearance.

**IMPRESSION:** MRI of the left knee does not show any evidence of significant meniscus or cruciate ligament tear. Degenerative signal Grade II is present in the periphery of the meniscus and there may be a small peripheral tear in the body of the medial meniscus. 2 cm multiloculated cyst centrally in the proximal tibial metaphysis.

Thank you for this patient referral.

Delbert Hahn, M.D.

DH/apd
D: 11/23/04
T: 11/23/04

7094 University Court • Montgomery, AL 36117

(334) 271-OPEN (6736) • Office: (334) 271-1345 • Fax (334) 271-1342

www.imaimontgomery.com



script 11/23/04[Page 1 of 1]



**Integrated Magnetic Imaging**

A Division of Radiology & Imaging, Inc.

**271-OPEN** (6736)
Toll Free: 1-866-271-9944

7094 University Court        74240 Tallassee Highway
Montgomery, AL 36117       Wetumpka, AL 36075
Ph: (334) 271-1345          Ph: (334) 567-8383
Fax: (334) 271-1342         Fax: (334) 567-1880

**High Field MRI, Open MRI,
Ultrasound, 3D Ultrasound,
24-hour Holter, Event Monitoring,
Cat Scan and X-Ray**



Accredited by the American
College of Radiology

---

*TO BE SIGNED BY PHYSICIAN ONLY.*

**INTEGRATED MAGNETIC IMAGING • (334) 271-1345 or 1-866-271-9944**

Patient Name: Eddie Haynes

Exam Type: MRI Lt Knee     Diagnosis: Knee sprain

☐ With & Without IV Contrast    ☐ Without IV Contrast _____

☐ Oral CT Contrast     Date: 11-23-04     Time: 7:15     AM / PM

Physician Signature: _____

*Please be aware that a 24 hour notice is required for cancellations, to avoid being charged for missed appointment.*

## WE HAPPILY ACCEPT STAT PATIENTS UPON REQUEST





Case 2:06-cv-01093-WKW-WC    Document 33-5    Filed 01/11/2008    Page 47 of 82

*650*
*MB*

*5439*

TO:    M.F. Smith, District Chief

From:   E.J. Haynes, Firefighter

Date:   March 4, 2005

RE:    Engine 14 Driver

Dear Sir,

It is a pleasure as well as an honor to be chosen Driver of Engine 14.
I am more than willing if the City of Montgomery needs me to do so.
However, if there is someone else is more willing or highly qualified to drive
Engine 14,I will assist them as needed to be ready to take any assignment. I have
been driving the Fire Truck off and on for the last fourteen years and I am
currently the driver.

Being a Driver for Engine 14 I know I must inform you of my medications. The
medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4
mg. PRN(two –three times a week).
Medications that I take on my off days and on a as needed basis are Hydrocodone
5/500, Diazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50.,
and over the counter Benadryl for my sinus problem.

Again, thank you for your consideration for me being Engine 14 Driver. It is an
honor to be a Montgomery Firefighter and take on the duties of a dedicated
Fireman.

Respectfully,

E. J. Haynes, F/F Station 14



**Ψ Palmer Psychiatric Services, PC**
Clemmie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:    (334) 280-3230
Fax:      (334) 280-3272
Email: CPalm94@aol.com

April 14, 2005

RE: Eddie Haynes
DOB 08/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work without taking Valium or Gabitril. Mr. Haynes can perform his duties in his current capacity with no restrictions. If you have concerns do not hesitate to call or write.

Cordially,

CP/nb

# PSYCHEMEDICS CORPORATION

543

**PSYCHEMEDICS FORENSIC DRUG TEST CUSTODY AND CONTROL FORM - INITIAL TESTING**

Bar Code Number          F818760          CIT002
Lot Type                 CCF ID           Client Code

**STEP 1:** Completed by Collector. Have donor sign page 2.

**A. Sample Collected For:** City Of Montgomery - Fire Department - (fire)

Dr. Michael Turner
Southeastern Industrial and Family Medicine Assoc.
1860 Forest Ave
Montgomery, AL 36106
V:(334)281-4441  F:(334)281-4444

City of Montgomery - Fire Department
103 N. Perry Street   City Hall
Montgomery, AL 36101

**B. Donor SSN or Employee ID #**   _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_
14 CHARACTERS MAXIMUM - Must Match Donor ID on Sample Acquisition Card (SAC)

**C. Reason for Test** ☐ Pre-Employment ☐ Random ☐ Reasonable Suspicion/Cause ☑ Return to duty ☐ Other _____ Please specify

**D. Donor ID Verified**   ☑ Photo ID    ☐ Employer Representative _____ Signature of Employer Representative

**E. Drug Tests to be Performed** ☑ Cocaine, Opiates, PCP, Amphetamines, Marijuana
☐ Other (Specify)

**F. COLLECTION SITE INFORMATION:** _SIF MH_
COLLECTION FACILITY

_1860 Forest Ave_    _MIGN, AL 36104_
ADDRESS / CITY / STATE / ZIP CODE

BUSINESS PHONE NUMBER (REQUIRED):                    BUSINESS FAX NUMBER

**STEP 2:** Collector copies Subject ID from CCF to SAC; Collector completes information on Integrity Seal and SAC **EXCEPT** Donor's initials; Collector obtains sample from donor and places sample in SAC in accordance with procedures.
Source of Sample:    Hair from ☐ Head  ☐ Chest  ☑ Underarm/s  ☐ Leg/s  ☐ Other _____ Must specify approval code

Collector affixes signed Integrity Seal to SAC; Collector removes Bar Code from CCF and affixes it to SAC.

**STEP 3:** Donor initials SAC; Donor completes STEP 3A on Page 2 – Donor Certification.

**STEP 4:** Chain of Custody – Initiated by Collector and Completed by Laboratory.

Collector Remarks:
I, the collector, certify that the enclosed sample was obtained with the consent of the donor, that proper identification of the donor was made, and that the appropriate authorization was obtained from the donor for disclosure of the results to the above named result recipient.

_Esther Thurston_            _[signature]_            _March 31, '05_        _DHC_
Print Collector Name          Signature of Collector      Date (example Jan/01/2005)    Sample Released To:
                                                                                        Name of delivery service
                                                                                        transferring sample to lab.

Collector places Page 1 of the CCF (this page) and the SAC (initialed by the Donor) in the pouch and seals it. Donor initials and dates the seal on the pouch.

**STEP 3A:** COMPLETED BY DONOR

**Donor Certification:** certify that I am the test subject, that the sample contained in the envelope is my sample, that it was cut close to the skin, and I witnessed the sample collector seal the sample in the envelope. I consent to the testing of the sample by Psychemedics Corporation and to the release of the results to the named test result recipient. I hereby release Psychemedics Corporation, its officers, employees, agents and representatives from any and all liability arising from the reporting of my results to the authorized recipient and the recipient's use thereof.

_[signature]_                                    _Edde J. Haynes_
Donor Signature                                  Donor Printed Name

_334 284 7919_          _334 272 0317_          _8/17/70_
Daytime Phone            Evening Phone            Date of Birth

Case 2:06-cv-01093-WKW-WC    Document 33-5    Filed 01/11/2008    Page 50 of 62

# NON D.O.T. CUSTODY AND CONTROL FORM

(Do Not Use This Form For D.O.T. Collections)

LabCorp OPS RTP
7604 Alexander Drive
RTP          NC 27709
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

SPECIMEN ID NO **0630632903**          LAB ACCESSION NO

## STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE

A. Employer Name, Address and I.D. No.

City Of Montgomery RT (05021
St N Perry Street, Suite 111
Montgomery        AL 36104
334-241-2512   AI.B

B. MRO Name, Address, Phone and Fax No.

MICHAEL L TURNER, M.D.
SOUTHEASTERN IMP & FAMILY MEE
1800 FOREST AVE
MONTGOMERY        AL 36106
PH. 334 262-4441   FX. 334-262-4568

C. Donor SSN or Employee I.D. No. 424 - 23 - 1040

D. Reason for Test:  ☐ Pre-employment  ☐ Random  ☐ Reasonable Suspicion/Cause  ☐ Post Accident
☑ Return to Duty  ☐ Follow-up  ☐ Other (specify)

E. Drug Tests to be Performed:  789100 78918L 54CRT 8010

F. Collection Site Address:

SI FINH
1000 Forest AVE
Hily LL 36010

Collector Phone No. 334 - 241 - 4445
Collector Fax No. 334 - 

## STEP 2: COMPLETED BY COLLECTOR

Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F?  ☑ Yes  ☐ No, Enter Remark

Specimen Collection:  ☑ Split  ☐ Single  ☐ None Provided (Enter Remark)  ☐ Observed (Enter Remark

**REMARKS:**

STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

## STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable requirements.

X _(Signature of Collector)_   Time of Collection 3:45 PM  **SPECIMEN BOTTLE(S) RELEASED TO:**

_(PRINT) Collector's Name (First, MI, Last)_   Date (Mo/Day/Yr.) 03 31 05   Lab Exp service   _Name of Delivery Service Transferring Specimen to Lab_

**RECEIVED AT LAB:**

X _(Signature of Accessioner)_

_(PRINT) Accessioner's Name (First, MI, Last)_   Date (Mo/Day/Yr.)

**Primary Specimen Bottle Seal Intact**

☐ Yes
☐ No, Enter Remark Below

**SPECIMEN BOTTLE(S) RELEASED TO:**

## STEP 5: COMPLETED BY DONOR

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct. 3/31/05

X _(Signature of Donor)_   Eddi.E J Haines   _(PRINT) Donor's Name (First, MI, Last)_   Date (Mo/Day/Yr.) 8/17/70

Daytime Phone No. 334, 2847919   Evening Phone No. 334, 272 0317   Date of Birth 8/17/70

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (COPY 5). --DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

## STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN

In accordance with applicable requirements, my determination/verification is:

☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELLED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE                                        ☐ ADULTERATED   ☐ SUBSTITUTED

**REMARKS**

X _(Signature of Medical Review Officer)_   X _(PRINT) Medical Review Officer's Name (First, MI, Last)_   Date (Mo/Day/Yr.)

## STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN

In accordance with applicable requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON

X _(Signature of Medical Review Officer)_   X _(PRINT) Medical Review Officer's Name (First, MI, Last)_   Date (Mo/Day/Yr.)

FORM 580 BC, REVISED X01

COPY 3 - COLLECTOR COPY - YELLOW

**LabCorp**

5440

**PALMER PSYCIATRIC SERVICES, PC**
Clemmie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, AL 36116

**Office Note**

Date: 3/28/05

Name: Eddie Hayne          DOB: 8/17/1070

**SUBJECTIVE:**
Patient was seen today. Chief complaint _____
Main issue discussed today was:

1. _want - 4/4 [illegible] will be 15 yr — Fire Dep.

2. sleep — ok

3. appetite —

**Medication**  a. compliance 1. compliant  2. Non compliant 3. Partially compliant
b. side effects  1. none — 2. _____

**OBJECTIVE:**
Appearance _____

Interview Behavior- i.e. cooperative, hostile, superficial, eye contact hypervigilant, exaggerated startle response

Level of Consciousness- alert, oriented X _Y_. Lethargic, stuporous, comatose, fluctuating

Mood _oM_     Affect- wnl, mildly constricted, constricted, blunted, flat, congruent with mood

Speech - regular rate & rhythm, responsive to cues from the interviewer, spontaneous, latency, pressured, nonpressured, monotone, soft, whispered, dramatic, poverty of speech, poverty of content of speech, slurring, mumbling, receptive/expressive aphasia, stuttering, dysarthric

Thought Process - logical, coherent, FOI/LOA, blocking, confusion, muteness, perseveration, confabulation, tangentiality/circumstantiality could focus sustain & shift attention

Thought Content- no A/V hallus., no special powers, TB/TI/TC, No Suicidal/Homicidal ideation, delusions, IOR, obsessions, compulsions, preoccupation_____

Assessment/Plan:   1) _G A D_
2) Unknown Smg #60- 1 hrill - 4
3) Gabitril 4mg #64 - 2abt 4
Lexapro 10mg #30 - 1 qam - 4
3o gm q p

O Pl

5435

 **Palmer Psychiatric Services, PC**
Clemmie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:   (334) 280-3230
Fax:      (334) 280-3272
Email:  CPalm94@aol.com

March 4, 2005

RE: Eddie Haynes
DOB 08/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work on the current medications Lexapro, Valium, and Gabitril. He has not had any side effects on his current medications. Mr. Haynes is to take his medication as prescribed. He was instructed to take Valium on an as needed basis. Mr. Haynes has no work restrictions and should continue to perform his duties at his current capacity. He has been stable on his current medication and working full time without difficulty. If you have concerns do not hesitate to call or write.

Cordially,

CP/mb

**Return To Work/School**

Name: *Eddie Haynes*

~~this patient~~ was under my care from *3/24/05* to *3/31/05*

and may be able to return to work/school on *To be*
*determined by*
*employer.*

Limitations/Remarks:_____

_____

Dr. _____ ad/pp Phone (334) 261-4445

Address *1600 Forest Ave*    Date *7/27/05*
*Montgomery al* 36106

**Avelox**
moxifloxacin HCl Tablets

**Avelox I.V.**
moxifloxacin HCl in NaCl Injection

**TO:**     **Southeastern Industrial & Family Medicine Associates, LLC**
          **Michael C. Turner, D.O.**

**FROM:  Eddie J. Haynes**

$6742$

**DATE:  June 9, 2005**

**RE:     Personal Records**

I would like to obtain a copy of my personal file dating back from
September 13, 2004 to present.

Thank you,

Eddie Haynes

RTW slip for Security Job
for time missed due to eval
requested by com./pm

## CERTIFICATE TO RETURN TO WORK OR SCHOOL

Mr
Mrs    Eddie Naymes
Ms

was under my care from 5/25/06 to

and will be able to return to work/school on 5/25/06

Remarks _____

Phone 261-4445

Dr   SOUTHEASTERN INDUSTRIAL
     & FAMILY MEDICINE ASSOCIATES, LLC   Date 5/25/06
Address   1600 FOREST AVENUE
          MONTGOMERY, AL 36106

ATLEY

ATUSS DM    ATUSS MS    ATUSS HD    ATUSS EX    ATUSS G

For COM Fire Dept.
Pending completion of
Dr. Turners notes on exam /pm

**CERTIFICATE TO RETURN TO WORK OR SCHOOL**

Mr
Mrs    Eddie Haynes
Ms

was under my care from  5/25/06  to _____

and will be able to return to work/school on _____

Remarks  TBD  by employer
_____

Dr  SOUTHEASTERN INDUSTRIAL  Phone 261-4445
    & FAMILY MEDICINE ASSOCIATES, LLC Date 5/25/06
Address  1600 FOREST AVENUE
    MONTGOMERY, AL 36106
                        pm

ATUSS DM   ATUSS MS   ATUSS HD   ATUSS EX   ATUSS G

5433

**CERTIFICATE TO RETURN TO WORK OR SCHOOL**

Mr
Mrs     _Eddie Haynes_
Ms

was under my care from _3/31/05_   _1:45 P.m_ to_____

and will be able to return to work/school on _____

Remarks _Office Visit for Evaluation_

Dr _Michael Jurace_                    Phone _241-4445_

Address _1600 Forest Ave._            Date _3/31/05_

_Mtg. Al  36106_

ATLEY

**ATUSS DM     ATUSS MS     ATUSS HD     ATUSS EX     ATUSS G**

*12.08*

*9850*

CITY OF MONTGOMERY
PHYSICIAN AUTHORIZATION AND TREATMENT REPORT

TO BE COMPLETED BY THE DEPARTMENT:

DEPARTMENT _____  DATE OF INJURY _9-13-04_

EMPLOYEE NAME _Eddie Haynes_   SSN _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_

EMPLOYEE AUTHORIZED TO SEE DOCTOR _____

DATE _11/30/04_                    TIME _____

AUTHORIZING OFFICIAL _____    DATE _____

**P H Y S I C I A N S**

Please complete this AUTHORIZATION AND TREATMENT REPORT and return it to the City of Montgomery via employee or mail.

REFERRALS must be approved by the Workers Compensation Office

LIGHT DUTY assignments must be accompanied with specific restrictions.

CITY OF MONTGOMERY--Payroll Division    Telephone: 241-2015
P.O. Box 1111
Montgomery, AL 36101-1111

TO BE COMPLETED BY PHYSICIAN:

EMPLOYEE SEEN _11-30-04_ Office / OR Emergency Room    _11-30-04_ Date

X-RAYS _____ were  OR _____ were not  TAKEN

DIAGNOSIS: _____

TREATMENT: _____

MEDICATION PRESCRIBED (Types and Amount) _____

EMPLOYEE _MAY_ / OR MAY NOT  RETURN TO WORK THIS DATE  OR NORMAL DUTY / LIGHT

IF LIGHT DUTY, GIVE SPECIFIC RESTRICTIONS _____

IF EMPLOYEE CAN'T RETURN, INDICATE DATE EXPECTED TO RETURN:

DATE_____ TO NORMAL DUTY_____ OR LIGHT DUTY_____

DATE EMPLOYEE SHOULD RETURN TO DOCTOR _____

SIGNATURE OF PHYSICIAN

9599

PHYSICIAN'S REPORT OF DISABILITY AND RECOMMENDATIONS

TO BE COMPLETED BY THE DEPARTMENT

DEPARTMENT _____ DEPT OF _____ Sept 13 2009

EMPLOYEE NAME _____ SSN _____

EMPLOYEE AUTHORIZED TO SEE DOCTOR _____

DATE _____

_____

AUTHORIZING OFFICIAL _____

P   Please complete all items _____ and return
H   it to the _____
Y   REFERRALS _____ Compensation Office
S
I   MEDICATIONS _____
C   results _____
I   CHECK _____ 201-2015
A   CHARGE _____
N   MONTHLY _____
S

TO BE COMPLETED BY PHYSICIAN

EMPLOYEE SEEN _____

X-RAYS _____

DIAGNOSIS _____

TREATMENT _____

MEDICATION _____

EMPLOYEE _____ LIGHT

IF LIGHT _____

IF EMPLOYEE _____

DATE _____ OR NIGHT DUTY

DATE EMPLOYEE SHOULD RETURN _____

_____

DEPARTMENT OF PERSONNEL

CITY OF MONTGOMERY
PHYSICIAN AUTHORIZATION AND TREATMENT REPORT

TO BE COMPLETED BY THE DEPARTMENT:

DEPARTMENT _____ DATE OF INJURY _____

EMPLOYEE NAME  Eddie Haynes _____ SSN 4-X4-23-1040

EMPLOYEE AUTHORIZED TO SEE DOCTOR _____

DATE  11-15-04 _____ TIME _____

AUTHORIZING OFFICIAL _____

P
H       Please complete this AUTHORIZATION AND TREATMENT REPORT and return
Y       it to the City of Montgomery via approved channels.
S
I       REFERRALS must be approved by the Workers Compensation Office.
C
I       LIGHT DUTY assignments must be accompanied by specific
A       restrictions.
N
S       CITY OF MONTGOMERY--Payroll Division        Phone: 241-2015
        P.O. Box 1111
        Montgomery, AL 36101-1111

TO BE COMPLETED BY PHYSICIAN:

EMPLOYEE SEEN ___✓___  OR _____  __11-15-04__
                Office        Emergency Room          Date

X-RAYS _____ OR _____
            Were              Were Not

DIAGNOSIS:  Knee Pain

TREATMENT:  PT

MEDICATION PRESCRIBED (Types and Amount) _____

EMPLOYEE __✓__ OR _____ RETURN TO WORK _____ OR ___✓___
           MAY      MAY NOT                    NORMAL    LIGHT
                                                DUTY     DUTY

IF LIGHT DUTY, GIVE SPECIFIC RESTRICTIONS: _____
  duty _____ No running _____

IF EMPLOYEE CAN'T RETURN, INDICATE DATE OF RETURN:

DATE _____ TO NORMAL DUTY _____ OR LIGHT DUTY _____

DATE EMPLOYEE SHOULD RETURN TO DOCTOR  11-22-04
                                        2:00

_____
SIGNATURE OF PHYSICIAN

11·3)
9094

## City of Montgomery
## PHYSICIAN AUTHORIZATION and TREATMENT REPORT

### TO BE COMPLETED BY THE DEPARTMENT:

Department ___Fire___                          Date of Injury ___September 13, 2004___

Employee Name ___E.J. Haynes___                SSN 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

Employee Authorized to see Doctor ___Dr. Turner___

Date ___November 9, 2004___                    Time ___1115___

_____                  _____
Authorizing Official                           Date

**P**  Please complete this AUTHORIZATION AND TREATMENT REPORT and return
**H**  it to the City of Montgomery via employee or mail.
**Y**
**S**  REFERRALS must be approved by the Workers Compensation Office
**I**
**C**  Light Duty assignments must be accompanied with specific restrictions
**I**
**A**  CITY OF MONTGOMERY -- Payroll Division        Telephone: 241-2015
**N**  P.O. Box 1111
**S**  Montgomery, Al. 36101-1111

### TO BE COMPLETED BY PHYSICIAN:
EMPLOYEE SEEN___✓___ OR _____           ___11-9-04___
              Office      Emergency Room         Date

X-RAYS _____ OR _____ TAKEN
        were      were not

DIAGNOSIS: ___Knee P__

TREATMENT: ___Meds PT___

MEDICATION PRESCRIBED (Types and Amounts) _____

_____

EMPLOYEE___✓___ OR _____ RETURN TO WORK THIS DATE _____ OR ___✓___ DUTY
          MAY      MAY NOT                            NORMAL       LIGHT

IF LIGHT DUTY, GIVE SPECIFIC RESTRICTIONS ___No hazardous dut___

___No Manual___

IF EMPLOYEE CAN'T RETURN, INDICATE DATE EXPECTED TO RETURN:

DATE _____ TO NORMAL DUTY _____ OR LIGHT DUTY _____

DATE EMPLOYEE SHOULD RETURN TO DOCTOR ___11/15/04 @ 3:30___

_____
SIGNATURE OF PHYSICIAN

2944

**SOUTHEASTERN IMMUNOTRIAD OF FAMILY MEDICINE ASSOCIATES, LLC**
MICHAEL C. TURNER, D.O.
1600 FOREST AVE., MONTGOMERY, AL 36106
PHONE: (334)261-4445 FAX: (334)261-4448
WWW.SIFMA.COM

## *ALL SECTIONS OF THIS FROM MUST BE COMPLETED*

**PATIENT INFORMATION**          *PLEASE PRINT *

NAME _Eddie Haynes_                    SSN # _424.23.1040_

CURRENT ADDRESS _4501 Middle Fork Rd_ DOB _8 / 17 / 70_

CITY/STATE _Montg, AL._        HOME PHONE # (334) _272 0317_

ZIP CODE _36106_              CELL PHONE OR BEEPER # (___) _____

**EMPLOYER INFORMATION**

EMPLOYER NAME: _Montg. Fire Dept_ TELEPHONE NO. (334) _284 7919_

WHO AUTHORIZED YOU TO COME TO OUR OFFICE? _Montg Fire Dept. / Chief Smith_

**REASON FOR APPOINTMENT**

1. WERE YOU INJURED AT WORK? YES OR NO IF YES, EXPLAIN YOUR INJURY & HOW IT HAPPENED.
   IF NO, PLEASE PROCEED TO NUMBER 2. BELOW
_Left Knee getting into car._

DATE OF INJURY _Sept 15, 2001_    JOB TITLE/POSITION _Firefighter_
SHIFT/WORK HOURS _24/48_          HOW LONG EMPLOYED _15 yrs_

2. WHAT SERVICE MAY WE PROVIDE? (PLEASE CIRCLE) PRE-EMPLOYMENT PHYSICAL,
   EMPLOYMENT PHYSICAL, DOT PHYSICAL, DRUG SCREEN, IF OTHER (PLEASE EXPLAIN)
   _OTHER_ _Montgomery Fire Dept advised me to report to see Dr! Turner_

## AUTHORIZATION TO RELEASE INFORMATION

I authorize the release of medical information necessary to process this claim or treat this injury. This may include request of records from other sources. I permit a copy of this authorization to be used in the place of the original. I also authorize the physicians and medical personnel to render medical treatment to me as requested by myself and my employer listed above with regard to my injury or examination. I understand under the new HIPPA Regulations, my employer will have a right to my medical information regarding the care rendered to me for this injury or examination.

Signature _[signature]_                Date _3/22/05_

THANK YOU FOR ALLOWING US TO CARE FOR YOUR NEEDS!

**Southeastern Industrial and Family Medicine Associates, LLC**
**MICHAEL C. TURNER, D.O.**
**1600 FOREST AVE.**
**Montgomery, Al. 36106**
**(334) 261-4445 / www.sifma.com**

***PATIENT INFORMATION*:**

**Patient Name:** _Eddie J. Hoynes_     SSN# _424 23 1040_

**Current Address:** _1501 Middle Fork Rd._     DOB: _8/17/70_

**City/State:** _Montgomery, AL._     **Telephone No:** _(334) 272 0317_

**Zip Code:** _36106_     **Cell Phone or Beeper No:** (334) _657 1853_

***EMPLOYER INFORMATION*:**

**Employer Name:** _Montg. Fire Dept_     **Telephone No:** _(334) 284 7919_

**Supervisor's name or person that authorized you to come to our office:** _Capt. Hackett_

***REASON FOR APPOINTMENT*:**

1. Were you injured on the job? (yes)  no  (circle one) If yes, explain your injury and how it happened.

   _Stepping into my car, I guess I over-extended causing pain in my left knee_

2. Date of your injury? _9/13/04_     **Job Title/Position:** _firefighter_

   **Shift/Work Hours** _C shift / 24 hours_     **How long employed?** _14 yrs 5 months_

3. If you do not have an injury, what services may we provide you? (employment physical, drugscreen, DOT physical etc...)

   _City requirements_

***AUTHORIZATION TO RELEASE INFORMATION*:**

I authorize the release of medical information necessary to process this claim or treat this injury. This may include request of records from other sources. I permit a copy of this authorization to be used in the place of the original. I also authorize the physicians and medical personnel to render medical treatment to me as requested by myself and my employer listed above with regard to my injury or examination. I understand under the new HIPPA Regulations, my employer will have a right to any medical information about the care rendered to me for this incident.

**DATE:** _9/14/04_     **SIGNATURE:** _[signature]_

**ALL SECTIONS OF THIS FORM MUST BE COMPLETED !**

**THANK YOU FOR ALLOWING US TO CARE FOR YOUR NEEDS!**

PLAINTIFF'S
EXHIBIT

**Chief complaint**

The Chief Complaint is  New injury (L) knee pain

## Past medical/surgical history

### Reported History:

*Reported medications*  Taking medication Zoloft, Valium prn, seizure Rx prn  A recent immunization for tetanus Done in military, date unknown, pt feels within time frame

*Physical trauma*  Physical trauma 9/13/2004 Pt states he was getting in the car after getting food for the fireman and twisted his (L) knee  No previous injury to knee  Is still able to walk, stoop, etc but just feels pain in this knee  dc

## Personal history

*Work*  Work history Employed for COM Fire Dept as Fireman x 14 years

## Physical findings

### Vital signs:

· SBP 130/85 mmHg

No evidence of edema, negative Drawer, Lachman and McMurray  Mild tenderness over medial knee

## Assessment

Michael C Turner, Do made the following assessments

· Knee sprain

## Allergies

An allergy Cipro

## Plan

Patient may take OTC Advil, ice as directed. He may continue with regular duty and return as needed


PLAINTIFF'S
EXHIBIT
3

Eddie Haynes  Gender: M  DOB: 8/7/1950  Encounter Date and Time: 11/09/2004 11:10 AM  Examiner: Michael C Turner, DO

**Chief complaint**

The Chief Complaint is: L cap knee injury

## Past medical/surgical history
### Reported History:
*Reported medications:* Medication history Valium, Zoloft

*Physical trauma:* Physical trauma 9/14/2004 Pt here for reck of (L) knee injury. States his knee has never really stopped hurting. States his knee really begans hurting after he exercises and/or runs. Also states he is unable to do squats. Never had P T ... di

## Personal history
*Work:* Work history Employed by COMFD x 15 years

## Physical findings
### Vital signs:

| Vital Signs/Measurements | Value |
|---|---|
| PR | 84 bpm |
| Blood pressure | 132/84 mmHg |

Negative drawer, Lachman and McMurray by exam. Mild pain with valgus strain. No evidence of edema

## Assessment
Michael C Turner, Do made the following assessments

• Knee joint pain

## Allergies
An allergy Cipro

## Plan
Michael C Turner, Do ordered the following therapy

• Physical therapy evaluation

Motrin 800 mg tablet  SIG  1 TAB orally 3 times a day for 10 day(s) 3 times a day  Dispense  30 TAB  Refill  0
Skelaxin 800 mg tablet  SIG  1 TAB orally 2 times a day for 10 day(s) 1 after work and 1 at bedtime  Dispense  20 tab(s)  Refill  0
Patient is placed on medications and is schedukled for PT. He is placed on light duty and we will recheck in one week


PLAINTIFF'S EXHIBIT 4

**Chief complaint**
The Chief Complaint is Fit for duty

## Past medical/surgical history
### Reported History:

*Reported medications* Taking medication Ibuprofen, Gabitril, Valium, Lexapro, Demerol, Darvocet N 100, Benadry prn allergies; Skelaxin.

Pt states that these Rx's are prescribed by Drs. Wells, Palmer and Teresa Brown ...

## Subjective
Pt here for Fit for Duty exam. Pt states that his (L) knee bothers him off and on.

Pt presently on multiple medications. Does not want to reveal reasons at this time for all of his medications. States he wants this left confidential between he and his other doctors. ..dc.

## Physical findings
### Vital signs:

| Vital Signs/Measurements | Value |
| --- | --- |
| PR | 96 bpm |
| Blood pressure | 120/78 mmHg |
| Weight | 201 lbs |

## Plan
Patient was instructed to have medical records whith but he does not so we will reschedule him when we have received his release of records.


PLAINTIFF'S EXHIBIT
5

**Southeastern Industrial & Family Medicine Associates**

## AUTHORIZATION FOR USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

**Patient Identification:**
Printed Name: _Eddie Haynes_      Date of Birth: _8-17-70_

Address: _4501 Middle Fork Rd    Montgomery AL   36106_

Social Security#: _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_     Home Phone: _272-0317_     Cell: _____

**Information To Be Released – Covering the Periods of Health Care:**

From (date) _____ to (date) _____
From (date) _____ to (date) _____

**Please check type of information to be released:**

| | | | |
|---|---|---|---|
| [X] Entire Medical Record | { } Pathology Reports | { } Hospital Records | [X] X-Ray Reports |
| { } History & Physical Exams | [X] Consultation Reports | { } Progress Notes | { } X-Ray Films |
| [X] Lab Test Results/Reports | [X] Office Visit Notes | [X] Operative Reports | { } ER Records |
| [X] Medications | { } Other: *(specify)*_____ | | |

**Purpose of Request:**

| | | | |
|---|---|---|---|
| [X] Treatment | [X] Consultation | { } Patient Requested | { } Billing or Claims Payment |

**Person or Facility Authorized to Receive Information:**

**Southeastern Industrial & Family Medicine Associates, LLC**
**1600 Forest Avenue**
**Montgomery, Alabama 36106**
**Telephone: (334)261-4445 Fax: (334)261-4448**

**PLAINTIFF'S EXHIBIT**
**6**

**Drug and/or Alcohol Abuse, and/or Psychiatric, and/or HIV/AIDS Records Release:**
I understand that if my medical or billing record contains information in reference to drug and/or alcohol abuse, psychiatric care, sexually transmitted Disease, Hepatitis B or C testing, and/or other sensitive information, I AGREE to its release as part of the requested information.

Check One: [X] YES     { } NO   _____ Initials

I understand that if my medical or billing record contains information in reference to HIV/AIDS (Human Immunodeficiency Virus/Acquired Immuno-Deficiency Syndrome) testing and/or treatment, I AGREE to its release as part of the requested information:

Check One: { } YES     { } NO   _____ Initials

**Time Limit & Right to Revoke Authorization:**
Except to the extent that action has already been taken in reliance on this authorization, at any time I can revoke this authorization by submitting a notice in writing to the facility Privacy Officer. This authorization is effective for _____ months after date signed.

**Signature of Patient or Personal Representative Who May Request Disclosure:**

I understand that _____ may not condition my treatment on whether I sign this authorization form unless specified above under <u>Purpose of Request</u>. I can inspect or copy the protected health information (PHI) to be used or disclosed. I authorize Southeast Industrial & Family Medicine to use and disclose the PHI specified above.

Signature: _X_____     Date: _3-24-05_
Authority to sign if not patient: _____

Re-disclosure:
I understand the information disclosed by this authorization may be subject to re-disclosure by the recipient and will no longer by protected by HIPAA. The facility, its employees, officers and physicians are hereby released from any legal responsibility or liability for disclosure to the extent indicated and authorized



**Clemmie Palmer, III, M.D.**
3000 Woodley Road, Suite A
Montgomery, AL 36116
Phone: 334-288-3230
Fax: 334-288-3272

## CONFIDENTIAL FACSIMILE TRANSMITTAL

Date 3-28-05

To: Southeastern Industrial    Fax Number: 261- 4448

Re: Eddie Haynes

From: Mary Henry (?)

Number of Pages: 4 including cover

Comment:

_____
_____
_____
_____

The information in this facsimile transmission is confidential and privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of, or reliance on the contents of this facsimile transmission is prohibited. If you have received this facsimile in error, please notify us immediately by telephone to arrange for the return of the entire facsimile transmission, including any copies thereof to the above address.

*Thank you.*



PLAINTIFF'S
EXHIBIT
8

5440

**PALMER PSYCIATRIC SERVICES, PC**
Clenanie Palmer III, M.D.

3090 Woodley Road, Suite A
Montgomery, AL 36116

**Office Note**

Date: 3/28/05

Name: Eddie Hayne          DOB: 8/17/1070

**SUBJECTIVE:**
Patient was seen today. Chief complaint _____
Main Issue discussed today was;

1. _want - 4/4/2005 will be 15yar F.R. Dep._

2. _sleep — ok_

3. _appetite -_

**Medication**   a. compliance  1. compliant  2. Non compliant  3. Partially compliant
b. side effects  1. none ——— 2. _____

**OBJECTIVE:**
Appearance   _casm_

Interview Behavior- i.e. cooperative, hostile, superficial, eye contact hypervigilant, exaggerated startle response

Level of Consciousness- alert, oriented X __Y__. Lethargic, stuporous, comatose, fluctuating

Mood __o√__   Affect- wnl, mildly constricted, constricted, blunted, flat, congruent with mood

Speech - regular rate & rhythm, responsive to cues from the interviewer, spontaneous, latency, pressured, nonpressured, monotone, soft, whispered, dramatic, poverty of speech, poverty of content of speech, slurring, mumbling, receptive/expressive aphasia, stuttering, dysarthric

Thought Process - logical, coherent, FOI/LOA, blocking, confusion, muteness, perseveration, confabulation, tangentiality/circumstantiality could focus sustain & shift attention

Thought Content- no A/V halluc., no special powers, TB/TI/TC, No Suicidal/Homicidal ideation, delusions, IOR, obsessions, compulsions, preoccupation _____

Assessment/Plan:   1.) _GAD_

2.) _Valium 5mg #60- 1 bid - √_

3.) _Gabitril 4mg #60 - 2 qhs √_
_Lexapro 10mg #30 / 1qam - √_
_30 8mm 4 p_

_O Ru_

5435



**Palmer Psychiatric Services, PC**
**Clemmie Palmer III, M.D.**

3080 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:    (334) 280-3230
Fax:      (334) 280-3272
Email: CPalm94@aol.com

March 4, 2005

RE: Eddie Haynes
DOB 08/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work on the current medications Lexapro, Valium, and
Gabitril. He has not had any side effects on his current medications. Mr. Haynes is to
take his medication as prescribed. He was instructed to take Valium on an as needed
basis. Mr. Haynes has no work restrictions and should continue to perform his duties
at his current capacity. He has been stable on his current medication and working full
time without difficulty. If you have concerns do not hesitate to call or write.

Cordially,

CP/mb

## Chief complaint
The Chief Complaint is: Fit for duty

## History of present illness
Eddie Haynes is a 34 year old male.

Pt states he is here to have his medication checked for his job. He was here the other day and that we were to find out about some records concerning his medications.

## Past medical/surgical history
### Reported History:
*Reported medications:* Medication history: Lexapro, Gabitril, Ibuprofen, Skelaxin, Valium, DCN, Benedryl prn, Hydrocodone.
*Medical:* Reported medical history: L. knee injury/pain, R. foot injury, anxiety,.

## Personal history
*Work:* Work history Pt is employed by COMFD x 15 yrs.

## Physical findings
### Vital signs:

| Vital Signs/Measurements | Value |
| --- | --- |
| Blood pressure | 142/92 mmHg |
| Weight | 198 lbs |

### Lungs:
° Respiration rhythm and depth was normal. ° Clear to auscultation.

### Cardiovascular system:
*Heart Rate And Rhythm:* ° Normal.
*Murmurs:* ° No murmurs were heard.

### Abdomen:
*Auscultation:* ° Abdominal auscultation revealed no abnormalities.
Reviewed letters and medications from treating physicians. Patient has no physical limitations. He states he does not take his medications while on duty.

## Allergies
Cipro. Reaction(s): Itching, Rash. Identified: Unknown.

## Plan
Patient is physically fit to return to duty. The concerns come form the medications he is taking for his anxiety and joint pains. He is prescribed the Valium 5mg bid and Gabitril qd. The patient states he does not take any medications but the Lexapro while on duty. This logic made no sense to me that you would need to take the medicine on your days off while not under stress but not need it when in the most stressful situations. These medications effects could carry over to his on duty time. Any drug screen performed would most likely be positive even when on duty
There are safety issues for him driving a truck and working on the fire line while under the influence of these medications though he claims he does not take while on duty. The only way to prove it would see him taking the medication while on duty. Administrative decision is needed.


PLAINTIFF'S
EXHIBIT
9

**PSYCHEMEDICS**
C O R P O R A T I O N

HAIR ANALYSIS DRUG TEST RESULTS

Patented Technologies

| | MRO | Reference | CLIENT |
|---|---|---|---|
| Do Not Send By Mail | | | |

| | |
|---|---|
| Voice (334)261-4445 / Fax (334)261-4448 | Voice (334)241-2517 / Fax (334)241-4410 |
| DR MICHAEL TURNER<br>SOUTHEASTERN INDUSTRIAL AND FAMILY MEDICINE<br>ASSOCIATES L L<br>1600 FOREST AVE<br>MONTGOMERY AL 36106 | John Carnell<br>City Of Montgomery Alabama<br>103 N. Perry Street - City Hall<br>Montgomery AL 36104<br>Fire<br>Eddie Haynes |

| | | |
|---|---|---|
| Client Code CIT002<br>Entity ID 10024006<br>CCF ID F818760 | Date Collected 03/31/2005<br>Date Received 04/01/2005<br>Date Reported 04/03/2005<br>Test Use Other Return to duty | Lab ID 114162592<br>Subject ID 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<br>Sample Length 0 to 3 4cm |

| Drug: | Result. | RIA Cutoffs |
|---|---|---|
| COCAINE | Negative | 5 ng/10mg |
| OPIATES | Negative | 2 ng/10mg |
| PHENCYCLIDINE (PCP) | Negative | 3 ng/10mg |
| AMPHETAMINES | Negative | 5 ng/10mg |
| MARIJUANA | Negative | 2 ng/gm |

- Body hair sample submitted.

- Sample received with Chain of Custody Intact.

- A "Negative" result means that the drug was not detected in an amount that meets or exceeds the cutoff A "Positive" result means that the drug was detected in an amount that meets or exceeds the Mass Spec cutoff

- Please contact your Client Services Representative with questions regarding these test results

PLAINTIFF'S
EXHIBIT
_1D_

Southeastern Industrial & Famiy Medicine Associates, L.L.C.
Dr. Michael Turner
1600 Forest Avenue
Montgomery, AL 36106
(334) 261-4445  Fax (334) 261-4448

Date:              April 5, 2005

Employer:          City of Montgomery
                   P.O. Box 1111
                   Montgomery, Al 36104-1111
                   Attn: John Carnell

Donor Name:        Eddie Haynes

Social Security#:  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

Specimen #:        0630632903

Collection Date:   03/31/05

Reason for Test:   Return to Duty

COC Rev'd:         03/31/05

I have reviewed the laboratory results for the specimen identified above
in accordance with requirements equivalent to or meeting Federal regulations.

**My Final Determination: NEGATIVE DRUGSCREEN**

Medical Review Officer

Michael C. Turner. D O

PLAINTIFF'S
EXHIBIT
11

6,400

**Southeastern Industrial & Family Medicine Associates, L.L.C.**
**Dr. Michael Turner**
**1600 Forest Avenue**
**Montgomery, AL 36106**
**(334) 261-4445 Fax (334) 261-4448**

Date:                September 24, 2004

Employer:            COM Risk Management
                     Attn: John Carnell
                     PO Box 1111
                     Montgomery, AL  36101-1111

Donor Name:          Eddie Haynes

Social Security:     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

Specimen #:          0772382553

Collection Date:     09/14/04

Reason for Test:     Post Accident

Collector:           Esther Harrison

Collection Site:     Southeastern Industrial & Family Medicine

I have reviewed the laboratory results for the specimen identified above
in accordance with requirements equivalent to or meeting Federal regulations.

## My Final Determination: NEGATIVE Drug Screen

Signature of Medical Review Officer
Michael C. Turner, D.O.

PLAINTIFF'S
EXHIBIT
12

# PSYCHEMEDICS

C O R P O R A T I O N

of event #006785

## HAIR ANALYSIS DRUG TEST RESULTS

**Patented Technologies**
Scientific Director Werner A. Baumgartner, Ph.D.
Medical Director Harry M. Rauss, M.D.

**MRO**                                                    **CLIENT**

Voice: (334)832-4450 / Fax: (334)264-4742 /
(401)696-1155

DR MICHAEL TURNER
INDUSTRIAL MEDICINE SPECIALIST LLC
1501 FOREST AVE
MONTGOMERY AL 36106

Voice: (334)241-2517 / Fax: (334)241-4410
**Jeff Downes**
**City Of Montgomery Alabama**
103 N. Perry Street - City Hall
Montgomery AL 36101

*Eddie Haynes*

| | | |
|---|---|---|
| Client Code: CTT002 | Date Collected: 01/24/2002 | Lab ID: 112963039 |
| Entity ID: 10024006 | Date Received: 01/25/2002 | Subject ID: 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 |
| TRF ID: L310468 | Date Reported: 01/25/2002 | Sample Length: 0 to 4.5 cm |
| | Test Use: Unknown | |

| *Drug:* | *Result:* | *RIA Cutoffs:* |
|---|---|---|
| COCAINE | **Negative** | 5 ng/10 mg |
| OPIATES | **Negative** | 5 ng/10 mg |
| PHENCYCLIDINE (PCP) | **Negative** | 3 ng/10 mg |
| AMPHETAMINES | **Negative** | 5 ng/10 mg |
| MARIJUANA | **Negative** | 2 ng/gm |

- Extremely curly or very unaligned hair submitted.  This type of hair cannot be properly aligned and/or cut which may affect the time frame represented by the analysis.

- Sample received with Chain of Custody intact.

- A "Negative" result means that the drug was not detected in an amount that meets or exceeds the cutoff.  A "Positive" result means that the drug was detected in an amount that meets or exceeds the Mass Spectrometry cutoff.

- Please contact your Client Services Representative with questions regarding these test results.

PLAINTIFF'S
EXHIBIT
13

Ψ **Palmer Psychiatric Services, PC**
**Clemmie Palmer III, M.D.**

3090 Woodley Road, Suite A
Montgomery, Alabama 36116
doctor.medscape.com/CPalmerMD

Phone:    (334) 280-3230
Fax:      (334) 280-3272
Email:  CPalm94@aol.com

April 14, 2005

RE: Eddie Haynes
DOB 08/17/1970

To Whom It May Concern:

Mr. Eddie Haynes is able to work without taking Valium or Gabitril. Mr. Haynes can perform his duties in his current capacity with no restrictions. If you have concerns do not hesitate to call or write.

Cordially,

CP/nb

PLAINTIFF'S
EXHIBIT
14

Eddie Haynes 6340                                                           5/25/2006

## 1 Note 5/25/2006 9:05:00 AM

Eddie Haynes, Gender: M, DOB: 8/17/1970. Encounter Date and Time: 5/25/2006 09:05 AM, Examiner: Michael C. Turner, DO

**Chief complaint**
The Chief Complaint is: Fit for duty

**Allergies**
No allergies

**Past medical/surgical history**
**Reported History:**
    No past medical history reported
    *Reported medications:* No recent immunization for exams.
    *Physical exams:* Physical exams Pt states that he is here for a fit for duty to go back to the fire department. +b.
Shoulder surgery in 2006.

**Personal history**
Work: Work history Pt employed with COM.

**Physical findings**
Vital signs:
Vital Signs/Measurements                          Value
Blood pressure                                    148/96 mmHg
Weight                                            313 lbs

**Assessment**
Fit for Duty.

**Plan**
Nothing has changed since his last evaluation. He is still physically fit for duty. He is still taking Lexapro, Flexeril, Valium 5mg bid, and Celexa. He does not take them while at work. The medications could affect his performance while on duty which involves driving a fire truck and working on the fire line. Why he would not need or take these medications for anxiety while on duty I do not understand. There must be an administrative decision with this case.

RECEIVED MAY 2 6 2006

Page 1

PLAINTIFF'S
EXHIBIT
15



PLAINTIFF'S
EXHIBIT
16

## CERTIFICATE TO RETURN TO WORK OR SCHOOL

Mr
Mrs
Ms _Eddie Haynes_

was under my care from _5/25/06_ to _____

and will be able to return to work/school on _____

Remarks _TBD by employer_

Dr _____

SOUTHEASTERN INDUSTRIAL     Phone _861-4445_
& FAMILY MEDICINE ASSOCIATES, LLC   Date _5/25/06_
1600 FOREST AVENUE
MONTGOMERY, AL 36106

ATUSS DM     ATUSS MS     ATUSS HD     ATUSS EX     ATUSS G

## FIREFIGHTER

Duties are as follows:

Sec. 230, Shall enact life-saving skills on the fire scene and keep loss of property to a minimum in a fire situation by preventing the spreading of a fire, protecting adjacent structures and controlling and extinguishing the fire as directed by superior officers in command at the fire scene. The following are some other responsibilities:

a. Search and Rescue of any victims.

b. Catching hydrants, making up lines, ventilation.

c. Safely and aggressively fight fires.

d. Cause as little damage as possible.

e. Clean up after fire and help in the investiga-0ion.

f. Cleaning and checking equipment for any faults.

g. Aid driver with putting apparatus in full service.

Sec. 231, Be responsible for helping maintain function-ability of hand and power tools, apparatuses and appurtenances.

Sec. 232, Perform housekeeping chores around station, that includes sweeping, mopping, and waxing of floors, cleaning kitchen articles, cleaning rest rooms, cleaning windows and maintain up-keep of station grounds.

Sec. 233, Will be observant so he could, if needed, aid in the performance of duties for other members of his company. Will as needed in the absence of the driver perform duties of the driver when necessary, and called upon.

Sec. 234, Shall be courteous and helpful in their relations with the public and strictly observe the rules of cleanliness of their person and surroundings.

Sec. 235, Shall refer all reports and matters relating to the department, to or through their immediate superior officer.



PLAINTIFF'S EXHIBIT 17

Sec. 236, Shall not leave premises while on duty without special permission.

Sec. 237, Shall acquaint themselves with all matters contained in these rules.

Sec. 238, Will perform other miscellaneous duties as assigned by superior officers.

Sec. 239, Shall responsible for knowing all physical conditions, streets, hydrants, buildings, and fire protection systems - in first alarm territories and pre-planned assignments.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **EDDIE J. HAYNES,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. 2:06-CV-1093-WKW** |
| | ) |
| **CITY OF MONTGOMERY,** | ) |
| **Defendant.** | ) |

### DEFENDANT'S AMENDED RESPONSE TO PLAINTIFF'S
### PLAINTIFF'S FIRST INTERROGATORIES

COMES NOW Defendant City of Montgomery and answers Plaintiff Eddie J.
Haynes' First Interrogatories as follows:

1.    Prior to answering these interrogatories, have you made due and diligent
search of the books, records, and papers of the Defendant and due and diligent inquiry of
the agents and employees of the Defendant regarding the matters referred to in these
interrogatories?

**RESPONSE: Yes.**

2.    Please identify, by name, present employer and business address, job title,
and shift, each person employed by Defendant at Fire Station 14, District 111, during the
period from November 1, 2004 through March 15,2005.

**RESPONSE:  Defendant objects to this interrogatory as it is overbroad,
unduly burdensome and not reasonably calculated to produce admissible evidence.
Defendant also objects to the extent that this interrogatory seeks information
irrelevant to this case. Notwithstanding the foregoing objections, see attached.**

3.    Please identify, by name, job title, and present employer and business
address, each person who played any role in making the decision to place Plaintiff on sick



PLAINTIFF'S
EXHIBIT
4

leave or involuntary leave on March 15, 2005, and state in your answer the role played by each person.

**RESPONSE: Retired Fire Chief John McKee, Assistant Fire Chief C.E. Walker, and Fire Chief Miford Jordan (who was Deputy Fire Chief on March 15, 2005.)**

4.    Please identify, by name, job title, and present employer and business address, each person who played any role in making the decision to have Plaintiff see Dr. Michael Turner for a fitness for duty examination and state in your answer the role played by each person.

**RESPONSE: Retired Fire Chief John McKee and current Fire Chief Miford Jordan. City of Montgomery Risk Manager John Carnell was also involved. Also, the Montgomery Fire Department looks to the National Fire Protection Association Rules and Regulations as a guideline for best practices, but has not adopted them in their entirety so they are not binding on the Montgomery Fire Department.**

5.    Please identify, by date, substance, and participants, each written communication between any agent or employee of Defendant and Dr. Michael Turner regarding Plaintiffs fitness for duty or Plaintiffs medications.

**RESPONSE: Defendant objects to this interrogatory to the extent that it requests attorney work product and documents or information protected by attorney-client privilege. Defendant objects to this interrogatory as it is overbroad, unduly burdensome and not reasonably calculated to produce admissible evidence. Defendant also objects to the extent that this interrogatory seeks information irrelevant to this case. Notwithstanding the foregoing objections, see attached.**

6.      Please identify, by date, substance, and participants, each oral communication between any agent or employee of Defendant and Dr. Michael Turner regarding Plaintiffs fitness for duty or Plaintiffs medications.

**RESPONSE:  Defendant objects to this interrogatory to the extent that it requests attorney work product and documents or information protected by attorney-client privilege. Defendant objects to this interrogatory as it is overbroad, unduly burdensome, unlimited in scope or time, and not reasonably calculated to produce admissible evidence. Defendant also objects to the extent that this interrogatory seeks information irrelevant to this case. Notwithstanding the foregoing objections, see attached.**

7. Please identify, by name, job title, present employer and business address, the persons who played any role in making the decision to notify Plaintiff by letter dated June 20, 2006 that his employment status with the Montgomery Fire Department had been considered a voluntary resignation effective June 14, 2006, and state in your answer the role played by each person in making that decision.

**RESPONSE:  Retired Fire Chief John McKee and current Fire Chief Miford Jordan.**

8. Please describe in detail all actions taken by Kimberly O. Fehl and any other agent or employee of the Defendant with regard to the medical records release authorizations and general release forms requested to be completed by the Plaintiff in the letter dated August 1, 2005 from Kimberly O. Fehl to Gerald L. Miller, once those authorizations were returned to Ms. Fehl after having been executed by the Plaintiff.

**RESPONSE: Defendant objects to this interrogatory to the extent that it requests attorney work product and documents or information protected by attorney-client privilege. Defendant also objects to this interrogatory as it is overbroad, unduly burdensome and not reasonably calculated to produce admissible evidence. Defendant also objects to the extent that this interrogatory seeks information irrelevant to this case. Notwithstanding the foregoing objections, see attached.**

9. Please identify, by date, substance, and participants, all written and oral communications between, on the one hand, Kimberly O. Fehl and any other agent or employee of Defendant and, on the other hand, Dr. Clemmie Palmer, related to the Plaintiff.

**RESPONSE: Defendant objects to this interrogatory to the extent that it requests attorney work product and documents or information protected by attorney-client privilege. Defendant also objects to this interrogatory as it is overbroad, unduly burdensome and not reasonably calculated to produce admissible evidence. Notwithstanding the foregoing objections, see attached.**

10. Please state whether Kimberly O. Fehl or any agent or employee of Defendant ever forwarded any medical records of the Plaintiff to Dr. Clemmie Palmer and, if so, please state the date such records were forwarded and the date and substance of all resulting communications.

**RESPONSE: No.**

11. Please state whether Kimberly O. Fehl or any agent or employee of Defendant ever forwarded any medical records of the Plaintiff to Dr. Michael Turner and, if so,

please state the date such records were forwarded and the date and substance of all

resulting communications.

**RESPONSE: No.**

Submitted this 27th day of June, 2007.

_Miford Jordan_

Miford Jordan for
Montgomery Fire Department

**SWORN to and SUBSCRIBED before me this the 7th day of June, 2007.**

Notary Public
My commission expires 8-29-09

Allison H. Highley (HIG024)
Kimberly O. Fehl (FEH001)
Attorneys for Defendant

OF COUNSEL:
Legal Department
City of Montgomery
Post Office Box 1111
Montgomery, Alabama 36101-1111
(334) 241-2050
(334) 241-2310 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by first class

United States Mail on this 27th day of June, 2007:

        Gerald L. Miller
        REDDEN, MILLS & CLARK, LLP
        940 Financial Center
        505 North 20th Street
        Birmingham, Alabama 35203

Allison H. Highley (HIG024)
Of Counsel