**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | | |
|---|---|---|---|
| EDDIE J. HAYNES, | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| v. | ) | CASE NO. | **2:06cv1093-WKW** |
| | ) | | |
| | ) | | |
| CITY OF MONTGOMERY, | ) | | |
| ALABAMA | ) | | |
| | ) | | |
| **Defendant.** | ) | | |

**REPLY BRIEF OF DEFENDANT TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, City of Montgomery, submits this Reply Brief to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and states unto the Court the following:

**I.    NO VIOLATION OF AMERICANS WITH DISABILITIES ACT ("ADA").**

The City of Montgomery did not violate the ADA with respect to Plaintiff Eddie Haynes because it never perceived Haynes as substantially limited in any of his major life activities within the meaning of the ADA. 42 U.S.C. §12102(2)(C). Eddie Haynes was a fire fighter. Although NFPA standards subject firefighters to a higher fitness standard than other ADA plaintiffs due to potential dangers to themselves or the public at large, Haynes cannot show that he is limited in any major life activity.

As a threshold issue, Haynes has still not met his burden to make a prima facie showing of discrimination. Under the controlling law in this Circuit, "[t]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007), *citing Earl v. Mervyns, Inc.*, 207 F.3d at 1365. To

establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. *Id.* at 1255-1256. Haynes cannot show any of the three. Haynes cannot even decide what he thinks the basis for discrimination was – he lists all possibilities in his Complaint and argues various bases throughout his pleadings.

Although only persuasive authority, the analysis in *Diggs v. Town of Manchester*, 303 F. Supp.2d 163 (D. Conn. 2004), is instructive in the case at bar. In *Diggs*, the fact that a town required a firefighter to undergo a fitness for duty evaluation did not equate to regarding the firefighter as substantially impaired in the major life activity of working, and therefore firefighter was not "regarded as" disabled so as to fall within the protections of the Rehabilitation Act or Americans with Disabilities Act. Specifically, that court said:

> Plaintiff asserts that he was disabled because his employer perceived him as having a mental disability that prevented him from performing his job. An employer's request for a mental evaluation, however, does not equate to regarding the employee as substantially impaired in the major life activity of working.

*Diggs v. Town of Manchester*, 303 F.Supp.2d 163, 184-185 (D.Conn. 2004), *citing Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir.1998); *Giordano v. City of New York*, 274 F.3d at 749-50; *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646-47 (2d Cir.1998), cert. denied, 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). The *Diggs* Court went on to say:

> And, it certainly does not mean that the Town regarded him as unable to perform a broad range of jobs compared to the average person having comparable skills, training and abilities. *Giordano*, 274 F.3d at 749. At most, the evidence showed that the Town and some of Plaintiff's officers were concerned about his ability to perform as a firefighter given the stressful nature of the job. That concern does not equate to their regarding him as unable to perform a wide range of jobs. Therefore, Plaintiff has failed to establish that he was "regarded as" disabled so as to fall within the protections of the ADA and the

Rehabilitation Act.

*Diggs v. Town of Manchester*, 303 F.Supp.2d 163, 185 (D.Conn. 2004).

To prevail, Haynes must produce evidence that the City regarded him as having an impairment that substantially limited a major life activity. Haynes has failed to do this. The evidence clearly shows that the City merely relied on NFPA standards which consider safety issues presented by Haynes' ability to safely drive a fire truck to the scene of an emergency at extremely high rates of speed and/or react promptly and efficiently while performing duties on the fireline. Driving a fire truck and working on the fireline are not major life activities.

The evidence also clearly shows that at all times Haynes had the keys in his proverbial hand; he could have returned to work at any time, once the City's questions had been answered. Haynes' claims that he wanted to return to work are disingenuous. Haynes tries to put the burden on the City to prove he is fit for duty. If Eddie Haynes truly wanted to return to work, he would have resolved the multiple medication issue regarding those identified by his private doctor versus what Haynes provided the City's doctor. Haynes admits that he never complied with the City's requests to get his private doctor to contact the City's doctor.

A.    **HAYNES WAS NOT PERCEIVED AS DISABLED AS DEFINED UNDER ADA**

Haynes cannot demonstrate that the City knew of an alleged impairment or even that the City mistakenly believed that Haynes had an impairment that substantially limited a major life activity. Nowhere in his EEOC charges or complaint has Haynes identified himself as having Generalized Anxiety Disorder. But now, in his Opposition to Defendant's Motion for Summary Judgment (Doc. 32) Haynes claims that "the City violated the ADA by placing Mr. Haynes on involuntary leave and then terminating him because of a perceived disability – possible side effects of medications prescribed for Generalized Anxiety Disorder." (Doc. 32, p. 16 ¶ 1). Haynes submits no authority

3

for his claim that possible medication side effects are an adequate basis for perceived disability as defined by ADA. Haynes cites *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521-522 (1999), for the holding by the United States Supreme Court that " a person is regarded as disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, non-limiting impairment substantially limits one or more major life activities." However there is nothing to support that the City ever perceived Haynes to be disabled.

The Eleventh Circuit has held that, for a plaintiff to prevail under the theory that the employer regarded him as having an impairment, he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is "substantially limiting" and significant. *Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004), *citing Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir.1999).

Under ADA, "[W]hen the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires ... that plaintiffs allege that they are unable to work in a broad class of jobs." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002*), quoting Sutton v. United Air Lines, Inc*., 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Santiago Clemente v. Executive Airlines*, 213 F.3d 25, 32 (1st Cir. 2000) ("to be substantially limited in the major life activity of working, [the plaintiff] must be precluded from more than a particular job.")

When a plaintiff claims that the major life activity is working, the regulations are more specific about the meaning of "substantially." The plaintiff must be able to prove that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Case law has emphasized that the plaintiff must be precluded from more

than one particular task or type of job to rise to the level of "substantially" limited. See *Sutton v. United Air Lines*, 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000).

At best, Haynes' only evidence is that the City could have regarded him as substantially impaired in major life activity pertains to the life activity of working as a firefighter. The life activity of working as a firefighter is not a broad range of jobs. Therefore, even if the City perceived him to be substantially impaired from working as a firefighter, his claim would fail under ADA.

Haynes relies on the testimony of Mary House Kessler ("Kessler"), vocational expert for the Social Security Administration, to support that Dr. Turner perceived him as having a disability. Kessler cites data considered in forming her opinion *(Doc.33-3, p. 7, ¶ 19),* but does not list NFPA standards as data considered in her opinion. Therefore her opinion is inconclusive.

Haynes' psychiatrist, Dr. Palmer, provided a letter to the City stating that Haynes had no work restrictions or side effects and identified three medications that Haynes was prescribed. However, in his memo and during his fit for duty evaluation with Dr. Turner, Haynes identified additional medications that he was taking. Dr. Turner knew what medications are permitted under NFPA standards. (*DX 5, Jordan Affidavit*). Dr. Turner advised that Haynes was physically fit for duty, but that the combined effect of the medications he reported taking caused safety concerns and required an administrative decision.  (*DX 5, Jordan Affidavit*).

Haynes was put on leave in March 2005 and remained on leave until June 2006.  Haynes was never perceived or considered to be disabled.  (*DX 5, Jordan Affidavit*). The City wanted Haynes to be able to return to work as a firefighter but only if it was safe for the public and him to do so. (*DX 5, Jordan Affidavit*). Haynes was asked to have his personal physician contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking, versus the three Dr. Palmer

mentioned in his letters. (*DX 5, Jordan Affidavit*)  Haynes' attorney was also advised that Haynes' personal physician should contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking. (*DX 7 A-I, Correspondence Compilation*).

Any underlying condition that required Haynes to take medication was never at issue.  The sole issue was whether the multiple medications that Haynes volunteered he was taking were acceptable by NFPA standards for a firefighter.  To make that determination, Haynes was required to get a fit for duty evaluation, just as many other members of the fire department, to determine if they still meet fitness protocols under NFPA standards.  Haynes was not perceived as having a disability.  The potential side effect from taking medication is not a disability.  Haynes was not subjected to unlawful discrimination but subjected to the same rules as other members of the fire department.

For the foregoing reasons, Haynes' claims under the ADA fail.  Summary Judgment in favor of Defendant City of Montgomery is proper and all claims should be dismissed.

### B.    NFPA STANDARDS

Haynes, repeatedly throughout his brief, claims that the fit for duty evaluation performed by Dr. Turner was flawed because Dr. Turner only asked about his medications.  Haynes submits that Dr. Turner did not perform a physical evaluation; did not consult medical or scientific studies about the likelihood of particular side effects from his medications; and did not test or order testing for functional capacity evaluations. *(Doc. 32, p. 14, ¶¶ 3 & 4).*   Dr. Turner testified that he based his evaluation of Haynes solely on the guidelines identified in the NFPA standards. *(Doc. 31, pp. 30-31; PX 3 and DX 6, Turner Depo. p. 62, line 9 through p. 66, line 2).*  Dr. Turner reviewed the prescription medications and determined that Haynes did not meet the NFPA standards. *(PX 3 and DX 6, Turner Depo. p. 62, line 9 through p. 64, line 1).*

In *Carleton v. Commonwealth*, 858 N.E.2d 258 (Mass. 2006), a candidate for the position of

6

firefighter brought a state disability discrimination action against a city after he was denied employment based on his inability to pass standard hearing test without assistance of hearing aid. The standards for firefighter personnel in State of Massachusetts were synonymous with and identical to NFPA 1582. That court in referencing NFPA standards stated:

> The NFPA is the preeminent fire code and standards organization in the United States, and NFPA Document 1582 is "a standard that has been adopted by fire fighting organizations throughout the United States." *Sicard v. Sioux City*, 950 F.Supp. 1420, 1425 (N.D.Iowa 1996).

In the footnote to that section, the *Carleton* court explained further:

> The National Fire Protection Association [NFPA] is a non-profit organization comprised of fire fighting professionals, occupational specialists, engineers, physicians, and inspectors. The NFPA develops guidelines or standards on numerous topics ranging from building codes and boilers to hazardous materials and protective clothing. The NFPA has developed physical standards for the appointment of firefighters. These standards were the product of consultation between physicians and occupational specialists experienced with the demands and hazards of firefighting.... Many of the standards developed by the NFPA are adopted by [the Occupational Safety and Health Administration] and state agencies. It is estimated that several thousand fire departments use the NFPA's standards for hearing." *Nagel v. Boston Fire Dept*, 18 M.D.L.R. 221, 222 (Oct. 18, 1996). See *Miller v. Sioux Gateway Fire Dept.* 497 N.W. 2d 838, 842 (Iowa 1993).

Haynes, in his brief, submits an incomplete quote from Annex B of NFPA 1582, Section B.1.1, *Legal Protections for Individuals with Handicaps or Disabilities*. The section, in its entirety, states:

> **B.1.1 Legal Protections for Individuals with Handicaps or Disabilities.** The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq., and implementing regulations prohibit discrimination against those with handicaps or disabilities under any program receiving financial assistance from the federal government. The Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12101 et seq., also prohibits employment discrimination by certain private

employers against individuals with disabilities. In addition, many states have enacted legislation prohibiting discrimination against those with handicaps or disabilities. Generally speaking, these laws prevent the exclusion, denial of benefits, refusal to hire or promote, or other discriminatory conduct against an individual based on a handicap or disability, where the individual involved can, with or without reasonable accommodation, perform the essential functions of the job without creating undue hardship on the employer or program involved.

Beginning in 1999, the United States Supreme Court has issued a series of decisions limiting the scope of the ADA. As a result, persons with certain kinds of impairments that are mitigated by corrective measures such as medication for high blood pressure or eyeglasses for myopia are not "disabled" under the ADA. See *Sutton v. United Airlines, Inc*., 527 U.S. 471 (1999); *Murphy v. United Parcel Service, Inc*., 118 S. Ct. 2133 (1999); and *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555 (1999).

More recently the Supreme Court held that an impairment is not a disability covered by the ADA unless it severely restricts a person from doing activities that are of central importance to most people's daily lives. See *Toyota Motor Mfgr., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). These cases significantly limit the persons who can claim the protections of the federal ADA, but do not, by any means, eliminate the ADA as an important consideration in fire service-related employment decisions. Moreover, it should be borne in mind that separate disability protections exist under laws of many states, and some of these laws have been interpreted to afford greater protections than that afforded by the ADA. *See*, *for example*, *Dahill v. Boston Department of Police*, 434 Mass. 233 (2001), where the Supreme Judicial Court of Massachusetts ruled that a corrective device to alleviate a disability is not relevant in determining whether someone is disabled under the state's disability law.

**The disability discrimination laws, therefore, continue to be an important part of the legal framework that governs employment-related decisions. Although this standard has been developed with this in mind, these laws can, depending on the jurisdiction and the circumstances, affect the degree to which the authority having jurisdiction can implement the standard in an individual case. Users of this standard should be aware that, while courts, in assessing disability discrimination claims, are likely to give considerable weight to the provisions of a nationally recognized standard such as NFPA** 1582 [*see, for example, Miller v. Sioux*

> *Gateway Fire Department*, 497 N.W.2d 838 (1993)], **reliance on the standard alone may not be sufficient to withstand a challenge to an adverse employment decision.**  (Emphasis added.)

In citing this section, Haynes contends that the NFPA standards acknowledge that the requirements of ADA override the NFPA standards.  However, read in its entirety, it is clear that the standards are developed recognizing federal and state disability discrimination laws thereby resulting in challenges by an employee to an adverse employment decision.

### 1.    THE CITY OF MONTGOMERY USES NFPA STANDARDS SELECTIVELY

Haynes places importance on the fact the NFPA standards have not been adopted by the City in their entirety.  Haynes contends that Dr. Turner was not required to do the fitness for duty evaluation based on NFPA standards because the City had not adopted the standards in their entirety.  Haynes submits nothing more than conclusory allegations to support his argument that Dr. Turner did not have follow NFPA standards because the City had not adopted them all as mandatory.   In fact, the NFPA standards in their entirety may not be applicable to every municipality, instead providing guidelines where relevant.

Ordinances passed by the Montgomery City Council regarding fire protection and prevention are found in Chapter 13 of the Code of Ordinances for the City of Montgomery.  Chapter 13, Article I, Section 13-41 of the Code of Ordinances of the City of Montgomery gives the chief of the fire department the authority to promulgate the rules and regulations of the department subject to the approval of the Mayor.  Miford Jordan, presently Chief of the Fire Department, was Deputy Chief in March 2005 when Eddie Haynes submitted the memo to District Chief Smith.  (*DX 5, Jordan Affidavit*).  Chief Jordan testified that the Montgomery Fire Department follows the standards set out in Chapter 10, NFPA 1500 *Standard on Fire Department and Occupational Safety and Health*

*Program* and NFPA 1582 *Standard on Occupational Medical Program for Fire Departments*. (*DX 5, Jordan Affidavit*). Therefore the NFPA standards have been used by at least two administrations of the fire department.

Although the City is not required to adopt by ordinance standards on which individual departmental policies and procedures are founded, the Montgomery City Council has passed an ordinance adopting NFPA 1. Article III of Chapter 13 of the Code of Ordinances of the City of Montgomery is titled *Fire Prevention Standards*. Article III was passed, with exceptions, for the purpose of prescribing regulations governing the design, installation and maintenance of buildings for the public.

Haynes can cite no authority for his implied claim that the City of Montgomery may not employ standards and rules that have not been adopted by ordinance. The City may, and does, routinely utilize standards and rules that have not been made part of the City code.

## 2.    MONTGOMERY FIREFIGHTERS ARE SUBJECT TO NFPA FITNESS STANDARDS

"The NFPA has developed physical standards for the appointment of firefighters. These standards were the product of consultation between physicians and occupational specialists experienced with the demands and hazards of firefighting … Many of the standards developed by the NFPA are adopted by [the Occupational Safety and Health Administration] and state agencies." NFPA 1582.

Chapter 9 of NFPA 1582 gives the fire department physician detailed standards for determining fitness for duty. Dr. Turner, as the Montgomery Fire Department physician, is required under NFPA 1582, to carefully evaluate every firefighter's ability to safely perform his essential job tasks in light of any medications that firefighter is taking. Dr. Turner testified that he based his evaluation of Haynes solely on the guidelines identified in the NFPA standards. *(Doc. 31, pp. 30-*

10

*31; PX 3 and DX 6, Turner Depo. p. 62, line 9 through p. 66, line 2).*  Dr. Turner reviewed the prescription medications and determined that Haynes did not meet the NFPA standards.  (*PX 3 and DX 6, Turner Depo. p. 62, line 9 through p. 64, line 1).*

Dr. Turner was advised of the nine medications that Haynes stated he was taking and asked to conduct a medical examination pursuant to NFPA 1582.  Dr. Turner determined that Haynes was physically fit but found that the medications might affect his ability to safely perform his job duties.  Additionally, Dr. Palmer only listed three medications for Haynes and there were inconsistencies between how the medications were prescribed by Dr. Palmer, Dr. Palmer's letter stating Haynes was compliant, and how often Haynes reported he was taking them.

### 3.    FITNESS FOR DUTY IS JOB RELATED BUSINESS NECESSITY

Haynes contends that the City violated 42 U.S.C. § 12112 (d) (4) by exceeding the scope of a permissible medical examination or inquiry.  Haynes contends that the examinations are not job related because Dr. Turner would not clear Haynes for work even though he might have been physically able to perform the essential job functions.  If the Court determines that Haynes is an individual with a disability recognized under ADA, the Court must next consider whether the City's protocol regarding the fit for duty assessment is "job-related for the position in question and is consistent with business necessity."42 U.S.C.A. § 12112(b)(6).

As set out above, the NFPA standards are the product of consultation between physicians and occupational specialists experienced with the demands and hazards of firefighting and  have been prepared recognizing that state and federal disability discrimination laws exists.  It is clear from the evidence submitted that Dr. Turner based his evaluation on the fitness protocols and medical requirements on standards that address essential job tasks that are applicable to fire service only.  Haynes cites many cases to support his argument but none are analogous to the present case.

Under NFPA 1582, the standards employed by the department physician are objective and clear. The reasons for performing these medical evaluations are explicitly set out, further assisting the department physician in tailoring his assessment closely to the essential job duties of firefighters. Attention to fitness protocols set out by NFPA is not only important to a candidate for firefighter but to incumbent employees as well. Haynes was the driver for Engine 14 and worked on the fire line. The essential job duties of Haynes, as a firefighter, cannot be compared to those of others in the case law relied on by Haynes.

In *Spurlock v. United Air Lines, Inc.*, 475 F.2d 216, 219 (10th Cir. 1972), the Tenth Circuit considered risks to public health and safety when considering whether a particular standard is justified by business necessity and noted, "when ... the human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related…The public interest clearly lies in having the most highly qualified persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job." *Id*. at 219.

The NFPA sets forth criteria that are very important in protecting the firefighters themselves, as well as the public at large, from situations where a firefighter's medical condition could affect their ability to safely respond to emergency operations. (*DX 5, Jordan Affidavit*). In the line of duty, firefighters are subjected to very high physiological, psychological and environmental demands, and the City has an obligation to ensure that each firefighter is capable of withstanding those pressures unique to emergency response and firefighting. (*DX 5, Jordan Affidavit*).

Additionally, Haynes is not the only fire department employee that has been required to pass a fit for duty evaluation. On October 23, 2007, Haynes submitted a Second Request for Production to the City of Montgomery. (*DX 9, Plaintiff's Second Request of Production of Documents to*

*Defendant*).  Haynes requested copies of the reasons and results of fit for duty evaluations of other employees that were referenced in a letter dated November 10, 2005 to Sandra Figgers with the EEOC. (*DX 9,¶ 3, Plaintiff's Second Request of Production of Documents to Defendant*).  The City objected because the information sought by Haynes was confidential medical information of individuals that were not parties or involved in this lawsuit.  (*DX 10, ¶ 3, Defendant's Response to Plaintiff's Second Request of Production of Documents to Defendant*).  On December 11, 2007, the Court granted Plaintiff's Motion to Compel on and ordered the City to produce the records (with individual identifying information redacted) and put the records under protective order.  (*Doc. 30, Amended Order on Motion and Protective Order*).  The records of other employees from the fire department were produced for a period covering from November 2004 to approximately October 2007.  (*DX 11, Copy of Letters dated December 13, 2007 and December 19, 2007 to Gerald Miller regarding Produced Evaluations*).

Assuming *arguendo*, that Haynes has made a prima facie showing as an individual with a disability under ADA, the City has shown that the fit for duty examination challenged by Haynes was job-related for the position of firefighter and consistent with business necessity and that Haynes was in no way singled out for examination.

### 4.  FIREFIGHTERS CAN POSE UNIQUE RISK TO THE PUBLIC

The ADA permits employers to use qualification standards that include requirements not to pose direct threats to the health or safety of other individuals in the workplace. An EEOC regulation carries that a step further by allowing an employer to screen out a worker not only for the risks that he or she would pose to other employees, but also for risks to the employee's own health and safety in the workplace. 29 C.F.R. § 1630.15(b)(2). The Supreme Court has upheld a challenge to the EEOC's regulation. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 122 S.Ct. 2045, 153 L.Ed. 2d 82

(2002). It is part of the plaintiff's burden to show that he can perform the essential functions of the job. *Moses v. American Nonwovens, Inc.*, 97 F.3d 446 (11th Cir. 1996).

The EEOC publishes interpretive enforcement guidance to the ADA regulations which may be helpful to the courts. "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141-142, 97 S.Ct. 401, 411 (1976), *quoting Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

The EEOC interpretive guidance is instructive on the issue of periodic medical examination of public safety employees, providing:

> D. Periodic Testing and Monitoring
> In most instances, an employer's need to make disability-related inquiries or require medical examinations will be triggered by evidence of current performance problems or observable evidence suggesting that a particular employee will pose a direct threat. The following questions, however, address situations in which disability-related inquiries and medical examinations of employees may be permissible absent such evidence.
>
> 18. May employers require periodic medical examinations of employees in positions affecting public safety (e.g., police officers and firefighters)?
>
> Yes. In limited circumstances, periodic medical examinations of employees in positions affecting public safety that are narrowly tailored to address specific job-related concerns are permissible. (66)
>
> Example A: A fire department requires employees for whom firefighting is an essential job function to have a comprehensive visual examination every two years and to have an annual electrocardiogram because it is concerned that certain visual disorders and heart problems will affect their ability to do their job without posing a direct threat. These periodic medical examinations are permitted by the ADA.

14

Example B: A police department may not periodically test all of its officers to determine whether they are HIV-positive because a diagnosis of that condition alone is not likely to result in an inability or impaired ability to perform essential functions that would result in a direct threat.

Example C: A private security company may require its armed security officers who are expected to pursue and detain fleeing criminal suspects to have periodic blood pressure screenings and stress tests because it is concerned about the risk of harm to the public that could result if an officer has a sudden stroke.

If an employer decides to terminate or take other adverse action against an employee with a disability based on the results of a medical examination, it must demonstrate that the employee is unable to perform his/her essential job functions or, in fact, poses a direct threat that cannot be eliminated or reduced by reasonable accommodation. (67)[1] Therefore, when an employer discovers that an employee has a condition for which it lawfully may test as part of a periodic medical examination, it may make additional inquiries or require additional medical examinations that are necessary to determine whether the employee currently is unable to perform his/her essential job functions or poses a direct threat due to the condition.

*EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, July 27, 2000. The corresponding *Questions and Answers* provides EEOC investigators and attorneys in the field as well as employers and employees answers to frequently asked questions about how the law applies with respect to people who are current employees.

May an employer ask all employees what prescription medications they are taking? (Question 8)

---

[1] Note 39. "Direct threat" means a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodation. 29 C.F.R. §1630.2(r)(1998). Direct threat determinations must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job, considering a reasonable medical judgment relying on the most current medical knowledge and/or best available objective evidence. Id. To determine whether an employee poses a direct threat, the following factors should be considered: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and, (4) the imminence of the potential harm. Id.

Generally, no. In limited circumstances, however, employers may be able to ask employees in positions affecting public safety about their use of medications that may affect their ability to perform essential functions and thereby result in a direct threat.

For example, an airline could require pilots to report when they are taking medications that may affect their ability to fly. A fire department, however, could not require employees in administrative positions to report their use of medication because it is unlikely that these employees would pose a direct threat as a result of an inability, or impaired ability, to do their jobs.

*EEOC Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Acts (ADA)*, Question 8 (emphasis added). Perhaps more relevant, is Question 12, which says:

May an employer have an employee who it reasonably believes will pose a direct threat examined by its own health care provider? (Question 12)

Yes. This is because the employer is responsible for assessing whether an employee poses a direct threat based on a reasonable medical judgment that relies on the most current medical knowledge and/or best objective evidence.

The health care professional the employer chooses should have expertise in the employee's specific medical condition and be able to provide medical information that allows the employer to determine the effects of the condition on the employee's ability to perform his or her job.

**If the employer's health care professional believes that the employee poses a direct threat, but the employee's own doctor disagrees, the employer should evaluate the conflicting medical information by considering, for example, the area of expertise of each medical professional; the kind of information each provided; and, whether the information provided is consistent with the employer's own observations of or knowledge about the employee.**

*EEOC Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Acts (ADA)*, Question 12

16

(emphasis added). Haynes is not the only member of the fire department who has been required to take a fit for duty evaluation and did not meet NFPA standards. Haynes cannot impose his opinion, a vocational expert opinion, or the opinion of his private physician to refute Dr. Turner's knowledge of the medications that Haynes identified that he was taking and the fit for duty requirements as it relates to NFPA guidelines followed by the City of Montgomery Fire Department.

## II. FIRST ALLEGATION THAT ADMINISTRATION INSISTED ON MEDICATION LETTER FROM HAYNES

Although the City of Montgomery has consistently stated that Haynes' self initiated the proclamation regarding the nine medications he was taking in his March 4, 2005 memo to District Chief Stoudenmier started the inquiry into Haynes fit for duty status, Haynes for the first time since May 2005 now contends that "the administration downtown was insisting" that he write a letter identifying the medications that he was taking.

Specifically, paragraph 9 of Haynes' declaration states:

> On February 28, 2005 Cpt. Hackett again came to me and stated that the administration downtown was insisting that I write a letter listing the medications that I take. I asked him why they wanted such a letter and he stated he did not know. I told him I had no problem driving the fire truck and he stated he knew that. He said he had tried to explain all of this to the administration downtown, but they insisted that I write such a letter.

Paragraph 10 of Haynes declaration goes further to state:

> On March 4, 2005 I wrote a letter, as requested, to District Chief M.F. Smith. A true and correct copy of that letter is attached as Exhibit C. In that letter I did <u>not</u> request to be relieved of the duty of driving the fire truck. To the contrary, the letter begins, "It is a pleasure as well as an honor to be chosen Driver of Engine 14. And I am more than willing if the City of Montgomery needs me to do so." In the letter I went on to inform the City of my current medications and all the medications that I had taken in the last six months. I ended the letter as follows: "Again, thank you for your consideration for me being Engine 14 Driver. It is an honor to be a Montgomery Firefighter and take on the duties of a dedicated Fireman."

17

In paragraph 10 of the Declaration, Haynes submits to the Court that he did not request to be relieved of the duty of driving the fire truck. However, paragraph 10 also omits a material part of the actual content of the memo, which submitted in its entirety states the following:

> To:     M. F. Smith, District Chief
> From:  E.J. Haynes, Firefighter
> Date:   March 4, 2005
> RE:     Engine 14 Driver
>
> It is a pleasure as well as an honor to be chosen Driver of Engine 14. I am more than willing if the City of Montgomery needs me to do so. However, if there is someone else is more willing or highly qualified to drive Engine 14, I will assist them as needed to be ready to take any assignment. I have been driving the Fire Truck off and on for the last fourteen years and I am currently the driver.
>
> Being a Driver for Engine 14 I know I must inform you of my medications. The medications include Ibuprofen 600 mg. daily, Lexapro 10 mg. daily, and Gabitril 4 mg. PRN (two-three times a week.
>
> Medications that I take on my off days and on a as needed basis are Hydrocodoen 5/500, Duazepam 5 mg., Cyclobenzaprine 10., Skelaxin 800., Meperidine 50., and over the counter Benadryl for my sinus problem.
>
> Again, thank you for your consideration for me being Engine 14 Driver. It is an honor to be Montgomery Firefighter and take on the duties of a dedicated firemen.
>
> Respectfully,
> E. J. Haynes, F/F Station 14

(*PX 1C, Declaration of Eddie J. Haynes and DX 5B, Jordan Affidavit*) (Emphasis added).

Haynes now contends that the "administration downtown was insisting" that he write a letter listing his medications. However, there is nothing in Haynes' correspondence to the District Chief that his memo is in response to a request from the administration downtown. It is unclear why if, as Haynes contends, he was not requesting to be relieved from the driving the fire truck, that it was

18

necessary for him to clarify that the subject of his memo was "Engine 14 Driver" rather than something like "Response to Prescribed Medication Request". It is also unclear why Haynes would state, "However, if there is someone else is more willing or highly qualified to drive Engine 14, I will assist them as needed to be ready to take any assignment. I have been driving the Fire Truck off and on for the last fourteen years and I am currently the driver." (*PX 1C, Declaration of Eddie J. Haynes and DX 5B, Jordan Affidavit*).

Eddie Haynes filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first Charge of Discrimination was filed on May 9, 2005, two months after his March 4, 2005 memo to District Chief Smith and alleges discrimination based on race, disability and retaliation:

> I was hired by the above-named employer on April 4, 1990, as a fire fighter. Since January 29, 2003, and continuing I have been subjected to harassment and intimidation due to my being disabled. My employer has made an issue over the medication that I am required to take. I have further been subjected to adverse conditions of employment because I complained about the unfair treatment of black employees. On March 15, 2005, I was forced to take leave while an investigation is being conducted into my medication.
>
> I believe that I am being discriminated against because of my race, black, my disability and in retaliation for having opposed practices made unlawful under Title VII of the Civil Rights Act of 1964, as amended and the American with Disabilities Act of 1990. White employees on medication are treated more favorably.

(*DX 1, Charge of Discrimination No. 130 2005 04376*).

On August 8, 2006, Haynes filed an Amended Charge of Discrimination alleging discrimination based on race, disability and retaliation stating the following:

> On May 9, 2005 I filed a Charge of Discrimination, Charge number 130-2005-04376, against the above employer. This Charge is an amendment to, and supplements, that Charge. I expressly reallege all allegations made in my previous charge dated May 9, 2005.

> Since the filing of my original Charge on May 9, 2005 I continued to be on involuntary leave from my employment until June 14, 2006, when the employer terminated my employment.
>
> I believe that I was subjected to discrimination, harassment, adverse conditions of employment, involuntary leave and termination in violation of the Americans with Disabilities Act of 1990 because the employer perceived or regarded me as being disabled.

(*DX 2, Amended Charge of Discrimination No. 420 2006 04376*). Haynes does not allege in either charge of discrimination that the administration for the City of Montgomery Fire Department was insisting that he send a letter stating the medications that he took – a fact, if true, would have been important.

On December 8, 2006, Haynes filed a Complaint in the United States District Court alleging that the City of Montgomery had violated the Americans with Disabilities Act of 1990. *(Doc. 1)*. There is not one allegation in the Complaint that the administration for the City of Montgomery Fire Department insisted that Haynes send a letter or memo that identified his medications. *(Doc. 1)*.

Finally, Haynes was represented and the City advised Haynes' counsel that it was Haynes' March 4, 2005 memo that initiated the inquiry into Haynes' fitness. (*DX 7C, Correspondence Compilation*). However, there is nothing in the correspondence between attorneys on his work status that states or even suggests that the reason Haynes sent the March 4, 2005 memo was at the insistence of the City of Montgomery Fire Department administration. (*DX 7A-I, Correspondence Compilation*). Haynes' new claim that he was forced to write the March 4, 2005 memo appears to be a recent fabrication and as such should be disregarded by the Court.

## III. TESTIMONY OF MARY HOUSE KESSLER

As previously stated, Haynes also submits testimony of Mary House Kessler, vocational expert for the Social Security Administration, to support his claim that Dr. Turner perceived him as

20

having a disability.  However, Kessler's opinion is erroneous and flawed.  As shown above, Kessler does not list NFPA standards as something she considered, and does not appear to have taken into consideration the unique demands of firefighting in her records review and analysis.   Further, disability in terms of qualifying for Social Security is different than the legal construct that is disability as statutorily defined under the ADA, and Kessler gives no indication that she tailored her review to the circumstances in this case, or that she is even aware of certain public policy exceptions for emergency responders.

## IV.    HAYNES VOLUNTARILY RESIGNED OR ABANDONED HIS JOB

Haynes was put on leave in March 2005 and remained on leave until June 2006.  Haynes was never perceived or considered to be disabled.  (*DX 5, Jordan Affidavit*). The City wanted Haynes to be able to return to work as a firefighter but only if it was safe for him and the public to do so. (*DX 5, Jordan Affidavit*). Haynes was asked to have his personal physician contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking, versus the three Dr. Palmer mentioned in his letters.  (*DX 5, Jordan Affidavit*)  Haynes' attorney was also advised that Haynes' personal physician should contact Dr. Turner so the two doctors could discuss all nine of the medications Haynes reported taking.  (*DX 7 A-I, Correspondence Compilation*).

After approximately fourteen months on leave, Haynes was advised that if he failed to resolve Dr. Turner's concerns and return to work on May 22, 2006, that pursuant to Montgomery City-County Rules and Regulations, Rule IX, Section I, he would be considered to have resigned from his job as a firefighter. Haynes did not comply and was deemed to have resigned by job abandonment on June 14, 2006. (*DX 8, Montoya Affidavit*).

## CONCLUSION

Haynes does not have a physical or mental impairment that substantially limits or limited one

or more of his major life activities nor is there a record of Haynes having a physical or mental impairment that substantially limited one or more of his major life activities. Haynes was never perceived to be disabled. The underlying condition that required medication was never at issue. The only issue was whether the combination of medications Haynes was using were permissible by NFPA standards. Haynes has not identified any physical or mental impairment that would entitle him to protection by the ADA. Therefore, Haynes cannot demonstrate a prima facie case under the ADA showing that he is in the class of persons protected by the ADA.

Under NFPA 1582, the standards employed by the department physician are objective and clear. The reasons for performing these medical evaluations are explicitly set out, further assisting the department physician in tailoring his assessment closely to the essential job duties of firefighters. It is clear from the evidence that the fit for duty examination challenged by Haynes was job-related for the position of firefighter and consistent with business necessity.

The NFPA standards do not have to adopted by ordinance passed by the City Council to be valid guidelines in determining departmental rules and regulations for employees. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.Rule* 56(c).

Haynes cannot impose his opinion, a vocational expert opinion, or the opinion of his private physician to refute Dr. Turner's knowledge of the medications that Haynes identified that he was taking and the fit for duty requirements as it relates to NFPA guidelines followed by the City of Montgomery Fire Department.

Haynes was given many opportunities to resolve his fit for duty status. Haynes was advised that if he failed to return to work on May 22, 2006, he would be considered to have resigned from his job as a firefighter. Haynes did not and resigned by job abandonment on June 14, 2006.

Therefore, based on the foregoing, Defendant's Motion for Summary Judgment is due to granted.

Submitted this 28th day of January, 2008.

/s/Kimberly O. Fehl
Kimberly O. Fehl (FEH001)
Allison H. Highley (HIG024
Attorneys for City of Montgomery

OF COUNSEL:
City of Montgomery
Legal Division
Post Office Box 1111
Montgomery, AL  36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by electronic filing and

notification through CM/ECF with United States District Court Middle District of Alabama on this

28th day of January, 2008:

Gerald L. Miller, Esq.
REDDEN, MILLS, & CLARK
940 Financial Center
505 North 20th Street
Birmingham, AL  35203

/s/Kimberly O. Fehl
Of Counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **EDDIE J. HAYNES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.    2:06cv1093-WKW** |
| | ) | |
| | ) | |
| **CITY OF MONTGOMERY,** | ) | |
| **ALABAMA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EVIDENTIARY SUBMISSIONS IN SUPPORT OF DEFENDANTS'**
**REPLY TO PLAINTIFF'S OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In support of Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Defendant, City of Montgomery, adopts and incorporates the following evidentiary submissions previously submitted with Defendants' Motion for Summary Judgment:

*DX 1, Charge of Discrimination No. 130 2005 04376*

*DX 2, Charge of Discrimination No. 420 2006 04376*

*DX 3, Notice of Rights to Sue, Charge No. 130 2005 04376*

*DX 4, Notice of Rights to Sue, Charge No. 420 2006 04376*

*DX 5, Affidavit of M. Jordan*

*DX 6, Deposition of Dr. Michael Turner, pages* 47, 62, 63, 64, 65, 85, 86 & 87

*DX 7 A - I, Correspondence Compilation*

1

*A -  Gerald Miller letter dated May 12, 2005*
*B -  Gerald Miller letter dated July 27, 2005*
*C – Kimberly Fehl letter dated August 1, 2005*
*D – Gerald Miller letter dated August 9, 2005*
*E – Gerald Miller letter dated November 16, 2005*
*F – Gerald Miller letter dated May 12, 2006*
*G – Kimberly Fehl letter dated May 17, 2006*
*H – Gerald Miller dated May 22, 2006*
*I – Gerald Miller letter May 31, 2006*

*DX 8, Affidavit of Barbara M. Montoya*

Additionally, Defendants submit the following evidentiary submissions in support of Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment:

*DX 6, Deposition of Dr. Michael Turner,  page 66 is added to pages 47, 62, 63, 64, 65, 85, 86 & 87*

*DX 9, Plaintiff's Second Request of Production of Documents to Defendant*

*DX 10, ¶ 3, Defendant's Response to Plaintiff's Second Request of Production of Documents to Defendant*

*DX 11, Copy of Letters dated December 13, 2007 and December 19, 2007 to Gerald Miller regarding Produced Evaluations.*

Respectfully submitted this 28th  day of January, 2008.

/s/ Kimberly O. Fehl
Kimberly O. Fehl (FEH001)

OF COUNSEL:
City of Montgomery
City Attorney's Office
P. O. Box 1111
Montgomery, AL 36101-1111
Telephone: (334) 241-2050
Facsimile: (334) 241-2310

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2008, I electronically filed the foregoing with the Court of the Clerk using the CM/ECF system to be upon the following:

> Gerald L. Miller, Esq.
> *REDDEN, MILLS, & CLARK*
> 940 Financial Center
> 505 North 20th Street
> Birmingham, AL 35203

> /s/ Kimberly O. Fehl
> Of Counsel

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


EDDIE J. HAYNES,

   Plaintiff,


   vs. CIVIL ACTION NO: 2:06-CV-1093-WKW


CITY OF MONTGOMERY, ALABAMA,

   Defendant.



DEPOSITION OF MICHAEL C. TURNER


The deposition of MICHAEL C. TURNER was
taken before Krista Price, September 25,
2007, at 1600 Forest Avenue, Montgomery,
Alabama 36106, commencing at 1:46 p.m.
pursuant to the stipulations set forth
herein:



DEFENDANT'S
EXHIBIT
6

# BIRMINGHAM  REPORTING  SERVICE

Page 6

1          MICHAEL C. TURNER, DO,

2    having first been duly sworn, was examined

3    and testified as follows:

4

5       THE COURT REPORTER:   Usual

6    stipulations?

7       MR. MILLER:   That's fine.

8

9    EXAMINATION BY MR. MILLER:

10       Q   Would you state your name for the

11    record?

12       A   Michael Clark Turner.

13       Q   And are you a licensed physician in

14    the State of Alabama?

15       A   I am.

16       Q   Are you licensed to practice

17    osteopathy or medicine?

18       A   Osteopathy medicine, yes.

19       Q   All right.   Is your title Doctor of

20    Osteopathy?

21       A   Yes, it is.

22       Q   When were you licensed in the State

23    of Alabama?

# BIRMINGHAM REPORTING SERVICE

Page 47

1    Q   Going back to the visit on March

2    31st, 2005, did you do a physical exam on

3    that occasion?

4        A   Yes, sir.

5        Q   What did that reveal or let me

6    first ask if you would just describe what

7    you did as far as a physical exam is

8    concerned?

9        A   Basically vital signs were

10   obtained, basic lungs, cardiovascular,

11   abdomen.  And then he and I reviewed his

12   information from Dr. Palmer.

13       Q   As far as the physical exam itself,

14   was everything normal?

15       A   Within normal limits.

16       Q   Did you find any physical

17   limitations at that time?

18       A   No physical limitations as we would

19   describe it, no.

20       Q   And did you conclude that Mr.

21   Haynes was physically fit for duty as a

22   firefighter?

23       A   He was physically fit, yes.

# BIRMINGHAM REPORTING SERVICE

Page 62

1  sedative.

2      Q  Is it a narcotic drug?

3      A  It is not a narcotic.

4      Q  And when we say narcotic drug are

5  we -- are you using that in a sense it is

6  derived from an opium?

7      A  Opiate, yes.  Basically like a

8  Lortab, those type of things.

9      Q  Now I notice in your March 31st

10  office note you say these medication

11  effects could carry over to his duty time.

12  Do you see that?

13      A  Right.

14      Q  And you are indicating that there

15  is a possibility that they could, right?

16      A  Sure.

17      Q  And then later you say there are

18  safety issues for him driving a truck and

19  working on the fire line while under the

20  influence of these medications, though he

21  claims he does not take while on duty?

22      A  Right.

23      Q  You see that?  When you say safety

# BIRMINGHAM REPORTING SERVICE

Page 63

1  issues is that another way of saying that

2  you had a concern about that?

3      A   There is a concern, but there is

4  also a standard for that too.   The issue

5  is is he taking them or not.

6      Q   Okay.

7      A   I mean if he is taking them, then

8  he is not on the fire line.

9      Q   When you say he is not on the fire

10  line, you mean that you would not

11  recommend?

12      A   He did not meet standard for it.

13      Q   What standard are you referring to?

14      A   The National Fire Protection

15  Association.   And I think they have

16  probably been updated since his last one,

17  since this was done.

18      Q   But your testimony is that the

19  National Fire Protection Association

20  standard would not permit him to work on

21  the fire line while taking these

22  medications?

23      A   Yes.   I can explain in more detail

# BIRMINGHAM REPORTING SERVICE

Page 64

1    but, yes.

2        Q    And you are referring again to the

3    Valium, the Gabitril and Lexapro?

4        A    Yes.

5        Q    And did you tell Mr. Haynes about

6    the National Fire Protection Association

7    standards?

8        A    I am not sure if I specifically

9    mentioned those. I mean he was aware of

10   the issue of it being between him being on

11   them and not being on them, the

12   medications.

13       Q    And he told you that he had never

14   never taken Valium or Gabitril while he

15   was on duty, didn't he?

16       A    That is what he told me.

17       Q    Did you believe him?

18       A    You have to. You also have to look

19   at how the medicine is prescribed.  And if

20   a doctor is prescribing it that way, then

21   he should write it that way.  He shouldn't

22   write it for every day.  But it is

23   prescribed every day.

# BIRMINGHAM REPORTING SERVICE

Page 65

1    Q  Well, Dr. Palmer said the Valium

2    was as needed basis, did he not?

3    A  He did.  But in his note he has it

4    one twice a day, number sixty.  So that

5    means he wrote it to be taken twice a day

6    every day with four refills.

7    Q  And in his March 4th, 2000 letter

8    he said he was instructed to take Valium

9    on an as needed basis?

10   A  Right.  There is contradiction

11   between his letter and what he wrote on

12   his office note.

13   Q  When you talked Mr. Haynes he said

14   he took it on an as needed basis, didn't

15   he?

16   A  He said he did, yes.

17   Q  And did not ever take it on duty?

18   A  That is what he said.

19   Q  It's correct is it not that the

20   National Fire Protection Association

21   standards are not -- they are not a

22   statute are they?  They are not a law?

23   A  They are a standard that the

# BIRMINGHAM    REPORTING    SERVICE

Page 66

1    Montgomery Fire Department goes by in

2    their pre-employment and evaluations.

3        Q    My question was they are not a

4    governmental statute, are they?

5        A    I don't know that they are

6    governmental statute.    I know they are

7    the standards that the Montgomery Fire

8    Department goes by.

9        Q    They are not a governmental

10    regulation, are they?

11        MS. HIGHLEY:    Object to the form of

12    the question.

13        Q    Well, let me ask you this:

14        A    I don't know the best way to answer

15    that question.

16        Q    And we refer it to as NFPA, don't

17    we?

18        A    Uh-huh.

19        Q    You are familiar with that?

20        A    Yeah.

21        Q    The NFPA is not a governmental

22    body, is it?

23        A    No.

# BIRMINGHAM REPORTING SERVICE

Page 85

1        Q   Okay.  And after that point when

2    did you next see Mr.  Haynes?

3        A   5/25/06.

4        Q   So that would be a year later

5    approximately?

6        A   I assume that's -- yeah, I guess.

7    (Whereupon, Plaintiff's Exhibit No. 15,

8    was marked for identification and the same

9    is attached hereto.)

10       Q   And is Plaintiff's 15 a rather poor

11   copy of your office note from that date?

12       A   It is a small copy, yes.  Not

13   poor.

14       Q   And the -- what was the purpose of

15   that examination or visit?

16       A   Fit for duty again.

17       Q   Okay.  Do you know who made that

18   appointment or how that came about?

19       A   It would have been through the City

20   or the fire department.

21       Q   And at this time you had not seen

22   Mr. Haynes in about a year?

23       A   Right.

# BIRMINGHAM REPORTING SERVICE

Page 86

1    Q  Did you do a physical exam on that

2    occasion?

3    A  No.  Basically went back just

4    through his history.  I mean that is what

5    we are dealing with again.

6    Q  Did you do vital signs?

7    A  We did do vital signs, sure.

8    Q  And you didn't find anything

9    abnormal?

10   A  His blood pressure may be a little

11   elevated that day, but whose wouldn't be

12   when you come in for this.

13   Q  Not for anything that would

14   disqualify him from working?

15   A  If we were looking for that, then

16   we would recheck him after he sat for

17   twenty minutes and he would, you know --

18   that would not be his final pressure right

19   there if that is what we were looking at.

20   Q  And you noted on that occasion in

21   your notes that he was still physically

22   fit for duty?

23   A  Uh-huh.

# BIRMINGHAM REPORTING SERVICE

Page 87

1    Q   But nothing had changed?

2    A   Right.

3    Q   Correct?  Meaning that he was still

4    taking Lexapro, Valium and Gabitril?

5    A   Right.

6    Q   And also it says Flexeril?

7    A   Uh-huh.

8    Q   What is that?

9    A   That is a muscle relaxer.

10   Q   So that is a -- he was taking fewer

11   medications perhaps or basically the --

12   A   Basically the same.

13   Q   The same, but with a different

14   muscle relaxer?

15   A   Right.

16   Q   And your concerned centered on

17   Lexapro, Valium and Gabitril, didn't it?

18   A   Yes.  And of course the Flexeril is

19   more potent than Skelaxin in causing

20   sleepiness, drowsiness, reaction times,

21   all those things.

22   Q   And it is a muscle relaxant?

23   A   Yes.

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| EDDIE J. HAYNES, | ) |
| PLAINTIFF, | ) |
| | ) |
| | ) |
| vs. | )CASE NO. 2:06-cv-1093-WKW |
| | ) |
| CITY OF MONTGOMERY, ALABAMA, | ) |
| | ) |
| DEFENDANT. | ) |

## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

Comes now the Plaintiff, Eddie J. Haynes, and requests the Defendant, City of Montgomery, Alabama, to permit the Plaintiff to inspect and to copy the following documents in accordance with the Federal Rules of Civil Procedure:

1.      Any and all documents discussing or relating to the alleged practice of the Montgomery Fire Department of looking to the National Fire Protection Association Rules and Regulations as a guideline for best practices, as stated in Defendant's Amended Response to Plaintiff's First Interrogatories (Amended Response#4).

2.      All documents, including policies, memoranda, and correspondence, which discuss the National Fire Protection Association Rules and Regulations.

3.      All documents in your possession relating to the twelve fit for duty evaluations referred to in the attached November 10, 2005 letter from Kimberly O. Fehl to Sandra Figgers, including all documents reflecting the reasons for those fit for duty evaluations, and the results of those fitness for duty evaluations.

4.      The City of Montgomery Motor Vehicle Operation Policy and all amendments thereto

DEFENDANT'S
EXHIBIT

in effect from 2000 through 2006.

    5.    All documents reflecting procedures for certifying employees of the City of Montgomery to operate City vehicles and all amendments to such procedures for the period from 2000 through 2006.

    6.    The City of Montgomery Drug and Alcohol Abuse Policy and all amendments thereto in effect from 2000 through 2006.

_Gerald L. Miller_
Gerald L. Miller
Attorney for Plaintiff, Eddie J. Haynes

**OF COUNSEL:**
REDDEN, MILLS & CLARK, LLP
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 322-0457

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing by placing same in the United States Mail, postage prepaid and properly addressed, upon the following:

Allison H. Highley
Kimberly O. Fehl
Assistant City Attorney
City of Montgomery
P.O. Box 1111
Montgomery, Alabama 36101-1111

on this the 23rd day of October, 2007.

_Gerald L. Miller_
Of Counsel

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDDIE J. HAYNES,　　　　　　　　)
　　　PLAINTIFF,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　CASE NO. 2:06-CV-1093-WKW
　　　　　　　　　　　　　　　　)
CITY OF MONTGOMERY,　　　　　)
　　　DEFENDANT.　　　　　　　　)

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW Defendant City of Montgomery and in response to Plaintiff's Second Request for Production of Documents states the following:

1. Any and all documents discussing or relating to the alleged practice of the Montgomery Fire Department of looking to the National Fire Protection Association Rules and Regulations as a guideline for best practices, as stated in Defendant's Amended Response to Plaintiffs First Interrogatories (Amended Response #4).

**RESPONSE: Defendant objects to this interrogatory as it is overbroad, unduly burdensome and unlimited in scope or time. Notwithstanding the foregoing objections, NFPA codes and standards are generally accepted as a professional standard for fire service. Additionally, see attached.**

2. All documents, including policies, memoranda, and correspondence, which discuss the National Fire Protection Association Rules and Regulations.

**RESPONSE: See attached.**

3. All documents in your possession relating to the twelve fit for duty evaluations referred to in the attached November 10, 2005 letter from Kimberly O. Fehl to Sandra



Figgers, including all documents reflecting the reasons for those fit for duty evaluations, and the results of those fitness for duty evaluations.

**RESPONSE: Defendant objects to this interrogatory as seeks confidential information of individuals that are not parties or are otherwise involved in this lawsuit. Notwithstanding the foregoing objections, the Risk Manager is advised by a department director when they would like an employee to receive a fitness for duty assessment. However there are no documents reflecting why the request is being made kept in the Risk Management office. The Risk Manager, however, does receive a copy of the fitness for duty evaluation from the physician after it is completed.**

4. The City of Montgomery Motor Vehicle Operation Policy and all amendments thereto in effect from 2000 through 2006.

**RESPONSE: See attached.**

5. All documents reflecting procedures for certifying employees of the City of Montgomery to operate City vehicles and all amendments to such procedures for the period from 2000 through 2006.

**RESPONSE: See attached.**

6. The City of Montgomery Drug and Alcohol Abuse Policy and all amendments thereto in effect from 2000 through 2006.

**RESPONSE: See attached.**

**Submitted this _7th_ day of December, 2007.**

Allison H. Highley (HIG024)
Kimberly O. Fehl (FEH001)
Attorneys for Defendant

OF COUNSEL:
Legal Department
City of Montgomery
Post Office Box 1111
Montgomery, Alabama  36101-1111
(334) 241-2050
(334) 241-2310 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by first class

United States Mail on this 7th day of December, 2007:

Gerald L. Miller
REDDEN, MILLS & CLARK, LLP
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

Kimberly O. Fehl (FEH001)
Of Counsel

#1 AND #2

## ARTICLE I. IN GENERAL

### Sec. 13-1. When persons prohibited from approaching apparatus.

Whenever any fire engine or other apparatus is brought out on duty, the officer in charge may direct all persons, except officers of the city and members of the fire department, not to approach within 30 yards of such equipment, and it shall be unlawful for any person to remain or come within such distance after due notification of such order, without lawful excuse.

(Code 1980, § 13-6)

**State law references:** Refusing to assist in fire control, Code of Ala. 1975, § 13A-10-6.

### Sec. 13-2. Interference with apparatus unlawful.

It shall be unlawful for any person wilfully to interfere with any fire engine or other apparatus of the department, while on its way to or from fires or alarms of fire, or to tamper with such equipment at any time.

(Code 1980, § 13-7)

**State law references:** Obstructing governmental operations, Code of Ala. 1975, § 13A-10-2; criminal damage to property, Code of Ala. 1975, § 13A-7-20 et seq.

### Sec. 13-3. Following or parking near apparatus.

It shall be unlawful for the driver of any vehicle other than persons duly authorized or on official business to follow any fire apparatus traveling in response to a fire alarm closer than 500 feet, or to drive into or park such vehicle within the block where fire apparatus has stopped in answer to a fire alarm.

(Code 1980, § 13-8)

**State law references:** Similar provisions, Code of Ala. 1975, §§ 13A-10-6, 32-5-113, 32-5A-58.

### Sec. 13-4. Crossing fire hose.

It shall be unlawful for any person to drive over any unprotected hose of the fire department when such hose is laid down on any street, thoroughfare or driveway for use at a fire or alarm of fire, without the consent of the member of such department in command.

(Code 1980, § 13-9)

**State law references:** Similar provisions, Code of Ala. 1975, § 32-5A-59.

### Sec. 13-5. Interfering or tampering with fire alarm systems.

It shall be unlawful for any person intentionally and unlawfully, to injure, disturb, or interfere with any portion of a fire alarm system or other equipment connected to or associated with the fire alarm system.

(Code 1980, § 13-10; Ord. No. 42-94, § I, 10-31-1994)

**State law references:** Obstructing governmental operations, Code of Ala. 1975, § 13A-10-2; criminal damage to property, Code of Ala. 1975, § 13A-7-20 et seq.

## Sec. 13-6. False alarms.

It shall be unlawful for any person wilfully or maliciously to create or give a false alarm of fire.

(Code 1980, § 13-11)

**State law references:** Similar provisions, Code of Ala. 1975, § 13A-10-8.

## Sec. 13-7. Use of fire hydrants.

The city's fire hydrants are for the use of the fire department and shall be used only by members thereof and only for such purpose, except upon written permission of the superintendent of waterworks.

(Code 1980, § 13-12)

## Sec. 13-8. Fireworks.

(a)  It shall be unlawful for any person to possess, store, offer for sale, sell at retail, or use or explode any fireworks.

(b)  Notwithstanding the provisions of subsection (a) of this section, any public or private fireworks display shall be by permit only. No permit shall be issued until:

(1)  All provisions of NFPA 1123 (1997) and chapter 20 of the Standard Fire Prevention Code are met; and

(2)  Proof is shown to the fire official that the display being conducted is done by a competent operator who has been approved by the fire official and that the display is of such character and so located, discharged or fired so as not to be hazardous to property or endanger any person.

(Ord. No. 10-98, 4-21-1998)

**State law references:** Fireworks, Code of Ala. 1975, § 8-17-210 et seq.

Secs. 13-9--13-40. Reserved.

## ARTICLE III. FIRE PREVENTION STANDARDS

### Sec. 13-111. NFPA No. 1, Fire Prevention Code.

Pursuant to the authority granted to the cities and towns of the state by Code of Ala. 1975, § 11-45-8, there is hereby adopted by the city council, for the purpose of prescribing regulations governing the design, installation, and maintenance of buildings, all of that certain code printed in booklet form known as NFPA 1, The Fire Prevention Code, 2003 edition, except such portions as are deleted, modified, amended, or supplemented in section 13-112, of which code not less than three copies have been and are now filed in the office of the city clerk, and the same are hereby adopted and incorporated as fully as if set out at length in this section.

(Ord. No. 54-2004, § I, 7-20-2004)

### Sec. 13-112. Exceptions and amendments.

The exceptions and amendments to the code referred to in section 13-111 are as follows:

Annexes D, G, H, I, J, K of NFPA 1, 2003 edition are adopted and amended to read 2003 editions (or latest edition).

Section 13-2.1 of NFPA 1, 2003 edition, shall have the following added:

A certified sprinkler contractor recognized by the state fire marshal's office shall perform new installations, modifications, repairs, inspections, maintenance, and testing of standpipes.

Section 13.3.1.2 of NFPA 1, 2003 edition shall have the following added:

A certified sprinkler contractor recognized by the state fire marshal's office shall perform new installations, modifications, repairs, inspections, maintenance, and testing of fire sprinkler systems.

Section 7-3.2.1 of NFPA 1, 2003 edition, shall have the following added: A certified sprinkler contractor recognized by the state fire marshal's office shall perform new installations, modifications, repairs, inspections, maintenance, and testing of standpipes.

NFPA 101, The Life Safety Code, 2003 edition, is adopted.

(Ord. No. 54-2004, § II, 7-20-2004)

### Sec. 13-113. Duties of officials named in code.

When references are made in the code adopted in this article to the duties of certain officials named therein that designated official of the city who has duties corresponding to those of the named official in such code shall be deemed to be the responsible official insofar as enforcing the provisions of such code is concerned.

(Ord. No. 54-2004, § IV, 7-20-2004)

#4 AND #5

City of Montgomery Motor Vehicle Operations Policy

1.01    Purpose: To establish a City of Montgomery Policy pertaining to the requirements and responsibilities for operating a City vehicle.

1.02    Definition of a City Vehicle: Any vehicle that is owned, leased, rented, or loaned to the City of Montgomery. This includes equipment that does not require a driver's license but will be operated on a public street.

1.03    Drivers License Requirements:

A.    Prospective and current employees, whose job duties include the operation of a City vehicle, must be in possession of a valid and current Alabama driver's license to include the appropriate class of commercial license for the vehicle being operated. Under no circumstances shall a City employee, whose license has been cancelled, revoked, suspended, or expired, operate a vehicle around or about a roadway.

B.    During the hiring, promotion, or transfer of a current or prospective City employee, whose duties include the operation of a City vehicle, said employee shall produce a valid and current Alabama driver's license.

C.    An employee, whose job duties include the operation of a City vehicle, shall immediately, within 24 hours, notify his/her department head (or delegated official) of any change in the status of his/her driver's license or the receipt of any citation for a moving violation in the operation of a motor vehicle whether the citation is on or off the job. Failure to immediately report a driver's license revocation, suspension, cancellation, or citation, as required by this paragraph, shall result in disciplinary action in adherence with Rule IX, City of Montgomery Personnel Rules and Regulations and paragraph D of this section.

D.    An employee who fails to report a change in the status of his/her driver's license or the receipt of any citation for a moving violation shall be subject to one or more of the following:

-    letter of reprimand, or
-    suspension without pay, or
-    revocation of driving privileges and transfer/demotion to a job not requiring the ability to drive, or
-    termination of employment

*REVISED SEPTEMBER 28, 2000*

1.04    Motor Vehicle Record (MVR) Requirements:

A.    An applicant for a position with the City of Montgomery, whose job duties include driving a City vehicle, will have his/her current MVR reviewed, prior to being employed, by the hiring authority or so delegated official. If the MVR has greater than eight points in a 24 month period listed for traffic violations or a conviction or pending charge for driving under the influence during that period, that applicant will be disqualified from consideration for the position in question.

B.    If a current employee whose job description includes the duty to operate a City vehicle, has, at any time, an MVR that is found to be greater than eight (8) points according to the points scale for the State of Alabama UTC offense codes, that employee shall be required to attend a defensive driving course at his/her own expense. The accumulation of points is for a 24- month period. The date of reference for points accumulation shall be the date of the conviction. The Risk Management Division shall be responsible for reviewing, around the anniversary date of the employee's initial hiring or promotion to a position necessitating the driving of a vehicle, the employee's MVR.

C.    The employee who is identified as having an MVR greater than eight (8) points will be given two weeks from the date of notification to present a certificate from a school of defensive driving to the appropriate department head, or the employee's driving privileges will be suspended until such certification is presented.

D.    Any current employee arrested for driving under the influence of alcohol or drugs will be immediately prohibited from operating City vehicles. If the person is ultimately found not guilty of driving under the influence of alcohol or drugs, driving privileges will be returned immediately. If the person is found guilty, driving privileges will be taken away for an additional period not to exceed one (1) year starting with the initial date driving privileges were revoked. If greater than one year has elapsed between the date of arrest and conviction for DUI, the employee's driving privileges will be revoked for, at least, an additional 90 days from the date of conviction.  It is the responsibility of the employee to report such an arrest or conviction to his/her supervisor.

1.05    Seat Belt Use

A.    Seat belt use is mandatory in all City vehicles. This applies to both the driver and all passengers in seating locations equipped with seat belts.

1.06    Procedures for Obtaining Certification to Operate City Vehicles

*REVISED SEPTEMBER 28, 2000*

A.    Police and Fire Departments: The Police and Fire Department shall develop their own procedures for certifying employees and applicants to operate City vehicles. These procedures must comply with the driver's license and MVR requirements outlined in this policy. The Police and Fire Department shall provide the Safety and Training Supervisor with a roster of each graduating academy class. This roster should list new officers and firefighters by name and driver's license number. Annually, the Police and Fire Department shall provide the Safety and Training Supervisor with a list of authorized drivers.

B.    All Other Departments: All new employees who may, as a part of his/her job duties, operate City vehicles or current employees being promoted or transferred into positions that may require operating City vehicles will have their driver's license and current MVR reviewed by the appropriate department head or designee. The purpose of this review is to ensure compliance with sections 1.03 and 1.04 of this policy. The MVR and the employee will be brought to the Safety and Training Supervisor who will certify the employee to operate City vehicles and brief the employee on the City of Montgomery Motor Vehicle Operations Policy.

1.07    Involvement of the City Attorney's Office

A.    The City Attorney's office will be notified of any accident that involves personal or bodily injury to a City employee or another party. This notification should be made in writing by the employee's department head. Further personnel action as to the employee involved in the accident shall be suspended until the City Attorney gives directions with regard to the disposition of the employee and/or accident review/investigation.

B.    A representative of the City Attorney's Office should be present at ALL hearings of the accident review board.

1.08    Central Accident Review Board

A.    Effective with implementation date of this policy, there shall be created a Central Accident Review Board. The purpose of this board will be to review all motor vehicle accidents that involve City of Montgomery employees.

B.    The Risk Manager will serve as the administrator of the Accident Review Board. As administrator, the Risk Manager will be responsible for setting the agenda for the Board, determining the meeting dates and times, and keeping minutes from the Board. All decisions of the Board will be forwarded by the Risk Manager to the affected department head for

*REVISED SEPTEMBER 28, 2000*

implementation. *The decision is to be implemented by the department unless the employee requests an appeal before the Mayor.*

C.   The Central Accident Review Board will consist of five (5) voting members, who shall serve for a term of one year. All five members must be present to effect a recommendation for any discipline of an employee. In the event a Board member is unable to attend, the appointing authority shall be empowered to select an alternate, who shall serve as alternate for a term of one year. The members will be appointed as follows:

Representative of the Police Department (appointed by the Chief of Police)

Representative of the Fire Department (appointed by the Fire Chief)

Representative of the Sanitation Department (appointed by the Sanitation Director)

Representative of the Maintenance Department (appointed by the Maintenance Director)

Representative of the Police Department who has experience, of a supervisory level, in the investigation of accidents. (appointed by the Chief of Police)

D.   The members of the Accident Review Board will elect a chairperson. That chairperson will conduct the meetings and serve as parliamentarian. All Board meetings will be operated according to an accepted rule of order as determined by the Board.

E.   All departments will submit accident reports/incident reports involving their employees to Risk Management for review . Risk Management shall conduct a initial investigation to determine whether the accident was CLEARLY NON-PREVENTABLE. Those accidents that are deemed CLEARLY NON-PREVENTABLE, after investigation by Risk Management, will not need to be reviewed by the Accident Review Board. Risk Management will notify the effected department head of whether the accident is clearly non-preventable or whether the accident is being referred to the Accident Review Board.

F.   The employee/driver involved in an accident which is to be reviewed shall be given *at least* two weeks written notice by the Board of the date when he/she is to appear before the Board. The written notice shall be given by the Risk Management Division. A Risk Management Division representative shall be responsible for serving as the prosecutor. The prosecutorial responsibilities will include calling witnesses and presenting

*REVISED SEPTEMBER 28, 2000*

evidence to the Board. The employee/driver shall also have the right to bring witnesses and submit evidence to the board. *Employees are not entitled to be represented by an attorney at the Board meeting.*

G.   The Board review will determine whether an accident was preventable or non-preventable and recommend disciplinary action for implementation by the employee's department head. The Board will use the following criteria to make these decisions.

- Number of previous preventable accidents while operating a City vehicle.
- Severity of the loss
- Contributing/mitigating circumstances to the accident
- The egregious/wanton nature of the accident
- Consideration of the preventability of the driver's actions
- *The employee's previous work record*

H.   Any *appeal of the board's decision will be made directly to the Mayor's Office within five (5) working days.*

I.   The appeals process will follow the same as all disciplinary actions to include appeal to the Mayor's Office and the Personnel Board for suspensions of 6 days or more.

1.09   Responsibilities

A.   Department heads shall be responsible for:

- Ensuring that employees are aware of the driver's license requirement and Motor Vehicle Record (MVR) requirement of this policy.
- Ensuring that the proper procedures are followed for certifying employees to operate City vehicles.
- Ensuring employees are aware of and comply with the seat belt usage requirement.

*REVISED SEPTEMBER 28, 2000*

To:    All Department Heads

From:  Jeff Downes
       Risk Manager

Date:  July 27, 2001

Re:    Motor Vehicle Operations Policy

Mayor Bright has approved the following amendment to the City Motor Vehicle Operations Policy. Please include this with your department's policy and procedures manuals as it affects your employees who operate City vehicles. Additionally, please post this amendment conspicuously so as to inform your employees of the change in policy.

**City of Montgomery Motor Vehicle Operations Policy**
**Section 1.04 D.**

Any current employee arrested for driving under the influence of alcohol or drugs will be immediately prohibited from operating City vehicles. If the person is ultimately found not guilty of driving under the influence of alcohol or drugs, driving privileges will be returned immediately. If the person is found guilty *and/or acknowledges guilt, the employee will continue to lose his/her driving privileges for an additional period of time that equates to one (1) year from the initial date driving privileges were revoked.* ~~driving privileges will be taken away for an additional period not to exceed one (1) year starting with the initial date driving privileges were revoked.~~ If greater than one year has elapsed between the date of arrest and conviction / acknowledgement of guilt for DUI, the employee's driving privileges will be revoked for, at least, an additional 90 days from the date of conviction.  It is the responsibility of the employee to report such an arrest, conviction, *and/or acknowledgement of guilt* to his/her supervisor.


THE ALABAMA DRIVER IMPROVEMENT POINT SYSTEM

DISCRETIONARY OFFENSES                                                                          POINTS

1.  Any conviction which resulted from a charge that involved the drinking of alcoholic beverages and
    The driving of a motor vehicle but did not require mandatory revocation of the driver license ............. 6
2.  Reckless Driving  or Reckless Endangerment involving operating a motor vehicle ............................. 6
3.  Speeding in Excess of 85 MPH (86 or above)..................................................................... 5
4.  Failure to Yield Right of Way ...................................................................................... 5
5.  Passing Stopped School Bus .......................................................................................... 5
6.  Wrong Side of Road ................................................................................................... 4
7.  Illegal Passing ....................................................................................................... 4
8.  Following Too Closely .............................................................................................. 3
9.  Disregarding Traffic Control Device ............................................................................... 3
10. Speeding  in Excess of Posted Limits ............................................................................. 2
11. All Other Moving Violations ........................................................................................ 2

ACTION

12 - 14 Points in a 2-year period .............................................................................. 60 Days
15 - 17 Points in a 2-year period .............................................................................. 90 Days
18 - 20 Points in a 2-year period ............................................................................. 120 Days
21 - 23 Points in a 2-year period ............................................................................. 180 Days
24 and above Points in a 2-year period ....................................................................... 365 Days
POINTS ARE ASSIGNED AND WILL RETAIN THEIR POINT COUNT FOR A PERIOD OF TWO YEARS FROM DATES
OF CONVICTION.

6467 (4/97)

*NOTE:

A motor vehicle
accident not
coded as a UIC
offense which
is accompanied
by another ac-
cident w/in a 12
month period
shall be weight-
ed as 3 points
as will subse-
quent accidents
w/in a 24 month
period

## APPLICATION FOR CITY DRIVER PERMIT

**OPERATOR'S FULL NAME:**

**DEPT:**

**DATE OF APPLICATION:**

**WORK TELEPHONE NUMBER:**

**LICENSE NUMBER:**

**CLASS OF LICENSE:**

**RESTRICTIONS:**

**SOCIAL SECURITY NUMBER:**

**EXPIRES:**

**NO ARRESTS OR CONVICTIONS FOR DRIVING UNDER THE INFLUENCE IN THE PAST 12 MONTHS_____**

# MEDICAL HISTORY QUESTIONAIRE

| YES | NO | |
|-----|-----|---|
| | | 1.   ANY DISEASE OR INJURY IN PAST 5 YEARS? |
| | | 2.   HEAD/BRAIN INJURIES, DISORDERS, OR ILLNESSES. |
| | | 3.   SEIZURES, EPILEPSY |
| | | 4.   EYE DISORDERS OR IMPAIRED VISION (EXCEPT CORRECTIVE LENSES) |
| | | 5.   EAR DISORDERS, LOSS OF HEARING OR BALANCE |
| | | 6.   HEART DISEASE OR HEART ATTACK OR OTHER CARDIAC CONDITION. |
| | | 7.   HEART SURGERY (VALVE REPALCEMENT, BYPASS, ANGIOPLASTY, PACEMAKER. |
| | | 8.   HIGH BLOOD PRESSURE |
| | | 9.   MUSCULAR DISEASE |
| | | 10.  SHORTNESS OF BREATH |
| | | 11.  LUNG DISEASE, EMPHYSEMA,ASTHMA, CHRONIC BRONCHITIS |
| | | 12.  KIDNEY DISEASE, DIALYSIS |

| | | |
|---|---|---|
| | | 13.   LIVER DISEASE |
| | | 14.   DIGESTIVE PROBLEMS |
| | | 15.   DIABETES OR ELEVATED BLOOD SUGAR CONTROLLED BY<br><br>-   DIET _____<br><br>-   PILLS _____<br><br>-   INSULIN |
| | | 16.   NERVOUS OR PSYCHIATRIC DISORDERS. E.G. SEVERE DEPRESSION |
| | | 17.  LOSS OF, OR ALTERED CONSCIOUSNESS |
| | | 18. FAINTING, DIZZINESS |
| | | 19. SLEEP DISORDERS, PAUSE IN BREATHING WHILE ASLEEP, DAYTIME SLEEPINESS, LOUD SNORING. |
| | | 20. STOKE OPR PARALYSIS |
| | | 21. MISSING OR IMPAIRED HAND, ARM, FOOT LEG, FINGER, TOE. |
| | | 22. SPINAL INJURY OR DISEASE |
| | | 23. CHRONIC LOW BACK PAIN. |
| | | 24. REGULAR, FREQUENT ALCOHOL USE |
| | | 25. NARCOTIC OR HABIT FORMING DRUG USE |

FOR ANY YES ANSWERS, GIVE A FULL EXPLAINATION ALONG WITH NAME AND ADDRESS OF TREATING PHYSICIAN, MEDICATION TAKEN - BOTH PERSCRIPTION AND OVER THE COUNTER.

*I certify that my answers above are full and true, to the best of my knowledge, and I understand that a false statement concerning my driving record or fitness for driving may be grounds for cancellation of city permit and/or dismissal from city employment. I understand that the City of Montgomery will review my Motor Vehicle Record initially to determine if I meet the qualifications for operating vehicles outlined in the City of Montgomery Motor Vehicle Operation policy and annually thereafter to ensure continued compliance with these same qualifications. I give my consent for the City of Montgomery to review my Motor Vehicle Records. I have been briefed by the City Safety & Training Supervisor on my responsibilities concerning the City of Montgomery Motor Vehicle Operation policy and have received a copy of this policy.*

**Employee Signature:**_____ **Date:**_____

**Safety & Training Supervisor's Signature:**_____ **Date:**_____

#6

## DRUG AND ALCOHOL ABUSE POLICY
## CITY OF MONTGOMERY

The City of Montgomery *must insist upon* an alcohol and drug-free workplace. The manufacture, distribution, dispensation, possession or use of illegal drugs and of alcohol in the workplace *is, therefore, prohibited*. The City *also recognizes that* use and abuse of illegal drugs and alcohol outside the workplace *may also cause* problems in the workplace.

The implementation of a drug and alcohol abuse policy by the City of Montgomery will further the overall interests of the City by (1) ensuring public safety; (2) developing public trust and integrity; (3) discouraging corruption; (4) developing high morale and safety in the workplace; (5) preventing a loss of productivity; and (6) minimizing or eliminating liability.

The City is concerned for the well being of its employees. The City believes it has a responsibility to provide a safe, healthy, and productive working environment for all of its employees.

The City of Montgomery adopts the following policy *in furtherance of its goal to establish* a drug-free workplace.

# I. RESPONSIBILITY

The implementation *of, and compliance with,* the City of Montgomery Drug and Alcohol Abuse Policy *is primarily* the responsibility of *the* department heads. Each department head *is responsible for ensuring* that all aspects of this policy are followed. In addition, the department head should assign a contact person in each department who will receive confidential drug testing information. The City of Montgomery Risk Manager will be *available to assist* each department head in the implementation of *this* policy.

# II. ILLEGAL DRUG OR ALCOHOL USE IN THE WORKPLACE

If *it is determined that an employee used, consumed, possessed or manufactured: (a) illegal drugs either during work hours or while on duty, or (b) alcohol, during work hours or while on duty if such use or consumption in any way impairs his/her ability to perform his/her job duties*, that employee will be terminated. A drug screen *or breath alcohol test* will be *performed, if possible, to confirm the* consumption *or use by the employee. An "illegal drug", for purposes of this policy, shall include cocaine, marijuana, PCP, opiates, amphetamines, ecstasy as well as any prescription narcotic, opiate, and/or amphetamine based drug for which the employee does not have a current, valid prescription in his/her name. Furthermore, in adherence with Title 49 Code of Federal Regulations Part 40, a breath alcohol concentration of .04 or greater shall constitute a positive finding for purposes of this policy.*

# III.  DRUG AND ALCOHOL SCREENING AND TESTING

(A)    FOR ALL CITY OF MONTGOMERY EMPLOYEES

### 1. PRE-EMPLOYMENT, TESTING:

All potential *merit system* employees, both temporary and permanent, shall be given an initial drug screen test after receiving a conditional offer of employment.  The conditional employee must pass the test before receiving final appointment to the position.  If the test result is positive for illegal drugs, the applicant will be refused employment for the position he/she was applying and will, additionally, be refused employment for ANY City of Montgomery position for a period of five (5) years thereafter. The test administered will ascertain whether the conditional employee has traces of any illegal drug in his/her system.

### 2. TESTING BASED ON REASONABLE SUSPICION DURING EMPLOYMENT:

If *there is reasonable suspicion to believe that an employee is* using *or possessing* illegal drugs or *is* under the influence of alcohol while working for the City, this employee may be *administered a drug screen and/or breath alcohol test*.  These tests must be in accordance with the City drug and alcohol testing procedure *to include verification of the test results by a qualified Medical Review Officer (MRO) as defined in 49 CFR Part 40.*

Supervisors are required to specify in writing the exact facts, symptoms, and/or observations of drug or alcohol use.  Any corroboration by other sources, which formed the basis for a reasonable suspicion, must also be documented.  The documentation is to be immediately forwarded to the supervisor's department head or his designee.

Circumstances which provide a basis for determining reasonable suspicion may include, but are not limited to:

a)  Direct observation of drug or alcohol use

b)  Presence of physical symptoms consistent with drug or alcohol use,i.e., alcohol odor, slurred speech, poor coordination and/or reflexes

c)  Abnormal or erratic behavior by the employee

d)  Information concerning recent drug or alcohol use by the employee, from a reliable and credible source

### 3. ON-THE-JOB INJURY TESTING:

Any employee who suffers an on-the-job injury may be subject to a drug screen and/or *breath* alcohol test pursuant to the City drug and alcohol testing procedure. The

PYR/rw03252004

test result must be verified by a qualified medical review officer (MRO). If the test results are positive for drug or alcohol use, workers compensation benefits *may not be paid to the employee.* Furthermore, the employee will be subject to paragraph "G" of the drug and alcohol testing procedure. A drug screen will be performed after *each and every* on-the-job injury that is treated by a physician; furthermore, if the physician or supervisor has reasonable suspicion to believe that the injured employee is under the influence of alcohol, a breath alcohol test will be administered as well. The injured employee has twelve (12) hours, *from the time of the injury,* to submit to the drug screen. The injured employee must submit to the breath alcohol test immediately upon request absent an overriding cause for delay. Failure to adhere to these time restraints may subject the employee to termination of employment and/or denial of workers compensation benefits.

(B)   FOR ALL CITY OF MONTGOMERY COMMERCIAL DRIVERS AND OTHER AUTHORIZED OPERATORS OF CITY OWNED
      In addition to the above stated policy, the following testing must be implemented *for commercial drivers* pursuant to the Omnibus Transportation Employee Testing Act, Public Law 102-143, which amends the Commercial Motor Vehicle Safety Act of 1986. All non-commercial drivers are dictated to follow this provision due to their authorized operation of City owned vehicles and not resulting from Federal Law.

   1. RANDOM TESTING:
   All authorized drivers of City owned vehicles, commercial or otherwise, shall be subject to at random drug and alcohol testing *during work hours.* The City of Montgomery Risk Manager shall submit at random a list of commercial *and other authorized* drivers from each applicable department for testing following the City Drug and Alcohol Testing Procedure to include verification of results by the MRO. The Risk Manager will be responsible for ensuring that all technical aspects of this at random testing follow U.S. Department of Transportation rules and regulations. The random testing will be conducted in phases and will ensure that the federally mandated percentage of commercial drivers is tested annually.

   2. POST VEHICULAR ACCIDENT:
   An authorized driver with the City of Montgomery may be given a drug screen *and breath alcohol test* following any vehicular accident involving a commercial or other vehicle owned by the City of Montgomery where there is loss of life, bodily injury, or significant property damage (in excess of $100.00). The testing will follow the Drug and Alcohol Testing Procedure to include verification by an MRO. The drug screen should be performed as soon as possible but no later than twelve (12) hours after the accident. *The employee shall submit to the breath alcohol test immediately absent an overriding cause for delay.* If the driver is seriously injured and cannot *therefore,* provide a specimen for the screen, the driver must authorize the release of any hospital reports that would indicate the presence of controlled substances in his/her system. Failure to adhere to the time constraints of the testing procedure *and to the release of records,* could subject the employee to termination of employment.

(C) FOR PUBLIC SAFETY *AND OTHER SAFETY SENSITIVE* EMPLOYEES:

1. This policy does not supersede any drug or alcohol testing policies already in place in the public safety area. It is *merely designed to supplement and in no way intended to repeal any policies utilized by the Montgomery Police or Fire Departments with the exception of Section IV Drug and Alcohol Testing Procedure.*

2. All public safety *and safety sensitive* employees are subject to at random testing. *Public Safety employees include sworn Police and Fire Department employees. Employees who are considered to hold safety sensitive positions will be identified as such by their respective department heads and notified of this status. These positions will include, but not be limited to, positions requiring or having direct access to a controlled substance, having access to NCIC information, a position where the employee's action or inaction directly affects public safety, and/or supervisors of those safety sensitive functions. Random testing shall be ensured through a computer-generated list or other non-discriminatory method* using random names from the employment population of each public safety *and/or safety sensitive* employee sector.

3. Annually, the total number of random tests should be *at least* twenty five per cent (25%) of the number of the public safety *and/or safety sensitive* employees in each department.

# IV. DRUG AND ALCOHOL TESTING PROCEDURE

A. *New employees will be informed of this policy through receipt of an employee handbook, that will include a copy of this policy, and will sign a form as soon as possible, following their hire date, acknowledging receipt thereof.*

B. An employee who is requested to submit to a drug or alcohol screen pursuant to this policy must *submit to such testing and be tested* or be subject to termination. *The testing may include, but is not limited to, the collection of urine, hair, breath, and/or fingernails. If the testing involves the collection of hair and/or finger nails and the employee intentionally cuts or removes hair and/or finger nails thus making the testing reasonably impossible, without a valid medical or other excuse, the employee will be given a maximum of thirty (30) days from the date of notification to provide the required hair or finger nail sample. Failure to provide such a sample will be deemed a refusal to submit to testing and could subject the employee to punishment, up to and including, termination.*

C. An employee who is requested to submit to a drug or alcohol screen will report immediately to the City designated testing *or collection* facility.

D. All drug and alcohol testing procedures shall be in accord with rules and regulations of the testing *or collection* facility.

E. The drug or alcohol test results will be forwarded to the City Risk Manager by the testing facility. The reports will be sent to the employee's department head or his designee and are to be kept secure and confidential, in a separate file, for at least three years. Each department head will assign only *one other employee* access to these files. Also, these designated employees will sign a statement *acknowledging the need to maintain* the confidentiality and privacy of these files. No other employee shall have access to these files without the express authorization of the Mayor.

F. All positive urine, *hair, and/or finger nail* specimens of drug tests will, *to the maximum degree possible*, be retained at the testing facility for *at least* thirty (30) days following the written report to the City. Any employee whose test results are positive may secure the *split urine* specimen sample and have an independent test performed, *or in the case of hair or fingernail collections, may request a "safety net" comparison retest*. The employee should notify the Risk Manager *of such a request*. The second test will be performed at the expense of the employee and will conform to commercially acceptable practices.

G. If an employee tests positive for the use of illegal drugs *that were used, consumed or ingested outside of work hours,* or is under the influence of alcohol *consumed outside of work hours but impairing behavior* during work hours, that employee will be disciplined as follows:

1. The first violation shall result in, *at a minimum, a* suspension of forty five (45) calendar days. *The Mayor shall have the discretion, based upon the nature of the employee's work responsibilities, prior work history, circumstance of the positive finding, and/or other information to discipline the employee in any other manner deemed appropriate to include, but not be limited to immediate termination of employment. Prior to an employee's returning to work after a positive drug or alcohol screen, he must first take and pass a subsequent drug or alcohol test. Any number of follow-up tests can be administered* to the employee without notification during the twelve (12) month period following the return to work.
2. The second violation shall *automatically* result in termination.
3. A VIOLATION by a commercial driver may also result in suspension of the driver's Commercial License based upon U.S. Department of Transportation rules and regulations.
4. An active employee who has his/her employment terminated due to a positive drug or alcohol test will be FOREVER barred from future re-employment with the City of Montgomery.
5. If an employee is suspended under Section IV Paragraph G(1) of this policy, the employee shall, within the first five (5) days of the suspension, agree to and undergo an assessment by a medical professional, selected by the City of Montgomery, to determine whether the employee will benefit from substance abuse treatment. If such professional recommends treatment, the employee shall be given prompt written notice of such recommendation and shall be given up to 72 hours from receipt of notification to comply with such

recommendation. A failure on the part of said employee to comply with such recommendation, in a timely fashion, as provided for in this subparagraph, may result in a forfeiture of rehabilitation benefits.

# V. DRUG AND ALCOHOL ABUSE TREATMENT

A. If an employee voluntarily admits to *abusing* alcohol, or *the use of* illegal drugs, or other mood or mind altering substances and desires treatment, that employee may request treatment from any supervisory personnel of his/her department or request help from *a medical provider* outside the department. This request shall be *kept* confidential. The City of Montgomery supports such requests for help and will accommodate the needs of such employees. There will be no *disciplinary* action taken against an employee *for requesting such* treatment; *so long as* such request is made prior to any of the following having occurred: an alleged violation of this policy, any City mandated drug screen or breath alcohol test request, and/or the arrest of such employee for a drug or alcohol related offense or crime. *An employee shall be permitted to take advantage of the provisions of this subparagraph on no more than two (2) occasions during employment with the City.* (Treatment is defined as the admission to a recognized inpatient or outpatient rehabilitation program and the subsequent follow-up care.)

B. Upon completion of treatment, the employee must adhere to all aftercare contracts and agreements *imposed by the healthcare provider and the City* and may be subject to a random drug screening. If the employee does not adhere to *the terms and conditions of these agreements,* disciplinary action, up to and including termination, may be brought against the employee. Each employee *utilizing the provisions of this subparagraph shall be required to sign a form agreeing to be bound by* this requirement.

# VI. MISCELLANEOUS

The City of Montgomery's *testing guidelines and procedures have been adopted primarily* for administrative purposes. The testing is not designed to enforce the criminal laws of the State of Alabama or to bring criminal charges against an employee suspected of using drugs. The program *seeks* to provide the employee with a regimen of testing that is *minimally* intrusive *while still providing* accurate results. *The goal is to* balance the integrity and benefits of testing procedures with the employee's right to privacy.

An individual's test results will not be released publicly *unless agreed to by the employee or ordered by a court or administrative body.* Information may be used for *internal* administrative purposes; however, the City will *strive* not to breach the employee's expectation of privacy.

PYR/rw03252004

# WALTER R. BYARS

CITY ATTORNEY
wbyars@montgomeryal.gov
tdavis@montgomeryal.gov

**KIMBERLY O. FEHL**
SENIOR STAFF ATTORNEY
kfehl@montgomeryal.gov

**C. MICHAEL McINNISH**
SENIOR STAFF ATTORNEY
mmcinnish@montgomeryal.gov

**WALLACE D. MILLS**
STAFF ATTORNEY
wmills@montgomeryal.gov

**ALLISON H. HIGHLEY**
ASSOCIATE ATTORNEY
ahighley@montgomeryal.gov

**MICHAEL D. BOYLE**
STAFF ATTORNEY
mboyle@montgomeryal.gov

December 13, 2007

Gerald A. Miller, Esq.
*REDDEN, MILLS & CLARK*
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

      Re:    *Haynes v. City of Montgomery*, In the United States District Court for the Middle District of Alabama, Northern Division, Case No. 2:06cv1093-WKW

Dear Mr. Miller:

    I have enclosed five fit for duty evaluations however they are not the ones referred to in the letter to Sandra Figgers. Our Risk Manager is still trying to locate copies of those referenced in the letter for the period November 2004 until November 2005. If you have any questions, you may call me at 241-2050, or email me at kfehl@montgomeryal.gov.

                    Sincerely,

                    Kimberly O. Fehl

KOF/ms
Enclosure



# WALTER R. BYARS

C I T Y   A T T O R N E Y
wbyars@montgomeryal.gov
tdavis@montgomeryal.gov

**KIMBERLY O. FEHL**
SENIOR STAFF ATTORNEY
kfehl@montgomeryal.gov

**C. MICHAEL McINNISH**
SENIOR STAFF ATTORNEY
mmcinnish@montgomeryal.gov

**WALLACE D. MILLS**
STAFF ATTORNEY
wmills@montgomeryal.gov

**ALLISON H. HIGHLEY**
ASSOCIATE ATTORNEY
ahighley@montgomeryal.gov

**MICHAEL D. BOYLE**
STAFF ATTORNEY
mboyle@montgomeryal.gov

December 19, 2007

Gerald A. Miller, Esq.
*REDDEN, MILLS & CLARK*
940 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

   Re: *Haynes v. City of Montgomery*, In the United States District Court for the Middle District of Alabama, Northern Division, Case No. 2:06cv1093-WKW

Dear Mr. Miller:

  I have enclosed the remaining fit for duty evaluations. Eddie Haynes' evaluation has already bee produced. If you have any questions, you may call me at 241-2050, or email me at kfehl@montgomeryal.gov.

     Sincerely,

     Kimberly O. Fehl

KOF/ms
Enclosures