IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| EDDIE J. HAYNES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:06-CV-1093-WKW |
| | ) |
| CITY OF MONTGOMERY, ALABAMA, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This case involves alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). By Order (Doc. # 39) dated February 21, 2008, the court denied the Motion for Summary Judgment (Doc. # 15) filed by the defendant. The motion was denied for the reasons set forth below.

**I. FACTS AND PROCEDURAL HISTORY**

Viewing the submitted evidence in the light most favorable to the plaintiff, the court finds the following facts.

Plaintiff Eddie J. Haynes ("Haynes") worked as a firefighter for the defendant, the City of Montgomery ("City"), from April 4, 1990, to June 14, 2006, in the City's Fire Department. (Haynes Decl. ¶ 2.) In November 2002, Haynes began seeing a psychiatrist, Dr. Palmer, for symptoms of anxiety. (*Id.* ¶ 3.) Dr. Palmer diagnosed Haynes with General Anxiety Disorder and prescribed Valium, Gabitril, and Zoloft. (*Id.*) In January 2003, Lt. R. L. Johnson sent Haynes home from work until he could present verification from

Dr. Palmer regarding his medications and their side effects.[1] (*Id.* ¶ 5.) Dr. Palmer faxed a letter to Chief Walker that explained that Haynes had no side effects from his medications, had no work restrictions, and should continue to perform his current workload. The Fire Department allowed Haynes to report back to duty on the same day. (*Id.* ¶ 6.)

On February 24, 2005, Captain B. S. Hackett ("Hackett") wrote a memo to the District Chief requesting that Haynes be transferred to another shift because Haynes "is overly cautious while he is driving." (Jordan Aff., Ex. A.) Hackett told Haynes about the transfer request the next day. (Haynes Decl. ¶ 8.) Haynes told Hackett that he had no problem driving the fire truck. (*Id.*) On February 28, 2005, Hackett told Haynes that the City insisted that Haynes write a letter listing the medications that he was taking. (*Id.* ¶ 9.) Haynes complied with the City's request by writing a letter listing the medications he had taken in previous six month period: Ibuprofen, Lexapro, Gabitril, Hydrocodone, Diazepam, Cyclobenzaprine, Skelaxin, Meperidine, and Benadryl. (*Id.* ¶ 10, Ex. C.) Haynes also submitted another letter from Dr. Palmer, dated March 4, 2005, which again explained that Haynes had no side effects from his medications, had no work restrictions, and should continue to perform his current workload. (Haynes Decl. ¶ 11, Ex. D.)

On March 15, 2005, Assistant Chief Jordan ("Jordan") informed Haynes that he was being placed on sick leave pending an investigation of his medications and a determination

---

[1] The City asserts that Lt. Johnson's actions were precipitated by Haynes's statement that he did not feel comfortable driving the fire truck, (Jordan Aff., at 2), an assertion that Haynes denies. (Haynes Decl. ¶¶ 4-5.)

of whether he could perform his duties while taking those medications.[2] (Haynes Decl. ¶ 12.) Jordan informed Haynes that he would be able to return to work only if "the City and Risk Manager and the City doctor released [Haynes] to return to work." (*Id*.) On March 24, 2005, Haynes met with the City's doctor, Dr. Michael Turner, who reviewed Dr. Palmer's March 4 letter, they discussed his medications, and Haynes signed a medical release for Dr. Turner to obtain his medical records.[3] (*Id*. ¶ 13, Ex. E.) On March 28, 2005, Dr. Palmer faxed his office notes to Dr. Turner, which included Haynes's diagnosis of General Anxiety Disorder. (Turner Dep. 38-39, Ex. 8.)

Dr. Turner conducted Haynes's fit for duty examination on March 31, 2005, during which he reviewed the information from Dr. Palmer. (Turner Dep. 47.) Dr. Turner was concerned only with Haynes's use of Lexapro, Valium, and Gabitril. (*Id.* 55-56, 58-59). Haynes told Dr. Turner that the only medication he was taking while on duty was Lexapro, "an antidepressant, antianxiety medication," (*id*. at 60), and that he experienced no side effects. (Haynes Decl. ¶ 15.) After the examination, Dr. Turner drafted office notes that were sent to the City. (Turner Dep. Ex. 9.) The notes state that "[Haynes] is physically fit to return to duty." (*Id*.) However, Dr. Turner did not release Haynes for work and concluded that the City's "[a]dministrative decision is needed." (Turner Dep. 49-51, 81, Ex. 9.) This

---

[2] Haynes avers that "[i]nitially my leave was paid due to sick time, but beginning in May, 2005 until my termination in May, 2006, my leave was unpaid." (Haynes Decl. ¶ 12.)

[3] This was not the first time that Haynes saw Dr. Turner. In September 2004, Dr. Turner treated Haynes for a slight knee injury. At that time Dr. Turner was made aware that Haynes was taking Zoloft, Valium, and Gabitril. He released Haynes for duty without informing the City that he had any concerns about Haynes taking these medications. (Turner Dep. 19-23.)

is because he had concerns about the possible side effects of the medications – even though Hayne's drug screen was negative, side effects vary from person to person, and there was no reason to disbelieve Dr. Palmer's assessment that Haynes had no side effects on the medications. Dr. Turner never attempted to discuss the medications with Dr. Palmer. He did not ask Haynes for any additional information; he did not test his physical or mental functioning; he did not review recent medical literature; and he did nothing else to determine if Haynes actually had side effects. Dr. Turner indicated that he would not have cleared Haynes for any job that involved driving a vehicle of any sort, working in a safety sensitive position, or working on the fire line. (Turner Dep. 44-45, 53-55, 57, 63-64, 71-73, 78-80.)

After the examination, Haynes asked various persons in the fire department about coming back to work. He was told that he could not come back to work until Dr. Turner cleared him. When Haynes asked Dr. Turner's office about clearance, he was told that it was the City's decision. (Haynes Decl. ¶ 16.) In April, Dr. Palmer wrote another letter in which he stated Haynes was able to work without taking Valium or Gabitril at all, but neither the City nor Dr. Turner would clear Haynes because Dr. Turner was still concerned about the Lexapro. (Turner Dep. 83-84, Ex. 14.) During 2005 and 2006 Haynes continued to make efforts at being cleared for work to no avail. (Haynes Decl. ¶ 16.) By letter dated May 4, 2006, the Fire Chief sent a letter to Haynes stating that if he did not return to work by May 22, 2006, he would be considered to have resigned his position by job abandonment. When Haynes reported to work on May 22, 2006, he was sent home, but he was allowed to

see Dr. Turner on May 25, 2006. Dr. Turner only asked about Haynes's medications and learned that nothing had changed. Haynes later received a letter from the City dated June 20, 2006, which informed him that effective June 14, 2006, the fire department deemed him to have voluntarily resigned. (Haynes Decl. ¶¶ 18-21, Exs. F-G.)

Haynes filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first charge, filed on May 9, 2005, alleged discrimination based on disability, race, and retaliation. The charge was amended on August 8, 2006. Haynes was issued a Notice of Right to Sue Letter on November 8, 2006, and he filed a four-count complaint against the City on December 8, 2006. Counts I and II allege that the City, by placing Haynes on involuntary leave, refusing to reinstate him to employment, and by terminating his employment, violated the ADA, 42 U.S.C. § 12112(a). Count III alleges that the City violated the ADA, 42 U.S.C. § 12112(d)(4), by requiring Haynes to submit to prohibited medical examinations and inquiry. Count IV alleges that the City's use of impermissible qualification standards violated the ADA, 42 U.S.C. § 12112(b)(6). Haynes seeks declaratory and injunctive relief; back pay and compensatory damages, reinstatement to employment or front pay, and costs, fees, and expenses.

## II. JURISDICTION

Because this case arises under the ADA, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations supporting

both.

### III. STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if a "'reasonable jury could return a verdict for the non-moving party.'" *Damon v.*

*Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

In general, the ADA protects individuals against disparate treatment in employment because of a disability. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment."). The ADA also protects against employment practices that have a disparate impact on persons with disabilities. *See, e.g.*, 42 U.S.C. § 12122(b)(6). The court analyzes each claim.

### A.     *Counts One and Two*

It is alleged that the City violated the ADA by placing Haynes on involuntary leave and refusing to reinstate him (count one) and by terminating his employment (count two) because the City regarded Haynes as having a disability.

#### 1.     **Prima Facie Case**

Where a plaintiff does not present direct evidence of discrimination, the burden-shifting analysis employed in Title VII employment discrimination actions is applicable.

*Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). First, Haynes has the burden to establish a prima facie case of disability discrimination by a preponderance of the evidence, which requires a showing that (1) Haynes has a disability; (2) Haynes is a qualified individual; and (3) the City unlawfully discriminated against Haynes because of the disability. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005) (internal quotation marks omitted). The City specifically challenges the first and third elements of Haynes's prima facie case.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).[4] A person is regarded as having such an impairment if an employer either "mistakenly believes that a person has a physical [or mental] impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines,*

---

[4] The City argues that "Haynes is confused" because of the language used in his EEOC charges and the complaint. (Def.'s Br. 13.) Although the language used in the original and amended charges of discrimination likely was relevant to the EEOC's investigation, it is not relevant here. The court looks only to the complaint for Haynes's allegations of discrimination. In his complaint, Haynes alleged that the City discriminated against him because of his "disability" under all three of the ADA's definitions of "disability." (Compl. ¶¶ 9, 14.) Haynes does not respond to the City's argument that Haynes did not actually have an "impairment that substantially limits one or more of the major life activities;" however, it is clear from Haynes's briefing that he is proceeding to trial solely on the "regarded as" definition. Therefore, the court analyzes the prima facie case only as to whether Haynes was "regarded as having such an impairment."

*Inc.*, 527 U.S. 471, 489 (1999).[5] The latter provision is met where a person is perceived as being significantly restricted in the ability to perform either a class of jobs or a broad ranges of jobs in various classes. *D'Angelo*, 422 F.3d at 1227.

Because the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working, *id.*, the City argues that "[t]he life activity of working as a firefighter is not a broad range of jobs." (Def.'s Br. 17.) Haynes argues in response that Dr. Turner regarded Haynes as being substantially limited in the ability to do jobs involving hazardous work due to the possible side effects of the medications prescribed for generalized anxiety disorder. The unrefuted testimony of Haynes's expert, Dr. Mary House Kessler, shows that this perception foreclosed Haynes from a broad range of jobs. (*See* Kessler Decl. ¶ 17.)

The City further argues that Haynes was not cleared for duty because of his medications, not because he has an impairment. (*See* Def.'s Br. 16.) Haynes is correct with respect to *Sutton*'s requirement that the effects of mitigating measures should be considered

---

[5] EEOC regulations illuminate the meaning of "regarded as having such an impairment":

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*); *see also Hoard v. CHU2a, Inc.*, 228 Fed. Appx. 955, 959 (11th Cir. 2007).

in the determination of whether a person is substantially limited in major life activity of working. *Sutton*, 527 U.S. at 481. But the City's argument fails for a more fundamental reason: it is an ultimate issue for resolution by the jury. Not only is it undisputed that Haynes, in fact, has an impairment as defined by the ADA,[6] but it has also been demonstrated that a genuine issue of material fact exists as to whether the City's attitudes, beliefs, or perceptions of the impairment, including any mitigating measures such as medications, resulted in Haynes being substantially limited in the major life activity of working. Dr. Turner knew that Haynes had been diagnosed with general anxiety disorder and had been taking medications for that impairment. Dr. Turner wrote in his office notes: "[Haynes] states he does not take any medications but the Lexapro while on duty. This logic makes no sense to me that you would need to take the medicine on your days off while not under stress but not need it when in the most stressful situations." (Ex. 9 to Turner Dep.) A jury could conclude that the City, by adopting Dr. Turner's opinion, discriminated against Haynes by not making an individualized assessment of Haynes's present ability to safely perform the job and not making a decision based on the most current medical knowledge and the best available objective evidence. *See Bragdon v. Abbot*, 524 U.S. 624, 649 (1998).

With respect to the third element of the prima facie case, the City contends without authority that it did not take an employment action against Haynes but that Haynes "was deemed to have resigned by job abandonment." (Def.'s Br. 22-23.) The evidentiary

---

[6] "Physical or mental impairment means . . . [a]ny mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R.§ 1630.2(h).

10

submissions are replete with material facts that create a genuine issue as to this element of the prima facie case.

### 2. Burden Shift

Haynes having established a prima facie case of disability discrimination, the burden shifts to the City to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Cleveland v. Home Shopping Network, Inc.*, 329 F.3d 1189, 1193 (11th Cir. 2004). The court gleans from the briefing that the City claims that Haynes was not fit for duty because he did not meet the National Fire Protection Association ("NFPA") standards. To the extent the standards in themselves can be deemed a "legitimate, non-discriminatory reason," Haynes shows that the City's reliance on the NFPA standards is merely pretext for discrimination. *See id.* Haynes has submitted evidence from which it could be inferred that (1) the City had not adopted the relevant NFPA standard; (2) the NFPA standard does not prohibit the use of Lexapro; (3) Dr. Turner did not have concerns about Haynes job performance in September 2004 when he was using similar medications; (4) the City allowed Haynes to work while taking the medications since January 2003 and Haynes had no performance problems during that time; and (5) the City attempted to avoid liability by pushing the responsibility of clearing Haynes to Dr. Turner, who found Hayes to be physically fit for duty yet refused to release him. These facts are sufficient for a jury to conclude that "the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks

omitted), and that the real reason for placing Haynes on involuntary unpaid leave and terminating his employment was discrimination because of disability. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).[7] For these reasons, Haynes has carried his burden, and the summary judgment motion as to counts one and two was denied.

## B.     Count Three

In count three, Haynes alleges discrimination "by requiring [Haynes] to undergo medical examinations and by making medical inquiries of [Haynes] not shown to be job-related and consistent with business necessity," in violation of 42 U.S.C. § 12112(d)(4). (Compl. ¶ 17.) An employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such an employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity," § 12112(d)(4)(A); however, an employer "may make inquiries into the ability of an employee to perform job-related functions." § 12112(d)(4)(B). The burden is on the City to prove job-relatedness and business necessity. *Fredenburg v. Contra Costa County Dept. of Health Servs.*, 172 F.3d 1176, 1182 (9th Cir. 1999).

Although not clear from its brief, the City appears to challenge count three on

---

[7] Assuming *arguendo* that the City has adopted the relevant NFPA standards and that the NFPA mandates that every person who takes Lexapro while off duty is prohibited from employment on the fire line due to safety risks, the City has not presented any authority, and the court is not aware of any authority, that supports the proposition that a set of non-legislative guidelines is a complete defense to the mandates of the ADA.

summary judgment because it argues that it "has shown that the fit for duty examination challenged by Haynes was job-related for the position of firefighter and consistent with business necessity."[8] (Def.'s Br. 22.) In support of this argument, the City states that it follows the NFPA standards, including NFPA 1582, which guides the fire department's physician in evaluating a firefighter's ability to safely perform his essential job tasks in light of any medications that he is taking. (*Id*. at 19-21.)

In light of the public safety considerations, it is clear that the ADA permits the City to subject Haynes to a fitness for duty examination. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999). Haynes does not dispute this. Instead, Haynes argues there was a violation because the City "exceed[ed] the scope of a permissible medical examination or inquiry," (Pl.'s Br. 20), the examination as given was not job-related, and there was no business necessity for such an extended examination and inquiry where Dr. Turner had determined that Haynes was physically fit for duty and merely speculated about possible but not actual side effects. Haynes's argument presents a genuine issue of material fact. The

---

[8] The City asserts that "[i]f the Court determines that Hayes is an individual with a disability recognized under ADA, the Court must next consider whether the City's protocol regarding the fit for duty assessment is 'job-related for the position in question and is consistent with business necessity.'" (Def.'s Br. 18-19.) From this passage it appears that the City contends that Haynes must prove that he has a disability as defined by the ADA as an element of a § 12112(d)(4) claim. The Eleventh Circuit has not answered the question of whether the ADA's prohibition against certain medical inquiries and examinations applies to non-disabled employees. *See Watson*, 177 F.3d at 935. For trial purposes, the court will follow the guidance of other circuits that have held that employees need not prove they are qualified individuals with a disability to bring claims challenging the scope of medical examinations and inquiries under the ADA. *See Conroy v. N.Y. State Dept. of Correctional Servs.*, 333 F.3d 88, 94 (2d Cir. 2003); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 969-70 (8th Cir. 1999); *Fredenburg*, 172 F.3d at 1182 (9th 1999); *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997).

City does not explicitly address Haynes's scope argument, and, therefore, has not carried its burden of showing no genuine issue of material fact. The City's summary judgment motion with respect to count three was thus denied.

C.  *Count Four*

Count four alleges disability discrimination in violation of 42 U.S.C. § 12112(b)(6) "by using qualification standards that screen out or tend to screen out individuals with disabilities not shown to be job-related and consistent with business necessity." (Compl. ¶ 19.) Other than listing the elements of and explaining the burdens of proof of an ADA disparate impact claim, (*see* Def.'s Br. 10-11), the City does not specifically challenge Haynes's § 12112(b)(6) claim. Accordingly, the claim remains for trial.

### V.  CONCLUSION

For the reasons set forth above, the summary judgment motion was denied. All claims remain for trial.

DONE this 12th day of March, 2008.

                                     /s/  W. Keith Watkins
                                     UNITED STATES DISTRICT JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

**1.**   **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a)   **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

    (b)   **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c)   **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d)   **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e)   **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2. **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).